1   BENJAMIN B. WAGNER
    United States Attorney
2   WILLIAM S. WONG
    MICHAEL D. ANDERSON
3   Assistant United States Attorneys
    501 I Street, Suite 10-100
4   Sacramento, CA  95814
    Telephone:  (916) 554-2700
5   Facsimile:  (916) 554-2900

6   Attorneys for the United States of America

**ORIGINAL
FILED**

JUN 0 1 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

7

8                   IN THE UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11   IN THE MATTER OF THE SEARCH OF:          CASE NO.  2:11-SW-0498 EFB

12   Snellings' Firearms                      [PROPOSED] ORDER FOR
     2675 Land Avenue                         PARTIALLY UNSEALING SEARCH
13   Sacramento, California                   WARRANT AND RELATED
                                              DOCUMENTS
14

15

16

17

18          The government's request to unseal the redacted affidavit in support of a search warrant,

19   which is attached to this order and is incorporated by reference, is GRANTED.

20   SO ORDERED:

21   DATED: 6-1-2012

22                                            HON. EDMUND F. BRENNAN
                                              U.S. Magistrate Judge
23

24

25

26

27

28

Exhibit "D"

## Affidavit in Support of a Search Warrant

1. I, Special Agent Sara M. Lewis, Bureau of Alcohol, Tobacco, Firearms and Explosives, United States Department of Justice, being duly sworn on oath, depose and say:

2. I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice. I have been so employed since July 2002. I have a Bachelors degree in Criminal Justice from California State University, Fresno, and a Masters degree in Criminal Justice from California State University, Fresno. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Program and the Bureau of Alcohol, Tobacco, Firearms and Explosives, New Professional Training (NPT), Special Agent Academy.

3. I have investigated no less than 100 cases involving federal firearms violations including straw purchase violations. I have spoken to several straw purchasers about how and why they committed the act of straw purchasing. I have received training regarding straw purchase investigations. I have spoken to more experienced investigators about how people commit straw purchases and other federal firearm violations. I have assisted on investigations involving people engaged in the firearms business of selling firearms without a Federal Firearms License (FFL). I have received training on federal violations of people engaged in the firearms business without an FFL. I have spoken with experts and more experienced investigators that have conducted investigations of people who have engaged in the business of selling firearms without an FFL. I have interviewed subjects who were engaged in the business of selling firearms without an FFL.

## Federal Firearm Licensing Related Laws and Definitions

4. I am familiar with federal laws and know that it is a violation of Title 18, United States Code, Section 371, if two or more persons conspire to commit any offense against the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy.

5. It is a violation of Title 18, United States Code, Section 922(a)(1)(A), for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce.

6. It is a violation of Title 18, United States Code, Section 922(a)(6), for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition

from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious or misrepresented identification, intended or likely to deceive such importer manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearms or ammunition.

7. It is a violation of Title 18, United States Code, Section 924(a)(1)(A) to knowingly make any false statement or representation with respect to the information required by Chapter 44 of Title 18 to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief of disability under the provisions of this chapter.

8. It is a violation of Title 18, United States Code, Section 924(a)(3)(A) for any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly makes any false statement or representation with respect to the information required by the provisions of Chapter 44 of Title 18 to be kept in the records of a person licensed under this chapter.

9. Title 18, United States Code, Section 921(a)(3), defines a firearm as any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon.

10. A Federal Firearms License (FFL) is a license that enables an individual or a company to engage in the business pertaining to the manufacture and/or sales of firearms and ammunition.[1]  Having an FFL is a prerequisite to be "engaged in the business" of firearm sales.

11. Title 18 United States Code, Section 921(a)(11)(A) defines the term "dealer" as meaning any person engaged in the business of selling firearms at wholesale or retail.

12. Title 18, United States Code, Section 921(C) defines "engaged in the business" as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection for a hobby, or who sells all or part of his personal collection.

---

[1]  The term FFL is used to mean both a federal firearms license and a federal firearms licensee.  The term will be used interchangeably throughout this affidavit.

13. Title 18, United States Code, Section 921(22) states that the term "with the principle objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal collection: *Provided,* the proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

### California Law and Off Roster Firearms

14. California Penal Code Section 12125 and 12126 address the definition of "off roster firearms." In summary, a handgun sold by an FFL must be on the approved roster of firearms in the State of California. However there is an exemption that allows peace officers to purchase off roster firearms.

15. During the course of this investigation, Supervising Special Agent Blake Graham assisted in the process of determining which firearms are "off roster" firearms. Supervising Agent Graham explained to your affiant and TFO Halstead how to determine which firearms are "off roster" firearms by utilizing a link on the California Department of Justice website (http://certguns.doj.ca.gov). Supervising Agent Blake Graham is a sworn California peace officer employed by the California Department of Justice (DOJ). Agent Graham is assigned to the Bureau of Firearms where his duties include, but are not limited to, conducting investigations on violations of California's firearms statutes and criminal investigations involving businesses with a federal firearms license (FFL). Agent Graham is involved in the process of approving what handguns may be sold in the State of California and amending the roster of approved handguns certified for sale in California. With the assistance of Agent Blake Graham, ATF TFO Greg Halstead and I utilized the California Department of Justice website to determine whether a handgun or pistol was an "off roster" firearm. In this Affidavit where it is noted that a handgun or pistol is an "off roster" firearm, that determination was made by TFO Halstead and myself. Additionally, all photographs of firearms contained in this Affidavit were determined to be "off roster" handguns except the photograph of the rifle contained on page 36.

16. Therefore, this affiant believes that there is substantial demand in the firearms market to obtain off roster handguns as only peace officers may purchase the new handguns.

17. California Penal Code Section 12070(a) states that no person shall sell, lease, or transfer firearms unless he or she has been issued a license pursuant to Section 12071. Any person who violates this section is guilty of a misdemeanor. However, this section does not prohibit the "infrequent" sale and/or transfers of firearms.

18. California Penal Code Section 12070(c)(1) defines "infrequent" sales or transfers of pistols , revolvers, and other firearms capable of being concealed upon the person, as less than 6 transactions per calendar year. For this purpose "transaction" means a single sale, lease, or transfer of any number of pistols, revolvers, or any other firearm capable of being concealed upon the person.

19. Ryan McGOWAN is in violation of California Penal Code Section 12070(a). McGOWAN has conducted 10 private party transactions in 2010 and 8 private party transactions in 2011.

20. Thomas LU is in violation of California Penal Code Section 12070(a). LU has conducted 9 private party transactions in 2011.

21. The selling, lending and/or giving of a high capacity magazine is a felony violation of the California Penal Code Section 12020 (Unlawful carrying and Possession of Weapons). A high capacity magazine is a magazine capable of holding more than 10 rounds of ammunition.

## Scope of Requested Search Warrant

22. The information set forth in this Affidavit is based, in part, upon my own personal knowledge, but it is also based upon information provided to me by other law enforcement officers and reports generated by other law enforcement personnel. Because this Affidavit is presented for the limited purpose of setting forth probable cause for the requested search warrant, I have not necessarily included every fact known to me through this investigation. I have set forth only those facts necessary to establish probable cause to believe that contraband, fruits of the crimes, and other items illegally possessed, property designed for use, intended for use, or used in committing the offenses outlined in this Affidavit and in particular, those items listed in Attachment B will be found at the locations requested to be searched more fully described, and incorporated by reference in Attachment A to this Affidavit.

23. Based on the evidence set forth in this affidavit there is probable cause to believe that evidence of the foregoing crimes are likely to be found on or at the following persons, vehicles, lockers and residences, each of which is more particularly described in Attachment A, which is incorporated in the search warrant as though fully set forth herein:

   a. Persons:

   Ryan McGOWAN, (hereinafter "McGOWAN"), date of birth, ▇▇▇▇▇ ;

Thomas LU (hereinafter "LU"), date of birth, █████████;

Darryl DEGUZMAN, (hereinafter "DEGUZMAN"), date of birth, ████████;

Robert SNELLINGS, (hereinafter "SNELLINGS"), date of birth, ████████;

Christopher LENERT, (hereinafter "LENERT"), date of birth, ███████;
and

Christopher KJELLBERG, (hereinafter "KJELLBERG"), date of birth, ████████;

b. **Vehicles:** 2006, black, Lexus, California license plate ████████ (registered to McGOWAN per California Department of Motor Vehicles database records); 2006 white, Lexus, California License plate ████████ (registered to LU per California DMV database records); and any and all vehicles found to be in the care and control of all listed subjects in Attachment A at the time of the execution of the search warrant and evidenced by DMV registration, suspect or witness statements as to the actual use or possession of the vehicles(s), or possession of the vehicle key(s).

c. **Lockers:** The lockers of McGOWAN, LU, and DEGUZMAN, located at Rio Consumes Correctional Center (RCCC), 12500 Bruceville Road, Elk Grove, California and the locker of LENERT, located at the Sacramento Regional Transit District Headquarters, 1400 29th Street, Sacramento, California as described in Attachment A.

d. **Residences:**

The residence of Ryan McGOWAN, ████████████, Elk Grove, California;

The residence of Thomas LU, ███████████ Elk Grove, California;

The residence of Darryl DEGUZMAN, ███████████, Elk Grove, California;

The residence of Robert SNELLINGS, ████████████, Rancho Murieta, California;

The residence of Christopher LENERT, ████████████, Sacramento, California;

The residence of Christopher KJELLBERG, ████████████, Rocklin, California;

e. **Business**:

The business premises of SNELLINGS' FIREARMS, 2675 Land Avenue, Sacramento, California;

24. It is my belief that those items listed on Attachment B-1 through B-23 attached hereto may be found on the persons and locations described in Attachment A attached hereto. I base this belief on the information set forth in this Affidavit, my training and experience, and the experience of the law enforcement officers with whom I have consulted.

## Primary Subjects of Investigation

25. Ryan McGOWAN is a 30 year old male employed the Sacramento County Sheriff's Department as a deputy sheriff. MCGOWAN has utilized the screen names "SacDep" and "dldeguz" on the CalGuns website. MCGOWAN has sold three firearms to ATF undercover agents.

26. Thomas LU is a 41 year old male employed by the Sacramento County Sheriff's Department as a deputy sheriff. LU has utilized the screen name "Teabag" on the CalGuns website. LU has sold nine firearms to an ATF undercover agent.

27. Robert SNELLINGS is a 62 year old male who possesses a Federal Firearm Licensee (FFL) for SNELLINGS' FIREARMS. SNELLINGS has sold and/or transferred 33 firearms to MCGOWAN and 29 firearms to LU between 2008 to the present.

28. Darryl DEGUZMAN is a 31 year old male employed by the Sacramento County Sheriff's Department as a deputy sheriff. DEGUZMAN has utilized a screen name of "dldeguz" on the CalGuns website.

29. Christopher KJELLBERG is a 40 year old male employed by the Roseville Police Department as an officer. KJELLBERG has private party transferred five off roster firearms to individuals who could not otherwise legally purchase the firearms.

30. Christopher LENERT is a 30 year old male who is employed by the Sacramento Police Department as an officer. LENERT has private party transferred 2 off roster firearms to individuals who could not otherwise legally purchase the firearms.

## Overview of Investigation

31. On July 1, 2011, ATF Task Force Officer (TFO) Greg Halstead and your affiant spoke with the owner of a gun store who is an FFL located in Sacramento County.

32. The owner stated that he/she wanted to advise TFO Halstead and your affiant about an individual who had conducted an unusual amount of private party transfers (PPT) of firearms at his/her business.

33. The owner provided TFO Halstead and your affiant with copies of internal store documents summarizing the transactions made by an individual named Ryan McGOWAN. Included in the photocopies were a Sacramento County Sheriff's identification card and a California DMV driver's license belonging to Ryan McGOWAN.

34. The documents revealed that Ryan McGOWAN has private party transferred 9 firearms between July 2009 and June 2011 through the FFL that contacted us.

35. Ryan McGOWAN is identified per the Sacramento County Known Person File (KPF) as follows: ███ male ███ approximately ███ pounds, ███ hair and ███ eyes, with a date of birth of ███████.

36. Further investigation revealed that McGOWAN is employed as a Deputy Sheriff with the Sacramento County Sheriff's Department (SSD). McGOWAN has been employed by SSD since 2008 and is currently assigned at the Rio Consumes Correctional Center (RCCC).

37. A query of AFS (Automated Firearms System) indicates that McGOWAN has purchased 41 (handguns) firearms since 2008. Of the 41 firearms, McGOWAN has private party transferred 25 firearms. Nineteen were private party transferred within one year of the initial purchase and of the 19 firearms, 5 of the firearms were private party transferred within 4 weeks of the purchase.

38. Dealer Record of Sale (DROS) records show that 33 of the 41 firearms obtained by McGOWAN were transferred to him through SNELLINGS' FIREARMS.

39. The AFS system maintains records for purchases and transfers of handguns sales only. There is no automated record keeping system that records the purchases and/or transfers of rifles. Based on the lack of an automated database, your affiant is unable to determine the number of purchases and subsequent transfer, if any, of long guns, by McGOWAN and Thomas LU.

40. ATF Area Supervisor Roger Root is a Supervisor for Industry Operations Investigators. The duties of an Industry Operation Investigator (IOI) include qualification and compliance inspections to determine if the Federally licensed entities in the firearms and explosives industries are following the laws and regulations that affect their respective industries. ATF IOI Supervisor Root reviewed ATF records and verified that McGOWAN does not possess a Federal Firearms License.

### www.CalGuns.net

41. www.CalGuns.net is a social media website that is designed for the firearm community in California. It contains a variety of forums in which people can post information, questions, and sales of firearms. One of the forums is titled "private firearm sales."

### McGOWAN and "SacDep"

42. During the course of the investigation, TFO Halstead checked the Calguns website to see if he could locate any posting for firearms by McGOWAN. While searching the website TFO Halstead discovered a subject posting under the screen name "SacDep." There were several postings by "SacDep" of firearms that were the same kind owned by McGOWAN. Some of the dates for firearms listed by "SacDep" for sale are close in time to when DROS records indicate McGOWAN private party transferred the same type of firearm. "SacDep" also listed his location as Sacramento and his occupation was listed as "Sacramento Department of Human Waste." It is my opinion and the opinion of TFO Halstead that "SacDep" is short for Sacramento Deputy, since McGOWAN is a Sacramento County Sheriff's Deputy. The CalGuns website is divided up into numerous forum topics. The forums are divided up into threads. A thread is an online conversation discussing a particular topic. A thread is started when someone begins a new topic on the forum. There were approximately 25 new threads started by "SacDep" in a variety of different forums. I will include some of the postings by "SacDep" that led TFO Halstead

and I to believe that the person posting under the screen name "SacDep" was Ryan McGOWAN.

43. One of the forums is titled "CalGuns LEO'S." LEO is a well known acronym for Law Enforcement Officer. I located a thread started on the CalGuns LEO'S forum by "SacDep." The posting was dated 06-09-2009 and titled "off-list pistols" and the following text was written:

*What is the rule/law for selling? Is there a time that has to pass or a certain number of pistols every year? If you know of the penal code that explains it please let me know. thank you*

44. On 09-04-2009, in the "California handguns" forum, "SacDep" started the following thread:
*Scenario: Cop buys off list gun and keeps it for a month. Cop decides to sell gun to non cop buddy (PPT). Non cop buddy keeps gun for a month. Non cop buddy decides to sell gun to non cop CalGuns member. Two non cops go to FFL to do PPT...*

*Does the gun need to be single shot for the transfer? Please only comment if you are 100% sure of what you are talking about. Thanks in advance.*

45. On 02-22-2010, in the "Private Firearms Sales" forum, "SacDep" started a thread where numerous firearms were advertised over a period of time. The thread started on 02-22-2010 and the last posting on the thread by "SacDep" was on 10-01-2010. I copied some of the postings and pictures from the forum added them below:
*I also have a NIB GSG-5PK for sale. It is available for PPT in Sacramento Area for $479. It does not have a maglock. You will need to acquire a maglock or accept separated in a couple pieces. Comes with factory case and accessories.*

*Springfield XD .45 GAP-Used. shoots great. im not sure how many rounds I have put through it. Ammo is a tad expensive so it sits in the safe. comes with everything pictured $400*
*I will travel for PPT for the right price.*

*\*\*Buyer pays DROS for all transactions\*\**



**Photograph of firearm posting listed above**



**Photograph of firearm posting listed above*

46. Based on DROS records which I have reviewed, I know that at the time of this posting McGOWAN owned a GSG-5PK pistol and Springfield XD .45 caliber pistol. McGOWAN purchased one of the GSG 5PK pistols on 07-30-2009 and the second one he didn't purchase until 03-25-2010, not long after this ad was posted.

47. On 03-16-2010, at 2:53 PM, "SacDep" posted: *"btt new gun added."* The next posting is by a CalGuns member with screen name "Friar Tuck". On 03-16-2010, at 3:05 PM, "Friar Tuck" posted: *"How much for the 5.7??"* The next posting is by "SacDep" on 03-16-2010, at 3:35 PM, where he posted: *"trade-something equally awesome."* On 03-18-2010 "SacDep" posted: *"added a PLR-16 to the table."*

48. Sometime between 02-22-2010 and 03-29-2010, "SacDep" added the following post and pictures:

*Originally Posted by SacDep* 🖼

*OMG still for sale? Yes. It is a used but in great condition Intratec AB-10 with non threaded/shrouded barrel. comes with a 30 round rebuild kit which will have to be converted to a 10/30 round. PPT only in Sacramento area (not at The Gunroom (they suck), or WildBill's (won't DROS)). Please make sure you have an FFL who will DROS this gun. River City and Snellings are the only two I know who will do it. Willing to trade for something equally awesome but I prefer to sell. 579 firm!!!! Thanks for looking. this is how the gun looks now.*



**Photograph of firearm posting listed above**

*this is how my other one looks after I installed a Tec-9 upper and hogue slip on (gives you an idea)*



*Does not come with case or 10 round mag shown in picture*
**Photograph of firearm listed above.**

*Also for trade is a Beretta 92D Centurion 9MM pistol. Functions perfectly but has some holster wear. It does have night sights but they are kinda dim. U can definitely use them at night though. This gun is DAO. Not looking for anything specific. No case or original paperwork.*



**Photograph of firearm posting listed above**

*USED Keltec PLR-16 .223 pistol. does not come with Eotech or 10/30 magazine. It will come with a 10 round magazine and everything else shown minus the carpet. Sounds amazing. Trade*



**Photograph of firearm posting listed above**

*Slightly used FN 5.7. Works and looks great. Comes with everything you see. Mags will need to be made to 10 rounders. Trade*



**Photograph of firearm posting listed above**

*Also, Magnum Research Micro Desert Eagle. Gently used. Great condition. Im pricing it along with the others I have seen for sale around here. Comes with original case and whatnot $750 OBO NO TRADES*



**Photograph of firearm posting listed above**

49. On 03-21-2010, "SacDep" updates the thread by posting: *"btt. prices added."* On 03-22-2010, "SacDep" posted: *"5.7 SPF."* On 03-23-2010, "SacDep" posted: *"FN 5.7 sold novanryder."*

50. I know that SPF stands for "sold pending funds" and the 5.7 is referring to the FN 5.7 pistol. This posting also led me to believe that "SacDep" was the screen name being used by McGOWAN. DROS records show that McGOWAN did a private party transfer of his FN 5.7 pistol on 03-23-2010 one day after "SacDep" posted the gun was sold. After McGOWAN sold this FN 5.7 pistol, he purchased a second one on 04-12-2010. McGOWAN later private party transferred the second FN 5.7 pistol on 06-29-2011. Purchasing a second FN 5.7 pistol within three weeks of selling the first one is unusual unless you are engaged in the business of selling firearms.

51. On 03-28-2010, "SacDep" posted: *"92d sold and added the MPA 930 aka the bumbfire king!"* DROS records show that McGOWAN did a private party transfer of a Beretta, model 92D, on 03-31-2010. DROS records show that at the time of this posting McGOWAN also owned a MPA 930 pistol.

52. On 04-05-2010, "SacDep" posted: *"bump with 2 new guns."* There were no photographs of the firearms on the thread at the time TFO Halstead discovered the posting. A person posting on the thread has the ability to delete or modify their postings. It is common for some posters to delete their posting once their firearms are sold. Based on the information in the next three paragraphs, I believe the posting on 04-05-2010 for two new guns by "SacDep" was for an H&K pistol and a Springfield model XDM 9mm pistol.

53. On 04-05-2010, a person with the screen name, manuelcardenas77 posted: *"Nice guns bro!. I like the HK but tooooooo far."* The next posting is by a person with screen name, jlh95811, which states: *"Just out of curiosity what caliber is the XDm 3.8?"* The next posting is by "SacDep", which he replies: *"Sorry..9mm".* On 04-06-2010, "SacDep" posted: *"XDm SPF"* (sold pending funds). On 04-07-2010, someone with the screen name "killzone45" posted the following question: *"SO is the XDm actually sold or just pending?* To which "SacDep" responded by posting on 04-07-2010: *"Sold today to a great buyer! Ill let you know if my buddy decides to get rid of his."* DROS records show that McGOWAN did a private party transfer of a Springfield XDM pistol on 04-07-2010. DROS records show McGOWAN purchased the Springfield XDM approximately 12 days earlier on 03-25-2010. It is unusual for someone to buy a firearm and then sell the firearm 12 days later, unless you are engaged in the business of selling firearms.

54. It should be noted that DROS records show McGOWAN purchased a second Springfield XDM on 04-12-2010, only five days after selling the first XDM. The purchasing of a

second Springfield XDM just five days after selling the first one is unusual unless you are engaged in the business of selling firearms. On 06-29-2010, "SacDep" added the second Springfield XDM by posting: *"9mm XDm 3.8 added!"* On 08-08-2010, "SacDep" posted: *"XDM sold."* DROS records show the second Springfield XDM was private party transferred by McGOWAN on 08-07-2010.

55. On 04-07-2010, *"SacDep"* posted: *"HK SPF to mlatino"*. This posting shows the HK was sold pending funds to the person with screen name Mlatino. On 04-08-2010, "SacDep" posted: *"HK sold."* DROS records show that McGOWAN private party transferred an H&K pistol to a Matthew Latino on 04-08-2010. I believe the screen name Mlatino belongs to Matthew Latino and this further supports the conclusion that "SacDep" is the screen name used by McGOWAN.

56. On 06-28-2010, "SacDep" posted: *"Micro desert eagle sold. Chrome .50AE sold. I have a black .50AE available. No pics yet."* Based on the DROS records, I know that McGOWAN did a private party transfer of Micro Desert Eagle pistol on 06-27-2010 and one chrome .50 caliber pistol on 07-10-2010.

## July 15, 2011 - UC Meet With MCGOWAN

57. On July 2, 2011, acting in an undercover capacity, ATF TFO Halstead made contact with an individual later identified as McGOWAN on the CalGuns website. ATF TFO Halstead expressed interest in an Uzi pistol via private messaging. The screen name listed on CalGuns was "dldeguz." On July 10, 2011, "dldeguz" accepted an offer of $1300 for an off roster Vector Arms, 9 millimeter pistol. "dldguz" stated on private message that his name is Ryan and could be contacted at 209-481-0968.

58. On July 15, 2011, acting in an undercover (UC) capacity, an ATF Special Agent (hereinafter referred to as UC#1) met McGOWAN at River City Gun Exchange in the City of Sacramento in the parking lot, which was videotaped/recorded. UC #1 viewed a DMV photograph of McGOWAN prior to meeting him at the store and subsequently positive identified the person he met in the parking lot as McGOWAN. McGOWAN told UC #1 that he was running late because he just sold a rifle to someone else just before his meeting with UC #1. McGOWAN allowed UC #1 to view and manipulate the Uzi. McGOWAN gave disassembled magazines capable of holding 25 rounds of ammunition to UC #1. McGOWAN informed UC #1 that he could transfer a high capacity magazine as long as it was not put together. McGOWAN provided instructions to UC #1 on how to assemble the magazines so they had the capacity to hold more than 10 rounds of ammunitions and then told UC #1 to place the magazines in his vehicle before they

entered River City Gun Exchange. McGOWAN assembled one of the high capacity magazines together and gave it to UC #1 intact. California law prohibits the transferring of high capacity magazines. Transferring high capacity magazines is a felony violation of California Penal Code 12020(a)(2).

59. When UC #1 attempted to walk with the firearm towards the entrance of River City Gun Exchange, McGOWAN informed him that a transfer of money inside the store would result in taxes collected by the store for the sale of the firearm. UC #1 consented to paying McGOWAN $1300 in cash for the Vector Arms, Model HR4332, 9mm pistol, serial number 507102 in the parking lot and then entered the store with McGOWAN to complete the private party transfer.

60. After the transfer was completed at River City Gun Exchange, UC #1 and McGOWAN exited the store. An unidentified Asian male exited the store and walked up to McGOWAN and expressed interest in purchasing a Vector Arms. The Asian male identified himself as "Ton" and then asked McGOWAN how he was able to procure the Uzi pistol. McGOWAN informed Ton that he was a "cop" so he could procure these items and transfer them to UC #1. McGOWAN continued to inform Ton that disassembled high capacity magazines are ok to transfer. Moreover, McGOWAN stated that it was up to the "transferee" what they wanted to do once they were in possession of the high capacity magazines. McGOWAN took Ton's phone number and said he would put him in contact with his friend that has similar Uzi type pistols for sale.

**Firearm purchased on July 15th 2011*



## August 4, 2011 - UC Meeting with McGOWAN

61. On July 22, 2011, TFO Halstead acting in an undercover capacity made contact with McGOWAN on the CalGuns website. TFO Halstead communicated with the screen name "dldeguz" via private messages. McGOWAN had an off roster MasterPiece Arms, MPA22, .22 caliber pistol, for sale on CalGuns for $350. Acting on behalf of UC #1, TFO Halstead negotiated a deal for the firearm and set up a meeting for August 4, 2011, to pay for and transfer the firearm.

62. On August 4, 2011, UC #1 met McGOWAN at River City Gun Exchange and purchased a MasterPiece Arms, MPA 22, .22 caliber pistol, serial number J5573, in the parking lot for $350, which was videotaped/recorded. McGOWAN also provided UC #1 with a disassembled high capacity magazine and again showed UC #1 how to assemble the magazine together. McGOWAN again instructed UC #1 to put the high capacity magazines in his vehicle prior to entering River City Gun Exchange. UC #1 and McGOWAN entered River City Gun Exchange and conducted a private party transfer of the firearm from McGOWAN to UC #1.

63. During the meeting on August 4, 2011, McGOWAN told UC #1 that he usually schedules all of his firearm deals on the same day. McGOWAN asked UC #1: "do you have any friends looking for a mini Uzi like the one you got from me?" McGOWAN was referencing the firearm that UC #1 purchased from him on July 15, 2011. McGOWAN stated that his "buddy has one for sale." UC #1 told McGOWAN he would ask around and would contact him at a later time. During the course of this investigation, UC #1 expressed interest in obtaining a specific firearm, a Ruger, LCP, .380 caliber handgun, from McGOWAN. However, McGOWAN was unable to provide the specific firearm for UC #1.

64. On a later date, McGOWAN placed UC #1 in contact with Thomas LU. McGOWAN stated that LU may have firearms in his inventory that the UC #1 would be interested in purchasing.



**Purchase on August 4th 2011**

### September 9, 2011 - UC Meeting with McGOWAN

65. On September 7, 2011, acting in an undercover capacity, TFO Halstead made contact with McGOWAN on behalf of UC #2 on the CalGuns website communicating via private messages with the screen name "dldeguz". McGOWAN posting under the screen name "dldeguz" listed an off roster Desert Eagle, gold plated with tiger stripes, .50 caliber pistol for $3000. TFO Halstead negotiated the price down to $2950 utilizing private messaging on the CalGuns website for the Desert Eagle, .50 caliber pistol.

66. On September 9, 2011, an ATF undercover agent (hereinafter referred to as UC #2), met with McGOWAN at Wild Bill's Old West Trading Company located at 10490 East Stockton Blvd in Elk Grove, California. McGOWAN arrived in a 2006 black, Lexus 4 door sedan, with California license plate[        ] Per the California Department of Motor Vehicles (DMV), the vehicle is registered to Ryan McGOWAN.

67. McGOWAN gave UC #2 a discounted price of $2900 (instead of $2950) for a Magnum Research, Desert Eagle, .50 caliber pistol, serial number 36205661, while in the parking lot, which was videotaped/recorded. McGOWAN told UC #2 that the business would charge sales tax if the sale is conducted inside the business. After MCGOWAN counted out the cash, UC #2 and McGOWAN entered Wild Bill's Old West Trading Company and completed a private party transfer of the firearm from McGOWAN to UC #2.

68. A query of AFS shows that McGOWAN purchased the Magnum Research, Desert Eagle, .50 caliber pistol, serial number 36205661, from Personal Defense Weapons on August 16, 2011. Considering the California 10 day waiting period, McGOWAN would not have been able to pick up the firearm from Personal Weapons Defense until August 26, 2011. He posted it for sale on CalGuns for $3000 under the screen name of "dldeguz" on September 7, 2011. Hence, McGOWAN could have only possessed the firearm for no more than 13 days before posting it for sale.

69. TFO Halstead contacted an employee named "Dan" from Personal Defense Weapons via telephone. Dan stated that the above listed firearm is listed for approximately $1877 at this time. Dan stated that this type of firearm needs to be custom ordered.

70. Based on my training and experience and information relayed to me by agents/detectives, I know that persons who purchase firearms retain the firearms for indefinite periods of time because of their intrinsic and monetary value. McGOWAN possessed the above listed firearm for a very short period of time which would be more common for someone who is engaged in the business of firearm sales. In this specific case, McGOWAN was able to make a profit from the sale of this off roster firearm due to the difficulty of obtaining this firearm by non law enforcement personnel.



**Purchased on September 9th 2011**

## Suspicious Transactions of Firearms made by McGOWAN
### A. Multiple Purchases on Same Date

71. On numerous occasions Deputy Ryan McGOWAN has purchased multiple handguns on the same day. People engaged in the business of dealing firearms or trafficking firearms will often purchase multiple firearms at once. California Penal Code Section 12072(a)(9) prohibits a person from buying more than one handgun from a FFL within any 30 day period. However, law enforcement officers in California are exempt from the law and therefore can purchase as many handguns as they wish within a 30 day period. A review of the DROS (Dealer Record of Sale) and AFS records show the following multiple handgun sales made by McGOWAN:

### May 18th, 2009
- MasterPiece Arms, model MPA10, .45 caliber (off roster handgun)
- Leinad, model PM11, 9mm (off roster handgun)
- Intratec, model AB10, 9mm (off roster handgun)

### July 2nd, 2009
- Intratec, model AB10, 9mm (off roster handgun)
- Sturm & Ruger, model LCP, .380 caliber (off roster handgun)
- Kel Tec, model PLR16, .223 caliber (off roster handgun)
- Kel Tec, model PLR16, .223 caliber (off roster handgun)

### July 30th, 2009
- Group Industries, model GSG 5PK, .22 caliber (off roster handgun)
- Magnum Research, model Micro Desert Eagle, .380 caliber (off roster handgun)

### August 6th, 2009
- Intratec, model Tec-DC9, 9mm (off roster handgun)
- MasterPiece Arms, model MPA 10, .45 caliber (off roster handgun)
- MasterPiece Arms, model MPA 930SSTX, 9mm (off roster handgun)

### August 19th, 2009
- Springfield, model XD, .40 caliber
- Smith & Wesson, model 442, .38 caliber

## March 25th, 2010

- Group Industries, model GSP 5PK, .22 caliber
- Springfield Armory, model XDM, 9mm (off roster handgun)

## April 12th, 2010

- Fabrique Nationale (FN), model 57, 5.7 x 28 caliber
- Springfield Armory, model XDM, 9mm (off roster handgun)

## September 2nd, 2010

- IMI, model Desert Eagle, .50 caliber (off roster handgun)
- Kel Tec, model PF9, 9mm (off roster handgun)

## September 9th, 2010

- MasterPiece Arms, model MPA 22, .22 caliber (off roster handgun)
- Group Industries, model HR4332, 9mm (off roster handgun)

**B. Multiple Purchases of Same Make, Model, and Caliber**

72. McGOWAN has also purchased multiple firearms that appear to be the same make, model and caliber. People engaged in the business of selling or trafficking firearms often will purchase multiple firearms of the same make, model and caliber. Below is a summary of some of the transactions:

### .50 caliber Desert Eagle handguns

73. McGOWAN has purchased/obtained five (5) IMI, Desert Eagle, .50 caliber handguns. He has private party transferred four of the five and has the fifth one on consignment at a FFL. These five firearms are not on the approved list and are off roster handguns for sale in California.

74. On 08-16-2011, McGOWAN purchased a .50 caliber Desert Eagle from a Personal Defense Weapons (FFL) for approximately $1877. On 09-07-2011, McGOWAN listed a Magnum Research, Desert Eagle, .50 caliber for sale on the CalGuns website for $3000. On 09-09-2011, UC #2 purchased the .50 caliber firearm from MCGOWAN for $2900. Based on the serial number I was able to confirm the .50 caliber Desert Eagle purchased by UC #2 was the same .50 caliber Desert Eagle McGOWAN purchase approximately 25 days earlier.

75. On 09-02-2010, McGOWAN purchased an IMI, .50 caliber Desert Eagle, gold in color, handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred (PPT) the same firearm on 04-08-2011. It appears this .50 caliber was listed for sale on the CalGuns website under the screen name "dldeguz." The ad was posted on 04-07-2011, at 3:56 AM, and the postings indicate it was sold a short time later at 6:16 AM. There was a picture of the firearm and the following text in the ad:

*"THIS GUN IS STILL AVAILABLE UNLESS OTHERWISE NOTED. $2600 OBO Titanuim Gold Tiger Stripe Desert Eagle in like new condition. Only shot one magazine through it. Not a scratch on it. Comes with box, paper work and fired shell from factory. You can not buy these new right now. If you think you can, go ahead and try. PPT in Sac area. Buyer pays DROS. Thanks for looking."*



\*\*Firearm posting as listed above\*\*

76. On 07-22-2010, McGOWAN purchased an IMI, .50 caliber Desert Eagle, gold in color, handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred the same firearm on 03-26-2011.

77. On 05-24-2010, McGOWAN purchased an IMI, .50 caliber Desert Eagle, black in color, handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred the same firearm on 08-04-2010.

78. On 04-01-2010, McGOWAN purchased an IMI, .50 caliber Desert Eagle, chrome in color, handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred the same firearm on 07-10-2010.

## Fabrique Nationale

79. McGOWAN purchased two Fabrique Nationale (FN), model Five Seven handguns from SNELLINGS' FIREARMS and later private party transferred both of the them.

80. On 03-30-2009, McGOWAN purchased/obtained one of the FN handguns. He private party transferred the same firearm on 03-23-2010. Then on 04-12-2010, McGOWAN purchased/obtained another FN handgun. He private party transferred the second FN handgun on 06-29-2011 to another person.

## Group Industries, GSG 5PK

81. McGOWAN purchased two Group Industries, model GSG 5PK, .22 caliber handguns from SNELLINGS' FIREARMS. There is no record of McGOWAN private party transferring either of these handguns. However, "SacDep" has posted one for sale on CalGuns.

## Group Industries, model HR4332

82. McGOWAN purchased two Group Industries, model HR4332 handguns from SNELLINGS' FIREARMS and later private party transferred both of the firearms.

83. On 09-09-2010, McGOWAN purchased one of the Group Industries, model HR4332 handguns. On 06-24-2011, McGOWAN private party transferred the same handgun to another person.

84. On 02-15-2011, McGOWAN purchased a second Group Industries, model HR4332. On 07-15-2011, McGOWAN sold this same firearm to UC #1.

## Intratec, model AB-10

85. McGOWAN has purchased two Intratec, model AB-10 handguns from SNELLINGS' FIREARMS and later private party transferred both of them.

86. On 05-18-2009, McGOWAN purchased one of the Intratec, model AB-10 handguns. McGOWAN then private party transferred the same handgun on 08-28-2010 to another person.

87. On 07-02-2009, McGOWAN purchased the second Intratec, model AB-10 handgun. McGOWAN then private party transferred the same handgun on 08-28-2010 to another person.

88. These two AB-10's were transferred to two different people.

## Kel Tec, PLR 16

89. On 07-02-2009, McGOWAN purchased two Kel Tec, model PLR 16 handguns from SNELLINGS' FIREARMS. McGOWAN private party transferred one of the Kel Tec handguns on 07-21-2009 to another person. Then on 10-26-2009, McGOWAN purchased a third Kel Tec, PLR 16 handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred the third Kel Tec to another person on 09-11-2010.

## Magnum Research, Micro Desert Eagle

90. McGOWAN has purchased two Magnum Research, model Micro Desert Eagle handguns from SNELLINGS' FIREARMS and later private party transferred both of them.

91. On 06-18-2009, McGOWAN purchased one of the Micro Desert Eagles and then private party transferred the same handgun to another person on 07-07-2009.

92. On 07-30-2009, McGOWAN purchased the second Micro Desert Eagle and then private party transferred the same handgun to another person on 06-27-2010.

## MasterPiece Arms, MPA 10

93. McGOWAN has purchased two MasterPiece Arms, model MPA 10 handguns from SNELLINGS' FIREARMS. He later private party transferred one of the two handguns to another person.

94. McGOWAN purchased one on 05-18-2009 and the second one on 08-06-2009. The gun he purchased on 08-06-2009 was private party transferred to another person on 04-08-2010.

## Springfield Armory

95. McGOWAN purchased two Springfield Armory, model XDM handguns from SNELLINGS' FIREARMS. McGOWAN purchased the first one on 03-25-2010 and then on 04-7-2010, he private party transferred that handgun to another person. Shortly after the private party transfer of the first handgun, McGOWAN purchased a second Springfield Armory handgun on 04-12-2010. McGOWAN then private party transferred the second handgun to another person on 08-07-2010.

### Firearms Recovered at Crime Scene

96. On August 28, 2010, McGOWAN private party transferred a Intratec, Model AB10, 9mm pistol, serial number A060149 and a MasterPiece, model MPA930 pistol, serial number F9281, to Joseph Camilleri at River City Gun Exchange.

97. On February 21, 2011, Daly City Police Department (report ##11001520) recovered these two firearms that were private party transfers from McGOWAN to Joseph Camilleri. Daly City Police Department responded to a shots fired call that resulted in a 6 hour standoff with police SWAT team which ultimately resulted in the arrest of Camilleri for multiple state charges, including possession of illegal assault weapons, shooting into an unoccupied dwelling, manufacture/convert a machinegun.

### Straw purchase of Sturm, Ruger and Company, LCP, .380 Pistol, Serial Number 37182507 by McGOWAN

98. The following transaction appears to be a straw purchase for Robert SNELLINGS of SNELLINGS' FIREARMS made by McGOWAN. SNELLINGS' FIREARMS is a Federal Firearm Licensee (FFL) and is owned by Robert SNELLINGS.

99. A "straw purchase" is when someone buys a firearm with the intention of giving/selling it to someone else (the real purchaser) that did not buy and register the firearm.

100. McGOWAN purchased a Sturm, Ruger and Company, LCP, .380 caliber pistol, serial number 37182507, from SNELLINGS' FIREARMS on July 2, 2009. This specific firearm is an off roster firearm and can only be purchased new by a law enforcement officer. McGOWAN was able to purchase this firearm due to his peace officer status.

101. During the purchase of this firearm, McGOWAN filled out ATF form 4473. Question 12a of the ATF form 4473, asks: "Are you the actual buyer of this firearm(s) listed on the form?" On the form, McGOWAN answered "yes" to question 12a. If McGOWAN did not answer "yes", the sale would have been prohibited by law.

102. Question 12a also explains: **"you are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you".**

103. ATF Form 4473 then requires McGOWAN (the purchaser) to certify the following statement to be true and correct.

104. "I certify that the above answers are true and correct. I understand that answering "yes" to question 12a when I am not the actual buyer of the firearm is a crime punishable as a felony. I understand that a person who answers "yes" to any of the questions 12b through 12k is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12l is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 13. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law".

105. California law requires the owner of the firearm to wait 10 days before he/she can pick up the firearm from a FFL. During the 10 days, a background check is completed by the California Department of Justice.

106. On July 12, 2009, McGOWAN would have been able to pick up his firearm from SNELLINGS' FIREARMS. On July 13, 2009 (11 days after the purchase) McGOWAN private party transferred the Sturm Ruger LCP, .380 caliber pistol back to Robert SNELLINGS, as a private person (not the FFL).

107. SNELLINGS must fill out the ATF form 4473 and wait 10 days before he is able to possess the firearm. On July 27, 2009 (14 days after McGOWAN transferred the firearm to SNELLINGS), SNELLINGS private party transferred the firearm to William Perparos. This gun is later listed on the CCW (Carry Concealed Weapon) permit for Perparos on April 20, 2011.

**McGOWAN residence,** ███████████████ **, Elk Grove, California**

108. On August 4 2011, TFO Halstead and I observed McGOWAN park in the driveway at ████████████████ in Elk Grove, California.

109. On September 9, 2011, McGOWAN listed his address as ████████████████ in Elk Grove on his private party transfer paperwork at Wild Bill's Old West Trading Company.

110. On September 27, 2011, I queried McGOWAN in the Accurint database. Accurint is a computerized database available to law enforcement that provides current addresses of people. Accurint lists ██████████████ in Elk Grove as his residence.

111. On September 30, 2011, TFO Halstead and I observed the black Lexus, with California license plate number ▮▮▮▮▮, parked in the driveway of ▮▮▮▮▮▮▮▮▮▮ in Elk Grove.

112. On October 31, 2011, Sacramento County Sheriff's Department (SSD) Detective T. Koontz provided the address of ▮▮▮▮▮▮▮▮▮ in Elk Grove as the home address of McGOWAN per information provided by SSD records.

## Thomas LU

113. Thomas LU has been identified as a Sacramento County Sheriff's Deputy. Per the Sacramento County Known Person Files (KPF), LU was identified as an ▮▮▮ male, approximately ▮▮▮ pounds, ▮▮▮ hair and ▮▮▮ eyes, with a date of birth of ▮▮▮▮▮.

114. A query of AFS (Automated Firearms System) indicates that LU has obtained 34 (handguns) firearms since 2008. Twenty-seven of the 34 firearms were off roster firearms. LU has private party transferred a total of 23 firearms. Eighteen were private party transferred within one year of the initial purchase.

115. DROS records show that 29 of the 34 firearms obtained by LU were transferred to him through SNELLINGS' FIREARMS.

116. ATF Area Supervisor for Industry Operations, Roger Root reviewed ATF records and concluded that LU does not possess a Federal Firearms License.

117. During the purchases and/or acquisitions of all of the firearms, LU filled out ATF form 4473. Question 12a of ATF form 4473, asks: **"Are you the actual buyer of this firearm(s) listed on the form?"** On the form, LU answered "yes" to question 12a. If LU did not answer "yes", the sale would have been prohibited by law.

118. Question 12a also explains: **"you are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you".**

119. ATF Form 4473 then requires LU (the purchaser) to certify the following statement to be true and correct.

120. **"I certify that the above answers are true and correct. I understand that answering "yes" to question 12a when I am not the actual buyer of the firearm is a crime punishable as a felony. I understand that a person who answers "yes" to any of the questions 12b through 12k is prohibited from purchasing or receiving a firearm. I**

understand that a person who answers "yes" to question 121 is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 13. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law.

## August 11, 2011- UC Meeting With LU

121. On August 9, 2011, TFO Halstead, acting in an undercover capacity on behalf of UC #1 on the CalGuns website arranged a firearms purchase with "Tom." McGOWAN operating under the screen name "dldeguz" told TFO Halstead that his friend "Tom" had a Tec DC9 and a MasterPiece Arms, .45 caliber pistol, for sale for $500 each. McGOWAN sent a picture via text message of the firearms from his cell phone to UC #1's cell phone. McGOWAN also provided "Tom's" phone number of 916-420-4345. UC #1 verified the phone number by calling it the day of the firearms purchase and speaking to "Tom" directly.

122. On August 11, 2011, UC #1 met Thomas LU in the River City Gun Exchange parking lot. Similar to the meetings with McGOWAN, UC #1 walked over to LU'S vehicle and was able to view/manipulate the firearms. UC #1 purchased three off roster firearms which include a MasterPiece Arms, MPA10, .45 caliber pistol, serial number A0494, for $450, a Vector Arms, HR4332, 9 millimeter pistol, serial number 507186, for $1400, and a Intratec, Tec-dc9, 9 millimeter pistol, serial number D062624, for $450 from LU, for a total of $2300. UC #1 negotiated $100 off the initial asking price of the Tec DC9 and MasterPiece Arms, .45 caliber handgun, for sale for $500 each.

123. During the meeting, LU explained to UC #1 that several of the high capacity magazines had a wooden peg inserted in the magazine. The wooden peg is inserted in the magazine so the magazine could accept only 10 rounds of ammunition. However, LU told UC #1 that UC #1 can simply take the magazine apart and take out the wooden peg. LU continued to instruct to UC #1 how to circumvent the California "Assault Weapons Act" in regards to possessing high capacity magazines. LU told UC #1 that if the police asked him how he came into possession of the high capacity magazines, he needed to say: "I owned the magazines way before the ban and shit." Furthermore, LU informed UC #1: "they can't check."

124. The selling, lending and/or giving of a high capacity magazine is a felony violation of the California Penal Code Section 12020 (Unlawful carrying and Possession of Weapons). A

high capacity magazine is a magazine capable of holding more than 10 rounds of ammunition. The condition in which LU transferred the high capacity magazines to UC #1 is a felony violation of California Penal Code section 12020 because the magazines were not permanently modified to hold 10 rounds or less.

125. During the meeting, UC #1 asked LU if he was on www.CalGuns.net. LU stated that he was on www.CalGuns.net under screen name "Teabag." LU stated that he had some other guns he wanted to sell. Specifically, LU indicated that he had "Norinco AKs" for sale.

126. While filling out the private party transfer paperwork, LU provided his California identification card to the employee at River City Gun Exchange. The identification card stated his name was Thomas LU. When the transfer paperwork was complete, UC #1 and LU exited the River City Gun Exchange. LU informed UC #1 that he had a few more firearms in his vehicle. LU informed UC #1 that he had a Mossberg shotgun and another Uzi. UC #1 asked if the firearms were online. LU indicated that they weren't online because you can't put too much stuff online.



**Purchased on August 11th 2011**

## August 26, 2011-Purchase of two off roster firearms from LU

127. On August 16, 2011, TFO Halstead, acting in an undercover capacity began conversing with LU on the CalGuns website on behalf of UC #1. LU has an account with the screen name "Teabag" (which he identified as his screen name on the August 11 meeting). TFO Halstead expressed interest in purchasing an off roster Lancaster AK pistol (manufactured by Nodan Spud LLC) and an off roster Kel-Tec PLR 16 pistol. LU requested UC #1's private email account so that he could email photos, a list of 6 firearms and the corresponding sale prices that he had for sale. LU sent an email to UC #1 from an email account titled sac_thug4u@yahoo.com on August 22, 2011, with the above information. (See Attachment C for email conversation).

128. On August 26, 2011, UC #1 met with LU at the River City Gun Exchange to purchase a Nodac Spud, LLC, Model NDS-3, 7.62 caliber, serial number M006659, and a Kel Tec, PLR16, .223 caliber pistol, serial number P4Y17, for $1550 which was videotaped/recorded. LU led UC #1 to his vehicle to show UC #1 the firearms. LU was driving a white, 4-door, Lexus sedan, California license plate ▮▮▮▮. A query through DMV revealed that the 4-door, Lexus sedan, California license plate ▮▮▮▮ is registered to LU. LU opened the trunk of the vehicle, which contained boxes and firearm cases. UC #1 successfully purchased the above listed firearms from LU.

129. LU provided a few other firearms for UC #1 to review while they were still at his vehicle. LU provided UC #1 with a GSG5 pistol, a Norinco Uzi pistol with a wooden stock, and an AK-47 style rifle. UC #1 manipulated the action on each firearm and reviewed other features such as manufacturer markings and the bullet buttons. A bullet button is a magazine locking device. UC #1 ultimately told LU he would check to see if he knew anyone interested in the other firearms.

130. While filling out the transfer documents at the River City Gun Exchange, UC #1 overheard an employee of the gun store ask LU if he had recently received the Lancaster (manufactured by Nodac Spud, LLC) pistol. UC #1 observed the Lancaster pistol in a postal box. LU indicated that he had recently received the firearm. Additionally, LU indicated the firearm was delivered in the same postal box. UC #1 asked if LU bought the rifle online. LU responded affirmatively.

131. LU informed UC #1 about regulatory issues concerning the purchase of ammunition and handguns. LU indicated that purchasing a handgun in a gun dealer, such as River City Gun Exchange, was regulated to one gun a month. However, LU indicated that the type of transfer he and UC #1 were engaged in could be as many as 10 transfers.

132. Due to the fact that LU is a peace officer, he is not restricted to the amount of firearms he may purchase monthly.  A private citizen can only purchase one new handgun a month per California law.



**Purchased on August 26th 2011**

### September 7, 2011 - Meeting With LU

133. On September 6, 2011, TFO Halstead acting in an undercover capacity on behalf of UC #1 conversed with LU via email (Sac_thug4u@yahoo.com) regarding the purchase of four firearms (see attachment C for email).  LU stated that he had the following firearms for sale: Interdynamics KG-9, 9 millimeter pistol for $ 1,500 (off roster); Kel Tec PF-9 pistol for $400 (off roster); Intratec, TECDC 9, 9 millimeter pistol, serial number D029008, for $500 (off roster); and a Norinco, Model 320, 9 millimeter rifle serial number A10709, for $700.  TFO Halstead told LU that he was interested in purchasing the four firearms for $3100.  The meeting was set up for September 7, 2011, at River City Gun Exchange.

134. On September 7, 2011, UC #1 and LU met in the parking of the River City Gun Exchange, which was videotaped/recorded. UC #1 and LU walked over to LU's vehicle, a white Lexus sedan, California plate ██████ to see the firearms LU would be selling. UC #1 observed LU open his trunk, which contained cardboard boxes and hard case firearm containers. UC #1 observed that the firearms appeared consistent with the photographs of the firearms listed in LU's email. In regard to the KG-9 pistol, LU told UC #1 that the firearm could easily be converted to an automatic firearm by altering a piece of metal in the firearm. Furthermore, LU told UC#1 that because of the relative ease at which the firearms could be converted, the ATF directed the manufacturer to stop making the firearm in this manner.

135. In addition to showing the firearms to UC #1, LU provided UC #1 with high capacity magazines for each of the firearms. LU informed UC #1 that he had inserted a wood peg in the high capacity magazines thereby restricting the ability to insert more than the legal amount of ammunition in a magazine under California guidelines. LU has used this method of rendering large capacity magazines legal in the past. However, LU told UC #1: "it's up to you what you want to do after that."

136. On this occasion, LU suggested that he and UC #1 make the money transfer inside of his vehicle. UC #1 negotiated a deal from the initial $3100 asking price to the purchase price of $3000. LU agreed on a purchase price of $3000 for all four firearms. Following the money exchange in the vehicle, LU and UC #1 entered River City Gun Exchange and filled out the private party transfer paperwork.

137. Prior to the completion of the transaction, LU informed UC #1 that he has a few more firearms for sale. LU indicated that he has a .22 long rifle AK-47 for sale. LU also stated that he has a mini Tec 9 for sale as well. UC #1 informed LU that he would check with his associates regarding interest in purchasing the firearms. During the course of this investigation, UC #1 expressed interest in obtaining a specific firearm, a Ruger, LCP, .380 caliber handgun, from LU. However, LU was unable to provide the specific firearm for UC #1.



**Purchased on September 7th 2011**

### Suspicious Firearms Transactions made by LU
A. **Multiple Purchases on Same Date**

138. On numerous occasions, Deputy Thomas LU has purchased multiple handguns on the same day. People engaged in the business of dealing firearms or trafficking firearms will often purchase multiple firearms at once. California law prohibits a person from buying more than one handgun from a FFL within any 30 day period. However, peace officers in California are exempt from the law and therefore can purchase as many handguns as they wish within a 30 day period. A review of the DROS and AFS records show the following multiple handgun sales made by LU:

### November 22nd, 2010
- MasterPiece Arms, model MPA30 (off roster handgun)
- Taurus, model Raging Bull (off roster handgun)

### October 18th, 2010
- Intratec, model DC-9 (off roster handgun)
- Intratec, model DC-9 (off roster handgun)

### October 4th, 2010
- MasterPiece Arms, model MPA380 (off roster handgun)
- DSA, model TP9US (off roster handgun)

<u>September 23rd, 2010</u>

- Interdynamic, model KG9 (off roster handgun)
- Kel Tec, model PF9 (off roster handgun)

<u>September 2nd, 2010</u>

- IMI, model Micro Desert Eagle (off roster handgun)
- Masterpiece Arms, model MP10 (off roster handgun)
- Intratec, model Tec-DC9 (off roster handgun)

<u>August 12th, 2010</u>

- IMI, model Micro Desert Eagle (off roster handgun)
- Kel Tec, model P3AT (off roster handgun)
- Kel Tec, model PF9 (off roster handgun)

<u>July 22nd, 2010</u>

- Interdynamic, model KG99 (off roster handgun)
- Intratec, model Tec-DC9 (off roster handgun)

**B.**   <u>Multiple Purchases of Same Make, Model, and Caliber</u>

139. Deputy Thomas LU has also purchased multiple firearms that are the same make, model and caliber. People engaged in the business of selling or trafficking firearms often will purchase multiple firearms of the same make, model and caliber. Below is a summary of the transactions:

<u>Norinco, 1911A1</u>

140. LU purchased three Norinco, model 1911A1 handguns from SNELLINGS' FIREARMS. He purchased them on the following dates: 08-05-2010, 08-14-2010 and 10-07-2010. LU private party transferred the handgun he purchased on 10-07-2010 to another person on 07-28-2011.

<u>IMI, Desert Eagle</u>

141. LU purchased two IMI/Magnum Research, Desert Eagle, .50 caliber handguns. He purchased one from SNELLINGS' FIREARMS on 12-02-2010 (gold in color) and later private party transferred it to another person on 08-17-2011. LU purchased a second IMI, Desert Eagle, .50 caliber handgun on 09-03-2011 from Personal Defense Weapons.

### IMI, Micro Desert Eagle

142. LU purchased three Micro Desert Eagles, .380 caliber handguns from SNELLINGS FIREARMS. LU purchased one on 07-09-2009 and later private party transferred it to another person on 07-29-2011. LU purchased the second one on 08-12-2010 and later private party transferred it to another person on 09-03-2011. LU purchased the third one on 09-02-2010 and later private party transferred it to another person on 03-21-2011.

### Kel Tec, P3AT

143. LU purchased two Kel Tec, P3AT handguns, one from SNELLINGS' FIREARMS on 08-12-2010 and one from River City Gun Exchange on 11-04-2008.  The firearm he purchased on 11-04-2008 was later private party transferred to another person on 07-31-2010.

### Kel Tec, PF9

144. LU purchased two Kel Tec, PF9 handguns from SNELLINGS' FIREARMS. He purchased one on 08-12-2010 and later private party transferred it to another person on 03-21-2011. He purchased the second one on 09-23-2010 which he sold and private party transferred to UC #1 on 09-07-2011.

### Intratec, Tec-DC9

145. LU purchased six Intratec, TEC-DC9 handguns from SNELLINGS' FIREARMS. LU has private party transferred four of the six handguns after he purchased them.

146. LU purchased one of the handguns on 05-20-2010 and he later private party transferred it to another person on 04-23-2011.

147. LU purchased the second handgun on 06-07-2010 and he later sold it to UC #1 on 09-07-2011.

148. LU purchased the third handgun on 07-22-2010 and the fourth handgun 09-02-2010.

149. LU purchased the fifth and sixth handguns on 10-18-2010. LU sold one of them to UC #1 on 08-11-2011. He private party transferred the other handgun to another person on 04-23-2011.

### LU residence, ▓▓▓▓▓▓▓▓▓▓, Elk Grove, California

150. On August 26, 2011, I queried the registered owner's information of a Lexus sedan, license plate ▓▓▓▓▓ (vehicle present on August 16 and September 7 meet with UC

#1).  The vehicle is registered to LU at an address of ██████████████, Elk Grove, California.

151.  On September 7, 2011, LU listed the address of ██████████████, Elk Grove, California on his private party transfer paperwork on Elk Grove, California.

152.  On September 27, 2011, a query of Accurint indicated the most current address for LU is ██████████████, Elk Grove, California.

153.  On September 30, 2011, TFO Halstead and I observed the white Lexus sedan which is registered to LU parked outside of ██████████████, Elk Grove.

154.  On October 31, 2011, Sacramento County Sheriff's Department (SSD) Detective T. Koontz provided the address of ██████████████, Elk Grove as the home address of LU per information provided by SSD records.

### Darryl DEGUZMAN

155.  Darryl DEGUZMAN has been identified as a Sacramento County Sheriff's Deputy.  Per the Sacramento County Known Person Files (KPF), DEGUZMAN is identified as a ████ male, █ approximately █ pounds, ████ hair and ████ eyes with a date of birth of ████.

### DEGUZMAN'S involvement

156.  ATF TFO Halstead reviewed a multitude of private sale postings located in the "private firearms sales" on the CalGuns website listed by other screen names.  ATF TFO Halstead discovered that a CalGuns user listed as "dldeguz" had posted off roster firearms that were consistent with the same type of firearms posted by "SacDep".

157.  On July 23, 2009, "dldeguz" posted a photo of brand new Micro Desert Eagle, .380 caliber pistol for sale on the CalGuns website.  TFO Halstead was able to identify the serial numbers located on the firearm in the picture as ME03936.  TFO Halstead queried the serial number ME03936 in AFS and discovered a DROS showing that Darryl DEGUZMAN, with date of birth 09-09-1980, purchased the Micro Desert Eagle pistol on 07-02-2009.  On July 29, 2009, the ad for sale was updated by "dldeguz" with the following posting: *"Sold!!!"* DROS records show DEGUZMAN private party transferred the firearm to a German Vasquez on July 29th, 2009.

158.  On April 14, 2011, "dldeguz" posted a FHN, FN, 5.7 caliber pistol for sale.  TFO Halstead was able to identify the serial number as 386118807 from the picture posted on

CalGuns.  A query conducted on AFS revealed that the above listed firearm was originally purchased by McGOWAN on April 12, 2010 and private party transferred by McGOWAN on June 29, 2011.

159. The firearm posted for sale on CalGuns with the screen name of "dldeguz" combined with UC #1's interactions with McGOWAN on three occasions utilizing the screen name "dldeguz" suggests that McGOWAN is posting his firearms for sale under DEGUZMAN's screen name on the CalGuns website.

160. Sacramento County Sheriff's Detective T. Koontz checked SSD records which verified that DEGUZMAN, LU, and McGOWAN work on the same floor and same shift at the Rio Consumnes Correctional Center (RCCC).

### DEGUZMAN Residence, ▮▮▮▮▮▮▮▮▮, Elk Grove, California

161. On September 27, 2011, a query of Accurint listed ▮▮▮▮▮▮▮▮ Elk Grove, California as the residence of DEGUZMAN.

162. On September 30, 2011, TFO Halstead and I observed a gold in color 2003 Toyota truck, license plate ▮▮▮▮▮ parked outside of ▮▮▮▮▮▮▮▮, Elk Grove, California. A query of the DMV database states that the Toyota truck is registered to DEGUZMAN.

163. On October 31, 2011, Sacramento County Sheriff's Department (SSD) Detective T. Koontz provided the address of ▮▮▮▮▮▮▮▮, Elk Grove as the home address of DEGUZMAN per information provided by SSD records.

### Robert SNELLINGS

164. Per the Sacramento County Known Person Files (KPF), SNELLINGS is identified as a white male, 5'10, approximately 180 pounds, brown hair and hazel eyes, with a date of birth of ▮▮▮▮▮▮

165. SNELLINGS presently possesses an FFL (FFL # 9-68-067-01-1D-17587) for SNELLINGS' FIREARMS located at 2675 Land Avenue in Sacramento, California.  LG FIREARMS (FFL) is located in the same business space as SNELLINGS' FIREARMS. Christopher LENERT and Brent Gentilcore are listed as the Federal Firearms licensees on LG Firearms FFL.

166. FFL'S are required by ATF regulations to maintain Records of Receipt and Disposition Book(s) (commonly referred to as A&D book).  This book is a ledger recording the

specifics of the firearm, the date the FFL acquired the firearm and the name and address of whom they acquired the firearm from. The disposition is the date the FFL transferred the firearm and the name and address of who they transferred it to.

## Robert SNELLINGS/SNELLINGS' FIREARMS

167. During the course of this investigation TFO Halstead was contacted by supervising Special Agent Blake Graham. Blake Graham is a sworn California peace officer employed by the California Department of Justice (DOJ). Agent Graham is assigned to the Bureau of Firearms where his duties include, but are not limited to, conducting investigations on violations of California's firearms statutes and criminal investigations involving businesses with a federal firearms license (FFL). Agent Graham is involved in the process of approving what handguns may be sold in the State of California and amending the roster of approved handguns certified for sale in California. Agent Graham has access to Dealer Records of Sales (DROS) for firearms transactions that occur within the State of California.

168. Agent Graham informed TFO Halstead that he discovered some suspicious transactions conducted through the business SNELLINGS' FIREARMS, located at 2675 Land Ave, Sacramento, California. The suspicious transactions involved firearms not on the roster of approved handguns, being purchased by California peace officers. The transactions identified by Agent Graham were suspicious because after the handguns were purchased by the peace officers they were private party transferred in a short period of time to Robert SNELLINGS as a private person, not to the business SNELLINGS' FIREARMS (FFL). Agent Graham was able to determine each of the purchasers were peace officers because of an exemption code, entered on the DROS when the sale is to a peace officer. A DROS is started on the date of purchase and/or transfer, even though the person may not pick up the firearm for ten days because of California's ten day waiting period for a background check.

169. California law enforcement officers are exempt from the waiting period if they have a letter signed by the head of the agency or commanding officer, stating they are full time paid peace officers authorized to carry a firearm in the performance of their duties and authorizing the purchase.

170. Since Robert SNELLINGS is not a peace officer, he is limited to the same restrictions as all California residents that wish to purchase a handgun from an FFL. A handgun can only be imported into the state and sold by a gun dealer (FFL) if the handgun is on the roster of approved and certified for sale list of firearms. If Robert SNELLINGS, as a private person, wanted to acquire a new handgun that is not on the roster of approved

handguns, he could do so if he had a peace officer illegally straw purchase it for him. If Robert SNELLINGS could get a peace officer to buy the off roster handgun, the peace officer would then have to private party transfer it to Robert SNELLINGS as a private person. In essence, SNELLINGS would have to have the handgun laundered through the peace officer(s) and then private party transferred through an FFL to him. Since Robert SNELLINGS also has an FFL, he is able to more discreetly complete the straw purchase through his business and then complete the private party transfer of the firearm back to himself, again using his own business (FFL) to complete the transfer.

171. Below is a list of the suspicious transactions conducted by peace officers, through SNELLINGS' FIREARMS (FFL) where the guns were then transferred back to Robert SNELLINGS, the private person. The information was obtained by reviewing the records provided by Agent Graham. The records are copies of the Dealer's Record of Sales (DROS) and records of the entries in the State of California's Automated Firearm System (AFS).

172. **On 08-12-2010,** Sacramento Police Officer Christopher LENERT, DOB ▮▮▮▮▮ started the DROS process for a semiautomatic, Carl Walther, model PK380, ".38 caliber" handgun, with serial number **PK038993**. The FFL that conducted the DROS was listed as Robert SNELLINGS. I believe the entry of the caliber on the DROS form, dated 08-12-2010, as a "38", is not correct and may have been a typo or may have been done intentionally by the FFL in an attempt to disguise the transaction or make the transaction less suspicious. I reviewed Carl Walther's website and located the product details for the PK380 model. They only offer it for sale in .380 caliber, thus the reason for the model being called "PK380". This handgun is not on the roster of approved handguns for sale in California and can only be purchased from an FFL by a peace officer.

173. On **09-13-2010,** approximately 32 days later, Christopher LENERT, with date of birth ▮▮▮▮▮▮, private party transferred a semiautomatic, Carl Walther, model PK380, .380 caliber handgun, with serial number **PK038993**, to Robert SNELLINGS as a private person. The firearm was transferred to Robert SNELLINGS, using Robert SNELLINGS' business (FFL) to conduct the transfer.

174. On 09-16-2011, TFO Halstead spoke with Sacramento Police Department Lieutenant James Beezley to see if Officer LENERT was ever given a letter to waive the ten day waiting period for the purchase of this firearm. Lieutenant Beezley is assigned to the Personnel Division, which is the division of the police department that issues letters to waive the ten day waiting period. Lieutenant Beezley stated that if a letter is issued, a copy of it is kept in the Personnel Division. Lieutenant Beezley stated he checked the records and Officer LENERT was never issued a letter to waive the ten day waiting

period for the purchase of the Carl Walther handgun listed above. This means the earliest Officer LENERT could have obtained the firearm from the gun store (SNELLINGS' FIREARMS) was on **08-22-2010,** which means he transferred the firearm to Robert SNELLINGS as a private person, after owning it for approximately 22 days.

175. On **07-09-2009,** Roseville Police Officer Christopher Tait KJELLBERG, with date of birth ⬛⬛⬛⬛, started the DROS process for a semiautomatic, .40 caliber Smith & Wesson, model PPS handgun, with serial number **AD3719.** The FFL that conducted the DROS was listed as Robert SNELLINGS. This firearm is not on the approved list of handguns for sale to California residents and can only be purchased from an FFL by a peace officer.

176. On **08-04-2009,** approximately 26 days later, Christopher Tait KJELLBERG, with the date of birth ⬛⬛⬛⬛, private party transferred a "10 caliber" Smith & Wesson, model PPS handgun, with serial number **AD3719,** to Robert SNELLINGS as a private person, not Robert SNELLINGS the FFL. The firearm was transferred to Robert SNELLINGS, as a private person, using Robert SNELLINGS, the FFL, to complete the transfer. It is my opinion that this is the same firearm Christopher KJELLBERG obtained from SNELLINGS, the FFL, the month prior. I believe the entry of the caliber on 08-04-2009 as a "10" is not correct and may have been a typo or may have been done intentionally by the FFL in an attempt to disguise the transaction or make the transaction less suspicious. I reviewed Smith & Wesson's website and located the product details for the PPS. They only offer it for sale in 9mm and .40 caliber.

177. On 09-14-2011, Sacramento County Sheriff's Detective Tom Koontz informed TFO Halstead that Robert SNELLINGS has been issued a Carry Concealed Weapons permit (CCW) by the Sacramento County Sheriff. Detective Koontz checked Robert SNELLINGS'S CCW records to determine which firearms he is authorized to carry. One of the firearms listed on Robert SNELLINGS'S CCW is a .40 caliber, model PPS, with serial number **AD3719.**

178. Detective Koontz stated Robert SNELLINGS submitted his application to the Sacramento County Sheriff's Department for a CCW on **07-16-2009.** At the time Robert SNELLINGS submitted his application he listed a .40 caliber, model PPS, with serial number **AD3719,** as a firearm he wanted listed on his CCW permit. This is a significant fact because according to the DROS records, Officer KJELLBERG hadn't even started the transfer process for the firearm to Robert SNELLINGS. The DROS records show Officer KJELLBERG didn't transfer the firearm to Robert SNELLINGS until **08-04-2009.** It is my opinion that Christopher KJELLBERG acted as a straw purchaser when he bought the .40 caliber, model PPS firearm and that he purchased it with the intent to

private party transfer it to Robert SNELLINGS as a private person. If Robert SNELLINGS desired this new firearm for his CCW he could only obtain it if a peace officer acted as straw purchaser and thus laundered the firearm into the state of California.

179.  On **04-30-2009,** a California Highway Patrol Officer started the DROS process for a semiautomatic, made in Germany, model 5PK, .22 caliber handgun, with serial number **A294392.** The FFL that conducted the DROS was listed as Robert SNELLINGS. This firearm is not on the roster of approved handguns for sale in California.

180.  On **06-01-2009,** approximately 32 days later, the same California Highway Patrol Officer, private party transferred a semiautomatic, made in Germany, model 5PK, .22 caliber handgun, with serial number **A294392,** to Robert SNELLINGS as a private person. The firearm was transferred to Robert SNELLINGS, using Robert SNELLINGS, the FFL, to complete the transfer.

181.  On **07-02-2009,** Sacramento County Sheriff's Deputy Ryan McGOWAN, with date of birth ▇▇▇▇▇▇, started the DROS process for a semiautomatic, Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37182507.** The FFL that conducted the DROS was listed as Robert SNELLINGS. This handgun is not on the roster of approved handguns for sale in California.

182.  On **07-13-2009,** approximately 11 days later, Ryan McGOWAN, with date of birth ▇▇▇ ▇▇▇, private party transferred the semiautomatic, Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37182507,** to Robert SNELLINGS as a private person. The firearm was transferred to Robert SNELLINGS, using Robert SNELLINGS, the FFL, to complete the transfer.

183.  Approximately 14 days later on **07-27-2009,** Robert SNELLINGS private party transfers the semiautomatic, Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37182507,** to a William Perparos, with date of birth ▇▇▇▇▇. The firearm was transferred to William Perparos, using Robert SNELLINGS, the FFL, to complete the transfer.

184.  Sacramento County Sheriff's Detective Tom Koontz informed TFO Halstead that William Perparos had been issued a CCW. When William Perparos applied for the CCW on 04-20-2011, he listed the Sturm & Ruger LCP with serial number **37182507,** as one of the firearms he desired to carry.

185. This Sturm & Ruger LCP was transferred four times in less than 30 days. It is my opinion and the opinion of other firearms experts I have spoken to about this, that this purchase and subsequent transfers to different people within such a short period of time shows a conspiracy to straw purchase between Deputy Ryan McGOWAN and Robert SNELLINGS.

### Christopher KJELLBERG

186. Per the California Department of Motor Vehicles, KJELLBERG is identified as a  male, ████ approximately ████ pounds, ████ hair and ████ eyes, with a date of birth of ████

### Suspicious Transactions Completed at SNELLINGS' FIREARMS (FFL) by Christopher KJELLBERG

187. In reviewing the DROS transactions completed through SNELLINGS FIREARMS (FFL), TFO Halstead and I identified several suspicious transaction involving peace officers purchasing off roster (non approved) handguns from SNELLINGS, the FFL, and transferring them within a short period of time to a third party, using SNELLINGS, the FFL, to complete the private party transfer. The following are the suspicious transactions:

188. On **09-21-2009**, Roseville Police Officer Christopher KJELLBERG started the DROS process for a Colt, model New Agent, .454 caliber handgun, with serial number **GTO4886**. This transaction was completed by SNELLINGS FIREARMS (FFL). This firearm is not on the approved list of handguns for sale in California.

189. On **10-03-2009**, approximately 12 days later, Christopher KJELLBERG private party transferred the Colt, model New Agent, with serial number **GTO4886,** to a Craig Glasere. The private party transfer was completed through SNELLINGS' FIREARMS (FFL).

190. On **03-29-2010**, Roseville Police Officer Christopher KJELLBERG started the DROS process for a Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37351117**. This firearm is not on the approved list of handguns for sale in California. This transaction was completed at the D&L Engineering, located in Garden Valley, CA.

191. Approximately 65 days later, on **06-04-2010**, Christopher KJELLBERG private party transferred the Sturm & Ruger, model LCP .380 caliber handgun, with serial number **37351117,** to a Joseph O'Farrell.  Joseph O'Farrell is a retired police officer from the Roseville Police Department. However, it is unknown when he retired from the police department.

192. On **04-29-2010**, Roseville Police Officer Christopher KJELLBERG started the DROS process for Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37300127**. This transaction was completed by SNELLINGS Firearms (FFL). This firearm is not on the approved list of handguns for sale in California and can only be purchased from a FFL by a peace officer.

193. On **05-27-2010**, approximately 28 days later, Christopher KJELLBERG private party transferred the Sturm & Ruger, model LCP, .380 caliber handgun with serial number **37300127**, to a Ulysses Early. The private party transfer was completed through SNELLINGS' FIREARMS (FFL).

194. On **07-19-2011**, Roseville Police Officer Christopher KJELLBERG started the DROS process for a Glock, model 21Gen4, .45 caliber handgun, with serial number **RPH618**. The Glock 21, model Gen4 is the newest version of the Glock 21 and is not on the approved list of handguns for sale in California. This transaction was completed at Sacramento Black Rifle, a FFL, located in Rocklin, California.

195. Approximately 28 days later, on **08-16-2011**, Christopher KJELLBERG private party transferred the Glock, model 21 Gen4, .45 caliber handgun, with serial number **RPH618**, to a Ulysses Early. It should be noted that Christopher KJELLBERG and Ryan McGOWAN have private party transferred firearm(s) to Ulysses Early on other dates.

196. AFS records indicate that Ulysses Early owned a Glock model 21, .45 caliber handgun, but that he private party transferred it to another person on **07-16-2011**, just 3 days before Christopher KJELLBERG started the DROS on the newest model of the Glock 21, which he subsequently transferred to Ulysses Early. The history of these two firearms transactions leads me to believe that Ulysses Early wanted to update to the newest model of the Glock 21 (Gen 4), so he sold his older model and then had Christopher KJELLBERG straw purchase him the newer model, which was only available to peace officers.

## Christopher LENERT

197. Per the Sacramento County Known Person Files (KPF), LENERT is identified as a ▮▮▮ male, ▮▮▮ approximately ▮▮▮ pounds, ▮▮▮ hair and ▮▮▮ eyes, with a date of birth of ▮▮▮▮▮▮.

198. LENERT presently possesses an FFL (FFL # 9-68-067-01-4D-02777). LG FIREARMS (FFL) is located in the same business space as SNELLINGS' FIREARMS at 2675 Land

Avenue in Sacramento, California.   Christopher LENERT and Brent Gentilcore are listed as the Federal Firearms licensees on LG Firearms FFL.

## Suspicious Transactions completed at SNELLINGS FIREARMS (FFL) by Christopher LENERT

199. On **06-17-2010,** Sacramento Police Officer Christopher LENERT started the DROS process for two Sturm & Ruger, model LCP, .380 caliber handguns with serial number **37437161 and 37437405.** This transaction was completed by SNELLINGS' FIREARMS (FFL). These firearms are not on the approved list of handguns for sale in California and can only be purchased from a FFL by a peace officer.

200. Approximately 19 days later on **07-05-2010,** Christopher LENERT private party transferred the Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37437161,** to a Brent Gentilcore. The private party transfer was completed through SNELLINGS' FIREARMS (FFL).

201. On 09-16-2011, TFO Halstead spoke with Sacramento Police Department Lieutenant James Beezley to see if Officer LENERT was ever given a letter to waive the ten day waiting period for the purchase of this firearm. Lieutenant Beezley is assigned to the Personnel division, which is the division of the police department that issues letters to waive the ten day waiting period. Lieutenant Beezley stated that if a letter is issued, a copy of it is kept in the Personnel Division. Lieutenant Beezley stated he checked the records and Officer LENERT was never issued a letter to waive the ten day waiting period for the purchase of the Sturm & Ruger handgun listed above. This means the earliest Officer LENERT could have obtained the firearm from the gun store (SNELLINGS' FIREARMS) was on **06-27-2010,** which means he transferred the firearm to Brent Gentilcore after owning it for approximately 9 days.

202. The purchase of two firearms that are the exact make, model and caliber on the same day and the subsequent transfer of one of the firearms 19 days later to Gentilcore is consistent with this being a straw purchase.

203. As mentioned earlier in this affidavit, LENERT was involved in the following transaction, **on 08-12-2010,** LENERT started the DROS process for a semiautomatic, Carl Walther, model PK380, ".38 caliber" handgun, with serial number **PK038993.** The FFL that conducted the DROS was listed as Robert SNELLINGS. I believe the entry of the caliber on 08-12-2010 as a "38" is not correct and may have been a typo or may have been done intentionally by the FFL in an attempt to disguise the transaction or make the transaction less suspicious. I reviewed Carl Walther's website and located the product details for the PK380 model. It is only offered for sale in a .380 caliber, thus the reason

for the model being called "PK380". This handgun is not on the roster of approved handguns for sale in California and can only be purchased from an FFL by a peace officer.

204. On **09-13-2010**, approximately 32 days later, LENERT private party transferred a semiautomatic, Carl Walther, model PK380, .380 caliber handgun, with serial number **PK038993**, to Robert SNELLINGS as a private person. The firearm was transferred to Robert SNELLINGS, using Robert SNELLINGS'S business (FFL) to conduct the transfer.

### SNELLINGS Residence, ███████████ Rancho Murieta, California

205. On August 29, 2011, Sacramento Police Department received a "Gun Dealer Registration Application" that SNELLINGS submitted. On this application, SNELLINGS lists his private address as ██████████, Rancho Murieta, California.

206. On September 27, 2011, a query of Accurint listed ███████████, Rancho Murieta as SNELLINGS current address.

207. On October 31, 2011, a query of California Department of Motor Vehicles database provided information that SNELLINGS lists ████████, Rancho Murieta, California as his address for his driver's license.

### SNELLINGS' FIREARMS, 2675 Land Avenue, Sacramento, California

208. On August 29, 2011, Sacramento Police Department received a "Gun Dealer Registration Application" that SNELLINGS submitted. On this application, SNELLINGS lists his business address (SNELLINGS' FIREARMS) as 2675 Land Avenue, Sacramento, California.

209. On October 13, 2011, a query of Accurint lists SNELLINGS' FIREARMS address of 2675 Land Avenue, Sacramento, California.

### KJELLBERG Residence, ███████████ Rocklin, California

210. All of the private party transfers listed in this affidavit list ███████████, Rocklin, California.

211. On October 13, 2011, a query of Accurint lists KJELLBERG'S residence as ████████ ███████ Rocklin, California.

212. On October 29, 2011, TFO Halstead observed a white 2006, Toyota Tundra truck, California license plate in the driveway of ▓▓▓▓▓▓▓▓▓▓, Rocklin, California. A DMV query of this vehicle indicates that KJELLBERG is the registered owner of this vehicle.

### LENERT Residence, ▓▓▓▓▓▓▓▓▓▓▓▓, Sacramento, California

213. On September 24, 2011, LENERT listed the address of ▓▓▓▓▓▓▓▓▓▓ on his DROS paperwork for a private party transfer of a firearm.

214. On October 13, 2011, a query of Accurint listed LENERT'S residence as ▓▓▓▓▓▓▓▓▓▓, ▓▓▓, Sacramento, California.

215. On October 13, 2011, a query of Criss Cross computer database that maintains property records states LENERT and ▓▓▓▓▓▓ Lenert are the owners of ▓▓▓▓▓▓▓▓▓, Sacramento, California.

216. On October 14, 2011, a query of the Sacramento Municipal Utility District (SMUD) database lists ▓▓▓▓▓▓▓▓▓ as the account holder for ▓▓▓▓▓▓▓▓▓.

217. On October 31, 2011, I contacted Sacramento Police Department personnel and confirmed that LENERT'S residence is ▓▓▓▓▓▓▓▓▓, Sacramento, California.

### Information Regarding Items to be Seized

218. I know from my training, experience, and discussions with other law enforcement officials that firearm traffickers frequently possess the following which is evidence of the unlawful activity:

Firearms, firearms packaging material (boxes, addresses, shipping information), firearm accessories (including owner's manuals, holsters, gun cases, sights, trigger locks, cleaning tools, etc.), firearm records (purchase/sale, method of payment), and notes or other documentation concerning profits made (i.e., comparing cost of purchase vs. cost of sale),

Information concerning persons selling them firearms,

Information concerning persons to whom they sell firearms,

Information concerning methods used to advertise the availability of their firearms for purchase,

Photos of their firearms for purposes of advertising for sale, to keep track of their inventory, for insurance in case of theft, etc.

Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms,

Written statements showing profits made from the sale of firearms for internal purposes,

Bank deposit records, checking account records, and other financial documentation showing the purchase of firearms, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms.

Cell phone records which show the phone number and subscriber information, and numbers called/received.

Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc.

219. The non-physical evidence (i.e., documentation) can be in hard (paper) form, or may be in digital form stored on computers, smart phones, digital notebooks, personal computers or any other type of digital storage device (e.g. thumb drives, external hard drives, etc.). While the above described material and the devices holding the material would most likely be in their residence, it is also often found in their personal vehicle(s), in their personal work areas (desks, lockers, etc.) where they work, and/or rented storage lockers. In addition, since many persons these days carry their cellular telephones and, sometimes, digital notebooks, laptop computers, on their persons, it is often necessary to search and seize these items from the firearm traffickers' person to secure this evidence if they are away from their residence.

220. I also know from my training, experience and from discussions with other law enforcement officials that persons with a Federal Firearms License ("FFL"), which licenses them to sell firearms to the public, who engage in unlawful firearm sales frequently have the below described materials in addition to the above described material, which is frequently evidence needed to prove the unlawful activity:

    a.   Records concerning firearm purchases and sales including, but not limited to, the dealers' "Firearms Receipt and Disposition" book which is required by federal regulations to be kept by persons with a federal firearms license (FFL), ATF Forms 4473 (required for each firearm sale), inventory tracking documents, shipping boxes and labels, correspondence with the firearms supplier or firearms purchases,

    b.   Records showing private party transfers conducted by the FFL,

    c.   Photographs of firearms purchased or sold,

    d.   Indicia of persons in control of, and working at, the premises.

221.  The non-physical evidence (i.e., documentation) can be in hard (paper) form, or may be in digital form stored on computers, smart phones, digital notebooks, lap-tops or other digital storage device.

222.  In this case, I have taken the unique circumstances presented and attempted to fashion a separate list of items to be seized from each of the persons, vehicles, and places to be searched. The unique circumstances involved include that the offense conduct involved "off roster" firearms, that the targets of the investigation are law enforcement officials that are allowed/required to possess and carry firearms as part of their employment, that two of the targets are FFLs, that one of the targets (non-law enforcement) has a permit to carry a firearm which permit lists one of the firearms at issue. I have also factored in the differences in the apparent involvement of the various targets, and other factors, to fashion a specific list of items/material, that I believed would likely be found on the persons, vehicles, and locations requested to be searched.   Thus, I believe that items listed in Attachments B-1 through B-23 (as indicated specifically per person/location) will be found on the persons, vehicles, and places listed in Attachment A.

## Training and Experience Regarding Firearms Trafficking and Firearms Traffickers

223.  As a result of my experience and training, I have learned that traffickers who deal in, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators and these records may be kept on paper or contained in memory calculators or computers. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that the business of firearms trafficking is similar to drug trafficking and by analogy in the case of drug dealers,

evidence is likely to be found where the dealers live. United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

224. In my experience, firearms traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

225. It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up the purchase of guns, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the firearms traffickers in this case, MCGOWAN and LU, have used in the course of this investigation text messaging to communicate about their ongoing trafficking in firearms. Based on my training and experience, I believe that SNELLINGS, LENERT and KJELLBERG have likely communicated via text messaging with each other and/or potential buyers of "off roster" firearms.

226. I know that firearms traffickers use mobile cellular telephones to communicate with one another, either by voice or text message. Mobile cellular telephones are digital devices that preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other firearms traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a firearms trafficker is evidence of the associations of the firearms trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a firearms trafficker's mobile telephone can contain evidence of firearms trafficking because it shows the communications or planned communications of a firearms trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Firearms traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a firearms trafficker. Mobile telephones can also contain photographic data files, which can be evidence of

criminal activity when the user was a firearms trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

227. As described above and in **Attachment B-1 to B-23**, this Affidavit seeks permission to search and seize things that are related to the ongoing conspiracy between MCGOWAN, LU, DEGUZMAN, SNELLINGS, LENERT and KJELLBERG, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

228. Repeated firearms trafficking activity over lengthy periods of time generates greater amounts of evidence. Many items of evidentiary value, particularly computer and documentary evidence, are not illegal to possess and, therefore, not overtly incriminating in the criminal's view. It is also a common practice for firearms traffickers to maintain personal property used or obtained in their criminal activities and which constitute evidence of their crimes for extended periods of time.

229. I know, based on my training and experience, that the number of firearms traffickers using computers and electronic information storage devices, like the general population as a whole, is steadily increasing, and such computer hardware, software, documentation, passwords, and electronic information storage devices may be instrumentalities, fruits, or evidence of crimes. Moreover, such computers and electronic information storage devices offer firearms traffickers and distributors excellent and convenient devices for recording information concerning firearms product, including sources, co-conspirators and customers, records of purchases and sales, and any other information deemed pertinent by the firearms traffickers and distributor. Much of the electronic media storage devices, such as floppy disks, zip disks, thumb drives, CD-ROMs, SD memory cards, are very small, detachable, portable, and can be secreted in small containers, such as safes and clothing pockets. I also know, based on my training and experience, that firearms and traffickers often communicate with their criminal associates and with potential buyers through the use of electronic mail, instant messaging, text messaging, telephone answering machines, voicemail, pagers, and telephones (cellular and land line). To the firearms trafficker, these communication devices are part of his normal business equipment.

### Search and/or Seizure of Digital Devices

230. Based upon the facts and circumstances described above, there is probable cause to believe that evidence of the criminal violations previously described are maintained on computers, mobile cellular telephones, digital devices, and electronic storage media as described in **Attachment B1 through B23** at the location described with particularity in **Attachment A.**

231. This Affidavit seeks permission to search for and seize evidence of the crimes described above stored on computers and electronic/digital devices (collectively, "digital devices"), as well as any digital devices that constitute fruits and instrumentalities of the crimes. The government has not attempted to acquire the sought after material located on the digital devices through any other investigative or judicial process.

232. In preparing this Affidavit, I have consulted with experienced law enforcement agents who have received extensive training in the forensic examination of computers and digital devices. These agents related some of the technical information detailed below.

233. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and computers and digital devices, I know that data in digital form can be stored on a variety of systems, and storage devices, or media including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

234. Based upon my training and experience, and the investigation to date, I believe that computers, digital devices, and digital records and evidence will be found at the following addresses:

A. The residence of Ryan MCGOWAN located at ▬▬▬▬▬▬, Elk Grove, CA 95757;  including all outbuildings at ▬▬▬▬▬;

B. The residence of Thomas LU located at ▬▬▬▬▬y, Elk Grove, CA 95757;

C. The residence of Darryl DEGUZMAN located at ▬▬▬▬▬, Elk Grove, CA 95624;

D. The business address of SNELLINGS' FIREARMS located at **2675 Land Avenue, Sacramento, CA;**

E. The residence of Robert SNELLINGS located at ███████████, **Rancho Murieta, CA 95683;**

F. The residence of Christopher LENERT located at ███████████, **Sacramento, CA 95835; and**

G. The current residence of Christopher KJELLBERG located at ███████████ ████ **Rocklin, CA 95765;**

235.     Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information.  I know that it is common today for individuals and businesses to utilize computers to conduct their legal and/or illegal business and to store information related thereto.  I know based on my training and experience, including prior investigations specifically related to the trafficking of firearms, that subjects who are engaged in this illegal activity commonly store information related to their activities on computers and digital devices.

## Removal of Data Storage Devices For Review in a Laboratory Setting May be Required

239.     Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that a forensic image is an exact physical copy of a data storage device.  A forensic image captures all data on the subject media without viewing or changing the data in any way.  Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant.  I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data.  I also know that it is frequently necessary to remove digital devices or media for later laboratory evaluation off-site under controlled circumstances.  This is true for a number of reasons, including the following:

a.     Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the

necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

b.      Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

c.      The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the premises. Storage devices capable of storing 500 gigabytes of data are now commonplace in desktop computers. It can take several hours, or even days, to image a single hard drive. The larger the drive, the longer it takes. Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can become impractical.

d.      Since digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Moreover, a computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

e.      Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time

periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time period, can help determine who was sitting at the keyboard.

f.       Searching digital devices can require the use of precise, scientific procedures designed to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, data can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

240.   This warrant seeks authority to seize contextual data (or metadata), that is, evidence of how a digital device has been used, what it has been used for and who has used it. It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

a.       In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the

interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

b.      Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations (or on other devices).

c.      Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

## Search Procedure

241.   In searching for data capable of being read, stored, or interpreted by a computer, mobile cellular telephone, digital device, or storage media, law enforcement personnel executing the search warrant will employ the following procedure:

a.   **On-site search, if practicable.** Law enforcement officers trained in computer forensics (hereafter, "computer personnel"), if present, may be able to determine if digital devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data on the devices and conduct such a search if deemed practicable. Any device searched on-site will be seized if it contains any data falling within the list of items to be seized as set forth in the warrant and in **Attachment B1 through B23.**

b.   **On-site imaging, if practicable.** If a digital device cannot be searched on-site as described above, the computer personnel, if present, will determine whether the device can be imaged on-site in a reasonable amount of time without jeopardizing the ability to preserve the data and conduct such imaging if deemed practicable.

c.   **Seizure of digital devices for off-site imaging and search.** If no computer personnel are present at the execution of the search warrant, or if they determine that a digital device cannot be searched or imaged on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the digital device will be seized and transported to an appropriate law enforcement laboratory for review.

d.   Law enforcement personnel (potentially including, but not necessarily limited to, computer personnel) will examine the digital device to determine if it contains any data that falls within the list of items to be seized as set forth in the warrant and in **Attachment B1 through B23.**

e.   Law enforcement personnel will use procedures designed to identify items to be seized under the warrant. These procedures may include, without limitation, the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

f.   If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized

items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence. If the government needs additional time to determine whether an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.

g.      If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original digital device to its owner within a reasonable period of time if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

h.      SNELLINGS' FIREARMS is a functioning company that appears to conduct some legitimate business. The seizure of the company's computers may limit the company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

### Data to Be Seized

242.   Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, mobile cellular telephone, digital device, or storage media, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

a.      Any computer equipment, mobile cellular telephone, digital device, or storage media that are capable of being used to commit or further the crimes outlined

above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in **Attachment B1 through B23;**

b.    Any computer equipment, mobile cellular telephone, digital device, or storage media  used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in **Attachment B1 through B23;**

c.    Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in **Attachment B1 through B23;**

d.    Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, mobile cellular telephone, digital device, or storage media or software;

e.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, mobile cellular telephone, digital device, or storage media, or data to be searched;

f.    Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, mobile cellular telephone, digital device, storage media, or data;

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, mobile cellular telephone, digital device, storage media, or data to be searched;

h.    All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies;

bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device);

i.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device;

j.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment; and

k.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that are evidence of the manufacture and distribution of fraudulent identification documents.

## Retention of Image

243.    The government will retain a forensic image of each digital storage device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to any potential questions regarding the corruption of data; establishing the chain of custody of data; refuting any potential claims of fabrication, tampering, or destruction with/of data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

## Inventory and Return

244.    With respect to the seizure of electronic storage media or the seizure or imaging of electronically stored information, the search warrant return to the Court will describe the physical storage media that were seized or imaged.

## Conclusion

252.     Based on the foregoing, I respectfully submit that probable cause exists to search the persons, vehicles, lockers, and residences described more particularly in Attachment A , for the items described in Attachments B-1 through B-23, which is, evidence, fruits, and instrumentalities of violations of Title, 18, U.S.C. Section 371, Title 18, U.S.C Section, 922(a)(1)(A), Title 18 U.S.C. Section 922(a)(6), and Title 18, U.S.C. Section 924(a)(1)(A).

253.     Therefore, this Affidavit requests authority to search the locations set forth in **Attachment A** and seize the items described in **Attachment B-1 through B-23.**

## REQUEST FOR SEALING ORDER

254.     This criminal investigation is continuing.  We contemplate a number of additional interviews, subpoenas, and possibly grand jury testimony of witnesses in the near future.  Disclosure of the contents of this affidavit at this time could seriously impede the continuing investigation and prosecution by prematurely disclosing the details of the government's investigation.  This could potentially cause subjects of the investigation to flee, destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case.   If the affidavit was made public, potential subpoena recipients may attempt to destroy evidence.  Also, potential interviewees would be able to identify specific subjects of the investigation and could fabricate responses in order to avoid possible criminal liability.

I swear under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information and belief.

Approved as to form:

Sara M. Lewis, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

William S. Wong
Assistant U.S. Attorney

Sworn to and subscribed before
me this 2nd day of November 2011.

Hon. Edmund F. Brennan
United States Magistrate Judge