1   CREGGER & CHALFANT LLP
    ROBERT L. CHALFANT, SBN 203051
2   rlc@creggerlaw.com
    WENDY MOTOOKA, SBN 233589
3   wm@creggerlaw.com
    701 University Avenue, Suite 110
4   Sacramento, CA 95825
    Phone: 916.443-4443
5   Fax: 916.443-2124

6   Attorneys for Defendants COUNTY OF
    SACRAMENTO, SCOTT JONES, JESSE
7   BRUCKER

8             UNITED STATES DISTRICT COURT

9             EASTERN DISTRICT OF CALIFORNIA

10  JAMES EDWARD CUPP, an individual;        Case No.: 2:16-cv-00523 TLN KJN
    LAWRENCE "WOLF" HAVEN, an
11  individual,

12                   Plaintiffs,              DECLARATION OF WENDY MOTOOKA
                                              IN SUPPORT OF DEFENDANTS COUNTY
13        vs.                                 OF SACRAMENTO, SCOTT JONES AND
                                              JESSE BRUCKER'S MOTION TO DISMISS
14  KAMALA D. HARRIS, Attorney General        SECOND AMENDED COMPLAINT AND
    of the State of California, in her official  MOTION TO SEVER
15  capacity only; CITY OF CITRUS
    HEIGHTS; Citrus Heights Police
16  Department Chief CHRISTOPHER W.
    BOYD, in both his individual and official  Date: November 3, 2016
17  capacity; Citrus Heights Police Officer   Time: 2:00 P.M.
    CHIRSTIAN BAERRESEN, #371; Citrus        Courtroom: 2, 15th Floor
18  Heights Police Officer THOMAS            Judge: Hon. Troy L. Nunley
    LAMB,#315; UNKNOWN CITRUS
19  HEIGHTS POLICE OFFICER Badge
    Number 323; UNKNOWN CITRUS
20  HEIGHTS POLICE OFFICER who
    prepared Report Number CH14-02589 on
21  03/26/2014; TWO UNKNOWN NAMED
    PEACE OFFICERS OF THE CITRUS
22  HEIGHTS POLICE DEPARTMENT;
    COUNTY OF SACRAMENTO; SCOTT
23  JONES in his official capacity as Sheriff
    of County of Sacramento; Sacramento
24  Deputy Sheriff JESSE BRUCKER, #512;
    COUNTY OF PLACER; EDWARD N.
25  BONNER, #181, in his official capacity as
    Sheriff of Placer County; Placer County
26  Deputy MASON, #101

27                   Defendants.

28

CREGGER & CHALFANT LLP
701 University Ave., #110
Sacramento, CA  95825
(916) 443-4443

DECLARATION OF WENDY MOTOOKA  iso MTD
SAC                                              1
Case No.  2:16-cv-00523 TLN KJN

1   I, WENDY MOTOOKA, declare:

2       1.    I am an attorney duly admitted to practice before this Court and a member of the

3   firm of Cregger and Chalfant LLP, attorneys for defendants County of Sacramento, Scott Jones

4   and Jesse Brucker in this action.

5       2.    Attached hereto as **Exhibit A** is a true and correct copy of the Second Amended

6   Complaint filed in this action.

7       I declare under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.

9       Executed September 29, 2016 at Sacramento, California.

10

11               /s/ Wendy Motooka

12               WENDY MOTOOKA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREGGER & CHALFANT LLP
701 University Ave., #110
Sacramento, CA 95825
(916) 443-4443

DECLARATION OF WENDY MOTOOKA  iso MTD
SAC
Case No. 2:16-cv-00523 TLN KJN

2

# EXHIBIT A

1   Gary W. Gorski (SBN 166526)
    LAW OFFICES OF GARY W. GORSKI
2   3017 Douglas Blvd. Suite 150
    Roseville, CA  95661
3   916-758-1100
    CivilRightsAttorney@outlook.com
4   www.lonewolflaw.com

5   Daniel M. Karalash (SBN 176422)
    Strategic Law Command
6   3017 Douglas Blvd. Suite 150
    Roseville, CA  95661
7   (916) 787-1234
    dan@stratlaw.org
8   www.stratlaw.com

9   Attorneys for Plaintiffs
    JAMES EDWARD CUPP and
10  LAWRENCE "WOLF" HAVEN

11

12

13          THE UNITED STATES DISTRICT COURT

14      IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

15

16  JAMES EDWARD CUPP, an individual;       )   Case No. 16-CV-00523-TLN-KJN
    LAWRENCE "WOLF" HAVEN, an individual )
17                                          )
              Plaintiff,                    )
18                                          )   SECOND AMENDED COMPLAINT FOR
        vs.                                 )   MONETARY DAMAGES,
19                                          )   DECLARATORY AND INJUNCTIVE
    KAMALA D. HARRIS Attorney General of the )  RELIEF
20  State of California, in her official capacity only; )
    CITY OF CITRUS HEIGHTS; Citrus Heights )   (42 U.S.C. § 1983)
21  Police Department Chief CHRISTOPHER W. )
    BOYD, in both his individual and official )
22  capacity; Citrus Heights Police Officer   )   DEMAND FOR JURY TRIAL
    CHRISTIAN BAERRESEN, # 371; Citrus      )
23  Heights Police Officer THOMAS LAMB, #    )
    315; UNKNOWN CITRUS HEIGHTS POLICE )
24  OFFICER Badge Number 323;               )
    UNKNOWN CITRUS HEIGHTS POLICE           )
25  OFFICER who prepared Report Number      )
    CH14-02589 on 03/26/2014; TWO
26  UNKNOWN NAMED PEACE OFFICERS OF
    THE CITRUS HEIGHTS POLICE
27  DEPARTMENT; COUNTY OF
    SACRAMENTO; SCOTT JONES, in his
28  official capacity as Sheriff of County of
    Sacramento; Sacramento Deputy Sheriff JESSE

                          - 1 -

BRUCKER, # 512; COUNTY OF PLACER;
EDWARD N. BONNER, in his official capacity
as Sheriff of County of Placer; Placer County
Deputy MASON, # 181; Placer County Deputy
HINTZE, # 101.

   Defendants.

# COMPLAINT

## JURISDICTION AND VENUE

1.   Jurisdiction of this action is founded on 28 U.S.C. § 1331 in that the action arises under the Constitution and laws of the United States of America, and under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 in that this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress.

2.   The Second Amendment is the only right which requires <u>access</u> and <u>ownership</u> of a tangible item (i.e. gun, knife, taser, etc.).  To exercise this right, it essentially includes the right to have access to "arms" by way of sale or self manufacture.

3.   This Court has supplemental jurisdiction over Plaintiffs' state law claims asserted herein under 28 U.S.C. § 1367 because such claims arise out of the same case or controversy as the federal claims.

4.   Plaintiffs' seeks declaratory and injunctive relief authorized by 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

5.   Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(1), whereas all Defendants reside in the State of California and Defendant HARRIS resides in this judicial district.

## THE PARTIES

6.   Plaintiff JAMES EDWARD CUPP is a competent adult, natural person, and citizen of the United States of America, and at all relevant times a legal resident of Emery, South Dakota, and a citizen of the state of South Dakota.

7.   CUPP previously had a CCW from the State of Oregon for approximately 8 years (1996),

- 2 -

**Second Amended Complaint**

8.     CUPP has no criminal record.

9.     His home is a Fifth Wheel, made by KZ, Escalade.  Therefore, CUPP continuously travels through California which the possession of certain arms and weapons are not protected, though allowed in every other western state.

10.    CUPP is a heavy equipment operator, W-2 employee of Local 370, Operating Engineer, working in the petroleum industry between North Dakota and Texas.

11.    As a resident of the state of South Dakota, and fully exercising the rights and privileges thereof as a free person of that state, the only limitation CUPP has on firearm ownership is that which is prohibited by federal law.

12.    CUPP presently intends to travel, and has traveled into the state of California with firearms, including firearms with magazines containing more than ten rounds of ammunition, including a semi-automatic handgun with a detachable 11-15 round magazine and a semi-automatic rifle with a detachable 11-30 round magazine, loaded and readily accessible in both in his temporary residence while working in California and loaded in his work vehicle (either concealed or open) while traveling through dangerous areas of California, such as Richmond, Oakland, and Los Angeles.

13.    CUPP is aware of the incident of Reginald Denny being dragged from his vehicle during the 1992 Rodney King riots and beaten and kicked by a mob of protesters for simply driving through Los Angeles during a civil protest in the course and scope of his employment as a trucker http://en.wikipedia.org/wiki/Attack_on_Reginald_Denny

14.    CUPP desires to travel with firearms and knives, which as a citizen of the state of South Dakota is legal, into the state of California to protect himself, his family, his property, and his friends, his vehicle, his recreational vehicle (RV), while working, camping, hunting, and while performing various other activities such as carrying large sums of money associated with his work.

15.    Moreover, CUPP specifically has concern for the safety of himself and his cargo because of

- 3 -

truckers being hijacked and their cargo being stolen by gangs and drug cartels California.

16.  In addition, CUPP rides a Harley Davidson motorcycle and is constantly harassed by law enforcement for carrying knives in a manner which is legal under California law, open and exposed carry in a sheath.

17.  CUPP also intends on carrying .380 and/or 9 mm and/or .40 caliber semi-automatic handgun with a 11-15 round capacity in the saddle bag of his motorcycle.

18.  Thus, because CUPP is continuously harassed for carrying knives exposed, it is Plaintiffs' position that he wants to carry them concealed on his person so that he is not profiled by law enforcement.

19.  CUPP presently intends to exercise his constitutionally guaranteed right to self-defense while traveling into and through California, and taking up temporary residence for purposes of work.

20.  CUPP has unconstitutionally been prevented from doing so because of the code sections challenged and complained of herein, and because of Defendants' unconstitutional application and enforcement of those same sections.

21.  CUPP fears arrest, criminal prosecution, a fine, and imprisonment if he were to possess a concealed weapon on his person, in his vehicle, or in his RV without a permit or prior permission authorizing him to do so.  CUPP fears arrest, criminal prosecution, a fine, and imprisonment if he were to possess of open carried and/or concealed weapon on his person, in his vehicle, or in his RV with a magazine which holds more than 10 rounds without a permit or prior permission authorizing him to do so.

22.  Plaintiff CUPP's mother lives in Citrus Heights, CUPP drives to his mother house on his way to Texas, either in his fifth wheel, or his Harley Davidson motorcycle.

23.  At all relevant times, CUPP had temporary abode was parked at a friend's house, which was docked, plugged, and his truck was parked in another location.

24.  At all relevant times, CUPP was traveling through California with his travel trailer, and only staying temporarily for a few weeks visiting a friend.

25.  Plaintiff LAWRENCE "WOLF" HAVEN is a competent adult, natural person, and citizen of

- 4 -

**Second Amended Complaint**

the United States of America, and at all relevant times a legal resident of County of Sacramento, California.  He is a Veteran and Native-American, and as such belongs to a class which consists of a long tradition of keeping and bearing arms.

26.   Plaintiff is a Native American, Veteran (1979-1983 U.S.N. Honorable Discharge) and an avid hunter and owner of firearms.  Veterans and Native Americans have a long tradition of carrying and using California banned and prohibited weapons, especially firearms.

27.   While serving in the U.S. Navy, the United States entrusted HAVEN to work on heavy explosives and ordinances.

28.   The standard military side arm of the time was a .45 Caliber Semi-Automatic pistol, the type which California now seeks to ban.

29.   Defendant KAMALA D. HARRIS is the Attorney General of the State of California whereby the California Constitution Article V, section 13 grants the Attorney General a supervisory role over "every district attorney and sheriff and over such other law enforcement officers as may be designated by law."

30.   Article V, section 13 is fleshed out in several California statutes which grants full authority and power to the Attorney General with direct supervisory power over sheriffs and police chiefs, including the power to require written applications and fees regarding firearms.

31.   On January 3, 2011, KAMALA D. HARRIS was sworn in as the 32nd Attorney General of the State of California.

32.   On November 4, 2014 she was re-elected to a second term in office.  As stated on the government's official website, she is the first woman, the first African American, and the first South Asian to hold the office in the history of California.  See her website: https://oag.ca.gov/about

33.   Defendant HARRIS is the State of California Attorney General, and is the chief law enforcement officer of the State whereby all other named Defendants report to her.

34.   Defendant HARRIS is the State of California Attorney General, and as such is responsible for promulgation of administrative rules regarding firearms and weapons used for personal self defense.

-5-

**Second Amended Complaint**

35. Defendant HARRIS is the State of California Attorney General, and as such is responsible for executing and administering the laws, customs, practices, and policies of the State of California, under whose direction all defendants complained of in this action have acted on behalf of.

36. Defendant HARRIS is an agent, servant, and/or employee of the State of California, acting under color of state law as that phrase is used in 42 U.S.C. § 1983, and is responsible for enforcing the code sections complained of in this action.

37. Defendant HARRIS is therefore sued in her official capacity for which only injunctive relief is sought.

38. Defendants CITY OF CITRUS HEIGHTS, COUNTY OF SACRAMENTO, and COUNTY OF PLACER (hereinafter simply "MUNICIPAL DEFENDANTS") are a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983.

39. MUNICIPAL DEFENDANTS are created under the Constitution and Laws of the State of California.

40. Citrus Heights Police Department Chief CHRISTOPHER W. BOYD is a sworn peace officer acting under color of law in both his individual and official capacities.

41. Defendants CHRISTOPHER W. BOYD is the CITY OF CITRUS HEIGHTS Chief of Police, and as such is responsible for executing and administering the laws, customs, practices, and policies of Defendant CITY OF CITRUS HEIGHTS complained of in this action.

42. Defendant CHRISTOPHER W. BOYD is an agent, servant, and/or employee of Defendant CITY OF CITRUS HEIGHTS, acting under color of state law as that phrase is used in 42 U.S.C. § 1983, and is responsible for enforcing the code sections complained of in this action.

43. Defendant CHRISTOPHER W. BOYD is therefore sued in both his individual and official capacities.

44. Citrus Heights Police Officer CHRISTIAN BAERRESEN, # 371 is an agent, servant, and/or employee of Defendant CHRISTOPHER W. BOYD and Defendant CITY OF CITRUS

- 6 -

**Second Amended Complaint**

HEIGHTS, acting under color of state law as that phrase is used in 42 U.S.C. § 1983, and is responsible for enforcing the code sections complained of in this action.

45. Citrus Heights Police Officer THOMAS LAMB, # 315 is an agent, servant, and/or employee of Defendant CITY OF CITRUS HEIGHTS, acting under color of state law as that phrase is used in 42 U.S.C. § 1983, and is responsible for enforcing the code sections complained of in this action.

46. UNKNOWN CITRUS HEIGHTS POLICE OFFICER with Badge Number 323 is an agent, servant, and/or employee of Defendant CHRISTOPHER W. BOYD and Defendant CITY OF CITRUS HEIGHTS, acting under color of state law as that phrase is used in 42 U.S.C. § 1983, and is responsible for enforcing the code sections complained of in this action.

47. UNKNOWN CITRUS HEIGHTS POLICE OFFICER who prepared Report Number CH14-02589 on or about 03/26/2014 is an agent, servant, and/or employee of Defendant CHRISTOPHER W. BOYD and Defendant CITY OF CITRUS HEIGHTS, acting under color of state law as that phrase is used in 42 U.S.C. § 1983, and is responsible for enforcing the code sections complained of in this action.

48. Defendants UNKNOWN NAMED PEACE OFFICERS OF THE CITRUS HEIGHTS POLICE DEPARTMENT have not been located, but they will be added to this complaint upon uncovering their names through discovery.

49. SCOTT JONES, is named in his official capacity as Sheriff of County of Sacramento, is responsible for executing and administering the laws, customs, practices, and policies of HARRIS complained of in this action.

50. Sacramento Deputy Sheriff JESSE BRUCKER, # 512 at all times was acting under color of law.

51. EDWARD N. BONNER is named in his official capacity as Sheriff of County of Placer.

52. At all times, Placer County Deputy MASON, # 181 and Placer County Deputy HINTZE, # 101 were acting under color of law.

53. At all times, plaintiffs legally possessed and owned handguns and long-rifles, which were never illegal, even under California law, to possess and own.

-7-

54.     At the direction of state law and HARRIS, plaintiffs had their firearms confiscated by HARRIS and law enforcement officers, though no crime had been committed.  To this date, the arms have not been returned.

## FIRST CLAIM FOR RELIEF:
## CONSTITUTIONAL CHALLENGE TO STATE LAW
### Violation of the Second Amendment Right to Keep and Bear Arms
(Plaintiffs HAVEN, CUPP and Defendant HARRIS only)
(Safe-Gun List and Magazine Ban)
(Declaratory and Injunctive Relief Only)

55.     Plaintiffs incorporate the above allegations as if set forth fully here.

56.     The Second Amendment guarantees law-abiding citizens the right to keep and bear arms for self-defense purposes.

57.     Plaintiffs are a extremely familiar with firearms and the safe operation thereof, and in particular semi-automatic handguns with magazine capacities greater than 10 rounds and semi-automatic rifles capable of holding magazines containing more than 10 rounds of ammunition

58.     Plaintiffs intend to travel in and out the State of California with ammunition magazines which hold more than ten rounds, and they intend to purchase, possess, and use handguns which are not on California's approved list.

59.     However, because of the threat of enforcement, and actual enforcement, plaintiffs seek a permanent injunction enjoining HARRIS and the State of California from enforcing the magazine ban and safe gun list ban.

60.     Dealers may not sell any new handgun unless it is listed in the state Department of Justice roster of handguns certified for sale.

61.     The prohibition of purchasing the safest, most technologically advanced handguns, which have manual thumb safeties, such as the Ruger SR Series handguns, the Springfield Armory 9661HCXD Series of handguns, the Sig Sauer P230, the Taurus 24/7 Series and 92 Series, and the Beretta APX; and instead is relegated to purchasing 20+ year old Sig Sauer's, Glock and 100 year old revolvers, none of which have manual thumb safeties.

62.     The lack of these safety features have resulted in an inordinate amount of accidental

- 8 -

**Second Amended Complaint**

1. discharges by law enforcement, including the state's own experts who shot themselves.

63. Plaintiffs have the same rights active and retired officers have to purchase (and use for personal self-defense) the best and safest tool for the job.

64. California active and retired officers legally purchased 7,600 banned assault weapons through a legal exemption promulgated by the Attorney General (http://www.scpr.org/news/2011/12/21/30459/californian-cops-buy-over-7000-assault-weapons-ill/), and now the municipalities are jumping on the bandwagon of carving rights and privileges for only the chosen few (i.e. retired law enforcement). http://www.washingtontimes.com/news/2015/dec/3/retired-lapd-cops-exempted-ban-high-capacity-magaz/

65. Given this mash of government laws and regulation, this action seeks to put an end to government selecting who gets to exercise their rights under the Second Amendment. This is the equivalent of the government mandating which books the People can read to exercise their First Amendment Rights.

66. When it comes to self-defense, providing retired peace officers with superior rights to that of ordinary law-abiding citizens does not further either an important or compelling state interest, and more importantly, since law enforcement can only use reasonable force in self-defense, then the hand-guns they use are presumptively the type of firearm protected by the Second Amendment.

67. Plaintiffs are seeking to enjoin the State of California and defendants from enforcing current firearm statutes which infringe upon their constitutional rights as follows (which is clearly stated in the SAC):

    a.    To purchase off-roster handguns, which are legal under federal law.

    b.    To possess and purchase standard size handgun and rifle magazines which most exceed 10 rounds,

    c.    To travel interstate with magazines which contain more than 10 rounds of ammunition.

    d.    To either be issued a lifetime CCW upon application at the same cost that retired

-9-

**Second Amended Complaint**

officers pay or be permitted to carry a weapon openly.

68. The Second Amendment to the United States Constitution provides:

> A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.

69. The Second Amendment guarantees the right of law-abiding citizens to publicly carry operational handguns and rifles for self-defense.

70. The Second Amendment is incorporated to the states through the Fourteenth Amendment.

71. The United States Supreme Court has held that the right to keep and bear arms is a fundamental right.

72. Regulations infringing upon that right must meet heightened scrutiny.

73. Defendants implement policy and enforce laws which militarize law enforcement agencies, arming them in such a manner that they are no longer a police force, but rather a standing army.

74. The Constitution presumes that "The People" are reasonable, and that Government is a "necessary evil" to be curtailed and limited.

75. By definition, criminals do not abide by the laws.

76. Therefore, gun control legislation has only a minimal effect on a violent criminal's ability to obtain and use a firearm.

77. Unlike California, the majority of the population of the United States are armed, and permitted to purchase, transport and carry commonly used handguns and rifles.

78. Semi-Automatic firearms and large capacity ammunition magazines are banned in only five states: California (Oakland, LA, Richmond, Vallejo, Stockton) Maryland (Baltimore) Massachusetts, New Jersey (Camden, Newark, Jersey City), New York (New York) and D.C. (Hawaii's ban applies only to such magazines used with handguns).

79. As a result, these states also have the highest murder rates and crime ridden cities in the U.S.

80. Residents of Washington, D.C., with the lowest private gun ownership rate in the country, are more than five (5) times more likely to be the victim of a violent crime as compared to residents of Wyoming, with the highest private gun ownership rate in the country.

- **10** -

**Second Amended Complaint**

81. In Vermont, one of the safest states in the country, "citizens can carry a firearm without getting permission ... without paying a fee ... or without going through any kind of government-imposed waiting period."

82. Importantly, only about two percent (2%) of civilian shootings involved an innocent person mistakenly identified as a criminal.

83. The error rate for law enforcement officers is a staggering eleven percent (11%), more than five (5) times as high as the error rate for average citizens.

84. Federal Bureau of Investigation (FBI) reports show that in the fifteen (15) years following the passage of Florida's "shall issue" concealed carry law in 1987, 800,000 CCW permits have been issued and the homicide rate in Florida, which in 1987 was much higher than the national average, fell 52% bringing it below the national average.

85. California's current firearm laws denies law-abiding citizens their constitutional right to protect themselves and their families and places them at a significant disadvantage when confronted by an armed attacker.

86. Accordingly, Plaintiffs seeks declaratory and injunctive relief to enjoin Defendants' unconstitutional enforcement of defendants laws and policies.

87. California Penal Code section 25400 does not prohibit a citizen of the United States over 18 years of age who is in lawful possession of a handgun, and who resides or is temporarily in California, from transporting the handgun by motor vehicle provided it is unloaded and stored in a locked container . (Pen . Code, § 25610)  As stated by Defendant HARRIS online.

88. It is illegal for any person to carry a handgun concealed upon his or her person or concealed in a vehicle without a license issued pursuant to Penal Code section 26150 . (Pen . Code, § 25400)  A firearm locked in a motor vehicle's trunk or in a locked container carried in the vehicle other than in the utility or glove compartment is not considered concealed within the meaning of the Penal Code section 25400; neither is a firearm carried within a locked container directly to or from a motor vehicle for any lawful purpose . (Pen . Code, § 25610)  As stated by Defendant HARRIS online.

89. It is illegal to carry a loaded firearm on one's person or in a vehicle while in any public place,

- 11 -

on any public street, or in any place where it is unlawful to discharge a firearm . (Pen . Code, § 25850, subd . (a))  As stated by Defendant HARRIS online.

90. Nonconcealable firearms (rifles and shotguns) are not generally covered within the provisions of California Penal Code section 25400 and therefore are not required to be transported in a locked container . However, as with any firearm, nonconcealable firearms must be unloaded while they are being transported . A rifle or shotgun that is defined as an assault weapon pursuant to Penal Code section 30510 or 30515 must be transported in accordance with Penal Code section 25610.  As stated by Defendant HARRIS online.

91. Peace officers and <u>honorably</u> retired peace officers having properly endorsed identification certificates <u>may carry a concealed weapon at any time</u>. Otherwise, these exemptions apply only when the firearm is carried within the scope of the exempted conduct, such as hunting or target shooting, or within the course and scope of assigned duties, such as an armored vehicle guard transporting money for his employer. A person who carries a loaded firearm outside the limits of the applicable exemption is in violation of the law, notwithstanding his or her possession of an occupational license or firearms training certificate. (Pen . Code, § 12031(b).)  As stated by Defendant HARRIS online.

92. AB 892 (Stats. 2015, ch. 203) – Purchase of State-Issued Handgun by Spouse/Domestic Partner of Peace Officer Killed in the Line of Duty: Provides an exception to the Unsafe Handgun Act allowing the spouse/domestic partner of a peace officer killed in the line of duty to purchase their spouse/domestic partner's service weapon and hi-capacity magazines. (Pen . Code, § 32000.)

93. This extends to ammunition, current authority for a city or county to impose a charge relating to the seizure, impounding, storage, or release of a firearm. (Pen . Code, § 33880).

94. Handgun magazines of 16-20 rounds, and standard rifle magazines of 16-30 rounds are "typically used for lawful purposes" and are deemed presumptively reasonable as active duty and retired law enforcement are granted the rights and privileges to use them when applying reasonable force.

95. Widespread law enforcement use of a particular firearm, weapon or magazine, or edged

- 12 -

**Second Amended Complaint**

1    weapon proves that particular arms are common and typically used for lawful purposes,

2    rather than "dangerous and unusual."

3    96.    Standard magazine bans are unusual. See *Kennedy v. Louisiana*, 554 U.S. at 426 ("national

4    consensus" against a law which existed in only six states, and not federally); *Kerr v.*

5    *Hickenlooper*, 744 F.3d 1156, 1178 (10th Cir. 2014)(courts evaluating gun control laws

6    "consider the rarity of state enactments in determining whether they are constitutionally

7    permissible.").

8    97.    Standard magazine bans are dangerous because they reduce typical defensive fire power.

9    They shift risk of injury from violent aggressors to law-abiding innocents.

10   98.    Typically, in an officer shooting of an <u>unarmed</u> civilian, they discharge more than 10 rounds

11   to stop a person.

12   99.    Commencing in the 1999 (the time after when most police switched to semi-automatic pistols

13   from revolvers), there began a spike in the total number of rounds expended by police

14   shooting innocent people.

15   100.   In 1999, Amadou Diallo, was shot 41 times by four plain-clothed police officers outside of

16   his apartment in New York City. He committed no crime and was unarmed. The shooting

17   death of an <u>unarmed</u> 23-year-old Guinean immigrant in New York City is anything but

18   anomalous in today's America.

19   101.   A month later, Los Angeles Police killed a 19-year-old man after unloading over 90 shots on

20   him following a high-speed chase down an area freeway. The same month, New York police

21   fired at a suspected murderer 84 times.

22   102.   Deandre Brunston's, a 24-year-old shot 22 times by Los Angeles County Sheriff's deputies on

23   August 24, 2003, whereby the deputies had discharged 81 shots and killed the police K-9 at

24   the same time. https://en.wikipedia.org/wiki/Shooting_of_Deandre_Brunston

25   103.   Officer Wilson shot Michael Brown in the back 12 times.

26   https://en.wikipedia.org/wiki/Shooting_of_Michael_Brown

27   104.   In the case of former LA Police Officer Christopher Dorner shootings and manhunt, in two

28   separate incidents in the early morning hours of February 7, 2013, police fired on people who

- 13 -

**Second Amended Complaint**

turned out to be unrelated to Dorner and that Dorner (an African-American male) was not present at either incident and no firearms were involved in either incident (i.e. the police victims were unarmed).

https://en.wikipedia.org/wiki/Christopher_Dorner_shootings_and_manhunt#Truck_misidentifications

105.  Emma Hernandez, 71, and her daughter, Margie Carranza, 47, where delivering newspapers for the Los Angeles Times when LAPD officers fired over 102 bullets at the two Hispanic females.  Remarkably, they survived.

106.  Approximately 25 minutes after that incident, officers from the Torrance Police Department struck and opened fire on another vehicle.  Like the first shooting, the white male was unarmed and did not match the description of Dorner.  Over 30 bullets were fired at him.

107.  Therefore, since HARRIS and the State of California have determined that discharging more than 10 rounds for purposes of self defense is a reasonable use of force by law enforcement, then the Second Amendment and 14th Amendment protects the rights of all citizens to posses magazines and firearms holding more than 10 rounds, and no more than 30, since the average magazine for all makes and models of firearms is between 11 to 30 rounds.

108.  Defendant HARRIS has made her career pushing for more government control over the people of the State of California, and depriving them of their fundamental constitutional rights, privileges and immunities, especially those that the Framers of the Fourteenth Amendment sought to protect the most.

109.  At the same time, HARRIS and the State of California have pushed for the militarization of the police state by exempting California Peace Officers (both active and retired) from the very same firearms and magazines prohibited to the rest of the population.

110.  Defendant HARRIS has shown a blatant disregard of the rights of citizens to travel with firearms, which was one of the first and most important rights bestowed upon the newly freed slaves of the South after the civil war with the passage of the Fourteenth Amendment.

111.  As historian Flack noted in *The Adoption of the Fourteenth Amendment* 7 (Johns Hopkins 1908),  written at a time when gun control was not a political issue seized by those in power

- 14 -

**Second Amended Complaint**

for political gain; the central theme throughout all the debates over the Fourteenth

Amendment focused on the newly freed slaves rights to travel, vote, own property and

possess and bear arms to enforce their rights when the government couldn't.  See also

Antieau, *The Intended Significance of the Fourteenth Amendment* (Wm. Hein, Buffalo, N.Y.

1997), citing Royall, *The Fourteenth Amendment: The Slaughter House Cases*, 4 So. L. Rev.

(N.S.) 558, 563 (1879).   [All of the authorities the Supreme Court's central holding in"

*District of Columbia v. Heller*, 554 U. S. 570 (2008), was "that the Second Amendment

protects a personal right to keep and bear arms for lawful purposes, most notably for

self-defense within the home." *McDonald v. Chicago*, 561 U. S. 742, 780 (2010) (plurality

opinion).  And in *McDonald*, the Supreme Court recognized that the Second Amendment

applies fully against the States as well as the Federal Government. *Id.*, at 750; id., at 805

(THOMAS, J., concurring in part and concurring in judgment).]

112. Despite the holdings in *District of Columbia v. Heller*, 554 U. S. 570 (2008) and *McDonald
v. Chicago*, 561 U. S. 742, 780 (2010), the State of California and HARRIS continues to pass
and enforce laws resulting in categorical and constructive bans on firearms and attachments
thereto that millions of Americans, veterans, and retired peace officers commonly own for
lawful purposes, which then results in constructive ban on the right to travel.

113. Other than California, only six other states (which obviously include Connecticut, New York
and New Jersey) have unconstitutional draconian firearms laws which no other state even
remotely mandates, including limitations on the carrying or possession of specific weapons
and their accouterments (e.g. semi-automatic firearm bans, handgun bans and magazine
bans).

114. Defendant HARRIS is the top ranking law enforcement official in the state of California,
promulgating rules and regulations which deprived Plaintiff of right to keep and bear arms as
protected under the Second Amendment, and enforced laws which deprived Plaintiff of his
property rights in his firearms, and denied him equal protection of the law.

115. Plaintiffs seek an order which would enjoin defendants from enforcing laws which would not
otherwise be enforced against them had they been active or retired peace officers, since

- 15 -

**Second Amended Complaint**

officers are afforded the full panoply of protections afforded by the Second Amendment, Fourth Amendment, and Equal Protection Clause as bestowed upon other government officials, such as retired peace officers, spouses of peace officers, retired correctional officers, and other members of the government.

116.   This is a constitutional challenge to the complex statutory scheme set forth in Cal. Penal Code §§ 25450-25475, 26150-26225, 26300-26325, 32000-32030(Pen. Code, §§ 26950, 27650) which results in a **massive transfer of gun rights from plaintiffs to active and honorably retired California peace officers** in several very specific ways:

   a.   Allows officers to purchase and sell off-roster handguns, and keep those weapons after retirement. Non-Roster Handguns (Unsafe Handguns) (Penal Code, § 32000, subd. (b)(4).) Penal Code § 32000 does not prohibit the sale to, or purchase by, peace officers, and in turn, these officers may sell the firearms on the open market.

   b.   Allows officers to possess and purchase standard size handgun and rifle magazines which exceed 10 rounds, called Large Capacity Magazines, and keep them after retirement. (Penal Code § 32405)

   c.   Grants a lifetime CCW, without the costs and associated regulations Plaintiffs are subjected to (this is especially important since it allows interstate travel with a loaded firearm under federal law).  Penal Code §§ 25450, 25475, 12031(b)

   d.   If a peace officer is honorably retired, California law requires that the agency from which he retired issue the officer an identification certificate containing an endorsement to carry a concealed firearm.  Penal Code §§ 25455, 25465, 12031(b)

   e.   Allows officers to purchase semi-automatic rifles not otherwise available to the public for self defense, which they can keep even after their government service is terminated.

117.   Plaintiffs seek injunctive relief to enjoin HARRIS and the State of California from enforcing laws, rules and regulations which:

   a.   Limit plaintiffs' ability to keep, bear, and travel with off-roster handguns, which are legal under federal law.

- 16 -

**Second Amended Complaint**

b.   Limit plaintiffs' ability to possess, transport and purchase standard size handgun and rifle magazines which most exceed 10 rounds, as these are basic parts to modern operational and safe firearms.

c.   Limit plaintiffs' ability to travel interstate with magazines which contain more than 10 rounds of ammunition.

d.   Limit plaintiffs' ability to carry either a concealed weapon or openly carried weapon. Plaintiffs' concede if concealed carry is prohibited, then open carry is not.

118.   Further, plaintiffs request a positive injunction to either be issued a lifetime CCW upon application at the same cost that retired officers pay or be permitted to carry a weapon openly.

119.   Declaratory and Injunctive relief as to the offending statutory provisions relied upon.

120.   Plaintiffs seeks attorney fees pursuant to 42 U.S.C. Section 1988.

**SECOND CLAIM FOR RELIEF:**
**CONSTITUTIONAL CHALLENGE TO STATE LAW**
**Second Amendment Right to Keep and Bear Arms**
(Plaintiffs HAVEN, CUPP and Defendant HARRIS only)
(Unconstitutional Statute - Confiscation of Firearms)
(Injunctive and Declaratory Relief Only For Return of Firearms)

121.   Plaintiffs incorporate the above allegations as if set forth fully here.

122.   Penal Code Sections 18250-18275 allow law enforcement officers to confiscate firearms without any form of due process, even for false allegations of a crime being committed.

123.   Based upon information and belief, plaintiffs' firearms were illegally seized pursuant to this statutory section.  If another section was relied upon, then this challenge is to the offending statute.

124.   On January 1, 2005, the Law Enforcement Gun Release (LEGR) process became effective with the addition of Penal Code (PC) section 12021.3.

125.   This process requires any person who claims title to any firearm that is in the custody or control of a court or law enforcement agency and who wishes to have the firearm returned to submit a LEGR Application form for a determination by the California Department of Justice (the Department) as to whether he or she is eligible to possess a firearm.

- 17 -

**Second Amended Complaint**

126. Per the LEGR Application Submission Process, individuals seeking the return of a firearm(s) that is in the custody or control of a court or law enforcement agency must submit a LEGR Application along with the appropriate fees to the Department.

127. Additionally, if an individual is seeking the return of a long gun purchased prior to January 1, 2014, a Firearms Ownership Report application (BOF 4542A), is required to be be submitted along with the appropriate fees.

128. In violation of the Second Amendment, Defendant HARRIS and MUNICIPAL DEFENDANTS enforce a statutory scheme pursuant to Penal Code Section Penal Code Section 33850 (application for return of firearm), 33855 (authority of law enforcement to enforce), 33860, 33880 (fee), requiring CUPP to: 1) fill out and sign a document under the penalty of perjury called the "CALIFORNIA DEPARTMENT OF JUSTICE BUREAU OF FIREARMS Law Enforcement Gun Release Application", and 2) pay a processing fee of $20.00 for the first firearm (long gun or handgun), and $3.00 for each additional gun.

129. Both plaintiffs have had their firearms seized from their residences, without a warrant, without being charged, tried or convicted of a crime.

130. The firearms illegally seized have not been returned to plaintiffs.

131. By failing to immediately return plaintiffs firearms once it was determined that no crime had been committed, HARRIS has deprived plaintiffs of their ability to exercise their Second Amendment rights by taking the very instruments necessary for exercising such a right, akin to confiscating a paper and pen preventing the free exercise of speech.

132. Plaintiffs seek a positive injunction for HARRIS to release and return all firearms and ammunition illegally confiscated.

133. Declaratory and Injunctive relief as to the offending statutory provisions relied upon.

134. Plaintiffs seeks attorney fees pursuant to 42 U.S.C. Section 1988.

**THIRD CLAIM FOR RELIEF:**
**CONSTITUTIONAL CHALLENGE TO STATE LAW**
**Second Amendment**
(Plaintiff CUPP and Defendants HARRIS; CITY OF CITRUS HEIGHTS; Citrus Heights Police Department Chief CHRISTOPHER W. BOYD, in both his individual and official capacity; Citrus Heights Police Officer CHRISTIAN BAERRESEN, # 371; Citrus Heights Police Officer THOMAS LAMB, # 315; UNKNOWN CITRUS HEIGHTS POLICE OFFICER with Badge Number 323;

- 18 -

---

**Second Amended Complaint**

UNKNOWN CITRUS HEIGHTS POLICE OFFICER who prepared Report Number CH14-02589 only)
(Confiscation of Firearms and Knives)
(Declaratory, Injunctive and Monetary relief)

135.  Plaintiffs incorporate the above allegations as if set forth fully here.

136.  Only injunctive relief is sought against HARRIS.

137.  At all times, the law was well established as to the Second Amendment.

138.  Attached hereto as **Exhibit "A"** is a true and correct copy of the Sacramento Superior Court case docket noting the charge for PC 21310, carrying a concealed knife and a picture of the visible knife on the outside part of CUPP's leather vest.

139.  On or around March 25, 2014, approximately employees of the CITY OF CITRUS HEIGHTS (i.e. Citrus Heights Police Officer CHRISTIAN BAERRESEN, # 371; Citrus Heights Police Officer THOMAS LAMB, # 315; UNKNOWN CITRUS HEIGHTS POLICE OFFICER with Badge Number 323;  UNKNOWN CITRUS HEIGHTS POLICE OFFICER who prepared Report Number CH14-02589 on or about 03/26/2014) falsely arrested, without probable cause, issued him a temporary restraining order, for a concealed weapon, searched his temporary residence without a warrant, which was 8-9 miles away and illegally seized six (6) firearms legally, ammunition, magazines owned by CUPP, and two non-folding hunting knives that he carried openly on his person.

140.  CUPP was handcuffed and booked in the Sacramento County Jail, whereby he had to post bail, utilizing a bail bondsman, costing him damages.

141.  On or about 03/27/2014, a criminal complaint (*People v. Cupp*, Sacramento Case Number 14M02083) was filed against CUPP for violation of penal code section 21310, which provides.  "Except as provided in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who carries concealed upon the person any dirk or dagger is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170."

142.  California Penal Code Section 21310 violates the Second Amendment, Privileges and Immunities Clause of the 14th Amendment.

- 19 -

**Second Amended Complaint**

143. On 05/30/2014, the case against CUPP was dismissed with prejudice on the Sacramento District Attorney's own motion, resulting in an order for return of property to CUPP illegally seized.

144. Plaintiffs' two knives were returned to him, but not his six firearms and other firearm related tools and equipment.

145. At all times, CITY OF CITRUS HEIGHTS; Citrus Heights Police Department Chief CHRISTOPHER W. BOYD, in both his individual and official capacity; Citrus Heights Police Officer CHRISTIAN BAERRESEN, # 371; Citrus Heights Police Officer THOMAS LAMB, # 315; UNKNOWN CITRUS HEIGHTS POLICE OFFICER with Badge Number 323; UNKNOWN CITRUS HEIGHTS POLICE OFFICER who prepared Report Number CH14-02589 had time to obtain a warrant.

146. To this day, under color of law, Defendants have maintained possession over Plaintiffs' personal property, including ammunition, speed loaders, holsters, $1,000.

147. CUPP owns multiple firearms, and possesses them within his home, for both sporting use and self-defense purposes.

148. In violation of the Second Amendment, Fifth Amendment right against self incrimination, Due Process Clause of the Fourteenth Amendment, and Equal Protection Clause of the Fourteenth Amendment, Defendants HARRIS, CITY OF CITRUS HEIGHTS, and Chief CHRISTOPHER W. BOYD enforce a statutory scheme pursuant to Penal Code Section 33855 requiring CUPP to: 1) fill out and sign a document under the penalty of perjury called the "CALIFORNIA DEPARTMENT OF JUSTICE BUREAU OF FIREARMS Law Enforcement Gun Release Application" (See Exhibit "1" attached hereto and incorporated herein.), and 2) pay a fine called a "processing fee" in the amount of $20.00 for the first firearm (long gun or handgun), and $3.00 for each additional gun.

149. The "CALIFORNIA DEPARTMENT OF JUSTICE BUREAU OF FIREARMS Law Enforcement Gun Release Application" was created by Defendant HARRIS in or around January 2012.

150. On or about February 27, 2015, CUPP, through his attorney, filed a Claim for Damages (Tort

- 20 -

1    Claim) with the Defendant CITY OF CITRUS HEIGHTS for the return of the firearms.

2    151.   In addition, this Claim was also an internal affairs complaint.

3    152.   In a letter dated March 23, 2015 rejecting both CUPP's tort claim and demand for return of

4           his property, City Defendants reiterate Defendant HARRIS' policy of enforcing an

5           unconstitutional law and creating a undue burden on CUPP.

6    153.   Citrus Heights Police Department Chief CHRISTOPHER W. BOYD is a sworn peace officer

7           acting under color of law in both his individual and official capacities.

8    154.   Defendants CHRISTOPHER W. BOYD is the CITY OF CITRUS HEIGHTS Chief of

9           Police, and as such is responsible for executing and administering the laws, customs,

10          practices, and policies of Defendant CITY OF CITRUS HEIGHTS complained of in this

11          action.

12   155.   Defendant CHRISTOPHER W. BOYD is an agent, servant, and/or employee of Defendant

13          CITY OF CITRUS HEIGHTS, acting under color of state law as that phrase is used in 42

14          U.S.C. § 1983, and is responsible for enforcing the code sections complained of in this

15          action.

16   156.   Defendant CHRISTOPHER W. BOYD is therefore sued in both his individual and official

17          capacities.

18   157.   Citrus Heights Police Officer CHRISTIAN BAERRESEN, # 371 is an agent, servant, and/or

19          employee of Defendant CHRISTOPHER W. BOYD and Defendant CITY OF CITRUS

20          HEIGHTS, acting under color of state law as that phrase is used in 42 U.S.C. § 1983, and is

21          responsible for enforcing the code sections complained of in this action.

22   158.   Citrus Heights Police Officer THOMAS LAMB, # 315 is an agent, servant, and/or employee

23          of Defendant CITY OF CITRUS HEIGHTS, acting under color of state law as that phrase is

24          used in 42 U.S.C. § 1983, and is responsible for enforcing the code sections complained of in

25          this action.

26   159.   UNKNOWN CITRUS HEIGHTS POLICE OFFICER with Badge Number 323 is an agent,

27          servant, and/or employee of Defendant CHRISTOPHER W. BOYD and Defendant CITY OF

28          CITRUS HEIGHTS, acting under color of state law as that phrase is used in 42 U.S.C. §

- 21 -

**Second Amended Complaint**

1   1983, and is responsible for enforcing the code sections complained of in this action.

2   160.   UNKNOWN CITRUS HEIGHTS POLICE OFFICER who prepared Report Number CH14-

3          02589 on or about 03/26/2014 is an agent, servant, and/or employee of Defendant

4          CHRISTOPHER W. BOYD and Defendant CITY OF CITRUS HEIGHTS, acting under

5          color of state law as that phrase is used in 42 U.S.C. § 1983, and is responsible for enforcing

6          the code sections complained of in this action.

7   161.   Defendants UNKNOWN NAMED PEACE OFFICERS OF THE CITRUS HEIGHTS

8          POLICE DEPARTMENT have not been located, but they will be added to this complaint

9          upon uncovering their names through discovery.

10  162.   Plaintiff seeks monetary relief for being deprived of his right and property.

11  163.   Plaintiff seeks injunctive and declaratory relief for the return of his firearms, and other

12         property.

13  164.   Plaintiff has been damaged according to proof.

14  165.   HARRIS is named only for purposes of injunctive and declaratory relief only.

15  166.   Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

16                        **FOURTH CLAIM FOR RELIEF:**
                  **CONSTITUTIONAL CHALLENGE TO STATE LAW**
17                           **Fourth Amendment**
    (Plaintiff CUPP and Defendants HARRIS; CITY OF CITRUS HEIGHTS; Citrus Heights Police
18  Department Chief CHRISTOPHER W. BOYD, in both his individual and official capacity; Citrus
    Heights Police Officer CHRISTIAN BAERRESEN, # 371; Citrus Heights Police Officer THOMAS
19  LAMB, # 315; UNKNOWN CITRUS HEIGHTS POLICE OFFICER with Badge Number 323;
    UNKNOWN CITRUS HEIGHTS POLICE OFFICER who prepared Report Number CH14-02589
20                                 only)
    (Arrest, Confiscation of Firearms and Knives, without probable cause)
21              (Declaratory, Injunctive and Monetary relief)

22  167.   Plaintiffs incorporate the above allegations as if set forth fully here.

23  168.   The Fourth Amendment guarantees law-abiding citizens to be secure in their persons, houses,

24         papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

25         warrants shall issue, but upon probable cause, supported by oath or affirmation, and

26         particularly describing the place to be searched, and the persons or things to be seized.

27  169.   CUPP was arrested and his property confiscated without probable cause for carrying a

28         concealed weapon, protected by the Second Amendment, and which was not concealed, but

- 22 -

**Second Amended Complaint**

1    instead, carried in a sheath as all fixed blade knives are carried that way.

2    170.   Plaintiff seeks monetary relief for being deprived of his right and property.

3    171.   Plaintiff seeks injunctive and declaratory relief for the return of his firearms, and other

4           property.

5    172.   Plaintiff has been damaged according to proof.

6    173.   HARRIS is named only for purposes of injunctive and declaratory relief only.

7    174.   Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

**FIFTH CLAIM FOR RELIEF:**
**CONSTITUTIONAL CHALLENGE TO STATE LAW**
**Fifth Amendment**
(Plaintiff CUPP and Defendants HARRIS; CITY OF CITRUS HEIGHTS; Citrus Heights Police
Department Chief CHRISTOPHER W. BOYD, in both his individual and official capacity; Citrus
Heights Police Officer CHRISTIAN BAERRESEN, # 371; Citrus Heights Police Officer THOMAS
LAMB, # 315; UNKNOWN CITRUS HEIGHTS POLICE OFFICER with Badge Number 323;
UNKNOWN CITRUS HEIGHTS POLICE OFFICER who prepared Report Number CH14-02589
only)
(Confiscation of Firearms and Knives, without due process)
(Declaratory, Injunctive and Monetary relief)

14   175.   Plaintiffs incorporate the above allegations as if set forth fully here.

15   176.   The Fifth Amendment guarantees that "due process of law" be part of any proceeding that

16          denies a citizen "life, liberty or property".

17   177.   CUPP was arrested and his property confiscated without due process for carrying a

18          concealed weapon, protected by the Second Amendment, and which was not concealed, but

19          instead, carried in a sheath as all fixed blade knives are carried that way.

20   178.   Plaintiff seeks monetary relief for being deprived of his right and property.

21   179.   Plaintiff seeks injunctive and declaratory relief for the return of his firearms, and other

22          property.

23   180.   Plaintiff has been damaged according to proof.

24   181.   HARRIS is named only for purposes of injunctive and declaratory relief only.

25   182.   Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

**SIXTH CLAIM FOR RELIEF:**
**CONSTITUTIONAL CHALLENGE TO STATE LAW**
**Second Amendment**
(Plaintiff HAVEN and Defendants HARRIS; COUNTY OF SACRAMENTO; SCOTT JONES, in
his official capacity as Sheriff of County of Sacramento; Sacramento Deputy Sheriff JESSE

- 23 -

**Second Amended Complaint**

BRUCKER, # 512;  only)
(Confiscation of Firearms)
(Declaratory, Injunctive and Monetary relief)

183.   Plaintiffs incorporate the above allegations as if set forth fully here.

184.   The Second Amendment guarantees law-abiding citizens the right to keep and bear arms for self-defense purposes.

185.   On February 14, 2016, Sacramento Deputy Sheriff JESSE BRUCKER, # 512, acting color of law and the authority of HARRIS, COUNTY OF SACRAMENTO and SCOTT JONES, in his official capacity as Sheriff of County of Sacramento, and acting without a warrant or probable cause, illegally entered the residence of HAVEN.

186.   HAVEN was not present to give a consent and was unaware of the entry of BRUCKER.

187.   While in HAVEN's residence without informing HAVEN, BRUCKER seized the property of HAVEN consisting of three firearms, including an AR-7 semi-automatic rifle and a standard issue military semi-automatic 1911.

188.   No criminal charges were ever filed, and the government has failed to return HAVEN's three firearms and ammunition.

189.   At the direction of state law and HARRIS, plaintiff had his firearms confiscated by HARRIS and law enforcement officers, though no crime had been committed.  To this date, the arms have not been returned.

190.   Plaintiff seeks monetary relief for being deprived of his right and property.

191.   Plaintiff seeks injunctive and declaratory relief for the return of his firearms, and other property.

192.   Plaintiff has been damaged according to proof.

193.   HARRIS is named only for purposes of injunctive and declaratory relief only.

194.   Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

**SEVENTH CLAIM FOR RELIEF:**
**CONSTITUTIONAL CHALLENGE TO STATE LAW**
**Fourth Amendment**
(Plaintiff HAVEN and Defendants HARRIS; COUNTY OF SACRAMENTO; SCOTT JONES, in his official capacity as Sheriff of County of Sacramento; Sacramento Deputy Sheriff JESSE BRUCKER, # 512;  only)
(Arrest, Confiscation of Firearms and Knives, without due process)

- 24 -

**Second Amended Complaint**

1        (Declaratory, Injunctive and Monetary relief)

2  195.   Plaintiffs incorporate the above allegations as if set forth fully here.

3  196.   The Fourth Amendment guarantees law-abiding citizens to be secure in their persons, houses,

4        papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

5        warrants shall issue, but upon probable cause, supported by oath or affirmation, and

6        particularly describing the place to be searched, and the persons or things to be seized.

7  197.   On February 14, 2016, Sacramento Deputy Sheriff JESSE BRUCKER, # 512, acting color of

8        law and the authority of HARRIS, COUNTY OF SACRAMENTO and SCOTT JONES, in

9        his official capacity as Sheriff of County of Sacramento, and acting without a warrant or

10       probable cause, illegally entered the residence of HAVEN.

11  198.   HAVEN was not present to give a consent and was unaware of the entry of BRUCKER.

12  199.   While in HAVEN's residence without informing HAVEN, BRUCKER seized the property of

13       HAVEN consisting of three firearms, including an AR-7 semi-automatic rifle and a standard

14       issue military semi-automatic 1911.

15  200.   No criminal charges were ever filed, and the government has failed to return HAVEN's three

16       firearms and ammunition.

17  201.   At the direction of state law and HARRIS, plaintiff had his firearms confiscated by HARRIS

18       and law enforcement officers, though no crime had been committed.  To this date, the arms

19       have not been returned.

20  202.   Plaintiff seeks monetary relief for being deprived of his right and property.

21  203.   Plaintiff seeks injunctive and declaratory relief for the return of his firearms, and other

22       property.

23  204.   Plaintiff has been damaged according to proof.

24  205.   HARRIS is named only for purposes of injunctive and declaratory relief only.

25  206.   Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

26                   **EIGHT CLAIM FOR RELIEF:**
                        **Fifth Amendment**

27  (Plaintiff HAVEN and Defendants HARRIS; COUNTY OF SACRAMENTO; SCOTT JONES, in
     his official capacity as Sheriff of County of Sacramento; Sacramento Deputy Sheriff JESSE

28                   BRUCKER, # 512 only)

- 25 -

(Arrest, Confiscation of Firearms and Knives, without due process)
(Declaratory, Injunctive and Monetary relief)

207. Plaintiffs incorporate the above allegations as if set forth fully here.

208. The Fifth Amendment guarantees that "due process of law" be part of any proceeding that denies a citizen "life, liberty or property". In this case, there was never a proceeding.

209. On February 14, 2016, Sacramento Deputy Sheriff JESSE BRUCKER, # 512, acting color of law and the authority of HARRIS, COUNTY OF SACRAMENTO and SCOTT JONES, in his official capacity as Sheriff of County of Sacramento, and acting without a warrant or probable cause, deprived HAVEN of his property without due process.

210. At the direction of state law and HARRIS, plaintiff had his firearms confiscated by HARRIS and law enforcement officers, though no crime had been committed. To this date, the arms have not been returned.

211. Plaintiff seeks monetary relief for being deprived of his right and property.

212. Plaintiff seeks injunctive and declaratory relief for the return of his firearms, and other property.

213. Plaintiff has been damaged according to proof.

214. HARRIS is named only for purposes of injunctive and declaratory relief only.

215. Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

## NINTH CLAIM FOR RELIEF
## CONSTITUTIONAL CHALLENGE TO STATE LAW
### Violation of the Second Amendment Right to Keep and Bear Arms
(Plaintiff HAVEN and Defendant HARRIS; COUNTY OF PLACER; EDWARD N. BONNER, in his official capacity as Sheriff of County of Placer; Placer County Deputy MASON, # 181; Placer County Deputy HINTZE, # 101 only)
(P.C. 12210 - as written and as applied challenge)
(Monetary, Declaratory and Injunctive Relief)

216. Plaintiffs incorporate the above allegations as if set forth fully here.

217. The Second Amendment guarantees law-abiding citizens the right to keep and bear arms for self-defense purposes.

218. P.C. 12210 interferes with the right to possess non-lethal weapons for purposes of self defense.

219. Attached hereto as **Exhibit "B"** is a true and correct copy of the Criminal Complaint filed

- 26 -

**Second Amended Complaint**

1    against plaintiff, along with pictures of the purported "Slingshot", none of which could be

2    mistaken for an illegal weapon.

3  220.  Before the pirates of the Caribbean, Butch Cassidy, the Spanish Conquistadores, and the

4    Peloponnesian Wars, man's weapon of choice was rock with a rope attached to it.

5  221.  A slungshot is a maritime tool consisting of a weight, or "shot," affixed to the end of a long

6    cord, which pre-existed the founding of the United States.  It was a simple weapon, which

7    itself had been modified to become a slungshot.  In sum, it was an "arm" used prior to the

8    invention of gunpowder.

9  222.  On February 8, 2016, deputies from the Placer County Sheriff's Department stopped

10    Defendant HAVEN for what they falsely alleged an "illegal weapon" hanging from the

11    handle bars of his motorcycle, affectionately known as his "iron horse."

12  223.  HAVEN had attached to his motorcycle an ornamental and common "horse lead" (thick

13    nylon rope with a metal quick release - identical to a dog leash but thicker).

14  224.  Deputy MASON and his partner Deputy HINTZE arrested HAVEN for the illegal possession

15    of a slungshot in violation of P.C. 12210.

16  225.  A leash was determined by these Deputies to be an illegal "slungshot" and placed Mr.

17    HAVEN under felony arrest, booked, and had to pay bail, in violation of this Fourth

18    Amendment rights.

19  226.  While arresting HAVEN, HINTZE and MASON made various threatened comments to

20    HAVEN that he was a associated with outlaw motorcycle gangs by his appearance and

21    various bumper stickers on his motorcycle.

22  227.  No reasonable officer or person would deem a horse leash as an illegal weapon.

23  228.  The deputies motive for arresting HAVEN was his personal appearance and his various

24    stickers, both protected by the First Amendment.

25  229.  Plaintiff was damaged by having to pay for bail, an attorney, and getting his motorcycle out

26    of impound.

27  230.  On or about March 3, 2016, the Placer County District Attorney filed charges against

28    Defendant HAVEN for violating California Penal Code section 22210.  Defendant HAVEN

-27-

**Second Amended Complaint**

was arraigned on the charges in the above-entitled court.

231. On or about March 21, 2016 the Supreme Court of the United States rendered its unanimous per curium opinion in *Jaime Caetano v. Massachusetts* 577 U.S. ___ (2016) No. 14-10078; decided March 21, 2016. The holding of *Caetano* reiterated prior precedent and stated that the State's arguments for supporting draconian laws borders on the "frivolous", but yet, in 2016, California has only enhanced its draconian enforcement of arms of all types.

232. Prior to *Caetano*, the law was clearly established that the Second Amendment protects all "arms", and is not just applicable to firearms.

233. Plaintiff seeks monetary relief for being deprived of his right and property.

234. Plaintiff seeks injunctive and declaratory relief for the return of his horse leash.

235. Plaintiff has been damaged according to proof.

236. HARRIS is named only for purposes of injunctive and declaratory relief only.

237. Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

**TENTH CLAIM FOR RELIEF**
**CONSTITUTIONAL CHALLENGE TO STATE LAW**
**Violation of the Fourth Amendment**
(Plaintiff HAVEN and Defendant HARRIS; COUNTY OF PLACER; EDWARD N. BONNER, in his official capacity as Sheriff of County of Placer; Placer County Deputy MASON, # 181; Placer County Deputy HINTZE, # 101 only)
(P.C. 12210 - as written and as applied challenge)
(Monetary, Declaratory and Injunctive Relief)

238. Plaintiffs incorporate the above allegations as if set forth fully here.

239. The Fourth Amendment guarantees law-abiding citizens to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

240. P.C. 12210 interferes with the right to possess non-lethal weapons for purposes of self defense.

241. Attached hereto as **Exhibit "B"** is a true and correct copy of the Criminal Complaint filed against plaintiff, along with pictures of the purported "Slungshot", none of which could be mistaken for an illegal weapon.

- 28 -

**Second Amended Complaint**

242.  No reasonable officer or person would deem a horse leash as an illegal weapon, and as such, defendants lacked probable cause to seize plaintiff and his property.

243.  Plaintiff was damaged by having to pay for bail, an attorney, and getting his motorcycle out of impound.

244.  On or about March 3, 2016, the Placer County District Attorney filed charges against Defendant HAVEN for violating California Penal Code section 22210.  Defendant HAVEN was arraigned on the charges in the above-entitled court.

245.  The Second Amendment protects all "arms", and is not just applicable to firearms.

246.  Plaintiff seeks monetary relief for being deprived of his right and property.

247.  Plaintiff seeks injunctive and declaratory relief for the return of his horse leash.

248.  Plaintiff has been damaged according to proof.

249.  HARRIS is named only for purposes of injunctive and declaratory relief only.

250.  Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

Section 1988.

## ELEVENTH CLAIM FOR RELIEF
## CONSTITUTIONAL CHALLENGE TO STATE LAW
### Violation of the Fifth Amendment
(Plaintiff HAVEN and Defendant HARRIS; COUNTY OF PLACER; EDWARD N. BONNER, in his official capacity as Sheriff of County of Placer; Placer County Deputy MASON, # 181; Placer County Deputy HINTZE, # 101 only)
(P.C. 12210 - as written and as applied challenge)
(Monetary, Declaratory and Injunctive Relief)

251.  Plaintiffs incorporate the above allegations as if set forth fully here.

252.  The Fifth Amendment guarantees that "due process of law" be part of any proceeding that denies a citizen "life, liberty or property".  In this case, there was never a proceeding as to the confiscation of the horse/dog leash.

253.  P.C. 12210 interferes with the right to possess non-lethal weapons for purposes of self defense.

254.  Attached hereto as **Exhibit "B"** is a true and correct copy of the Criminal Complaint filed against plaintiff, along with pictures of the purported "Slungshot", none of which could be mistaken for an illegal weapon.

- 29 -

---

**Second Amended Complaint**

255.   No reasonable officer or person would deem a horse leash as an illegal weapon, and as such, defendants lacked probable cause to seize plaintiff and his property.

256.   Plaintiff was damaged by having to pay for bail, an attorney, and getting his motorcycle out of impound.

257.   On or about March 3, 2016, the Placer County District Attorney filed charges against Defendant HAVEN for violating California Penal Code section 22210.  Defendant HAVEN was arraigned on the charges in the above-entitled court.

258.   The Second Amendment protects all "arms", and is not just applicable to firearms.

259.   Plaintiff seeks monetary relief for being deprived of his right and property.

260.   Plaintiff seeks injunctive and declaratory relief for the return of his horse leash.

261.   Plaintiff has been damaged according to proof.

262.   HARRIS is named only for purposes of injunctive and declaratory relief only.

263.   Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

### TWELFTH CLAIM FOR RELIEF
### UNCONSTITUTIONALITY
### Violation of the Equal Protection Clause of the Fourteenth Amendment
(Plaintiffs HAVEN, CUPP and Defendant HARRIS only)
(Open or Conceal Carry, Safe-Gun List and Magazine Ban)
(Declaratory and Injunctive Relief Only)

264.   Plaintiffs incorporate the above allegations as if set forth fully here.

265.   The Second Amendment guarantees law-abiding citizens the right to keep and bear arms for self-defense purposes.

266.   However, former government workers have expansive Second Amendment rights, while all others have their rights continuously being stripped with no end in sight.

267.   Even active duty, part-time and retired Arson-Inspectors are included within the group of those who are not subject to the draconian laws of California.  See **Exhibit "C"** attached.

268.   As stated in **Exhibit "D"**, law enforcement officers can purchase an unlimited amount of firearms, without restriction or limited to specific type of caliber or capacity, nor are they limited to the safe gun list, exercising their Second Amendment rights without any of the burdens placed the plaintiffs.

- 30 -

**Second Amended Complaint**

269. Plaintiffs are seeking to enjoin the HARRIS and the State of California and defendants from enforcing current firearm statutes which infringe upon their constitutional rights as follows:

    a.    To purchase off-roster handguns, which are legal under federal law.

    b.    To possess and purchase standard size handgun and rifle magazines which most exceed 10 rounds,

    c.    To travel interstate with magazines which contain more than 10 rounds of ammunition.

    d.    To either be issued a lifetime CCW upon application at the same cost that retired officers pay or be permitted to carry a weapon openly.

270. Regulations infringing upon that right must meet heightened scrutiny.

271. The Constitution presumes that "The People" are reasonable, and that Government is a "necessary evil" to be curtailed and limited.

272. California's current firearm laws denies law-abiding citizens their constitutional right to protect themselves and their families and places them at a significant disadvantage when confronted by an armed attacker, while at the same time law enforcement and retirees are permitted to pick and choose the weapon of choice to be used for self defense.

273. This is a constitutional challenge to the complex statutory scheme set forth in Cal. Penal Code §§ 25450-25475, 26150-26225, 26300-26325, 32000-32030(Pen. Code, §§ 26950, 27650) which results in a **massive transfer of gun rights from plaintiffs to active and honorably retired California peace officers** in several very specific ways:

    a.    Allows officers to purchase and sell off-roster handguns, and keep those weapons after retirement. Non-Roster Handguns (Unsafe Handguns) (Penal Code, § 32000, subd. (b)(4).) Penal Code § 32000 does not prohibit the sale to, or purchase by, peace officers, and in turn, these officers may sell the firearms on the open market.

    b.    Allows officers to possess and purchase standard size handgun and rifle magazines which exceed 10 rounds, called Large Capacity Magazines, and keep them after retirement. (Penal Code § 32405)

    c.    Grants a lifetime CCW, without the costs and associated regulations Plaintiffs are

**Second Amended Complaint**

subjected to (this is especially important since it allows interstate travel with a loaded firearm under federal law). Penal Code §§ 25450, 25475, 12031(b)

    d.    If a peace officer is honorably retired, California law requires that the agency from which he retired issue the officer an identification certificate containing an endorsement to carry a concealed firearm. Penal Code §§ 25455, 25465, 12031(b)

    e.    Allows officers to purchase semi-automatic rifles not otherwise available to the public for self defense, which they can keep even after their government service is terminated.

274.    Plaintiffs seek injunctive relief to enjoin HARRIS and the State of California from enforcing laws, rules and regulations which:

    a.    Limit plaintiffs' ability to keep, bear, and travel with off-roster handguns, which are legal under federal law.

    b.    Limit plaintiffs' ability to possess, transport and purchase standard size handgun and rifle magazines which most exceed 10 rounds, as these are basic parts to modern operational and safe firearms.

    c.    Limit plaintiffs' ability to travel interstate with magazines which contain more than 10 rounds of ammunition.

    d.    Limit plaintiffs' ability to carry either a concealed weapon or openly carried weapon. Plaintiffs' concede if concealed carry is prohibited, then open carry is not.

275.    Further, plaintiffs request a positive injunction to either be issued a lifetime CCW upon application at the same cost that retired officers pay or be permitted to carry a weapon openly.

276.    Declaratory and Injunctive relief as to the offending statutory provisions relied upon.

277.    Plaintiffs seeks attorney fees pursuant to 42 U.S.C. Section 1988.

278.    As a direct and proximate result of Defendants' violation of Plaintiffs' Equal Protection rights under the Fourteenth Amendment, Plaintiffs have suffered irreparable and immediate harm and are entitled to declaratory and injunctive relief under 42 U.S.C. §§ 1983, 2201 and 2202.

**Second Amended Complaint**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that judgment be entered in his favor and against Defendants as follows:

1.) A declaration that California Penal Code section §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850 *et al.* violates the Second Amendment to the United States Constitution.

2.) A declaration that California Penal Code section §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850 violates the Second Amendment to the United States Constitution.

3.) A declaration that Defendants' enforcement of California Penal Code section §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850 *et al.* violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

4.) A declaration that California Penal Code §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850 violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

5.) A declaration that California Penal Code §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850 violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

6.) A declaration that California Penal Code §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850 violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

7.) A declaration that Defendants' enforcement of the Law Enforcement Officers Safety Act violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

8.) A declaration §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850, *et al.* violates the Constitution and laws of the State of

**Second Amended Complaint**

California.

        9.) A declaration C.P.C. §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850 violates the Constitution and laws of the State of California.

        10.) A declaration that Defendants application and enforcement of C.P.C. §§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850, *et al.* violates Plaintiffs' right to travel guaranteed by both Article IV, Section 2 of the United States Constitution and the Privileges or Immunities clause of the Fourteenth Amendment.

        11.) A declaration that Defendants application and enforcement of C.P.C. §§ 12050, *et al.* and 12025 violate Plaintiffs' right to Due Process guaranteed by the Fourteenth Amendment to the United States Constitution.

        12.) An injunction permanently enjoining Defendants from enforcing C.P.C.§§ 16150, subd. (b), 30305, 32310; Pen. Code, §§ 25400-25700, 26150-26225; Penal Code § 33850.

        13.) For remedies available pursuant to 42 U.S.C. § 1983 and for an award of reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

        14.) An order mandating that Defendants turn over all firearms and their accessories which were illegally seized by Defendants.

        15.) Damages for deprivation of a rights, property, and privileges, and such other relief as this Court deems just and equitable, including general and specific damages.

Dated: August 15, 2016        THE LAW OFFICES OF GARY W. GORSKI
                                Respectfully Submitted,
                                /s/ Gary W. Gorski
                                Gary W. Gorski
                                Attorney for Plaintiffs

**Second Amended Complaint**

**Exhibit A**

## Public Case Access
### Sacramento Superior Court

Your Account | Log Off | Find Order | Document Cart (0)
Welcome gary gorski

| Home | Civil | Criminal | Family | Probate | Small Claims | Traffic | Unlawful Detainer |

**Criminal Cases**

Search by Name
Search by Case
Search by Xref

**General Info**

How This Site Works

Criminal Home Page on Saccourt

Trial Readiness Notification

## Case Information

| | | | |
|---|---|---|---|
| **Defendant Name** | JAMES EDWARD CUPP | | |
| **Case Number** | 14M02083 | **Charge Document** | Complaint |
| **Xref** | 545808 | **Case Status** | Disposed |
| **Filing Date** | 03/27/2014 | **Court ID** | 34470 |

### Aliases

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| JAMES | E | CUPP | |
| JAMES | EDWARD | CUPP | |

### Related Cases

| | Case Number | Filing Date | Court ID |
|---|---|---|---|
| No related cases found. | | | |

### Charges

| Count | Charge | Severity | Degree | Allegation | Blood Alcohol % |
|---|---|---|---|---|---|
| C001 | PC 21310 | Misdemeanor | N/A | N/A | N/A |

### Future Hearings

| Date | Time | Dept. | Reason | Outcome |
|---|---|---|---|---|
| No future hearings found. | | | | |

### Hearing History

| Date | Time | Dept. | Reason | Outcome |
|---|---|---|---|---|
| 05/30/2014 | 8:30 AM | 04 | BAIL BOND INFORMATION | BOND EXONERATED |
| 05/30/2014 | 8:30 AM | 04 | COUNSEL INFORMATION | PD RELIEVED BY COURT |
| 05/30/2014 | 8:30 AM | 04 | TRIAL READINESS CONFERENCE | DISMISSED |
| 05/16/2014 | 8:30 AM | 04 | TRIAL READINESS CONFERENCE | CONTINUED |
| 04/08/2014 | 8:30 AM | 60 | FURTHER PROCEEDINGS | CONTINUED |
| 04/01/2014 | 1:30 PM | 60 | ARRAIGNMENT | ARRAIGNED |
| 04/01/2014 | 1:30 PM | 60 | COUNSEL INFORMATION | PD APPOINTED |

### Charge Dispositions

| Count | Plea | Charge | Disposition Code | Disposition Date | Severity | Degree |
|---|---|---|---|---|---|---|
| C001 | No Plea | PC 21310 | Dismissed | 05/30/2014 | Misdemeanor | |

### Sentence Summary

| Count | Sentence Type | Sentence Date | Prob. Type | Prob. Status | Prob. Term | Prob. Sup. | Custody Program | Custody Length | Non LT Code | Non LT Time | Non LT Susp. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| No sentencing information found. | | | | | | | | | | | |

Exhibit "A"



**Exhibit B**

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

MAR 03 2016

JAKE CHATTERS
EXECUTIVE OFFICER & CLERK
By: M. Ryan, Deputy

R. SCOTT OWENS
Placer County District Attorney
State Bar No. 146406
10810 Justice Center Drive, Suite 240
Roseville, CA 95678-6231

Tel: (916) 543-8000
Fax: (916) 543-2550


**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF PLACER**

--oOo--


THE PEOPLE OF THE
    STATE OF CALIFORNIA,

                  Plaintiff,

        -vs-

LAWRENCE JACK HAVEN

                  Defendant.
_____/

DA NO. 16-02-097707

COURT NO. 62-144141

**SPECIFIED MISDEMEANOR COMPLAINT**


**COUNT ONE**


On or about February 8, 2016, in the County of Placer, the crime of POSSESSION OF A DEADLY WEAPON, in violation of Penal Code section 22210, a specified misdemeanor, was committed by LAWRENCE JACK HAVEN, who did unlawfully manufacture, cause to be manufactured, import into the State of California, keep for sale, offer and expose for sale, and give, lend, and possess an instrument

1

Exhibit "B"

and weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap and slungshot.

## COUNT TWO

On or about February 8, 2016, in the County of Placer, the crime of UNSAFE SPEED, in violation of Vehicle Code section 22350, an infraction, was committed by LAWRENCE JACK HAVEN, who did willfully and unlawfully violate the basic speed law by driving upon a highway at a speed greater than was reasonable and prudent having due regard for existing conditions.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 25, 2016, at Roseville, Placer County, California.

R. SCOTT OWENS, DISTRICT ATTORNEY

By: _____
    TIMOTHY J. SANDS,
    DEPUTY DISTRICT ATTORNEY

---

### NOTICE.

PLEASE TAKE NOTICE THAT COUNSEL FOR THE PEOPLE HEREBY MAKE AN INFORMAL DEMAND FOR DISCOVERY (PURSUANT TO PENAL CODE SECTION 1054.3) WITHIN FIFTEEN DAYS.

---

2







**Red Black**









Mai Henderson Photographer ©

**Exhibit C**

80 Ops. Cal. Atty. Gen. 100, 1997 WL 206244 (Cal.A.G.)

Office of the Attorney General
State of California
Opinion No. 96-904

*1 April 25, 1997

THE HONORABLE BILL LEONARD
MEMBER OF THE CALIFORNIA STATE ASSEMBLY

THE HONORABLE BILL LEONARD, MEMBER OF THE CALIFORNIA STATE ASSEMBLY, has requested an opinion on the following questions:

1. Are full-time and part-time arson investigators of a local fire department eligible to receive identification certificates with concealed weapons endorsements when they retire?

2. If so, who is authorized to issue the identification certificates with the concealed weapons endorsements to qualified arson investigators?

CONCLUSIONS

1. Full-time arson investigators of a local fire department are eligible to receive identification certificates with concealed weapons endorsements when they retire if they were authorized to carry firearms and in fact did so during the course and scope of their employment. Part-time arson investigators of a local fire department are eligible to receive identification certificates with concealed weapons endorsements when they retire if their employing agency authorized them to act as peace officers while performing their primary duties, i.e., enforcing fire prevention or suppression laws, and they were authorized to carry firearms and in fact did so during the course and scope of their employment.

2. The fire chief is authorized to issue the identification certificates with concealed weapons endorsements to qualified arson investigators.

ANALYSIS

Penal Code section 12025 [FN1] sets forth the circumstances under which the crime of carrying a concealed weapon is committed. Exemptions to the prohibition on carrying a concealed weapon are found in section 12027, which in relevant part provides:

"Section 12025 does not apply to, or affect, any of the following:

"(a)(1)(A) Any peace officer, listed in Section 830.1 or 830.2, whether active or honorably retired, other duly appointed peace officers, honorably retired peace officers listed in subdivision (c) of Section 830.5, *other honorably retired peace officers who during the course and scope of their employment as peace officers were authorized to, and did, carry firearms . . . . Any peace officer described in this paragraph who has been honorably retired shall be issued an identification certificate by the law enforcement agency from which the officer has retired.* The issuing agency may charge a fee necessary to cover any reasonable expenses incurred by the agency in issuing certificates pursuant to this subdivision. As used in this section and Section 12031, the term 'honorably retired' includes all peace officers who have qualified for, and have accepted, a service or disability retirement. For purposes of this section and Section 12031, the term 'honorably retired' does not include an officer who has agreed to a service retirement in lieu of termination.

"(B) Any officer . . . shall have an endorsement on the identification certificate stating that the issuing agency approves the officer's carrying of a concealed firearm.

**\*2** "...............`.............

"(2) A retired peace officer . . . shall petition the issuing agency for the renewal of his or her privilege to carry a concealed firearm every five years. . . . The agency from which a peace officer is honorable retired may, upon initial retirement of that peace officer, or at any time subsequent thereto, deny or revoke, for good cause the retired officer's privilege to carry a concealed firearm. . . .**"**

Section 12027.1 states in relevant part:

"(b)(1) An identification certificate authorizing the officer to carry a concealed and loaded firearm or an endorsement may be revoked or denied by the issuing agency only upon a showing of good cause. Good cause shall be determined at a hearing, as specified in subdivision (d). **"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) A retired peace officer, when notified of the revocation of his or her privilege to carry a concealed and loaded firearm, after the hearing, or upon forfeiting his or her right to a hearing, shall immediately surrender to the issuing agency his or her identification certificate. The issuing agency shall reissue a new identification certificate without an endorsement. . . .

"(d) Any hearing conducted under this section shall be held before a three-member board. One member of the board shall be selected by the agency and one member shall be selected by the retired peace officer or his or her employee organization. The third member shall be selected jointly by the agency and the retired peace officer or his or her employee organization.

**"** Any decision by the board shall be binding on the agency and the retired peace officer.
**"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**"**

The two questions presented for resolution concern whether retired full-time and part-time arson investigators of a local fire department are eligible to receive identification certificates with concealed weapons endorsements under the terms of section 12027, and if so, who may issue the certificates to them. [FN2]

1. Eligibility To Carry a Concealed Weapon

In determining whether retired full-time and part-time arson investigators of a local fire department may meet the qualifications of section 12027, we first consider whether they acted as "peace officers" during the course and scope of their employment. Section 830 provides:

"Any person who comes within the provisions of this chapter [sections 830-832.9] and who otherwise meets all standards imposed by law on a peace officer is a peace officer, and not withstanding any other provision of law, no person other than those designated in this chapter is a peace officer. The restriction of peace officer functions of any public officer or employee shall not affect his or her status for purposes of retirement."

**\*3** Section 830.37 specifically provides with respect to arson investigators:

"The following persons are peace officers whose authority extends to any place in the state for the purpose of performing their primary duty or when making an arrest pursuant to Section 836 as to any public offense with respect to which there is immediate danger to person or property, or of the escape of the perpetrator of that offense, or pursuant to Section 8597 or 8598 of the Government Code. These peace officers may carry firearms only if authorized and under terms and conditions specified by their employing agency:

"(a) Members of an arson-investigating unit, regularly paid and employed in that capacity, of a fire department or fire protection agency of a county, city, city and county, district, or the state, if the primary duty of these peace officers is the detection and apprehension of persons who have violated any fire law or committed insurance fraud.
**"**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **"**

As recently explained in _Service Employees International Union Local 715, AFL-CIO_ v. _City of Redwood City_ (1995) 32 Cal.App.4th 53, 59-60:

"Chapter 4.5 specifies dozens of government employees as peace officers, sometimes simply by job title, but more often by reference both to a position and its primary duties. In general, chapter 4.5 names some classifications of employees as peace officers whose powers are either specified or limited, provides that other employees are not peace officers but may exercise some peace officer functions under certain circumstances, denies peace officer status to some classifications, and denies or restricts the right of some peace officers to carry firearms. [Citation.] The plain import of this statutory system is that the Legislature intended to grant peace officer status, and

the powers and authority conferred with that status in particular instances, subject to carefully prescribed limitations and conditions."

With respect to the retired full-time arson investigators, we believe that they would qualify as peace officers under the terms of section 830.37, subdivision (a). As arson investigators, their duties were to investigate crimes of arson, i.e., "the detection and apprehension of persons who have violated any fire law or committed insurance fraud." That was what they were "regularly paid and employed" to do as "[m]embers of an arson-investigating unit." We interpret the provisions of section 830.37 in a reasonable and common sense manner. (See *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1147 ["a practical construction is preferred"]; *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165 ["it is presumed the Legislature intended reasonable results . . ."].) Accordingly, while some members of an arson-investigating unit may not be employed to investigate violations of law or insurance fraud, the primary duty of arson investigators would so qualify as "the detection and apprehension of persons who have violated any fire law or committed insurance fraud" within the meaning of section 830.37, subdivision (a).

*\*4* Even though they were peace officers, however, the full-time arson investigators in question may not have been authorized to carry firearms by their employing agency, or even if authorized, may not have actually carried firearms while performing their duties. Both requirements must be met under the terms of section 12027, subdivision (a)(1)(A), in order to be eligible for an identification certificate with a concealed weapons endorsement.

We thus conclude that full-time arson investigators of a local fire department are eligible to receive identification certificates with concealed weapons endorsements when they retire if they were authorized to carry firearms and in fact did so during the course and scope of their employment.

The retired part-time arson investigators, on the other hand, would not meet the test of having been peace officers as defined in section 830.37, subdivision (a). They would not have been "regularly paid and employed" as "[m]embers of an arson-investigating unit, having "the primary duty of . . . the detection and apprehension of persons who have violated any fire law or committed insurance fraud." Instead, a part-time arson investigator is typically "regularly paid and employed" to perform fire prevention or fire suppression law enforcement duties. Such persons are called upon only occasionally to help in arson investigations. They often volunteer for the assignments and conduct their investigative services "off-shift" in addition to their regularly assigned duties. They normally do not carry firearms while performing their primary fire prevention or fire suppression enforcement duties. (See *Service Employees Internat. Union* v. *City of Redwood City, supra,* 32 Cal.App.4th at 55-58.)

It is conceivable that a part-time arson investigator could qualify as a peace officer under the terms of section 830.37, subdivision (b), which state:
>   "Members other than members of an arson-investigating unit, regularly paid and employed in that capacity, of a fire department or fire protection agency of a county, city, city and county, district, or the state, if the primary duty of these peace officers, when acting in that capacity, is the enforcement of laws relating to fire prevention or fire suppression."

In *Service Employees Internat. Union* v. *City of Redwood City, supra,* 32 Cal.App.4th 53, the court examined in detail the requirements of section 830.37, subdivision (b). It traced the legislative history of the statute and concluded that under subdivision (b), "fire department members are peace officers if they act in the capacity of peace officers and their primary duty when they do so is to enforce the fire [prevention or suppression] laws." (*Id.,* at p. 62.) It is for the employing agency to determine "whether its fire department members will act in the capacity of peace officers." (*Id.,* at p. 63.)

Given this judicial construction of subdivision (b) of section 830.37, we conclude that part-time arson investigators meet the standard for being "peace officers" if their employing agency authorizes them to act as peace officers while performing their primary duties, i.e., enforcing fire prevention or fire suppression laws. Upon honorable retirement, pursuant to section 12027, subdivision (a)(1)(A), they must also have been authorized to carry a firearm and in fact have carried a firearm "during the course and scope of their employment as peace officers" in order to be eligible for identification certificates with concealed weapons endorsements.

2. Issuance of an Identification Certificate

**\*5** We next consider who is authorized to issue identification certificates with concealed weapons endorsements to qualified retirees. Section 12050 allows only the sheriff of a county or the head of a municipal police department to issue a license to carry a concealed weapon. However, a retired peace officer meeting the requirements of section 12027, subdivision (a)(1)(A), "shall be issued an identification certificate by the law enforcement agency from which the officer has retired" with a concealed weapons endorsement unless the privilege to carry a concealed weapon is denied or revoked for "good cause" (§ 12027, subd. (a)(2)).

The concealed weapons endorsement of an identification certificate under the terms of section 12027 differs from the licensure requirements of section 12050. An officer who is currently employed is exempt pursuant to section 12027 from having to obtain a concealed weapons license. Similarly, a retired peace officer who has the appropriate identification certificate is exempt from the licensure requirements of section 12050. (See 70 Ops.Cal.Atty.Gen. 20 (1987).)

The conclusion that issuance of an identification certificate with a concealed weapons endorsement is a separate process from licensure as a means of authorizing the carrying of a concealed weapon is confirmed by a comparison of the procedures applicable when a certificate or license is revoked. Revocation of a retired peace officer's concealed weapons identification certificate generally requires a hearing by a three-member board. (§ 12027.1, subd. (d).) Revocation of a license is "highly discretionary" and without the requirement of an evidentiary hearing. (*Nichols v. County of Santa Clara* (1990) 223 Cal.App.3d 1236, 1241-1245.)

Since an identification certificate with a concealed weapons endorsement provides an exemption from the licensure requirements, the specification of the sheriff or head of the police department as the person who may issue a license is not relevant to issuance of a certificate. The certificate, as clearly stated by the Legislature, is to be issued by the law enforcement agency from which the officer has retired. (§ 12027, subd. (a)(1)(A).) In the case of a retired arson investigator, the issuing agency would be the employing fire department. The fire chief, as the head of that agency, would be authorized to issue the identification certificate with the concealed weapons endorsement.
Daniel E. Lungren
Attorney General

Anthony M. Summers
Deputy Attorney General

[FN1] All references hereafter to the Penal Code are by section number only.

[FN2] We note that section 12031 prohibits the carrying of a loaded firearm in a vehicle or public place; the prohibition applies to all firearms, whether concealed or not. Subdivision (b) of section 12031 contains an exemption from this prohibition similar to the one contained in section 12027, subdivision (a)(1)(A), for concealed weapons. A peace officer may qualify for an identification certificate with an endorsement authorizing the carrying of a concealed and loaded firearm. Our analysis herein with respect to concealed firearms is equally applicable to loaded firearms.

80 Ops. Cal. Atty. Gen. 100, 1997 WL 206244 (Cal.A.G.)

END OF DOCUMENT

(c) 2012 Thomson Reuters. No Claim to Orig. US Gov. Works

**Exhibit D**

1  BENJAMIN B. WAGNER
   United States Attorney
2  WILLIAM S. WONG
   MICHAEL D. ANDERSON
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA  95814
   Telephone: (916) 554-2700
5  Facsimile:  (916) 554-2900

6  Attorneys for the United States of America

**ORIGINAL
FILED**

**JUN 0 1 2012**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  IN THE MATTER OF THE SEARCH OF:          CASE NO. 2:11-SW-0498 EFB

12  Snellings' Firearms                       [PROPOSED] ORDER FOR
    2675 Land Avenue                          PARTIALLY UNSEALING SEARCH
13  Sacramento, California                    WARRANT AND RELATED
                                              DOCUMENTS
14

15

16

17

18         The government's request to unseal the redacted affidavit in support of a search warrant,

19  which is attached to this order and is incorporated by reference, is GRANTED.

20  SO ORDERED:

21  DATED: 6-1-2012

22                                            HON. EDMUND F. BRENNAN
                                              U.S. Magistrate Judge
23

24

25

26

27

28

                              3
                         Exhibit "D"

## Affidavit in Support of a Search Warrant

1. I, Special Agent Sara M. Lewis, Bureau of Alcohol, Tobacco, Firearms and Explosives, United States Department of Justice, being duly sworn on oath, depose and say:

2. I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice. I have been so employed since July 2002. I have a Bachelors degree in Criminal Justice from California State University, Fresno, and a Masters degree in Criminal Justice from California State University, Fresno. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Program and the Bureau of Alcohol, Tobacco, Firearms and Explosives, New Professional Training (NPT), Special Agent Academy.

3. I have investigated no less than 100 cases involving federal firearms violations including straw purchase violations. I have spoken to several straw purchasers about how and why they committed the act of straw purchasing. I have received training regarding straw purchase investigations. I have spoken to more experienced investigators about how people commit straw purchases and other federal firearm violations. I have assisted on investigations involving people engaged in the firearms business of selling firearms without a Federal Firearms License (FFL). I have received training on federal violations of people engaged in the firearms business without an FFL. I have spoken with experts and more experienced investigators that have conducted investigations of people who have engaged in the business of selling firearms without an FFL. I have interviewed subjects who were engaged in the business of selling firearms without an FFL.

## Federal Firearm Licensing Related Laws and Definitions

4. I am familiar with federal laws and know that it is a violation of Title 18, United States Code, Section 371, if two or more persons conspire to commit any offense against the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy.

5. It is a violation of Title 18, United States Code, Section 922(a)(1)(A), for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce.

6. It is a violation of Title 18, United States Code, Section 922(a)(6), for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition

from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious or misrepresented identification, intended or likely to deceive such importer manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearms or ammunition.

7. It is a violation of Title 18, United States Code, Section 924(a)(1)(A) to knowingly make any false statement or representation with respect to the information required by Chapter 44 of Title 18 to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief of disability under the provisions of this chapter.

8. It is a violation of Title 18, United States Code, Section 924(a)(3)(A) for any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly makes any false statement or representation with respect to the information required by the provisions of Chapter 44 of Title 18 to be kept in the records of a person licensed under this chapter.

9. Title 18, United States Code, Section 921(a)(3), defines a firearm as any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon.

10. A Federal Firearms License (FFL) is a license that enables an individual or a company to engage in the business pertaining to the manufacture and/or sales of firearms and ammunition.[1]  Having an FFL is a prerequisite to be "engaged in the business" of firearm sales.

11. Title 18 United States Code, Section 921(a)(11)(A) defines the term "dealer" as meaning any person engaged in the business of selling firearms at wholesale or retail.

12. Title 18, United States Code, Section 921(C) defines "engaged in the business" as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection for a hobby, or who sells all or part of his personal collection.

---

[1]  The term FFL is used to mean both a federal firearms license and a federal firearms licensee.  The term will be used interchangeably throughout this affidavit.

13. Title 18, United States Code, Section 921(22) states that the term "with the principle objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal collection: *Provided,* the proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

## California Law and Off Roster Firearms

14. California Penal Code Section 12125 and 12126 address the definition of "off roster firearms." In summary, a handgun sold by an FFL must be on the approved roster of firearms in the State of California. However there is an exemption that allows peace officers to purchase off roster firearms.

15. During the course of this investigation, Supervising Special Agent Blake Graham assisted in the process of determining which firearms are "off roster" firearms. Supervising Agent Graham explained to your affiant and TFO Halstead how to determine which firearms are "off roster" firearms by utilizing a link on the California Department of Justice website. (http://certguns.doj.ca.gov). Supervising Agent Blake Graham is a sworn California peace officer employed by the California Department of Justice (DOJ). Agent Graham is assigned to the Bureau of Firearms where his duties include, but are not limited to, conducting investigations on violations of California's firearms statutes and criminal investigations involving businesses with a federal firearms license (FFL). Agent Graham is involved in the process of approving what handguns may be sold in the State of California and amending the roster of approved handguns certified for sale in California. With the assistance of Agent Blake Graham, ATF TFO Greg Halstead and I utilized the California Department of Justice website to determine whether a handgun or pistol was an "off roster" firearm. In this Affidavit where it is noted that a handgun or pistol is an "off roster" firearm, that determination was made by TFO Halstead and myself. Additionally, all photographs of firearms contained in this Affidavit were determined to be "off roster" handguns except the photograph of the rifle contained on page 36.

16. Therefore, this affiant believes that there is substantial demand in the firearms market to obtain off roster handguns as only peace officers may purchase the new handguns.

17. California Penal Code Section 12070(a) states that no person shall sell, lease, or transfer firearms unless he or she has been issued a license pursuant to Section 12071. Any person who violates this section is guilty of a misdemeanor. However, this section does not prohibit the "infrequent" sale and/or transfers of firearms.

18. California Penal Code Section 12070(c)(1) defines "infrequent" sales or transfers of pistols, revolvers, and other firearms capable of being concealed upon the person, as less than 6 transactions per calendar year. For this purpose "transaction" means a single sale, lease, or transfer of any number of pistols, revolvers, or any other firearm capable of being concealed upon the person.

19. Ryan McGOWAN is in violation of California Penal Code Section 12070(a). McGOWAN has conducted 10 private party transactions in 2010 and 8 private party transactions in 2011.

20. Thomas LU is in violation of California Penal Code Section 12070(a). LU has conducted 9 private party transactions in 2011.

21. The selling, lending and/or giving of a high capacity magazine is a felony violation of the California Penal Code Section 12020 (Unlawful carrying and Possession of Weapons). A high capacity magazine is a magazine capable of holding more than 10 rounds of ammunition.

## Scope of Requested Search Warrant

22. The information set forth in this Affidavit is based, in part, upon my own personal knowledge, but it is also based upon information provided to me by other law enforcement officers and reports generated by other law enforcement personnel. Because this Affidavit is presented for the limited purpose of setting forth probable cause for the requested search warrant, I have not necessarily included every fact known to me through this investigation. I have set forth only those facts necessary to establish probable cause to believe that contraband, fruits of the crimes, and other items illegally possessed, property designed for use, intended for use, or used in committing the offenses outlined in this Affidavit and in particular, those items listed in Attachment B will be found at the locations requested to be searched more fully described, and incorporated by reference in Attachment A to this Affidavit.

23. Based on the evidence set forth in this affidavit there is probable cause to believe that evidence of the foregoing crimes are likely to be found on or at the following persons, vehicles, lockers and residences, each of which is more particularly described in Attachment A, which is incorporated in the search warrant as though fully set forth herein:

a. **Persons:**

Ryan McGOWAN, (hereinafter "McGOWAN"), date of birth,

Thomas LU (hereinafter "LU"), date of birth, ███████;

Darryl DEGUZMAN, (hereinafter "DEGUZMAN"), date of birth, ███████;

Robert SNELLINGS, (hereinafter "SNELLINGS"), date of birth; ███████;

Christopher LENERT, (hereinafter "LENERT"), date of birth, ███████; and

Christopher KJELLBERG, (hereinafter "KJELLBERG"), date of birth, ███████;

b. **Vehicles:** 2006, black, Lexus, California license plate ███████ (registered to McGOWAN per California Department of Motor Vehicles database records); 2006 white, Lexus, California License plate ███████ (registered to LU per California DMV database records); and any and all vehicles found to be in the care and control of all listed subjects in Attachment A at the time of the execution of the search warrant and evidenced by DMV registration, suspect or witness statements as to the actual use or possession of the vehicles(s), or possession of the vehicle key(s).

c. **Lockers:** The lockers of McGOWAN, LU, and DEGUZMAN, located at Rio Consumes Correctional Center (RCCC), 12500 Bruceville Road, Elk Grove, California and the locker of LENERT, located at the Sacramento Regional Transit District Headquarters, 1400 29th Street, Sacramento, California as described in Attachment A.

d. **Residences:**

The residence of Ryan McGOWAN, ███████████████, Elk Grove, California;

The residence of Thomas LU, █████████████ Elk Grove, California;

The residence of Darryl DEGUZMAN, ███████████, Elk Grove, California;

The residence of Robert SNELLINGS, ███████████, Rancho Murieta, California;

The residence of Christopher LENERT, ███████████, Sacramento, California;

The residence of Christopher KJELLBERG, ██████████, Rocklin, California;

e. **Business:**

The business premises of SNELLINGS' FIREARMS, 2675 Land Avenue, Sacramento, California;

24. It is my belief that those items listed on Attachment B-1 through B-23 attached hereto may be found on the persons and locations described in Attachment A attached hereto. I base this belief on the information set forth in this Affidavit, my training and experience, and the experience of the law enforcement officers with whom I have consulted.

## Primary Subjects of Investigation

25. Ryan McGOWAN is a 30 year old male employed the Sacramento County Sheriff's Department as a deputy sheriff. MCGOWAN has utilized the screen names "SacDep" and "dldeguz" on the CalGuns website. MCGOWAN has sold three firearms to ATF undercover agents.

26. Thomas LU is a 41 year old male employed by the Sacramento County Sheriff's Department as a deputy sheriff. LU has utilized the screen name "Teabag" on the CalGuns website. LU has sold nine firearms to an ATF undercover agent.

27. Robert SNELLINGS is a 62 year old male who possesses a Federal Firearm Licensee (FFL) for SNELLINGS' FIREARMS. SNELLINGS has sold and/or transferred 33 firearms to MCGOWAN and 29 firearms to LU between 2008 to the present.

28. Darryl DEGUZMAN is a 31 year old male employed by the Sacramento County Sheriff's Department as a deputy sheriff. DEGUZMAN has utilized a screen name of "dldeguz" on the CalGuns website.

29. Christopher KJELLBERG is a 40 year old male employed by the Roseville Police Department as an officer. KJELLBERG has private party transferred five off roster firearms to individuals who could not otherwise legally purchase the firearms.

30. Christopher LENERT is a 30 year old male who is employed by the Sacramento Police Department as an officer. LENERT has private party transferred 2 off roster firearms to individuals who could not otherwise legally purchase the firearms.

### Overview of Investigation

31. On July 1, 2011, ATF Task Force Officer (TFO) Greg Halstead and your affiant spoke with the owner of a gun store who is an FFL located in Sacramento County.

32. The owner stated that he/she wanted to advise TFO Halstead and your affiant about an individual who had conducted an unusual amount of private party transfers (PPT) of firearms at his/her business.

33. The owner provided TFO Halstead and your affiant with copies of internal store documents summarizing the transactions made by an individual named Ryan McGOWAN. Included in the photocopies were a Sacramento County Sheriff's identification card and a California DMV driver's license belonging to Ryan McGOWAN.

34. The documents revealed that Ryan McGOWAN has private party transferred 9 firearms between July 2009 and June 2011 through the FFL that contacted us.

35. Ryan McGOWAN is identified per the Sacramento County Known Person File (KPF) as follows: ▮ male ▮ approximately ▮ pounds, ▮ hair and ▮ eyes, with a date of birth of ▮▮▮▮

36. Further investigation revealed that McGOWAN is employed as a Deputy Sheriff with the Sacramento County Sheriff's Department (SSD). McGOWAN has been employed by SSD since 2008 and is currently assigned at the Rio Consumes Correctional Center (RCCC).

37. A query of AFS (Automated Firearms System) indicates that McGOWAN has purchased 41 (handguns) firearms since 2008. Of the 41 firearms, McGOWAN has private party transferred 25 firearms. Nineteen were private party transferred within one year of the initial purchase and of the 19 firearms, 5 of the firearms were private party transferred within 4 weeks of the purchase.

38. Dealer Record of Sale (DROS) records show that 33 of the 41 firearms obtained by McGOWAN were transferred to him through SNELLINGS' FIREARMS.

39. The AFS system maintains records for purchases and transfers of handguns sales only. There is no automated record keeping system that records the purchases and/or transfers of rifles. Based on the lack of an automated database, your affiant is unable to determine the number of purchases and subsequent transfer, if any, of long guns, by McGOWAN and Thomas LU.

40. ATF Area Supervisor Roger Root is a Supervisor for Industry Operations Investigators. The duties of an Industry Operation Investigator (IOI) include qualification and compliance inspections to determine if the Federally licensed entities in the firearms and explosives industries are following the laws and regulations that affect their respective industries. ATF IOI Supervisor Root reviewed ATF records and verified that McGOWAN does not possess a Federal Firearms License.

### www.CalGuns.net

41. www.CalGuns.net is a social media website that is designed for the firearm community in California. It contains a variety of forums in which people can post information, questions, and sales of firearms. One of the forums is titled "private firearm sales."

### McGOWAN and "SacDep"

42. During the course of the investigation, TFO Halstead checked the Calguns website to see if he could locate any posting for firearms by McGOWAN. While searching the website TFO Halstead discovered a subject posting under the screen name "SacDep." There were several postings by "SacDep" of firearms that were the same kind owned by McGOWAN. Some of the dates for firearms listed by "SacDep" for sale are close in time to when DROS records indicate McGOWAN private party transferred the same type of firearm. "SacDep" also listed his location as Sacramento and his occupation was listed as "Sacramento Department of Human Waste." It is my opinion and the opinion of TFO Halstead that "SacDep" is short for Sacramento Deputy, since McGOWAN is a Sacramento County Sheriff's Deputy. The CalGuns website is divided up into numerous forum topics. The forums are divided up into threads. A thread is an online conversation discussing a particular topic. A thread is started when someone begins a new topic on the forum. There were approximately 25 new threads started by "SacDep" in a variety of different forums. I will include some of the postings by "SacDep" that led TFO Halstead

and I to believe that the person posting under the screen name "SacDep" was Ryan McGOWAN.

43. One of the forums is titled "CalGuns LEO'S." LEO is a well known acronym for Law Enforcement Officer. I located a thread started on the CalGuns LEO'S forum by "SacDep." The posting was dated 06-09-2009 and titled "off-list pistols" and the following text was written:

*What is the rule/law for selling? Is there a time that has to pass or a certain number of pistols every year? If you know of the penal code that explains it please let me know. thank you*

44. On 09-04-2009, in the "California handguns" forum, "SacDep" started the following thread:
*Scenario: Cop buys off list gun and keeps it for a month. Cop decides to sell gun to non cop buddy (PPT). Non cop buddy keeps gun for a month. Non cop buddy decides to sell gun to non cop CalGuns member. Two non cops go to FFL to do PPT...*

*Does the gun need to be single shot for the transfer? Please only comment if you are 100% sure of what you are talking about. Thanks in advance.*

45. On 02-22-2010, in the "Private Firearms Sales" forum, "SacDep" started a thread where numerous firearms were advertised over a period of time. The thread started on 02-22-2010 and the last posting on the thread by "SacDep" was on 10-01-2010. I copied some of the postings and pictures from the forum added them below:
*I also have a NIB GSG-5PK for sale. It is available for PPT in Sacramento Area for $479. It does not have a maglock. You will need to acquire a maglock or accept separated in a couple pieces. Comes with factory case and accessories.*

*Springfield XD .45 GAP-Used, shoots great. im not sure how many rounds I have put through it. Ammo is a tad expensive so it sits in the safe. comes with everything pictured $400*
*I will travel for PPT for the right price.*

*\*\*Buyer pays DROS for all transactions\*\**



**Photograph of firearm posting listed above**



**Photograph of firearm posting listed above*

46. Based on DROS records which I have reviewed, I know that at the time of this posting McGOWAN owned a GSG-5PK pistol and Springfield XD .45 caliber pistol. McGOWAN purchased one of the GSG-5PK pistols on 07-30-2009 and the second one he didn't purchase until 03-25-2010, not long after this ad was posted.

47. On 03-16-2010, at 2:53 PM, "SacDep" posted: *"btt new gun added."* The next posting is by a CalGuns member with screen name "Friar Tuck". On 03-16-2010, at 3:05 PM, "Friar Tuck" posted: *"How much for the 5.7??"* The next posting is by "SacDep" on 03-16-2010, at 3:35 PM, where he posted: *"trade-something equally awesome."* On 03-18-2010 "SacDep" posted: *"added a PLR-16 to the table."*

48. Sometime between 02-22-2010 and 03-29-2010, "SacDep" added the following post and pictures:

*Originally Posted by SacDep*
*OMG still for sale? Yes. It is a used but in great condition Intratec AB-10 with non threaded/shrouded barrel. comes with a 30 round rebuild kit which will have to be converted to a 10/30 round. PPT only in Sacramento area (not at The Gunroom (they suck), or WildBill's (won't DROS)). Please make sure you have an FFL who will DROS this gun. River City and Snellings are the only two I know who will do it. Willing to trade for something equally awesome but I prefer to sell. 579 firm!!!! Thanks for looking. this is how the gun looks now.*



**Photograph of firearm posting listed above**

*this is how my other one looks after I installed a Tec-9 upper and hogue slip on (gives you an idea)*



*Does not come with case or 10 round mag shown in picture*
**Photograph of firearm listed above.**

*Also for trade is a Beretta 92D Centurion 9MM pistol. Functions perfectly but has some holster wear. It does have night sights but they are kinda dim. U can definitely use them at night though. This gun is DAO. Not looking for anything specific. No case or original paperwork.*



**\*\*Photograph of firearm posting listed above\*\***

*USED Keltec PLR-16 .223 pistol. does not come with Eotech or 10/30 magazine. It will come with a 10 round magazine and everything else shown minus the carpet. Sounds amazing. Trade*



**\*\*Photograph of firearm posting listed above\*\***

*Slightly used FN 5.7. Works and looks great. Comes with everything you see. Mags will need to be made to 10 rounders. Trade*



*\*\*Photograph of firearm posting listed above\*\**

*Also, Magnum Research Micro Desert Eagle. Gently used. Great condition. Im pricing it along with the others I have seen for sale around here. Comes with original case and whatnot $750 OBO NO TRADES*



**\*\*Photograph of firearm posting listed above\*\***

49. On 03-21-2010, "SacDep" updates the thread by posting: *"btt. prices added."* On 03-22-2010, "SacDep" posted: *"5.7 SPF."* On 03-23-2010, "SacDep" posted: *"FN 5.7 sold novanryder"*

50. I know that SPF stands for "sold pending funds" and the 5.7 is referring to the FN 5.7 pistol. This posting also led me to believe that "SacDep" was the screen name being used by McGOWAN. DROS records show that McGOWAN did a private party transfer of his FN 5.7 pistol on 03-23-2010 one day after "SacDep" posted the gun was sold. After McGOWAN sold this FN 5.7 pistol, he purchased a second one on 04-12-2010. McGOWAN later private party transferred the second FN 5.7 pistol on 06-29-2011. Purchasing a second FN 5.7 pistol within three weeks of selling the first one is unusual unless you are engaged in the business of selling firearms.

51. On 03-28-2010, "SacDep" posted: *"92d sold and added the MPA 930 aka the bumbfire king!"* DROS records show that McGOWAN did a private party transfer of a Beretta, model 92D, on 03-31-2010. DROS records show that at the time of this posting McGOWAN also owned a MPA 930 pistol.

52. On 04-05-2010, "SacDep" posted: *"bump with 2 new guns."* There were no photographs of the firearms on the thread at the time TFO Halstead discovered the posting. A person posting on the thread has the ability to delete or modify their postings. It is common for some posters to delete their posting once their firearms are sold. Based on the information in the next three paragraphs, I believe the posting on 04-05-2010 for two new guns by "SacDep" was for an H&K pistol and a Springfield model XDM 9mm pistol.

53. On 04-05-2010, a person with the screen name, manuelcardenas77 posted: *"Nice guns bro!. I like the HK but tooooooo far."* The next posting is by a person with screen name, jlh95811, which states: *"Just out of curiosity what caliber is the XDm 3.8?"* The next posting is by "SacDep", which he replies: *"Sorry..9mm"*. On 04-06-2010, "SacDep" posted: *"XDm SPF"* (sold pending funds). On 04-07-2010, someone with the screen name "killzone45" posted the following question: *"SO is the XDm actually sold or just pending?"* To which "SacDep" responded by posting on 04-07-2010: *"Sold today to a great buyer! Ill let you know if my buddy decides to get rid of his."* DROS records show that McGOWAN did a private party transfer of a Springfield XDM pistol on 04-07-2010. DROS records show McGOWAN purchased the Springfield XDM approximately 12 days earlier on 03-25-2010. It is unusual for someone to buy a firearm and then sell the firearm 12 days later, unless you are engaged in the business of selling firearms.

54. It should be noted that DROS records show McGOWAN purchased a second Springfield XDM on 04-12-2010, only five days after selling the first XDM. The purchasing of a

second Springfield XDM just five days after selling the first one is unusual unless you are engaged in the business of selling firearms. On 06-29-2010, "SacDep" added the second Springfield XDM by posting: *"9mm XDm 3.8 added!"* On 08-08-2010, "SacDep" posted: *"XDM sold."* DROS records show the second Springfield XDM was private party transferred by McGOWAN on 08-07-2010.

55. On 04-07-2010, *"SacDep"* posted: *"HK SPF to mlatino"*. This posting shows the HK was sold pending funds to the person with screen name Mlatino. On 04-08-2010, "SacDep" posted: *"HK sold."* DROS records show that McGOWAN private party transferred an H&K pistol to a Matthew Latino on 04-08-2010. I believe the screen name Mlatino belongs to Matthew Latino and this further supports the conclusion that "SacDep" is the screen name used by McGOWAN.

56. On 06-28-2010, "SacDep" posted: *"Micro desert eagle sold. Chrome .50AE sold. I have a black .50AE available. No pics yet."* Based on the DROS records, I know that McGOWAN did a private party transfer of Micro Desert Eagle pistol on 06-27-2010 and one chrome .50 caliber pistol on 07-10-2010.

### July 15, 2011 - UC Meet With MCGOWAN

57. On July 2, 2011, acting in an undercover capacity, ATF TFO Halstead made contact with an individual later identified as McGOWAN on the CalGuns website. ATF TFO Halstead expressed interest in an Uzi pistol via private messaging. The screen name listed on CalGuns was "dldeguz." On July 10, 2011, "dldguz" accepted an offer of $1300 for an off roster Vector Arms, 9 millimeter pistol. "dldguz" stated on private message that his name is Ryan and could be contacted at 209-481-0968.

58. On July 15, 2011, acting in an undercover (UC) capacity, an ATF Special Agent (hereinafter referred to as UC#1) met McGOWAN at River City Gun Exchange in the City of Sacramento in the parking lot, which was videotaped/recorded. UC #1 viewed a DMV photograph of McGOWAN prior to meeting him at the store and subsequently positive identified the person he met in the parking lot as McGOWAN. McGOWAN told UC #1 that he was running late because he just sold a rifle to someone else just before his meeting with UC #1. McGOWAN allowed UC #1 to view and manipulate the Uzi. McGOWAN gave disassembled magazines capable of holding 25 rounds of ammunition to UC #1. McGOWAN informed UC #1 that he could transfer a high capacity magazine as long as it was not put together. McGOWAN provided instructions to UC #1 on how to assemble the magazines so they had the capacity to hold more than 10 rounds of ammunitions and then told UC #1 to place the magazines in his vehicle before they

entered River City Gun Exchange. McGOWAN assembled one of the high capacity magazines together and gave it to UC #1 intact. California law prohibits the transferring of high capacity magazines. Transferring high capacity magazines is a felony violation of California Penal Code 12020(a)(2).

59. When UC #1 attempted to walk with the firearm towards the entrance of River City Gun Exchange, McGOWAN informed him that a transfer of money inside the store would result in taxes collected by the store for the sale of the firearm. UC #1 consented to paying McGOWAN $1300 in cash for the Vector Arms, Model HR4332, 9mm pistol, serial number 507102 in the parking lot and then entered the store with McGOWAN to complete the private party transfer.

60. After the transfer was completed at River City Gun Exchange, UC #1 and McGOWAN exited the store. An unidentified Asian male exited the store and walked up to McGOWAN and expressed interest in purchasing a Vector Arms. The Asian male identified himself as "Ton" and then asked McGOWAN how he was able to procure the Uzi pistol. McGOWAN informed Ton that he was a "cop" so he could procure these items and transfer them to UC #1. McGOWAN continued to inform Ton that disassembled high capacity magazines are ok to transfer. Moreover, McGOWAN stated that it was up to the "transferee" what they wanted to do once they were in possession of the high capacity magazines. McGOWAN took Ton's phone number and said he would put him in contact with his friend that has similar Uzi type pistols for sale.

\*\*Firearm purchased on July 15th 2011\*

## August 4, 2011 - UC Meeting with McGOWAN

61. On July 22, 2011, TFO Halstead acting in an undercover capacity made contact with McGOWAN on the CalGuns website. TFO Halstead communicated with the screen name "dldeguz" via private messages. McGOWAN had an off roster MasterPiece Arms, MPA22, .22 caliber pistol, for sale on CalGuns for $350. Acting on behalf of UC #1, TFO Halstead negotiated a deal for the firearm and set up a meeting for August 4, 2011, to pay for and transfer the firearm.

62. On August 4, 2011, UC #1 met McGOWAN at River City Gun Exchange and purchased a MasterPiece Arms, MPA 22, .22 caliber pistol, serial number J5573, in the parking lot for $350, which was videotaped/recorded. McGOWAN also provided UC #1 with a disassembled high capacity magazine and again showed UC #1 how to assemble the magazine together. McGOWAN again instructed UC #1 to put the high capacity magazines in his vehicle prior to entering River City Gun Exchange. UC #1 and McGOWAN entered River City Gun Exchange and conducted a private party transfer of the firearm from McGOWAN to UC #1.

63. During the meeting on August 4, 2011, McGOWAN told UC #1 that he usually schedules all of his firearm deals on the same day. McGOWAN asked UC #1: "do you have any friends looking for a mini Uzi like the one you got from me?" McGOWAN was referencing the firearm that UC #1 purchased from him on July 15, 2011. McGOWAN stated that his "buddy has one for sale." UC #1 told McGOWAN he would ask around and would contact him at a later time. During the course of this investigation, UC #1 expressed interest in obtaining a specific firearm, a Ruger, LCP, .380 caliber handgun, from McGOWAN. However, McGOWAN was unable to provide the specific firearm for UC #1.

64. On a later date, McGOWAN placed UC #1 in contact with Thomas LU. McGOWAN stated that LU may have firearms in his inventory that the UC #1 would be interested in purchasing.



**Purchase on August 4th 2011**

### September 9, 2011 - UC Meeting with McGOWAN

65. On September 7, 2011, acting in an undercover capacity, TFO Halstead made contact with McGOWAN on behalf of UC #2 on the CalGuns website communicating via private messages with the screen name "dldeguz". McGOWAN posting under the screen name "dldeguz" listed an off roster Desert Eagle, gold plated with tiger stripes, .50 caliber pistol for $3000. TFO Halstead negotiated the price down to $2950 utilizing private messaging on the CalGuns website for the Desert Eagle, .50 caliber pistol.

66. On September 9, 2011, an ATF undercover agent (hereinafter referred to as UC #2), met with McGOWAN at Wild Bill's Old West Trading Company located at 10490 East Stockton Blvd in Elk Grove, California. McGOWAN arrived in a 2006 black, Lexus 4 door sedan, with California license plate ▮▮▮▮▮▮ Per the California Department of Motor Vehicles (DMV), the vehicle is registered to Ryan McGOWAN.

67. McGOWAN gave UC #2 a discounted price of $2900 (instead of $2950) for a Magnum Research, Desert Eagle, .50 caliber pistol, serial number 36205661, while in the parking lot, which was videotaped/recorded. McGOWAN told UC #2 that the business would charge sales tax if the sale is conducted inside the business. After MCGOWAN counted out the cash, UC #2 and McGOWAN entered Wild Bill's Old West Trading Company and completed a private party transfer of the firearm from McGOWAN to UC #2.

68. A query of AFS shows that McGOWAN purchased the Magnum Research, Desert Eagle, .50 caliber pistol, serial number 36205661, from Personal Defense Weapons on August 16, 2011. Considering the California 10 day waiting period, McGOWAN would not have been able to pick up the firearm from Personal Weapons Defense until August 26, 2011. He posted it for sale on CalGuns for $3000 under the screen name of "dldeguz" on September 7, 2011. Hence, McGOWAN could have only possessed the firearm for no more than 13 days before posting it for sale.

69. TFO Halstead contacted an employee named "Dan" from Personal Defense Weapons via telephone. Dan stated that the above listed firearm is listed for approximately $1877 at this time. Dan stated that this type of firearm needs to be custom ordered.

70. Based on my training and experience and information relayed to me by agents/detectives, I know that persons who purchase firearms retain the firearms for indefinite periods of time because of their intrinsic and monetary value. McGOWAN possessed the above listed firearm for a very short period of time which would be more common for someone who is engaged in the business of firearm sales. In this specific case, McGOWAN was able to make a profit from the sale of this off roster firearm due to the difficulty of obtaining this firearm by non law enforcement personnel.



**Purchased on September 9th 2011**

## Suspicious Transactions of Firearms made by McGOWAN
### A. Multiple Purchases on Same Date

71. On numerous occasions Deputy Ryan McGOWAN has purchased multiple handguns on the same day. People engaged in the business of dealing firearms or trafficking firearms will often purchase multiple firearms at once. California Penal Code Section 12072(a)(9) prohibits a person from buying more than one handgun from a FFL within any 30 day period. However, law enforcement officers in California are exempt from the law and therefore can purchase as many handguns as they wish within a 30 day period. A review of the DROS (Dealer Record of Sale) and AFS records show the following multiple handgun sales made by McGOWAN:

### May 18th, 2009

- MasterPiece Arms, model MPA10, .45 caliber (off roster handgun)
- Leinad, model PM11, 9mm (off roster handgun)
- Intratec, model AB10, 9mm (off roster handgun)

### July 2nd, 2009

- Intratec, model AB10, 9mm (off roster handgun)
- Sturm & Ruger, model LCP, .380 caliber (off roster handgun)
- Kel Tec, model PLR16, .223 caliber (off roster handgun)
- Kel Tec, model PLR16, .223 caliber (off roster handgun)

### July 30th, 2009

- Group Industries, model GSG 5PK, .22 caliber (off roster handgun)
- Magnum Research, model Micro Desert Eagle, .380 caliber (off roster handgun)

### August 6th, 2009

- Intratec, model Tec-DC9, 9mm (off roster handgun)
- MasterPiece Arms, model MPA 10, .45 caliber (off roster handgun)
- MasterPiece Arms, model MPA 930SSTX, 9mm (off roster handgun)

### August 19th, 2009

- Springfield, model XD, .40 caliber
- Smith & Wesson, model 442, .38 caliber

<u>March 25th, 2010</u>

- Group Industries, model GSP 5PK, .22 caliber
- Springfield Armory, model XDM, 9mm (off roster handgun)

<u>April 12th, 2010</u>

- Fabrique Nationale (FN), model 57, 5.7 x 28 caliber
- Springfield Armory, model XDM, 9mm (off roster handgun)

<u>September 2nd, 2010</u>

- IMI, model Desert Eagle, .50 caliber (off roster handgun)
- Kel Tec, model PF9, 9mm (off roster handgun)

<u>September 9th, 2010</u>

- MasterPiece Arms, model MPA 22, .22 caliber (off roster handgun)
- Group Industries, model HR4332, 9mm (off roster handgun)

## B. Multiple Purchases of Same Make, Model, and Caliber

72. McGOWAN has also purchased multiple firearms that appear to be the same make, model and caliber. People engaged in the business of selling or trafficking firearms often will purchase multiple firearms of the same make, model and caliber. Below is a summary of some of the transactions:

### .50 caliber Desert Eagle handguns

73. McGOWAN has purchased/obtained five (5) IMI, Desert Eagle, .50 caliber handguns. He has private party transferred four of the five and has the fifth one on consignment at a FFL. These five firearms are not on the approved list and are off roster handguns for sale in California.

74. On 08-16-2011, McGOWAN purchased a .50 caliber Desert Eagle from a Personal Defense Weapons (FFL) for approximately $1877. On 09-07-2011, McGOWAN listed a Magnum Research, Desert Eagle, .50 caliber for sale on the CalGuns website for $3000. On 09-09-2011, UC #2 purchased the .50 caliber firearm from MCGOWAN for $2900. Based on the serial number I was able to confirm the .50 caliber Desert Eagle purchased by UC #2 was the same .50 caliber Desert Eagle McGOWAN purchase approximately 25 days earlier.

75. On 09-02-2010, McGOWAN purchased an IMI, .50 caliber Desert Eagle, gold in color, handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred (PPT) the same firearm on 04-08-2011. It appears this .50 caliber was listed for sale on the CalGuns website under the screen name "dldeguz." The ad was posted on 04-07-2011, at 3:56 AM, and the postings indicate it was sold a short time later at 6:16 AM. There was a picture of the firearm and the following text in the ad:

*"THIS GUN IS STILL AVAILABLE UNLESS OTHERWISE NOTED. $2600 OBO Titanuim Gold Tiger Stripe Desert Eagle in like new condition. Only shot one magazine through it. Not a scratch on it. Comes with box, paper work and fired shell from factory. You can not buy these new right now. If you think you can, go ahead and try. PPT in Sac area. Buyer pays DROS. Thanks for looking."*



**Firearm posting as listed above**

76. On 07-22-2010, McGOWAN purchased an IMI, .50 caliber Desert Eagle, gold in color, handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred the same firearm on 03-26-2011.

77. On 05-24-2010, McGOWAN purchased an IMI, .50 caliber Desert Eagle, black in color, handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred the same firearm on 08-04-2010.

78. On 04-01-2010, McGOWAN purchased an IMI, .50 caliber Desert Eagle, chrome in color, handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred the same firearm on 07-10-2010.

## Fabrique Nationale

79. McGOWAN purchased two Fabrique Nationale (FN), model Five Seven handguns from SNELLINGS' FIREARMS and later private party transferred both of the them.

80. On 03-30-2009, McGOWAN purchased/obtained one of the FN handguns. He private party transferred the same firearm on 03-23-2010. Then on 04-12-2010, McGOWAN purchased/obtained another FN handgun. He private party transferred the second FN handgun on 06-29-2011 to another person.

## Group Industries, GSG 5PK

81. McGOWAN purchased two Group Industries, model GSG 5PK, .22 caliber handguns from SNELLINGS' FIREARMS. There is no record of McGOWAN private party transferring either of these handguns.  However, "SacDep" has posted one for sale on CalGuns.

## Group Industries, model HR4332

82. McGOWAN purchased two Group Industries, model HR4332 handguns from SNELLINGS' FIREARMS and later private party transferred both of the firearms.

83. On 09-09-2010, McGOWAN purchased one of the Group Industries, model HR4332 handguns. On 06-24-2011, McGOWAN private party transferred the same handgun to another person.

84. On 02-15-2011, McGOWAN purchased a second Group Industries, model HR4332. On 07-15-2011, McGOWAN sold this same firearm to UC #1.

## Intratec, model AB-10

85. McGOWAN has purchased two Intratec, model AB-10 handguns from SNELLINGS' FIREARMS and later private party transferred both of them.

86. On 05-18-2009, McGOWAN purchased one of the Intratec, model AB-10 handguns. McGOWAN then private party transferred the same handgun on 08-28-2010 to another person.

87. On 07-02-2009, McGOWAN purchased the second Intratec, model AB-10 handgun. McGOWAN then private party transferred the same handgun on 08-28-2010 to another person.

88. These two AB-10's were transferred to two different people.

## Kel Tec, PLR 16

89. On 07-02-2009, McGOWAN purchased two Kel Tec, model PLR 16 handguns from SNELLINGS' FIREARMS. McGOWAN private party transferred one of the Kel Tec handguns on 07-21-2009 to another person. Then on 10-26-2009, McGOWAN purchased a third Kel Tec, PLR 16 handgun from SNELLINGS' FIREARMS. McGOWAN private party transferred the third Kel Tec to another person on 09-11-2010.

## Magnum Research, Micro Desert Eagle

90. McGOWAN has purchased two Magnum Research, model Micro Desert Eagle handguns from SNELLINGS' FIREARMS and later private party transferred both of them.

91. On 06-18-2009, McGOWAN purchased one of the Micro Desert Eagles and then private party transferred the same handgun to another person on 07-07-2009.

92. On 07-30-2009, McGOWAN purchased the second Micro Desert Eagle and then private party transferred the same handgun to another person on 06-27-2010.

## MasterPiece Arms, MPA 10

93. McGOWAN has purchased two MasterPiece Arms, model MPA 10 handguns from SNELLINGS' FIREARMS. He later private party transferred one of the two handguns to another person.

94. McGOWAN purchased one on 05-18-2009 and the second one on 08-06-2009. The gun he purchased on 08-06-2009 was private party transferred to another person on 04-08-2010.

## Springfield Armory

95. McGOWAN purchased two Springfield Armory, model XDM handguns from SNELLINGS' FIREARMS. McGOWAN purchased the first one on 03-25-2010 and then on 04-7-2010, he private party transferred that handgun to another person. Shortly after the private party transfer of the first handgun, McGOWAN purchased a second Springfield Armory handgun on 04-12-2010. McGOWAN then private party transferred the second handgun to another person on 08-07-2010.

**Firearms Recovered at Crime Scene**

96. On August 28, 2010, McGOWAN private party transferred a Intratec, Model AB10, 9mm pistol, serial number A060149 and a MasterPiece, model MPA930 pistol, serial number F9281, to Joseph Camilleri at River City Gun Exchange.

97. On February 21, 2011, Daly City Police Department (report ##11001520) recovered these two firearms that were private party transfers from McGOWAN to Joseph Camilleri. Daly City Police Department responded to a shots fired call that resulted in a 6 hour standoff with police SWAT team which ultimately resulted in the arrest of Camilleri for multiple state charges, including possession of illegal assault weapons, shooting into an unoccupied dwelling, manufacture/convert a machinegun.

**Straw purchase of Sturm, Ruger and Company, LCP, .380 Pistol, Serial Number 37182507 by McGOWAN**

98. The following transaction appears to be a straw purchase for Robert SNELLINGS of SNELLINGS' FIREARMS made by McGOWAN. SNELLINGS' FIREARMS is a Federal Firearm Licensee (FFL) and is owned by Robert SNELLINGS.

99. A "straw purchase" is when someone buys a firearm with the intention of giving/selling it to someone else (the real purchaser) that did not buy and register the firearm.

100. McGOWAN purchased a Sturm, Ruger and Company, LCP, .380 caliber pistol, serial number 37182507, from SNELLINGS' FIREARMS on July 2, 2009. This specific firearm is an off roster firearm and can only be purchased new by a law enforcement officer. McGOWAN was able to purchase this firearm due to his peace officer status.

101. During the purchase of this firearm, McGOWAN filled out ATF form 4473. Question 12a of the ATF form 4473, asks: "Are you the actual buyer of this firearm(s) listed on the form?" On the form, McGOWAN answered "yes" to question 12a. If McGOWAN did not answer "yes", the sale would have been prohibited by law.

102. Question 12a also explains: **"you are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you"**.

103. ATF Form 4473 then requires McGOWAN (the purchaser) to certify the following statement to be true and correct.

104. "I certify that the above answers are true and correct. I understand that answering "yes" to question 12a when I am not the actual buyer of the firearm is a crime punishable as a felony. I understand that a person who answers "yes" to any of the questions 12b through 12k is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12l is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 13. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law".

105. California law requires the owner of the firearm to wait 10 days before he/she can pick up the firearm from a FFL. During the 10 days, a background check is completed by the California Department of Justice.

106. On July 12, 2009, McGOWAN would have been able to pick up his firearm from SNELLINGS' FIREARMS. On July 13, 2009 (11 days after the purchase) McGOWAN private party transferred the Sturm Ruger LCP, .380 caliber pistol back to Robert SNELLINGS, as a private person (not the FFL).

107. SNELLINGS must fill out the ATF form 4473 and wait 10 days before he is able to possess the firearm. On July 27, 2009 (14 days after McGOWAN transferred the firearm to SNELLINGS), SNELLINGS private party transferred the firearm to William Perparos. This gun is later listed on the CCW (Carry Concealed Weapon) permit for Perparos on April 20, 2011.

**McGOWAN residence,** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ **, Elk Grove, California**

108. On August 4 2011, TFO Halstead and I observed McGOWAN park in the driveway at ▇▇▇▇▇▇▇▇▇▇ in Elk Grove, California.

109. On September 9, 2011, McGOWAN listed his address as ▇▇▇▇▇▇▇▇▇▇ t in Elk Grove on his private party transfer paperwork at Wild Bill's Old West Trading Company.

110. On September 27, 2011, I queried McGOWAN in the Accurint database. Accurint is a computerized database available to law enforcement that provides current addresses of people. Accurint lists ▇▇▇▇▇▇▇▇▇▇ in Elk Grove as his residence.

111. On September 30, 2011, TFO Halstead and I observed the black Lexus, with California license plate number ███████, parked in the driveway of ██████████████ in Elk Grove.

112. On October 31, 2011, Sacramento County Sheriff's Department (SSD) Detective T. Koontz provided the address of ████████████ in Elk Grove as the home address of McGOWAN per information provided by SSD records.

### Thomas LU

113. Thomas LU has been identified as a Sacramento County Sheriff's Deputy. Per the Sacramento County Known Person Files (KPF), LU was identified as an ████ male, ██ approximately ██ pounds, ███ hair and ████ eyes, with a date of birth of ████

114. A query of AFS (Automated Firearms System) indicates that LU has obtained 34 (handguns) firearms since 2008. Twenty-seven of the 34 firearms were off roster firearms. LU has private party transferred a total of 23 firearms. Eighteen were private party transferred within one year of the initial purchase.

115. DROS records show that 29 of the 34 firearms obtained by LU were transferred to him through SNELLINGS' FIREARMS.

116. ATF Area Supervisor for Industry Operations, Roger Root reviewed ATF records and concluded that LU does not possess a Federal Firearms License.

117. During the purchases and/or acquistions of all of the firearms, LU filled out ATF form 4473. Question 12a of ATF form 4473, asks: **"Are you the actual buyer of this firearm(s) listed on the form?"** On the form, LU answered "yes" to question 12a. If LU did not answer "yes", the sale would have been prohibited by law.

118. Question 12a also explains: **"you are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you".**

119. ATF Form 4473 then requires LU (the purchaser) to certify the following statement to be true and correct.

120. **"I certify that the above answers are true and correct. I understand that answering "yes" to question 12a when I am not the actual buyer of the firearm is a crime punishable as a felony. I understand that a person who answers "yes" to any of the questions 12b through 12k is prohibited from purchasing or receiving a firearm. I**

understand that a person who answers "yes" to question 12l is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 13. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law.

### August 11, 2011- UC Meeting With LU

121. On August 9, 2011, TFO Halstead, acting in an undercover capacity on behalf of UC #1 on the CalGuns website arranged a firearms purchase with "Tom." McGOWAN operating under the screen name "dldeguz" told TFO Halstead that his friend "Tom" had a Tec DC9 and a MasterPiece Arms, .45 caliber pistol, for sale for $500 each. McGOWAN sent a picture via text message of the firearms from his cell phone to UC #1's cell phone. McGOWAN also provided "Tom's" phone number of 916-420-4345. UC #1 verified the phone number by calling it the day of the firearms purchase and speaking to "Tom" directly.

122. On August 11, 2011, UC #1 met Thomas LU in the River City Gun Exchange parking lot. Similar to the meetings with McGOWAN, UC #1 walked over to LU'S vehicle and was able to view/manipulate the firearms. UC #1 purchased three off roster firearms which include a MasterPiece Arms, MPA10, .45 caliber pistol, serial number A0494, for $450, a Vector Arms, HR4332, 9 millimeter pistol, serial number 507186, for $1400, and a Intratec, Tec-dc9, 9 millimeter pistol, serial number D062624, for $450 from LU, for a total of $2300. UC #1 negotiated $100 off the initial asking price of the Tec DC9 and MasterPiece Arms, .45 caliber handgun, for sale for $500 each.

123. During the meeting, LU explained to UC #1 that several of the high capacity magazines had a wooden peg inserted in the magazine. The wooden peg is inserted in the magazine so the magazine could accept only 10 rounds of ammunition. However, LU told UC #1 that UC #1 can simply take the magazine apart and take out the wooden peg. LU continued to instruct to UC #1 how to circumvent the California "Assault Weapons Act" in regards to possessing high capacity magazines. LU told UC #1 that if the police asked him how he came into possession of the high capacity magazines, he needed to say: "I owned the magazines way before the ban and shit." Furthermore, LU informed UC #1: "they can't check."

124. The selling, lending and/or giving of a high capacity magazine is a felony violation of the California Penal Code Section 12020 (Unlawful carrying and Possession of Weapons). A

high capacity magazine is a magazine capable of holding more than 10 rounds of ammunition. The condition in which LU transferred the high capacity magazines to UC #1 is a felony violation of California Penal Code section 12020 because the magazines were not permanently modified to hold 10 rounds or less.

125. During the meeting, UC #1 asked LU if he was on www.CalGuns.net. LU stated that he was on www.CalGuns.net under screen name "Teabag." LU stated that he had some other guns he wanted to sell. Specifically, LU indicated that he had "Norinco AKs" for sale.

126. While filling out the private party transfer paperwork, LU provided his California identification card to the employee at River City Gun Exchange. The identification card stated his name was Thomas LU. When the transfer paperwork was complete, UC #1 and LU exited the River City Gun Exchange. LU informed UC #1 that he had a few more firearms in his vehicle. LU informed UC #1 that he had a Mossberg shotgun and another Uzi. UC #1 asked if the firearms were online. LU indicated that they weren't online because you can't put too much stuff online.



**Purchased on August 11th 2011**

### August 26, 2011-Purchase of two off roster firearms from LU

127. On August 16, 2011, TFO Halstead, acting in an undercover capacity began conversing with LU on the CalGuns website on behalf of UC #1.  LU has an account with the screen name "Teabag" (which he identified as his screen name on the August 11 meeting). TFO Halstead expressed interest in purchasing an off roster Lancaster AK pistol (manufactured by Nodan Spud LLC) and an off roster Kel-Tec PLR 16 pistol.  LU requested UC #1's private email account so that he could email photos, a list of 6 firearms and the corresponding sale prices that he had for sale.  LU sent an email to UC #1 from an email account titled sac_thug4u@yahoo.com on August 22, 2011, with the above information. (See Attachment C for email conversation).

128. On August 26, 2011, UC #1 met with LU at the River City Gun Exchange to purchase a Nodac Spud, LLC, Model NDS-3, 7.62 caliber, serial number M006659, and a Kel Tec, PLR16, .223 caliber pistol, serial number P4Y17, for $1550 which was videotaped/recorded.  LU led UC #1 to his vehicle to show UC #1 the firearms. LU was driving a white, 4-door, Lexus sedan, California license plate ███████.  A query through DMV revealed that the 4-door, Lexus sedan, California license plate ███████ is registered to LU.  LU opened the trunk of the vehicle, which contained boxes and firearm cases.  UC #1 successfully purchased the above listed firearms from LU.

129. LU provided a few other firearms for UC #1 to review while they were still at his vehicle. LU provided UC #1 with a GSG5 pistol, a Norinco Uzi pistol with a wooden stock, and an AK-47 style rifle.  UC #1 manipulated the action on each firearm and reviewed other features such as manufacturer markings and the bullet buttons. A bullet button is a magazine locking device.  UC #1 ultimately told LU he would check to see if he knew anyone interested in the other firearms.

130. While filling out the transfer documents at the River City Gun Exchange, UC #1 overheard an employee of the gun store ask LU if he had recently received the Lancaster (manufactured by Nodac Spud, LLC) pistol. UC #1 observed the Lancaster pistol in a postal box. LU indicated that he had recently received the firearm. Additionally, LU indicated the firearm was delivered in the same postal box. UC #1 asked if LU bought the rifle online. LU responded affirmatively.

131. LU informed UC #1 about regulatory issues concerning the purchase of ammunition and handguns.  LU indicated that purchasing a handgun in a gun dealer, such as River City Gun Exchange, was regulated to one gun a month. However, LU indicated that the type of transfer he and UC #1 were engaged in could be as many as 10 transfers.

132. Due to the fact that LU is a peace officer, he is not restricted to the amount of firearms he may purchase monthly. A private citizen can only purchase one new handgun a month per California law.



**Purchased on August 26th 2011**

### September 7, 2011 - Meeting With LU

133. On September 6, 2011, TFO Halstead acting in an undercover capacity on behalf of UC #1 conversed with LU via email (Sac_thug4u@yahoo.com) regarding the purchase of four firearms (see attachment C for email). LU stated that he had the following firearms for sale: Interdynamics KG-9, 9 millimeter pistol for $ 1,500 (off roster); Kel Tec PF-9 pistol for $400 (off roster); Intratec, TECDC 9, 9 millimeter pistol, serial number D029008, for $500 (off roster); and a Norinco, Model 320, 9 millimeter rifle serial number A10709, for $700. TFO Halstead told LU that he was interested in purchasing the four firearms for $3100. The meeting was set up for September 7, 2011, at River City Gun Exchange.

134. On September 7, 2011, UC #1 and LU met in the parking of the River City Gun Exchange, which was videotaped/recorded. UC #1 and LU walked over to LU's vehicle, a white Lexus sedan, California plate, ███████ to see the firearms LU would be selling. UC #1 observed LU open his trunk, which contained cardboard boxes and hard case firearm containers. UC #1 observed that the firearms appeared consistent with the photographs of the firearms listed in LU's email. In regard to the KG-9 pistol, LU told UC #1 that the firearm could easily be converted to an automatic firearm by altering a piece of metal in the firearm. Furthermore, LU told UC#1 that because of the relative ease at which the firearms could be converted, the ATF directed the manufacturer to stop making the firearm in this manner.

135. In addition to showing the firearms to UC #1, LU provided UC #1 with high capacity magazines for each of the firearms. LU informed UC #1 that he had inserted a wood peg in the high capacity magazines thereby restricting the ability to insert more than the legal amount of ammunition in a magazine under California guidelines. LU has used this method of rendering large capacity magazines legal in the past. However, LU told UC #1: "it's up to you what you want to do after that."

136. On this occasion, LU suggested that he and UC #1 make the money transfer inside of his vehicle.   UC #1 negotiated a deal from the initial $3100 asking price to the purchase price of $3000.  LU agreed on a purchase price of $3000 for all four firearms.  Following the money exchange in the vehicle, LU and UC #1 entered River City Gun Exchange and filled out the private party transfer paperwork.

137. Prior to the completion of the transaction, LU informed UC #1 that he has a few more firearms for sale. LU indicated that he has a .22 long rifle AK-47 for sale. LU also stated that he has a mini Tec 9 for sale as well. UC #1 informed LU that he would check with his associates regarding interest in purchasing the firearms.  During the course of this investigation, UC #1 expressed interest in obtaining a specific firearm, a Ruger, LCP, .380 caliber handgun, from LU. However, LU was unable to provide the specific firearm for UC #1.



**Purchased on September 7th 2011**

## Suspicious Firearms Transactions made by LU
### A.   Multiple Purchases on Same Date

138. On numerous occasions, Deputy Thomas LU has purchased multiple handguns on the same day. People engaged in the business of dealing firearms or trafficking firearms will often purchase multiple firearms at once. California law prohibits a person from buying more than one handgun from a FFL within any 30 day period. However, peace officers in California are exempt from the law and therefore can purchase as many handguns as they wish within a 30 day period. A review of the DROS and AFS records show the following multiple handgun sales made by LU:

### November 22nd, 2010
- MasterPiece Arms, model MPA30 (off roster handgun)
- Taurus, model Raging Bull (off roster handgun)

### October 18th, 2010
- Intratec, model DC-9 (off roster handgun)
- Intratec, model DC-9 (off roster handgun)

### October 4th, 2010
- MasterPiece Arms, model MPA380 (off roster handgun)
- DSA, model TP9US (off roster handgun)

### September 23rd, 2010

- Interdynamic, model KG9 (off roster handgun)
- Kel Tec, model PF9 (off roster handgun)

### September 2nd, 2010

- IMI, model Micro Desert Eagle (off roster handgun)
- Masterpiece Arms, model MP10 (off roster handgun)
- Intratec, model Tec-DC9 (off roster handgun)

### August 12th, 2010

- IMI, model Micro Desert Eagle (off roster handgun)
- Kel Tec, model P3AT (off roster handgun)
- Kel Tec, model PF9 (off roster handgun)

### July 22nd, 2010

- Interdynamic, model KG99 (off roster handgun)
- Intratec, model Tec-DC9 (off roster handgun)

**B.   Multiple Purchases of Same Make, Model, and Caliber**

139. Deputy Thomas LU has also purchased multiple firearms that are the same make, model and caliber. People engaged in the business of selling or trafficking firearms often will purchase multiple firearms of the same make, model and caliber. Below is a summary of the transactions:

### Norinco, 1911A1

140. LU purchased three Norinco, model 1911A1 handguns from SNELLINGS' FIREARMS. He purchased them on the following dates: 08-05-2010, 08-14-2010 and 10-07-2010. LU private party transferred the handgun he purchased on 10-07-2010 to another person on 07-28-2011.

### IMI, Desert Eagle

141. LU purchased two IMI/Magnum Research, Desert Eagle, .50 caliber handguns. He purchased one from SNELLINGS' FIREARMS on 12-02-2010 (gold in color) and later private party transferred it to another person on 08-17-2011.  LU purchased a second IMI, Desert Eagle, .50 caliber handgun on 09-03-2011 from Personal Defense Weapons.

### IMI, Micro Desert Eagle

142. LU purchased three Micro Desert Eagles, .380 caliber handguns from SNELLINGS FIREARMS. LU purchased one on 07-09-2009 and later private party transferred it to another person on 07-29-2011. LU purchased the second one on 08-12-2010 and later private party transferred it to another person on 09-03-2011. LU purchased the third one on 09-02-2010 and later private party transferred it to another person on 03-21-2011.

### Kel Tec, P3AT

143. LU purchased two Kel Tec, P3AT handguns, one from SNELLINGS' FIREARMS on 08-12-2010 and one from River City Gun Exchange on 11-04-2008.  The firearm he purchased on 11-04-2008 was later private party transferred to another person on 07-31-2010.

### Kel Tec, PF9

144. LU purchased two Kel Tec, PF9 handguns from SNELLINGS' FIREARMS. He purchased one on 08-12-2010 and later private party transferred it to another person on 03-21-2011. He purchased the second one on 09-23-2010 which he sold and private party transferred to UC #1 on 09-07-2011.

### Intratec, Tec-DC9

145. LU purchased six Intratec, TEC-DC9 handguns from SNELLINGS' FIREARMS. LU has private party transferred four of the six handguns after he purchased them.

146. LU purchased one of the handguns on 05-20-2010 and he later private party transferred it to another person on 04-23-2011.

147. LU purchased the second handgun on 06-07-2010 and he later sold it to UC #1 on 09-07-2011.

148. LU purchased the third handgun on 07-22-2010 and the fourth handgun 09-02-2010.

149. LU purchased the fifth and sixth handguns on 10-18-2010. LU sold one of them to UC #1 on 08-11-2011. He private party transferred the other handgun to another person on 04-23-2011.

### LU residence, ███████████, Elk Grove, California

150. On August 26, 2011, I queried the registered owner's information of a Lexus sedan, license plate ███████ (vehicle present on August 16 and September 7 meet with UC

#1).  The vehicle is registered to LU at an address of ███████████y, Elk Grove, California.

151. On September 7, 2011, LU listed the address of ███████████, Elk Grove, California on his private party transfer paperwork on Elk Grove, California.

152. On September 27, 2011, a query of Accurint indicated the most current address for LU is ███████████, Elk Grove, California.

153. On September 30, 2011, TFO Halstead and I observed the white Lexus sedan which is registered to LU parked outside of ███████████, Elk Grove.

154. On October 31, 2011, Sacramento County Sheriff's Department (SSD) Detective T. Koontz provided the address of ███████████, Elk Grove as the home address of LU per information provided by SSD records.

### Darryl DEGUZMAN

155. Darryl DEGUZMAN has been identified as a Sacramento County Sheriff's Deputy.  Per the Sacramento County Known Person Files (KPF), DEGUZMAN is identified as a ███ male, ██ approximately ██ pounds, ██k hair and ███ eyes with a date of birth of ███.

### DEGUZMAN'S involvement

156. ATF TFO Halstead reviewed a multitude of private sale postings located in the "private firearms sales" on the CalGuns website listed by other screen names.  ATF TFO Halstead discovered that a CalGuns user listed as "dldeguz" had posted off roster firearms that were consistent with the same type of firearms posted by "SacDep".

157. On July 23, 2009, "dldeguz" posted a photo of brand new Micro Desert Eagle, .380 caliber pistol for sale on the CalGuns website.  TFO Halstead was able to identify the serial numbers located on the firearm in the picture as ME03936.  TFO Halstead queried the serial number ME03936 in AFS and discovered a DROS showing that Darryl DEGUZMAN, with date of birth 09-09-1980, purchased the Micro Desert Eagle pistol on 07-02-2009.  On July 29, 2009, the ad for sale was updated by "dldeguz" with the following posting: *"Sold!!!"* DROS records show DEGUZMAN private party transferred the firearm to a German Vasquez on July 29th, 2009.

158. On April 14, 2011, "dldeguz" posted a FHN, FN, 5.7 caliber pistol for sale.  TFO Halstead was able to identify the serial number as 386118807 from the picture posted on

CalGuns. A query conducted on AFS revealed that the above listed firearm was originally purchased by McGOWAN on April 12, 2010 and private party transferred by McGOWAN on June 29, 2011.

159. The firearm posted for sale on CalGuns with the screen name of "dldeguz" combined with UC #1's interactions with McGOWAN on three occasions utilizing the screen name "dldeguz" suggests that McGOWAN is posting his firearms for sale under DEGUZMAN's screen name on the CalGuns website.

160. Sacramento County Sheriff's Detective T. Koontz checked SSD records which verified that DEGUZMAN, LU, and McGOWAN work on the same floor and same shift at the Rio Consumnes Correctional Center (RCCC).

**DEGUZMAN Residence, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Elk Grove, California**

161. On September 27, 2011, a query of Accurint listed ▓▓▓▓▓▓▓▓▓▓ Elk Grove, California as the residence of DEGUZMAN.

162. On September 30, 2011, TFO Halstead and I observed a gold in color 2003 Toyota truck, license plate ▓▓▓▓▓ parked outside of ▓▓▓▓▓▓▓▓▓, Elk Grove, California. A query of the DMV database states that the Toyota truck is registered to DEGUZMAN.

163. On October 31, 2011, Sacramento County Sheriff's Department (SSD) Detective T. Koontz provided the address of ▓▓▓▓▓▓▓▓▓, Elk Grove as the home address of DEGUZMAN per information provided by SSD records.

**Robert SNELLINGS**

164. Per the Sacramento County Known Person Files (KPF), SNELLINGS is identified as a white male, 5'10, approximately 180 pounds, brown hair and hazel eyes, with a date of birth of ▓▓▓▓▓.

165. SNELLINGS presently possesses an FFL (FFL # 9-68-067-01-1D-17587) for SNELLINGS' FIREARMS located at 2675 Land Avenue in Sacramento, California. LG FIREARMS (FFL) is located in the same business space as SNELLINGS' FIREARMS. Christopher LENERT and Brent Gentilcore are listed as the Federal Firearms licensees on LG Firearms FFL.

166. FFL'S are required by ATF regulations to maintain Records of Receipt and Disposition Book(s) (commonly referred to as A&D book). This book is a ledger recording the

specifics of the firearm, the date the FFL acquired the firearm and the name and address of whom they acquired the firearm from.  The disposition is the date the FFL transferred the firearm and the name and address of who they transferred it to.

## Robert SNELLINGS/SNELLINGS' FIREARMS

167. During the course of this investigation TFO Halstead was contacted by supervising Special Agent Blake Graham. Blake Graham is a sworn California peace officer employed by the California Department of Justice (DOJ). Agent Graham is assigned to the Bureau of Firearms where his duties include, but are not limited to, conducting investigations on violations of California's firearms statutes and criminal investigations involving businesses with a federal firearms license (FFL). Agent Graham is involved in the process of approving what handguns may be sold in the State of California and amending the roster of approved handguns certified for sale in California. Agent Graham has access to Dealer Records of Sales (DROS) for firearms transactions that occur within the State of California.

168. Agent Graham informed TFO Halstead that he discovered some suspicious transactions conducted through the business SNELLINGS' FIREARMS, located at 2675 Land Ave, Sacramento, California. The suspicious transactions involved firearms not on the roster of approved handguns, being purchased by California peace officers. The transactions identified by Agent Graham were suspicious because after the handguns were purchased by the peace officers they were private party transferred in a short period of time to Robert SNELLINGS as a private person, not to the business SNELLINGS' FIREARMS (FFL). Agent Graham was able to determine each of the purchasers were peace officers because of an exemption code, entered on the DROS when the sale is to a peace officer. A DROS is started on the date of purchase and/or transfer, even though the person may not pick up the firearm for ten days because of California's ten day waiting period for a background check.

169. California law enforcement officers are exempt from the waiting period if they have a letter signed by the head of the agency or commanding officer, stating they are full time paid peace officers authorized to carry a firearm in the performance of their duties and authorizing the purchase.

170. Since Robert SNELLINGS is not a peace officer, he is limited to the same restrictions as all California residents that wish to purchase a handgun from an FFL. A handgun can only be imported into the state and sold by a gun dealer (FFL) if the handgun is on the roster of approved and certified for sale list of firearms. If Robert SNELLINGS, as a private person, wanted to acquire a new handgun that is not on the roster of approved

handguns, he could do so if he had a peace officer illegally straw purchase it for him. If Robert SNELLINGS could get a peace officer to buy the off roster handgun, the peace officer would then have to private party transfer it to Robert SNELLINGS as a private person. In essence, SNELLINGS would have to have the handgun laundered through the peace officer(s) and then private party transferred through an FFL to him. Since Robert SNELLINGS also has an FFL, he is able to more discreetly complete the straw purchase through his business and then complete the private party transfer of the firearm back to himself, again using his own business (FFL) to complete the transfer.

171. Below is a list of the suspicious transactions conducted by peace officers, through SNELLINGS' FIREARMS (FFL) where the guns were then transferred back to Robert SNELLINGS, the private person. The information was obtained by reviewing the records provided by Agent Graham. The records are copies of the Dealer's Record of Sales (DROS) and records of the entries in the State of California's Automated Firearm System (AFS).

172. **On 08-12-2010,** Sacramento Police Officer Christopher LENERT, DOB ▮▮▮▮▮▮ started the DROS process for a semiautomatic, Carl Walther, model PK380, ".38 caliber" handgun, with serial number **PK038993.** The FFL that conducted the DROS was listed as Robert SNELLINGS. I believe the entry of the caliber on the DROS form, dated 08-12-2010, as a "38", is not correct and may have been a typo or may have been done intentionally by the FFL in an attempt to disguise the transaction or make the transaction less suspicious. I reviewed Carl Walther's website and located the product details for the PK380 model. They only offer it for sale in .380 caliber, thus the reason for the model being called "PK380". This handgun is not on the roster of approved handguns for sale in California and can only be purchased from an FFL by a peace officer.

173. **On 09-13-2010,** approximately 32 days later, Christopher LENERT, with date of birth ▮▮▮▮▮▮▮, private party transferred a semiautomatic, Carl Walther, model PK380, .380 caliber handgun, with serial number **PK038993,** to Robert SNELLINGS as a private person. The firearm was transferred to Robert SNELLINGS, using Robert SNELLINGS' business (FFL) to conduct the transfer.

174. On 09-16-2011, TFO Halstead spoke with Sacramento Police Department Lieutenant James Beezley to see if Officer LENERT was ever given a letter to waive the ten day waiting period for the purchase of this firearm. Lieutenant Beezley is assigned to the Personnel Division, which is the division of the police department that issues letters to waive the ten day waiting period. Lieutenant Beezley stated that if a letter is issued, a copy of it is kept in the Personnel Division. Lieutenant Beezley stated he checked the records and Officer LENERT was never issued a letter to waive the ten day waiting

period for the purchase of the Carl Walther handgun listed above. This means the earliest Officer LENERT could have obtained the firearm from the gun store (SNELLINGS' FIREARMS) was on **08-22-2010**, which means he transferred the firearm to Robert SNELLINGS as a private person, after owning it for approximately 22 days.

175. On **07-09-2009**, Roseville Police Officer Christopher Tait KJELLBERG, with date of birth (███████), started the DROS process for a semiautomatic, .40 caliber Smith & Wesson, model PPS handgun, with serial number **AD3719**. The FFL that conducted the DROS was listed as Robert SNELLINGS. This firearm is not on the approved list of handguns for sale to California residents and can only be purchased from an FFL by a peace officer.

176. On **08-04-2009**, approximately 26 days later, Christopher Tait KJELLBERG, with the date of birth ███████, private party transferred a "10 caliber" Smith & Wesson, model PPS handgun, with serial number **AD3719**, to Robert SNELLINGS as a private person, not Robert SNELLINGS the FFL. The firearm was transferred to Robert SNELLINGS, as a private person, using Robert SNELLINGS, the FFL, to complete the transfer. It is my opinion that this is the same firearm Christopher KJELLBERG obtained from SNELLINGS, the FFL, the month prior. I believe the entry of the caliber on 08-04-2009 as a "10" is not correct and may have been a typo or may have been done intentionally by the FFL in an attempt to disguise the transaction or make the transaction less suspicious. I reviewed Smith & Wesson's website and located the product details for the PPS. They only offer it for sale in 9mm and .40 caliber.

177. On 09-14-2011, Sacramento County Sheriff's Detective Tom Koontz informed TFO Halstead that Robert SNELLINGS has been issued a Carry Concealed Weapons permit (CCW) by the Sacramento County Sheriff. Detective Koontz checked Robert SNELLINGS'S CCW records to determine which firearms he is authorized to carry. One of the firearms listed on Robert SNELLINGS'S CCW is a .40 caliber, model PPS, with serial number **AD3719**.

178. Detective Koontz stated Robert SNELLINGS submitted his application to the Sacramento County Sheriff's Department for a CCW on **07-16-2009**. At the time Robert SNELLINGS submitted his application he listed a .40 caliber, model PPS, with serial number **AD3719**, as a firearm he wanted listed on his CCW permit. This is a significant fact because according to the DROS records, Officer KJELLBERG hadn't even started the transfer process for the firearm to Robert SNELLINGS. The DROS records show Officer KJELLBERG didn't transfer the firearm to Robert SNELLINGS until **08-04-2009**. It is my opinion that Christopher KJELLBERG acted as a straw purchaser when he bought the .40 caliber, model PPS firearm and that he purchased it with the intent to

private party transfer it to Robert SNELLINGS as a private person. If Robert SNELLINGS desired this new firearm for his CCW he could only obtain it if a peace officer acted as straw purchaser and thus laundered the firearm into the state of California.

179. On **04-30-2009**, a California Highway Patrol Officer started the DROS process for a semiautomatic, made in Germany, model 5PK, .22 caliber handgun, with serial number **A294392**. The FFL that conducted the DROS was listed as Robert SNELLINGS. This firearm is not on the roster of approved handguns for sale in California.

180. On **06-01-2009**, approximately 32 days later, the same California Highway Patrol Officer, private party transferred a semiautomatic, made in Germany, model 5PK, .22 caliber handgun, with serial number **A294392**, to Robert SNELLINGS as a private person. The firearm was transferred to Robert SNELLINGS, using Robert SNELLINGS, the FFL, to complete the transfer.

181. On **07-02-2009**, Sacramento County Sheriff's Deputy Ryan McGOWAN, with date of birth ███████, started the DROS process for a semiautomatic, Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37182507**. The FFL that conducted the DROS was listed as Robert SNELLINGS. This handgun is not on the roster of approved handguns for sale in California.

182. On **07-13-2009**, approximately 11 days later, Ryan McGOWAN, with date of birth ███████, private party transferred the semiautomatic, Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37182507**, to Robert SNELLINGS as a private person. The firearm was transferred to Robert SNELLINGS, using Robert SNELLINGS, the FFL, to complete the transfer.

183. Approximately 14 days later on **07-27-2009**, Robert SNELLINGS private party transfers the semiautomatic, Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37182507**, to a William Perparos, with date of birth ███████. The firearm was transferred to William Perparos, using Robert SNELLINGS, the FFL, to complete the transfer.

184. Sacramento County Sheriff's Detective Tom Koontz informed TFO Halstead that William Perparos had been issued a CCW. When William Perparos applied for the CCW on 04-20-2011, he listed the Sturm & Ruger LCP with serial number **37182507**, as one of the firearms he desired to carry.

185. This Sturm & Ruger LCP was transferred four times in less than 30 days. It is my opinion and the opinion of other firearms experts I have spoken to about this, that this purchase and subsequent transfers to different people within such a short period of time shows a conspiracy to straw purchase between Deputy Ryan McGOWAN and Robert SNELLINGS.

### Christopher KJELLBERG

186. Per the California Department of Motor Vehicles, KJELLBERG is identified as a █████ male, █████ approximately █████ pounds, █████ hair and █████ eyes, with a date of birth of █████

## Suspicious Transactions Completed at SNELLINGS' FIREARMS (FFL) by Christopher KJELLBERG

187. In reviewing the DROS transactions completed through SNELLINGS FIREARMS (FFL), TFO Halstead and I identified several suspicious transaction involving peace officers purchasing off roster (non approved) handguns from SNELLINGS, the FFL, and transferring them within a short period of time to a third party, using SNELLINGS, the FFL, to complete the private party transfer. The following are the suspicious transactions:

188. On **09-21-2009**, Roseville Police Officer Christopher KJELLBERG started the DROS process for a Colt, model New Agent, .454 caliber handgun, with serial number **GTO4886**. This transaction was completed by SNELLINGS FIREARMS (FFL). This firearm is not on the approved list of handguns for sale in California.

189. On **10-03-2009**, approximately 12 days later, Christopher KJELLBERG private party transferred the Colt, model New Agent, with serial number **GTO4886**, to a Craig Glasere. The private party transfer was completed through SNELLINGS' FIREARMS (FFL).

190. On **03-29-2010**, Roseville Police Officer Christopher KJELLBERG started the DROS process for a Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37351117**. This firearm is not on the approved list of handguns for sale in California. This transaction was completed at the D&L Engineering, located in Garden Valley, CA.

191. Approximately 65 days later, on **06-04-2010**, Christopher KJELLBERG private party transferred the Sturm & Ruger, model LCP .380 caliber handgun, with serial number **37351117**, to a Joseph O'Farrell. Joseph O'Farrell is a retired police officer from the Roseville Police Department. However, it is unknown when he retired from the police department.

192. On 04-29-2010, Roseville Police Officer Christopher KJELLBERG started the DROS process for Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37300127**. This transaction was completed by SNELLINGS Firearms (FFL). This firearm is not on the approved list of handguns for sale in California and can only be purchased from a FFL by a peace officer.

193. On 05-27-2010, approximately 28 days later, Christopher KJELLBERG private party transferred the Sturm & Ruger, model LCP, .380 caliber handgun with serial number **37300127**, to a Ulysses Early. The private party transfer was completed through SNELLINGS' FIREARMS (FFL).

194. On 07-19-2011, Roseville Police Officer Christopher KJELLBERG started the DROS process for a Glock, model 21Gen4, .45 caliber handgun, with serial number **RPH618**. The Glock 21, model Gen4 is the newest version of the Glock 21 and is not on the approved list of handguns for sale in California. This transaction was completed at Sacramento Black Rifle, a FFL, located in Rocklin, California.

195. Approximately 28 days later, on **08-16-2011**, Christopher KJELLBERG private party transferred the Glock, model 21 Gen4, .45 caliber handgun, with serial number **RPH618**, to a Ulysses Early. It should be noted that Christopher KJELLBERG and Ryan McGOWAN have private party transferred firearm(s) to Ulysses Early on other dates.

196. AFS records indicate that Ulysses Early owned a Glock model 21, .45 caliber handgun, but that he private party transferred it to another person on **07-16-2011**, just 3 days before Christopher KJELLBERG started the DROS on the newest model of the Glock 21, which he subsequently transferred to Ulysses Early. The history of these two firearms transactions leads me to believe that Ulysses Early wanted to update to the newest model of the Glock 21 (Gen 4), so he sold his older model and then had Christopher KJELLBERG straw purchase him the newer model, which was only available to peace officers.

### Christopher LENERT

197. Per the Sacramento County Known Person Files (KPF), LENERT is identified as a ▮▮▮ male, approximately ▮▮▮ pounds, ▮▮▮ hair and ▮▮▮ eyes, with a date of birth of ▮▮▮▮▮.

198. LENERT presently possesses an FFL (FFL # 9-68-067-01-4D-02777). LG FIREARMS (FFL) is located in the same business space as SNELLINGS' FIREARMS at 2675 Land

Avenue in Sacramento, California. Christopher LENERT and Brent Gentilcore are listed as the Federal Firearms licensees on LG Firearms FFL.

## Suspicious Transactions completed at SNELLINGS FIREARMS (FFL) by Christopher LENERT

199. On **06-17-2010,** Sacramento Police Officer Christopher LENERT started the DROS process for two Sturm & Ruger, model LCP, .380 caliber handguns with serial number **37437161 and 37437405.** This transaction was completed by SNELLINGS' FIREARMS (FFL). These firearms are not on the approved list of handguns for sale in California and can only be purchased from a FFL by a peace officer.

200. Approximately 19 days later on **07-05-2010,** Christopher LENERT private party transferred the Sturm & Ruger, model LCP, .380 caliber handgun, with serial number **37437161,** to a Brent Gentilcore. The private party transfer was completed through SNELLINGS' FIREARMS (FFL).

201. On 09-16-2011, TFO Halstead spoke with Sacramento Police Department Lieutenant James Beezley to see if Officer LENERT was ever given a letter to waive the ten day waiting period for the purchase of this firearm. Lieutenant Beezley is assigned to the Personnel division, which is the division of the police department that issues letters to waive the ten day waiting period. Lieutenant Beezley stated that if a letter is issued, a copy of it is kept in the Personnel Division. Lieutenant Beezley stated he checked the records and Officer LENERT was never issued a letter to waive the ten day waiting period for the purchase of the Sturm & Ruger handgun listed above. This means the earliest Officer LENERT could have obtained the firearm from the gun store (SNELLINGS' FIREARMS) was on **06-27-2010,** which means he transferred the firearm to Brent Gentilcore after owning it for approximately 9 days.

202. The purchase of two firearms that are the exact make, model and caliber on the same day and the subsequent transfer of one of the firearms 19 days later to Gentilcore is consistent with this being a straw purchase.

203. As mentioned earlier in this affidavit, LENERT was involved in the following transaction, **on 08-12-2010,** LENERT started the DROS process for a semiautomatic, Carl Walther, model PK380, ".38 caliber" handgun, with serial number **PK038993.** The FFL that conducted the DROS was listed as Robert SNELLINGS. I believe the entry of the caliber on 08-12-2010 as a "38" is not correct and may have been a typo or may have been done intentionally by the FFL in an attempt to disguise the transaction or make the transaction less suspicious. I reviewed Carl Walther's website and located the product details for the PK380 model. It is only offered for sale in a .380 caliber, thus the reason

for the model being called "PK380". This handgun is not on the roster of approved handguns for sale in California and can only be purchased from an FFL by a peace officer.

204. On **09-13-2010**, approximately 32 days later, LENERT private party transferred a semiautomatic, Carl Walther, model PK380, .380 caliber handgun, with serial number **PK038993**, to Robert SNELLINGS as a private person. The firearm was transferred to Robert SNELLINGS, using Robert SNELLINGS'S business (FFL) to conduct the transfer.

### SNELLINGS Residence, ███████████ Rancho Murieta, California

205. On August 29, 2011, Sacramento Police Department received a "Gun Dealer Registration Application" that SNELLINGS submitted. On this application, SNELLINGS lists his private address as ███████████, Rancho Murieta, California.

206. On September 27, 2011, a query of Accurint listed ███████████, Rancho Murieta as SNELLINGS current address.

207. On October 31, 2011, a query of California Department of Motor Vehicles database provided information that SNELLINGS lists ███████████, Rancho Murieta, California as his address for his driver's license.

### SNELLINGS' FIREARMS, 2675 Land Avenue, Sacramento, California

208. On August 29, 2011, Sacramento Police Department received a "Gun Dealer Registration Application" that SNELLINGS submitted. On this application, SNELLINGS lists his business address (SNELLINGS' FIREARMS) as 2675 Land Avenue, Sacramento, California.

209. On October 13, 2011, a query of Accurint lists SNELLINGS' FIREARMS address of 2675 Land Avenue, Sacramento, California.

### KJELLBERG Residence, ███████████ Rocklin, California

210. All of the private party transfers listed in this affidavit list ███████████, Rocklin, California.

211. On October 13, 2011, a query of Accurint lists KJELLBERG'S residence as ███████████ ███████████ Rocklin, California.

212. On October 29, 2011, TFO Halstead observed a white 2006, Toyota Tundra truck, California license plate in the driveway of ▮▮▮▮▮▮▮▮▮, Rocklin, California. A DMV query of this vehicle indicates that KJELLBERG is the registered owner of this vehicle.

**LENERT Residence, ▮▮▮▮▮▮▮▮▮, Sacramento, California**

213. On September 24, 2011, LENERT listed the address of ▮▮▮▮▮▮▮▮▮ on his DROS paperwork for a private party transfer of a firearm.

214. On October 13, 2011, a query of Accurint listed LENERT'S residence as ▮▮▮▮▮▮▮▮▮ ▮▮ Sacramento, California.

215. On October 13, 2011, a query of Criss Cross computer database that maintains property records states LENERT and ▮▮▮▮▮ Lenert are the owners of ▮▮▮▮▮▮▮▮▮, Sacramento, California.

216. On October 14, 2011, a query of the Sacramento Municipal Utility District (SMUD) database lists ▮▮▮▮▮▮▮▮▮ as the account holder for ▮▮▮▮▮▮▮▮▮

217. On October 31, 2011, I contacted Sacramento Police Department personnel and confirmed that LENERT'S residence is ▮▮▮▮▮▮▮▮▮, Sacramento, California.

**Information Regarding Items to be Seized**

218. I know from my training, experience, and discussions with other law enforcement officials that firearm traffickers frequently possess the following which is evidence of the unlawful activity:

> Firearms, firearms packaging material (boxes, addresses, shipping information), firearm accessories (including owner's manuals, holsters, gun cases, sights, trigger locks, cleaning tools, etc.), firearm records (purchase/sale, method of payment), and notes or other documentation concerning profits made (i.e., comparing cost of purchase vs. cost of sale),

> Information concerning persons selling them firearms,

> Information concerning persons to whom they sell firearms,

Information concerning methods used to advertise the availability of their firearms for purchase,

Photos of their firearms for purposes of advertising for sale, to keep track of their inventory, for insurance in case of theft, etc.

Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms,

Written statements showing profits made from the sale of firearms for internal purposes,

Bank deposit records, checking account records, and other financial documentation showing the purchase of firearms, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms.

Cell phone records which show the phone number and subscriber information, and numbers called/received.

Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc.

219.  The non-physical evidence (i.e., documentation) can be in hard (paper) form, or may be in digital form stored on computers, smart phones, digital notebooks, personal computers or any other type of digital storage device (e.g. thumb drives, external hard drives, etc.). While the above described material and the devices holding the material would most likely be in their residence, it is also often found in their personal vehicle(s), in their personal work areas (desks, lockers, etc.) where they work, and/or rented storage lockers. In addition, since many persons these days carry their cellular telephones and, sometimes, digital notebooks, laptop computers, on their persons, it is often necessary to search and seize these items from the firearm traffickers' person to secure this evidence if they are away from their residence.

220.  I also know from my training, experience and from discussions with other law enforcement officials that persons with a Federal Firearms License ("FFL"), which licenses them to sell firearms to the public, who engage in unlawful firearm sales frequently have the below described materials in addition to the above described material, which is frequently evidence needed to prove the unlawful activity:

    a.   Records concerning firearm purchases and sales including, but not limited to, the dealers' "Firearms Receipt and Disposition" book which is required by federal regulations to be kept by persons with a federal firearms license (FFL), ATF Forms 4473 (required for each firearm sale), inventory tracking documents, shipping boxes and labels, correspondence with the firearms supplier or firearms purchases,

    b.   Records showing private party transfers conducted by the FFL,

    c.   Photographs of firearms purchased or sold,

    d.   Indicia of persons in control of, and working at, the premises.

221. The non-physical evidence (i.e., documentation) can be in hard (paper) form, or may be in digital form stored on computers, smart phones, digital notebooks, lap-tops or other digital storage device.

222. In this case, I have taken the unique circumstances presented and attempted to fashion a separate list of items to be seized from each of the persons, vehicles, and places to be searched. The unique circumstances involved include that the offense conduct involved "off roster" firearms, that the targets of the investigation are law enforcement officials that are allowed/required to possess and carry firearms as part of their employment, that two of the targets are FFLs, that one of the targets (non-law enforcement) has a permit to carry a firearm which permit lists one of the firearms at issue. I have also factored in the differences in the apparent involvement of the various targets, and other factors, to fashion a specific list of items/material, that I believed would likely be found on the persons, vehicles, and locations requested to be searched.  Thus, I believe that items listed in Attachments B-1 through B-23 (as indicated specifically per person/location) will be found on the persons, vehicles, and places listed in Attachment A.

### Training and Experience Regarding Firearms Trafficking and Firearms  Traffickers

223.   As a result of my experience and training, I have learned that traffickers who deal in, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators and these records may be kept on paper or contained in memory calculators or computers. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that the business of firearms trafficking is similar to drug trafficking and by analogy in the case of drug dealers,

evidence is likely to be found where the dealers live. United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

224. In my experience, firearms traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

225. It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up the purchase of guns, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the firearms traffickers in this case, MCGOWAN and LU, have used in the course of this investigation text messaging to communicate about their ongoing trafficking in firearms. Based on my training and experience, I believe that SNELLINGS, LENERT and KJELLBERG have likely communicated via text messaging with each other and/or potential buyers of "off roster" firearms.

226. I know that firearms traffickers use mobile cellular telephones to communicate with one another, either by voice or text message. Mobile cellular telephones are digital devices that preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other firearms traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a firearms trafficker is evidence of the associations of the firearms trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a firearms trafficker's mobile telephone can contain evidence of firearms trafficking because it shows the communications or planned communications of a firearms trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Firearms traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a firearms trafficker. Mobile telephones can also contain photographic data files, which can be evidence of

criminal activity when the user was a firearms trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

227. As described above and in **Attachment B-1 to B-23**, this Affidavit seeks permission to search and seize things that are related to the ongoing conspiracy between MCGOWAN, LU, DEGUZMAN, SNELLINGS, LENERT and KJELLBERG, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

228. Repeated firearms trafficking activity over lengthy periods of time generates greater amounts of evidence. Many items of evidentiary value, particularly computer and documentary evidence, are not illegal to possess and, therefore, not overtly incriminating in the criminal's view. It is also a common practice for firearms traffickers to maintain personal property used or obtained in their criminal activities and which constitute evidence of their crimes for extended periods of time.

229. I know, based on my training and experience, that the number of firearms traffickers using computers and electronic information storage devices, like the general population as a whole, is steadily increasing, and such computer hardware, software, documentation, passwords, and electronic information storage devices may be instrumentalities, fruits, or evidence of crimes. Moreover, such computers and electronic information storage devices offer firearms traffickers and distributors excellent and convenient devices for recording information concerning firearms product, including sources, co-conspirators and customers, records of purchases and sales, and any other information deemed pertinent by the firearms traffickers and distributor. Much of the electronic media storage devices, such as floppy disks, zip disks, thumb drives, CD-ROMs, SD memory cards, are very small, detachable, portable, and can be secreted in small containers, such as safes and clothing pockets. I also know, based on my training and experience, that firearms and traffickers often communicate with their criminal associates and with potential buyers through the use of electronic mail, instant messaging, text messaging, telephone answering machines, voicemail, pagers, and telephones (cellular and land line). To the firearms trafficker, these communication devices are part of his normal business equipment.

### Search and/or Seizure of Digital Devices

230. Based upon the facts and circumstances described above, there is probable cause to believe that evidence of the criminal violations previously described are maintained on computers, mobile cellular telephones, digital devices, and electronic storage media as described in **Attachment B1 through B23** at the location described with particularity in **Attachment A.**

231. This Affidavit seeks permission to search for and seize evidence of the crimes described above stored on computers and electronic/digital devices (collectively, "digital devices"), as well as any digital devices that constitute fruits and instrumentalities of the crimes. The government has not attempted to acquire the sought after material located on the digital devices through any other investigative or judicial process.

232. In preparing this Affidavit, I have consulted with experienced law enforcement agents who have received extensive training in the forensic examination of computers and digital devices. These agents related some of the technical information detailed below.

233. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and computers and digital devices, I know that data in digital form can be stored on a variety of systems, and storage devices, or media including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

234. Based upon my training and experience, and the investigation to date, I believe that computers, digital devices, and digital records and evidence will be found at the following addresses:

    A. The residence of Ryan MCGOWAN located at ████████████████, Elk Grove, CA 95757;  including all outbuildings at ████████████████;

    B. The residence of Thomas LU located at ████████████y, Elk Grove, CA 95757;

    C. The residence of Darryl DEGUZMAN located at ████████████, Elk Grove, CA 95624;

D. The business address of SNELLINGS' FIREARMS located at 2675 Land Avenue, Sacramento, CA;

E. The residence of Robert SNELLINGS located at ████████████████, Rancho Murieta, CA 95683;

F. The residence of Christopher LENERT located at ████████████████, Sacramento, CA 95835; and

G. The current residence of Christopher KJELLBERG located at ████████████ Rocklin, CA 95765;

235. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information. I know that it is common today for individuals and businesses to utilize computers to conduct their legal and/or illegal business and to store information related thereto. I know based on my training and experience, including prior investigations specifically related to the trafficking of firearms, that subjects who are engaged in this illegal activity commonly store information related to their activities on computers and digital devices.

**Removal of Data Storage Devices For Review in a Laboratory Setting
May be Required**

239. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that a forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data. I also know that it is frequently necessary to remove digital devices or media for later laboratory evaluation off-site under controlled circumstances. This is true for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the

necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

b.    Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

c.    The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the premises. Storage devices capable of storing 500 gigabytes of data are now commonplace in desktop computers. It can take several hours, or even days, to image a single hard drive. The larger the drive, the longer it takes. Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can become impractical.

d.    Since digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Moreover, a computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

e.    Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time

periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time period, can help determine who was sitting at the keyboard.

    f.      Searching digital devices can require the use of precise, scientific procedures designed to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, data can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

240.    This warrant seeks authority to seize contextual data (or metadata), that is, evidence of how a digital device has been used, what it has been used for and who has used it. It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

    a.      In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the

interrelationships of the data to various parts of the computer's operation, this
information cannot be easily segregated.

b.     Digital data on the hard drive that is not currently associated with any file may
reveal evidence of a file that was once on the hard drive but has since been
deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph
that has been deleted from a word processing file). Virtual memory paging
systems can leave digital data on the hard drive that show what tasks and
processes on the computer were recently used. Web browsers, email programs,
and chat programs store configuration data on the hard drive that can reveal
information such as online nicknames and passwords. Operating systems can
record additional data, such as the attachment of peripherals, the attachment of
USB flash storage devices, and times the computer was in use. Computer file
systems can record data about the dates files were created and the sequence in
which they were created. This data can be evidence of a crime, can indicate the
identity of the user of the digital device, or can point toward the existence of
evidence in other locations (or on other devices).

c.     Further, evidence of how a digital device has been used, what it has been used
for, and who has used it, may be learned from the absence of particular data on a
digital device. Specifically, the lack of computer security software, virus
protection, malicious software, evidence of remote control by another computer
system, or other programs or software may assist in identifying the user indirectly
and may provide evidence excluding other causes for the presence or absence of
the items sought by this application. Additionally, since computer drives may
store artifacts from the installation of software that is no longer active, evidence
of the historical presence of the kind of software and data described may have
special significance in establishing timelines of usage, confirming the
identification of certain users, establishing a point of reference for usage and, in
some cases, assisting in the identification of certain users. This data can be
evidence of a crime, can indicate the identity of the user of the digital device, or
can point toward the existence of evidence in other locations. Evidence of the
absence of particular data on the drive is not generally capable of being
segregated from the rest of the data on the drive.

## Search Procedure

241.   In searching for data capable of being read, stored, or interpreted by a computer, mobile
cellular telephone, digital device, or storage media, law enforcement personnel executing
the search warrant will employ the following procedure:

a. **On-site search, if practicable.** Law enforcement officers trained in computer forensics (hereafter, "computer personnel"), if present, may be able to determine if digital devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data on the devices and conduct such a search if deemed practicable. Any device searched on-site will be seized if it contains any data falling within the list of items to be seized as set forth in the warrant and in **Attachment B1 through B23.**

b. **On-site imaging, if practicable.** If a digital device cannot be searched on-site as described above, the computer personnel, if present, will determine whether the device can be imaged on-site in a reasonable amount of time without jeopardizing the ability to preserve the data and conduct such imaging if deemed practicable.

c. **Seizure of digital devices for off-site imaging and search.** If no computer personnel are present at the execution of the search warrant, or if they determine that a digital device cannot be searched or imaged on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the digital device will be seized and transported to an appropriate law enforcement laboratory for review.

d. Law enforcement personnel (potentially including, but not necessarily limited to, computer personnel) will examine the digital device to determine if it contains any data that falls within the list of items to be seized as set forth in the warrant and in **Attachment B1 through B23.**

e. Law enforcement personnel will use procedures designed to identify items to be seized under the warrant. These procedures may include, without limitation, the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

f. If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized

items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence. If the government needs additional time to determine whether an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.

g.     If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original digital device to its owner within a reasonable period of time if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

h.     SNELLINGS' FIREARMS is a functioning company that appears to conduct some legitimate business. The seizure of the company's computers may limit the company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

### Data to Be Seized

242.   Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, mobile cellular telephone, digital device, or storage media, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

a.     Any computer equipment, mobile cellular telephone, digital device, or storage media that are capable of being used to commit or further the crimes outlined

above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in **Attachment B1 through B23;**

b.    Any computer equipment, mobile cellular telephone, digital device, or storage media used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in **Attachment B1 through B23;**

c.    Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in **Attachment B1 through B23;**

d.    Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, mobile cellular telephone, digital device, or storage media or software;

e.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, mobile cellular telephone, digital device, or storage media, or data to be searched;

f.    Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, mobile cellular telephone, digital device, storage media, or data;

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, mobile cellular telephone, digital device, storage media, or data to be searched;

h.    All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies;

bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email; instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device);

i.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device;

j.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment; and

k.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that are evidence of the manufacture and distribution of fraudulent identification documents.

## Retention of Image

243.   The government will retain a forensic image of each digital storage device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to any potential questions regarding the corruption of data; establishing the chain of custody of data; refuting any potential claims of fabrication, tampering, or destruction with/of data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

## Inventory and Return

244.   With respect to the seizure of electronic storage media or the seizure or imaging of electronically stored information, the search warrant return to the Court will describe the physical storage media that were seized or imaged.

## Conclusion

252.  Based on the foregoing, I respectfully submit that probable cause exists to search the persons, vehicles, lockers, and residences described more particularly in Attachment A , for the items described in Attachments B-1 through B-23, which is, evidence, fruits, and instrumentalities of violations of Title, 18, U.S.C. Section 371, Title 18, U.S.C Section, 922(a)(1)(A), Title 18 U.S.C. Section 922(a)(6), and Title 18, U.S.C. Section 924(a)(1)(A).

253.  Therefore, this Affidavit requests authority to search the locations set forth in **Attachment A** and seize the items described in **Attachment B-1 through B-23.**

## REQUEST FOR SEALING ORDER

254.  This criminal investigation is continuing. We contemplate a number of additional interviews, subpoenas, and possibly grand jury testimony of witnesses in the near future. Disclosure of the contents of this affidavit at this time could seriously impede the continuing investigation and prosecution by prematurely disclosing the details of the government's investigation. This could potentially cause subjects of the investigation to flee, destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case. If the affidavit was made public, potential subpoena recipients may attempt to destroy evidence. Also, potential interviewees would be able to identify specific subjects of the investigation and could fabricate responses in order to avoid possible criminal liability.

I swear under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information and belief.

Approved as to form:

Sara M. Lewis, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

William S. Wong
Assistant U.S. Attorney

Sworn to and subscribed before
me this 2nd day of November 2011.

Hon. Edmund F. Brennan
United States Magistrate Judge

Page 63 of 63