1  Gary W. Gorski (SBN 166526)
   LAW OFFICES OF GARY W. GORSKI
2  3017 Douglas Blvd. Suite 150
   Roseville, CA  95661
3  (916) 758-1100
   CivilRightsAttorney@BlackWolfLaw.com
4
   Daniel M. Karalash (SBN 176422)
5  STRATEGIC LAW COMMAND
   3017 Douglas Blvd. Suite 150
6  Roseville, CA  95661
   (916) 787-1234
7  dan@stratlaw.org
   www.stratlaw.com
8
   Attorneys for Plaintiffs
9  JAMES EDWARD CUPP and
   LAWRENCE "WOLF" HAVEN
10

11         THE UNITED STATES DISTRICT COURT

12     IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

13

14  JAMES EDWARD CUPP, an individual;        )  **Case No.**  16-CV-00523-TLN-KJN
    LAWRENCE "WOLF" HAVEN, an individual )
15                                           )  **PLAINTIFFS' OPPOSITION TO**
                        Plaintiff,           )  **KAMALA D. HARRIS, formerly Attorney**
16                                           )  **General of the State of California, in her**
            vs.                              )  **official capacity only; XAVIER BECERRA**
17                                           )  **Attorney General of the State of California,**
    KAMALA D. HARRIS, formerly Attorney      )  **in his official capacity MOTION TO**
18  General of the State of California, in her official )  **DISMISS FIFTH AMENDED**
    capacity only; XAVIER BECERRA Attorney   )  **COMPLAINT (5thAC)**
19  General of the State of California, in his official )
    capacity; *et al.*                       )  **Date: November 21, 2021**
20                                           )  **Time: 2:00 p.m.**
                        Defendants.          )  **Dept: 2**
21  _____      )  **Judge: Hon. Troy L. Nunley**
                                                **Action Filed: March 11, 2016**
22
                        <u>**OPPOSITION**</u>
23
24          The Second Amendment is a right which cannot be exercised without the ability to bear an

25  arm, which also means it must be in a person's possession. To exercise this right, it explicitly

26  includes the right to have access to "arms" by way of purchase, gift, bequest or self-manufacture.

27  Defendants presently employ and enforce a legal juggernaut of statutes, ordinances, and policies

28  suppressing the Right to Keep and Bear Arms, in violation of the Second Amendment; in sum, the

                                    **- 1 -**
   _____

1  state government blatantly snubs the United States Supreme Courts rulings in *District of Columbia*

2  *v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and most

3  recently *Caetano v. Massachusetts*, 577 U.S. ___, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016).

4      The government attempts to minimize the infringement by stating that it is only a "small

5  burden." (Def. Motion 9:6) The government attempts to marginalize the harm as though it is ok to

6  deprive someone of their property, which in turn deprives them of a fundamental right. Arms are a

7  separate and distinct class of property, entitled to heightened scrutiny.

8      As noted by another District Court, California's gun laws are complicated. See *Peruta v.*

9  *County of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc), cert. denied, 137 S. Ct. 1995

10  (June 26, 2017)("California has a multifaceted statutory scheme regulating firearms."). Each year,

11  California adds one more layer of complexity to its Penal Code relating to firearms. "The counties

12  and California have chipped away at the Plaintiffs' right to bear arms by enacting ..." by enacting a

13  regulatory "... scheme that is **tantamount** to a complete ban ..." on the right to keep and bear arms.

14  "Constitutional rights would become **meaningless** if states could obliterate them by enacting

15  **incrementally more burdensome restrictions** while arguing that a reviewing court must evaluate

16  each restriction by itself when determining constitutionality." [emphasis added] *Id.* at 953 (Callahan,

17  J., dissenting)

18      As the Supreme Court explained in *District of Columbia v. Heller*, 554 U.S. 570, 624-25

19  (2008), the Second Amendment protects the right of individuals to keep and bear arms that are in

20  common use for lawful purposes, such as self-defense, sport, hunting, and maintaining preparedness

21  for service in the militia. See also *Duncan v. Becerra*, 366 F. Supp.3d 1131 (S.D. Cal. 2019)

22      Plaintiffs HAVEN and CUPP have suffered actual injury in that their firearms, magazines

23  and ammunition have been confiscated, without just cause, to never be returned unless they

24  capitulate to the government for the return of their arms and property by paying a tax/fine/penalty,

25  subjecting themselves to additional background checks that have already been conducted at the time

26  of their arrest, and that their arms be subjected to additional registration and reporting requirements

27  they normally would not be subjected to other than the fact that the government took their arms to

28  begin with.

_____

**Plaintiffs' Opposition to Motion to Dismiss Fifth Amended Complaint**

1    Moreover, CUPP is a citizen of South Dakota, and still, California wants to register his guns

2  in a state database (5thAC para; which raises a whole different analysis as to CUPP because

3  California is attempting to enforce its gun registration requirements on citizens of other states even

4  though his property was returned for the charges being dismissed.

5    In addition, plaintiffs, and the public in general, face a credible threat of prosecution under

6  the challenged laws for possession of a horse leash called a "slungshot" under California law.

7  Individual plaintiffs have standing to challenge the gun control statutes, as they owned rifles and

8  pistols confiscated under law, and never returned without the payment of a tax/fine/penalty and

9  acquiescing to additional background checks already conducted at the time the arrest and

10  confiscation took place.  See *Ezell v. City of Chicago*, 651 F.3d 684, 695-96 (7th Cir. 2011)

11  (deciding that plaintiffs, who wished to engage in range training, had standing to bring a Second

12  Amendment challenge to a Chicago ordinance banning firing ranges, <u>reasoning that the very</u>

13  <u>existence of the ordinance implied a threat to prosecute</u>)*; see also Susan B. Anthony List v. Driehaus*,

14  573 U.S. 149 (2014).

15    It is important to note that the state has taken the position that it is enforcing the challenged

16  statutes. Plaintiffs' fear of prosecution and arrest is not misplaced, for each Plaintiff has already been

17  arrested for possession of protected "arms", as clearly defined by the Supreme Court in *Caetano*, and

18  which were not even firearms.  (CUPP 5thAC ¶s 37-44; HAVEN 5thAC ¶s 45-51.)

19    If HAVEN can be arrested for a slungshot in the form of a horse leash, and CUPP for an

20  open-carry knife; then it is clear that the threat of arrest is real under the statutes as written, and,

21  alternatively, as being applied by law enforcement – either way, the state must be enjoined from

22  enforcing the laws as-applied against plaintiffs and others similarly situated. The state is standing by

23  the officers enforcement of the statutes; by way of its motion, the state has confirmed the way the

24  statutes were applied against Plaintiffs was the intended method of enforcement of such statutes; and

25  that they can still be enforced in the future in the same manner for the same arms beared.

26    When an individual is subject to such a threat, an actual arrest, prosecution, or other
enforcement action is not a prerequisite to challenging the law. See *Steffel v.*
27  *Thompson*, 415 U. S. 452, 459, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974) ("[I]t is not
necessary that petitioner first expose himself to actual arrest or prosecution to be
28  entitled to challenge a statute that he claims deters the exercise of his constitutional

- 3 -

rights"); see also *MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118, 128-129, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat"). Instead, we have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent. Specifically, we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U. S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979). Several of our cases illustrate the circumstances under which plaintiffs may bring a preenforcement challenge consistent with Article III.

*Susan B. Anthony List v. Driehaus,* 573 U.S. ___, 134 S. Ct. 2334, 2342, 189 L. Ed. 2d 246 (2014).

Plaintiffs have standing.

### A.   Plaintiffs' Second Amendment Claims Are *Per Se* Actionable and That Strict Scrutiny Applies.

California Penal Code §§ 33850, 33855, 33860, 33865, and 33880 equally apply to plaintiffs for as each has had their firearms confiscated without any form of prosecution for a crime and CUPP had a court ordered release of property. Both plaintiffs have had their firearms seized from their residences, without a warrant, without being charged, tried and convicted of a crime. To the contrary, each plaintiff had the charging complaint dismissed by the county prosecutors. All their property being returned, except anything relating to firearms – as though their firearms should be treated differently than any other property. The firearms illegally seized have not been returned to plaintiffs. By failing to immediately return plaintiffs firearms once it was determined that no crime had been committed, the government has deprived plaintiffs of their ability to exercise their Second Amendment rights by taking the very instruments necessary for exercising such a right, akin to confiscating a paper and pen preventing the free exercise of speech. (5thAC ¶s 27-34.)

The level of scrutiny to be provided when confiscating a firearm is strict scrutiny *per se* per the Supreme Court of the United States in *District of Columbia v. Heller*, (2008) 554 U.S. 570.  The court came to two distinct and applicable rulings.

 What is more, in all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. As we said in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990):

 "'[T]he people' seems to have been a term of art employed in select parts of the Constitution. . . . [Its uses] sugges[t] that 'the people' protected by the Fourth

**- 4 -**

Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."
This contrasts markedly with the phrase "the militia" in the prefatory clause. As we will describe below, the "militia" in colonial America consisted of a subset of "the people"--those who were male, able bodied, and within a certain age range. Reading the Second Amendment as protecting only the right to "keep and bear Arms" in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as "the people."

**We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.**

*District of Columbia v. Heller* 554 U.S. 570, 580-581 (2008)(emphasis added.)

      **B.**    **The Court Should Not Dismiss the First Claim Challenging the LEGR Process**.

      **1.**    **The LEGR Process Burden Plaintiffs' Rights Under the Second Amendment**.

Plaintiffs had their firearms confiscated, and not returned, even though they have not been convicted of any crime. As to HAVEN, he was never even charged with a crime. Even their arms (i.e. slungshot and knife), which were not firearms, were confiscated. Even at this time, the Attorney General is defending the actions of law enforcement and the constitutionality of the statutes challenged as-applied and as-written. The fact that their arms have not been returned and/or destroyed creates sufficient standing and injury in fact. This conduct on the part of the state DOJ is consistent with the goal of complete disarmament.

It is impossible for Plaintiffs to exercise their constitutional rights without their firearms. "At the direction of Defendant, Plaintiffs had their firearms confiscated by law enforcement in perpetuity unless each plaintiff paid fines/taxes/penalties and surcharges, along with completing an application called the Law Enforcement Release Application." (5[th]AC, ¶ 27.) The government does not get to argue that Plaintiffs are not prohibited from going out an purchasing new firearms because no other property released in a criminal case is subjected to the fee and registration requirements. "This application is separate and distinct from a property receipt in criminal or civil proceeding in that Plaintiffs have to sign a document under the penalty of perjury in violation of the right to remain silent, pay a fee and surcharge, and submit to additional background checks that were performed at the time of arrest and confiscation." (5[th]AC, ¶ 28.)

1   Defendant has the ability to simple run a name and firearm clearance check and simply order
2   the local law enforcement to release the arms. (5[th]AC, ¶ 50.)  In fact, that is what happens when they
3   are arrested regardless as to whether they filled out the LEGR form and pay a fee. When CUPP and
4   HAVEN asked for the return of their arms from the seizing agencies, they stated that they cannot
5   return any arms unless given permission by the Attorney General's office. Plaintiffs were both
6   informed that only the Attorney General of California has the authority to order the release of
7   firearms when confiscated by law enforcement in California. (5[th]AC, ¶ 51-52.)

8   Defendant's Law Enforcement Release process requires any person who was never charged
9   with a crime, or who had a criminal complaint dismissed in toto, and who claims title to any firearm,
10  ammunition or ammunition feeding device that is in the custody or control of a court or law
11  enforcement agency and who wishes to have the aforementioned items returned, to submit a LEGR
12  Application form (Exhibit "B") to the State Attorney General, California Department of Justice (the
13  Defendant) to determine eligibility to possess a firearm, ammunition and/or ammunition feeding
14  device.  (See California Penal Code section 33850) (5[th]AC, ¶ 53.)

15  This release applies to any situation whereby guns and ammo are seized by law enforcement,
16  even if the no charges are filed against the citizen or the criminal case is dismissed because of an
17  erroneous arrest. (5[th]AC, ¶ 54.) HAVEN was never charged with a crime nor issued a restraining
18  order.

19  The only way individuals seeking the return of a firearm, ammunition and/or ammunition
20  feeding device that is in the custody or control of a court or law enforcement agency; they must
21  submit a LEGR Application along with the appropriate fees to the Defendant Attorney General,
22  whose department processes the application and then grants a clearance to the local law enforcement
23  agency to release the arms. (5[th]AC, ¶ 55.)

24  Additionally, if an individual is seeking the return of a long gun purchased prior to January 1,
25  2014 which has not been subsequently recorded in their name by either a self reporting application,
26  or registered as an assault weapon or .50 BMG rifle, is mandated to submit a Firearms Ownership
27  Report application (BOF 4542A), along with the designated fees. (5[th]AC, ¶ 56.)

28  Even though an "eligibility check" is done at the time the firearms are confiscated, Defendant

- 6 -

**Plaintiffs' Opposition to Motion to Dismiss Fifth Amended Complaint**

1  mandates additional "eligibility checks" with a mandated fee to be paid, even if the arms are

2  confiscated illegally by law enforcement or the citizen is innocent of circumstances giving rise to the

3  gun confiscation. (5[th]AC, ¶ 57.) Additionally, if an individual is seeking the return of a long gun

4  purchased prior to January 1, 2014, a Firearms Ownership Report application (BOF 4542A), is

5  required to be submitted along with the a fees to the Attorney General. (5[th]AC, ¶ 61.)

6       In violation of the Second Amendment, the Attorney General's officer enforces a statutory

7  scheme pursuant to Penal Code Sections 33850 (application for return of firearm), 33855 (authority

8  of law enforcement to enforce), 33860, 33880 (fee), requiring Plaintiffs to: 1) fill out and sign

9  **Exhibits "A" and "B"**, and any future iteration, under the penalty of perjury called the

10 "CALIFORNIA DEPARTMENT OF JUSTICE BUREAU OF FIREARMS Law Enforcement Gun

11 Release Application" during the statute of limitations for a criminal proceeding to be instituted, and

12 2) pay a processing fee of $20.00 for the first firearm (long gun or handgun), and $3.00 for each

13 additional gun, and 3) pay a storage fee.

14      The **First Claim for Relief** seeks a declaration as to the unconstitutionality of those statutory

15 provisions which provide for the confiscation of firearms, magazines and ammunition without their

16 return even if there is no criminal complaint filed (e.g. HAVEN), or if one is filed, the complaint

17 being dismissed (e.g. CUPP). See California Penal Code §§ 33850, 33855, 33860, 33865, and

18 33880.

19      The government treats firearms differently than all other property relating to the return of

20 property in the criminal case context — basically levying a tax on the property in the form of a fee

21 and additional firearm registrations, in violation of the Second Amendment, the Takings Clause, and

22 the Due Process Clause. To be clear, the taking of arms is a taking of a right, and not simply

23 property.  This is why the government treats the taking of arms differently than the taking of other

24 property. As such, arms are to be viewed as a separate and distinct class of property, entitled to

25 heightened scrutiny because of its nexus to the Second Amendment — the right requires an arm to

26 be used for purposes of self-defense.

27      Penal Code §§ 33850, 33855, 33860, 33865, and 33880 are equally offensive to plaintiffs as

28 each plaintiff has had their firearms confiscated without any form of prosecution for a crime. Both

1  plaintiffs have had their firearms seized from their residences, without a warrant, without being

2  charged (i.e. HAVEN only), tried or convicted of a crime. The firearms illegally seized have not

3  been returned to plaintiffs. By failing to immediately return plaintiffs firearms once it was

4  determined that no crime had been committed, the State has deprived plaintiffs of their ability to

5  exercise their Second Amendment rights by taking the very instruments necessary for exercising

6  such a right, akin to confiscating a paper and pen preventing the free exercise of speech.  This is an

7  ongoing injury and will continue. The Court must be reminded that the government confiscated all

8  of plaintiffs' arms. Only CUPP had some of his arms returned - two knives.

9      A government seizure of arms "in common use" by law-abiding citizens for self-defense

10  plainly violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

11  The state can point to no justification—let alone one sufficient to withstand heightened

12  scrutiny—for permanently seizing firearms lawfully and safely owned by approximately 70 to 100

13  million Americans to defend themselves.  Second, physically dispossessing gun owners of their

14  private property without just compensation from the government violates the Takings Clause. It is

15  no answer that the owner of a firearm confiscated by the state without any form of process can

16  simply go out and buy another firearm. Whatever expectations people may have regarding regulation

17  of their property, they do not expect it to be "occupied or taken away." *Horne v. Dep't of Agric.*, 135

18  S. Ct. 2419, 2427 (2015)(leading Taking case regarding personal property). Third, because it

19  permanently deprives owners of lawfully acquired firearms without advancing the government's

20  interest in public safety, the seizure of firearms violates the Due Process Clause. There is simply no

21  reason to believe that this will not continue.

22                    **2.      The LEGR Process Fails Strict Scrutiny Because the Level of**
                          **Scrutiny to Be Applied Is the Same as the Taking of Property**
23                        **without due process, and since the property here involves Arms**
                          **Protected Right under the Second Amendment, Strict Scrutiny**
24                        **must Apply.**

25      Because plaintiffs' firearms, magazines and ammunition (i.e. property) were taken, plaintiff's

26  Second Amendment rights were likewise stripped from plaintiffs, and therefore, this constitutes a

27  *per se* violation of the Second Amendment. The analogous level of review would be the taking of

28  property without any process whatsoever when this deprivation results from enforcement of the

established state procedures and from actions by officials with authority to both cause deprivations and provide post-deprivation process.

"To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake. Second, the plaintiff must prove that the defendant deprived him of such an interest without due process of law." *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999) (per curiam) (citation omitted). "The requirements of due process are not rigid; rather, they `call[] for such procedural protections as the particular situation demands.'" *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016) (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)).

Here, the interest affected is the use and possession of property (arms) necessary to exercise a fundamental right – the right to keep and bear arms. This property interest is significant because it is connected to the Second Amendment, and resulted in an indefinite deprivation of firearms following frivolous criminal charges, or, as in HAVEN's case, no charges.

The government had no right to enter the home of CUPP, and especially HAVEN; as there was adequate time to obtain a warrant, and no immediate danger existed. Then, after the Fourth Amendment violation, the government violates both the Second and Fifth Amendment by retaining the firearms for over several years.  The Court must consider "`the likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used.'"  *Mickelson*, 823 F.3d at 926 (quoting *Mackey v. Montrym*, 443 U.S. 1, 13 (1979)).

Once the government seized the arms, there was no process for their return without the payment of money and registration. There are two Eighth Circuit decisions which provide guidance to this court when viewing the Second Amendment deprivation through the Due Process clause and the taking of property. See *Lathon v. City of St. Louis*, 242 F.3d 841 (8th Cir. 2001) and *Walters v. Wolf*, 660 F.3d 307 (8th Cir. 2011).

In *Lathon*, police seized firearms from plaintiff per a valid search warrant but then refused to return them, absent a court order, even after it became clear the firearms were not contraband or needed as evidence and no criminal charges were to be filed.

In *Walters*, the plaintiff's firearm was seized per a valid arrest. The plaintiff demanded the

- 9 -

1  return of his firearm on several occasions, but though all charges against him had been dismissed or

2  resolved, the chief of police refused to return the firearm without a court order.

3       In both cases, the Eighth Circuit concluded that two separate deprivations had occurred: the

4  first, valid deprivation per a warrant or arrest, and a second, invalid deprivation that occurred when

5  something changed (police determined the weapons were not contraband or evidence, criminal

6  charges were dropped or resolved), with the result that the police no longer had a legal basis to retain

7  the weapons. See *Walters*, 660 F.3d at 314 ("A second deprivation occurred requiring a new due

8  process analysis when the defendants, with no legal grounds, refused to return Walter's property.");

9  *Lathon*, 242 F.3d at 843 ("The pivotal deprivation in this case was not the initial seizure of the

10  ammunition and weapons, but the refusal to return them without a court order after it was

11  determined that these items were not contraband or required as evidence in a court proceeding."). In

12  both cases, because the second deprivation occurred per official policy in accordance with state law,

13  when the police no longer had grounds to hold the firearms, and without "attendant exigencies

14  prohibiting or making impractical a reasonable predeprivation process," *Walters*, 660 F.3d at 314,

15  the court concluded that available post-deprivation process would not suffice. See *id.* at 315; *Lathon*,

16  242 F.3d at 843-44.

17       These holdings turned both on the "second" deprivation — at which point something had

18  changed and the police no longer had reason to hold the firearms — and, as the Eighth Circuit later

19  explained in *Mickelson v. County of Ramsey*, the "the inherently `lengthy and speculative' nature of

20  the post-deprivation remedy available — an action in tort" is not a procedure at all. *Mickelson*, 823

21  F.3d at 928 (quoting Walters, 660 F.3d at 313-14); see also *Lathon*, 242 F.3d at 844 (explaining that

22  even if a post-deprivation remedy could suffice, the court would not find the one available adequate

23  because the plaintiff's firearms had been distributed among four different Missouri counties and the

24  plaintiff's only recourse was to file four separate replevin actions to secure the return of his

25  weapons). "Our court since has suggested that post-deprivation administrative remedies are innately

26  distinguishable," a reading "consistent with the fact that our decision in *Walters* made much of the

27  city's failure to afford any independent administrative process through which an arrestee could

28  contest the city's retention of his property, even after the dismissal of charges." *Mickelson*, 823 F.3d

**Plaintiffs' Opposition to Motion to Dismiss Fifth Amended Complaint**

1    at 928. In some cases, then, "post-deprivation process may suffice, even when the deprivation occurs

2    pursuant to established state policy." *Id.*

3         In this case, the police seized firearms, relying upon a plethora of laws with a single

4    objective – the confiscation of firearms for the slightest of reasons – and then to retain them when

5    the purported "reason" has passed.  Furthermore, unlike *Lathon* and *Walters*, the seizure of

6    HAVEN's firearms was not part of any criminal case and the government had no reason to seize and

7    hold the firearms to start; and the first constitutional violation was a result of unlawful search of

8    HAVEN's home, an unlawful seizure of his firearms, an a third "constitutionally impermissible

9    deprivation" by holding the firearms without process for an indefinite period of time.  See *Cf.*

10   *Walters*, 660 F.3d at 315.

11        **C.     The Court Should Not Dismiss Plaintiff Haven's Second Claim for Relief
                   Because Slungshots Are Protected Under the Second Amendment.**

12        California's statute (as-written) bans a common class of arms (slungshot) which are less

13   lethal than a handgun, and doubles down by extending this statute to every day pet leashes (as-

14   applied), and Defendants' enforcement of same (as-applied), violates the Second Amendment.

15        The government, in its motion, defends the deputy sheriff's interpretation of what constitutes

16   a slungshot; the government embraces it with its motion. Therefore, under the statute, a dog leash or

17   horse leash is considered a slungshot under California law. These are commonly used by all pet

18   owners. There is nothing offensive by a pet owner using their leash or stay as a slungshot for

19   purposes of self-defense.

20        What arms are protected by the Second Amendment came before the Supreme Court by the

21   blanket prohibition of Massachusetts against the possession of a stun gun. The Massachusetts

22   Supreme Court upheld the blanket banishment of stun guns as weapons that were not protected by

23   the Second Amendment under three separate and distinct theories. First Massachusetts asserted that

24   since Stun Guns were not in common use at the time of the Second Amendment's enactment, they

25   did not fall under its protections. Second Massachusetts asserted Stun Guns are dangerous *per se* at

26   common law and unusual, they fell out the protections of the Second Amendment. Finally,

27   Massachusetts argued that stun guns were not readily adaptable to use in the military and therefore

28

                                              **- 11 -**
                  _____

          **Plaintiffs' Opposition to Motion to Dismiss Fifth Amended Complaint**

1  were outside the scope of the Second Amendment.

2      In *Caetano v. Massachusetts*, 577 U.S. ___, (March 21, 2016)(No. 14-10078), the Supreme

3  Court of the United States summarily rejected all of Massachusetts arguments. In vacating the

4  judgment of the Supreme Judicial Court of Massachusetts in its unanimous per curiam opinion, the

5  court has told us that a blanket prohibition of arms is *per se* unconstitutional.

6      The Court in *Caetano v. Massachusetts*, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (per

7  curiam) debunked the notion that stun guns were unprotected because they "were not in common use

8  at the time of the Second Amendment's enactment," *id.* at 1027 (quoting *Commonwealth v. Caetano*,

9  470 Mass. 774, 26 N.E.3d 688, 693 (Mass. 2015)), finding that notion "inconsistent with *Heller's*

10  clear statement that the Second Amendment 'extends . . . to . . . arms that were not in existence at the

11  time of the founding,'" *id.* at 1028 (alteration in original) (quoting Heller, 554 U.S. at 582); see *id.*

12  (rejecting conclusion "that stun guns are 'unusual' because they are 'a thoroughly modern invention'"

13  (quoting *Caetano*, 26 N.E.3d at 693-94)).

14      "A weapon may not be banned unless it is both dangerous and unusual," it "is a conjunctive

15  test." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., concurring). Because the

16  slungshot is not unusual, the Court need not consider if they are "dangerous" in a manner different

17  from the inherent "danger" of firearms in general—such "danger" to those who pose a threat, of

18  course, being the very reason arms are protected and useful in the first place. As Justice Alito

19  explained, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class

20  of arms commonly used for lawful purposes." *Id*.

21      Taking the pleading in a light most favorable to plaintiffs, the slungshot is an arm in common

22  use. California's categorical ban is unconstitutional. California's defense of the statute as-applied to

23  a horse lead (i.e. leash) is equally as offensive to the Second Amendment.

24      Relatedly, the *Heller* Court acknowledged that "if weapons that are most useful in military

25  service — M-16 rifles and the like — may be banned," it might be argued that "the Second

26  Amendment right is completely detached from the prefatory clause." 554 U.S. at 627. After all,

27  militias today "require sophisticated arms that are highly unusual in society at large." *Id.* But the

28  Court pointed out that "the conception of the militia at the time of the Second Amendment's

**- 12 -**

**Plaintiffs' Opposition to Motion to Dismiss Fifth Amended Complaint**

1   ratification was the body of all citizens capable of military service, who would bring the sorts of

2   lawful weapons that they possessed at home to militia duty." *Id.* Thus, "the fact that modern

3   developments have limited the degree of fit between the prefatory clause and the protected right

4   cannot change [judicial] interpretation of the right." *Id.* at 627-28.

5       Many U.S. Citizens use arms for ornamental purposes, and the law recognizes arms can be

6   maintained because they are considered a "curio" or "relic".  (See Cal. Penal Code Section 27565(5)

7   - "The firearm is a curio or relic, as defined in Section 478.11 of Title 27 of the Code of Federal

8   Regulations.")

83.   Plaintiff HAVEN was falsely arrested for violation of California Penal Code §
22210 (see also § 16590(m)) because his motorcycle had an **ornamental** horse lead
hanging from his handlebars, which the statute describes as a "slungshot", which is
punishable by imprisonment in a county jail not exceeding one year or imprisonment
pursuant to subdivision (h) of Section 1170.

84.   California Penal Code § 16590(m) likewise references "slungshot" as
prohibited by Section 22210.

85.   Defendant's enforcement of §§ 16590(m) and 22210 interferes with the right
to possess non-lethal weapons for purposes of self defense.

86.   A slungshot is a **maritime tool** consisting of a weight, or "shot," affixed to the
end of a long cord, which pre-existed the founding of the United States.  It was a
**simple weapon**, which itself had been modified to become a slingshot. In sum, it was
an "arm" used prior to the invention of gunpowder.

87.   **The slungshot has a long tradition and history of use as an arm protected
by the Second Amendment**.

88.   On February 8, 2016, deputies from the Placer County Sheriff's Department
stopped HAVEN for what they falsely alleged an "illegal weapon" hanging from the
handle bars of his motorcycle, affectionately known as his "iron horse."  (Attached
hereto as Exhibit "C" is red and black duplicate of the "illegal weapon" HAVEN had
hanging off his motorcycle handlebar)

89.   HAVEN had attached to his motorcycle an ornamental and common "horse
lead" (thick nylon rope with a metal quick release - identical to a dog leash but
thicker).

Is the government stating that only a firearm can dangle from HAVEN's motorcycle? Is the

government stating that slungshots are the weapon of choice by gang members, and not guns? No

matter which argument the government is relying upon, one thing is certain: the government's

position is that the law is going to be enforced and must remain on the books, even after *Caetano v.*

**- 13 -**

_____

1  *Massachusetts*.

2  Although the *Heller* Court acknowledges in passing that an armed populace is "better able to

3  resist tyranny," the great weight of its discussion of the right to arms focuses on "the core lawful

4  purpose of self-defense. The basic category of "Arms" is very broad: "[T]he Second Amendment

5  extends, prima facie, <u>to all instruments that constitute bearable arms</u>, even those that were not in

6  existence at the time of the founding." *Id.* The Second Amendment includes the right to possess, not

7  only firearms, but also other common personal defensive weapons such as pepper spray. Obviously,

8  a slungshot is a protected arm.

9  What arms are protected by the Second Amendment came before the Supreme Court by the

10  blanket prohibition of Massachusetts against the possession of a stun gun. The Massachusetts

11  Supreme Court upheld the blanket banishment of stun guns as weapons that were not protected by

12  the Second Amendment under three separate and distinct theories. **First** Massachusetts asserted that

13  since Stun Guns were not in common use at the time of the Second Amendment's enactment, they

14  did not fall under its protections. **Second** Massachusetts asserted Stun Guns are dangerous *per se* at

15  common law and unusual, they fell out the protections of the Second Amendment. **Finally,**

16  Massachusetts argued that stun guns were not readily adaptable to use in the military and therefore

17  were outside the scope of the Second Amendment.

18  In *Caetano v. Massachusetts*, 577 U.S. ___, (March 21, 2016)(No. 14-10078), the Supreme

19  Court of the United States summarily rejected all of Massachusetts arguments.  In vacating the

20  judgment of the Supreme Judicial Court of Massachusetts in its unanimous per curiam opinion, the

21  court has told us that a blanket prohibition of arms is *per se* unconstitutional.

22  When was the last time a slungshot was used in any crime that would justify defending the

23  law? Or, as in this case, when was the last time a person used a leash as a slungshot? Instead of

24  using logic and concede the ban on slungshots, as-written and as-applied, is unconstitutional;

25  California would rather keep an archaic law on the books, <u>defend the law as-applied to HAVEN</u>.

26  The law as-written and/or as-applied is to be enjoined.

27  <u>**CONCLUSION**</u>

28  For the above stated reasons, defendant's motion is properly denied.

- 14 -

**Plaintiffs' Opposition to Motion to Dismiss Fifth Amended Complaint**

1

2

3   Dated: January 5, 2021   THE LAW OFFICES OF GARY W. GORSKI
                 Respectfully Submitted,

4                     /s/ Gary W. Gorski

5                   Gary W. Gorski
                   Attorney for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**- 15 -**

**Plaintiffs' Opposition to Motion to Dismiss Fifth Amended Complaint**