**Gary W. Gorski CBN: 166526**
**Attorney at Law**
3017 Douglas Blvd., Suite 150
Roseville, CA  95661
Cell: (775) 720-1000
Fax: (916) 520-3930
CivilRightsAttorney@BlackWolfLaw.com

**Daniel M. Karalash (SBN 176422)**
**STRATEGIC LAW COMMAND**
3017 Douglas Blvd. Suite 150
Roseville, CA  95661
(916) 787-1234
dan@stratlaw.org
www.stratlaw.com

Attorneys for Plaintiffs JAMES EDWARD CUPP, an individual; LAWRENCE "WOLF" HAVEN, an individual

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES EDWARD CUPP, an individual; LAWRENCE "WOLF" HAVEN, an individual<br><br>Plaintiff,<br><br>vs.<br><br>KAMALA D. HARRIS, formerly Attorney General of the State of California, in her official capacity only; XAVIER BECERRA Attorney General of the State of California, in his official capacity; et al.<br><br>Defendants. | CASE NO.: 2:16-CV-00523-TLN-KJN<br><br>SUPPLEMENTAL BRIEFING |

1

**INTRODUCTION**

This case comes before this Court from an appeal of this Court's final orders granting Defendant's motion to dismiss for failure to state a claim and lack of standing, and a denial of a preliminary injunction. (ER_4, Order of September 28; 2021, ER_47, Order of September 24, 2020; ER_83, Order of October 9, 2018, denying request for preliminary injunction; ER_85, Order of September 21, 2018.)[1]

Plaintiffs' firearms were illegally seized, depriving them of their Second Amendment rights. (ECF No. 65, 103.) Local authorities refused to return the seized firearms due to a requirement that Plaintiffs must first complete the Law Enforcement Gun Release ("LEGR") application required under C.P.C. § 33850. (Id., 106, 108.) The Attorney General enforces C.P.C §§ "33850 (application for return of firearm), 33855 (authority of law enforcement to enforce), 33860, and 33880 (fee)" in violation of the Second Amendment. (Id., 108, 111.)

Additionally, if an individual is seeking the return of a long gun purchased prior to January 1, 2014, a Firearms Ownership Report application (BOF 4542A), is required to be submitted along with the appropriate fees. (ER_23, 5th AC, ¶ 56; ER_23, ¶ 61; ER_75, 3rd AC, ¶ 107; ER_180, ¶ 106; ER_202, 2nd AC ¶ 127.)

There are three operative pleadings, a Second, Third, and Fifth Amended Complaint. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022), the United States Supreme Court laid out a new test to be applied in Second Amendment challenges. To determine if a law violates the Second Amendment, a court should: (1) determine whether the Second Amendment's "plain text" covers the individual's challenged conduct; and (2) if the plain text of the Second Amendment covers the individual's conduct, the regulation is valid only if the

---

[1] "ER" is the Excerpts of Record filed in the Ninth Circuit, which is attached to the Request for Judicial Notice filed concurrently with this supplemental brief for ease of reference for the Court.

2

government shows the regulation is "consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126, 213 L. Ed. 2d 387 (2022). In addition to *Bruen*, there are four other Second Amendment decisions cited in *Bruen* further delineating the scope of that right of the Second Amendment and the test to be applied. See *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and *Caetano v. Massachusetts*, 577 U.S. 411 (2016)(per curiam). Ninth Circuit Second Amendment jurisprudence has been nullified *Bruen,* especially *Pena v. Lindley*, 898 F.3d 969, 975 (9th Cir. 2018) which has been cited in this court's previous orders.

*Bruen, Heller*, *McDonald*, and *Caetano* command that the Second Amendment protects an individual right to bear arms outside the home with modern firearms commercially available to the general public within the United States. As made clear in the pleadings in this case, a system of granting rights and privileges to one class of citizens, and denying another class the same rights and privileges, is fraught with obvious abuse. (See exhibits attached to Second Amended Complaint, ER_113 ".. an emerging problem that …. law enforcement officers are purchasing and then selling firearms in possible violation of Federal law [but not California law]."; ER_116_120 "*Here's all of the guns the ATF took from Pasadena Police lieutenant's Sierra Madre home*"; ER_122-124 "*California law that lets cops buy 'off-roster' guns expanded to include more in law enforcement*"; ER_126; ER_232-266 *Search Warrant* for California law enforcement officers purchasing guns on the ban list, and reselling them on the open market allowed per state law.)

Impetus to this case arises from three specific, unrelated incidents, but share a common theme showing the legislative trickery to squeeze out of existence the Second Amendment.

Plaintiffs were stereotyped as outlaw bikers because they fit a certain profile – Haven riding a Harley Davidson with a horse leash hanging off the side of his bike called a slungshot (i.e ER_142-149) and Cupp possessing a knife in a sheath on a leather vest called a concealed dirk or

3

dagger (i.e. ER_183; ER_220). The only problem with this stereotype is that neither Plaintiff has ever been arrested for any violation in their entire life; and neither belong to any outlaw motorcycle gang. Both are blue collar skilled tradesmen and truckers. Both Plaintiffs had their rifles and pistols seized and stripped of their Second Amendment rights without even committing a crime. Plaintiffs have been dragged through a legal gauntlet specifically leading to their disarmament in violation of their Second Amendment right to keep and bear arms. The political irony and hypocrisy cannot be ignored. The government has no problem with shutting down a gun shop over Covid while allowing Marijuana dispensaries, Home Depot, auto dealers and bike shops to remain open. See *McDougall v. Cty. of Ventura*, No. 20-56220 (9th Cir. Jan. 20, 2022).

Plaintiffs are pejoratively identified by defendant as bikers and that they are *per se* criminals. As the government quickly discovered, they made a big mistake. They arrested the wrong guys, and seized their guns --- instead of an apology and a return of arms, the state says pay additional fees for their return, and in Haven's case, when the arms were destroyed, they are now banned by California and cannot be replaced.

In dismissing Plaintiffs' case, this Court relied upon the two-step inquiry for determining whether a regulation violates the Second Amendment as set forth in *Pena v. Lindley*, 898 F.3d 969, 975 (9th Cir. 2018). *Pena* has now been overruled. See *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022).

**ARGUMENT**

This case is a classic example of the <u>intended consequence</u> of California's numerous gun control laws enacted by the State of California over decades – a complete disarmament of law-abiding citizens who bothered no one. Plaintiffs are seeking to enjoin the State of California from passing and enforcing any more laws which interfere with the fundamental right of the People in

4

general, and Plaintiffs in particular, to keep and bear arms which are not prohibited under federal law -- basically, enjoining California from violating the Second Amendment.

Plaintiffs seek injunctive relief to enjoin Defendant and the State of California from enforcing laws, rules and regulations which: Limit plaintiffs' ability to purchase, possess, keep, bear, and travel with off-roster handguns, which are legal under federal law.Limit plaintiffs' ability to purchase, possess, transport and purchase standard size handgun and rifle magazines which most exceed 10 rounds, as these are basic parts to modern operational and safe firearms. Limit plaintiffs' ability to travel interstate with magazines which contain more than 10 rounds of ammunition. Limit plaintiffs' ability to carry either a concealed weapon or openly carried weapon, including a slungshot and handgun. (ER_185, 2ndAC ¶s 67, 116, 269, 273-274.)

The key averment pertaining to the Equal Protection claim can be found at ER_185, 2ndAC ¶ 66, which states:

> When it comes to self-defense, providing retired peace officers with superior rights to that of ordinary law-abiding citizens does not further either an important or compelling state interest, and more importantly, since law enforcement can only use reasonable force in self-defense, then the hand-guns they use are presumptively the type of firearm protected by the Second Amendment.

The Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen* "demands a test rooted in the Second Amendment's text, as informed by history." 142 S.Ct. 2111, 2127 (2022). Under that test, so long as the Second Amendment "presumptively protects" the conduct the government seeks to regulate, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only" if the government meets that heavy burden "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

With a clear standard in hand, the following statutes have no historical analog and are unconstitutional. Under the text-and history-based test that now governs Second Amendment

5

jurisprudence, the appropriate resolution of this case is clear; the Court must hold that each of the following statutes implicate a core right and have no historical analog, and are therefore *per se* unconstitutional.

In addition, this is an <u>as-applied</u> challenge to the statutory scheme which invariably results in the revocation of Plaintiffs core fundamental right to keep and bear arms; and how the government confiscates the very arms protected without any recourse to acquiring those arms because they are now banned. However, California law enforcement (and retirees) are granted the full panoply of Second Amendment rights (i.e. lifetime CCWs, the purchase and acquisition of handguns available 48 other states, and magazines holding more than 10 rounds of ammunition.)[2]

The Second Amendment is the only right which cannot be exercised without possession, access and/or ownership of a tool (i.e. gun, knife, taser, etc.) and as proven in this case, a person can be arrested for a horse leash known by the State of California as a "slungshot", Penal Code Section 22210. (See ER_221-225 for the slungshot Haven was arrested for, and which was also destroyed by the government.)

Additionally, a person (Cupp) can be arrested for the open carry of a knife, (ER_219, Penal Code Section 21310[3]), and even when the charges are dismissed, the government keeps the firearms confiscated unless the citizen signs a Law Enforcement Gun Release Application while subject to a criminal investigation and pays a fee to the State DOJ.  Haven had his arms seized from his house without even an explanation.

Under statute, they have had their firearms confiscated, without an arrest or criminal complaint being filed (HAVEN) or a specious criminal complaint and dismissal at best (CUPP).

---

[2] Apparently New York is attempting to circumvent the Supreme Court's Second Amendment law by passing a California style "Safe Gun List" law.
[3] Penal Code Section 21310 is not the subject to challenge on this appeal and is only referenced for purposes of context as to how CUPP's firearms and knives were confiscated, but when the criminal complaint was dismissed for lack of legal sufficiency, the knives were returned to CUPP while his firearms, ammunition and magazines have never been returned the disposition date of May 30, 2014.

I. **SLUNGSHOT BAN**

*§ 22210. SAPS AND SIMILAR WEAPONS; PUNISHMENT*

> …[A]ny person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any … slungshot, is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

Haven was subjected to <u>felony arrest</u> and prosecution for possession of a horse-leash called a slungshot (ER_139; Penal Code § 22210), which is an arm clearly protected by the Second Amendment. (ER_44-46; ER_132, ¶ 15-16; ER_137-147.) See *Caetano v. Massachusetts*, 577 U.S. 411 (2016). His slungshot was destroyed pursuant to Penal Code § 22290. (ER_132, ¶ 8.)

A leather leash with a quick detach metal mechanism is an arm which is protected by the Second Amendment. The state has taken the position that a leather lease constitutes a slungshot for enforcement purposes. This statute is unconstitutional as-written, and how it is being applied---a leather decorative leash, which is a curio and relic of the past, being called a slungshot.

Moreover, these types of laws are a relic of discriminatory past used against the poor and freedmen after the adoption of the Fourteenth Amendment, no different than the interracial bans and segregation of the time. Without a doubt, the people most vulnerable to arrest for unlawfully carrying arms of any type were those of African American descent. See Flack, *The Adoption of the Fourteenth Amendment* 7 (Johns Hopkins 1908).

As Professor Flack points out, for example, Senator Saulsbury of Delaware, opposed the Fourteenth Amendment, the Freedmen's Bureau, and the Civil Rights Bills since they "deprive the state of their police power, and would nullify the laws of his State <u>which forbade negroes to keep arms or ammunition.</u>" Flack at 22, 25, 38 (emphasis added).

In *English v. State*, 35 Tex. 473 (1871), for example, a Texas statute "regulating, and in certain cases prohibiting, the carrying of deadly weapons," including "<u>pistols</u>, dirks, daggers,

slungshots, swordcanes, spears, brassknuckles and bowie knives," *id.* at 474, was challenged under the Second Amendment. The Texas Supreme Court's decision focused on all arms that were concealable. It had nothing to do with the type of arm. The court construed "arms" in the Second Amendment and the Texas constitution as referring only to weapons "used for purposes of war." *Id*. At 475.

## II.  MAGAZINE BAN

### § 16740. "LARGE-CAPACITY MAGAZINE"

As used in this part, "large-capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds …

### § 32310. LARGE-CAPACITY MAGAZINES; PROHIBITION; REMOVAL AND SURRENDER REQUIREMENTS; PUNISHMENT

\*\*\*

(c) … any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017: (1) Remove the large-capacity magazine from the state; (2) Sell the large-capacity magazine to a licensed firearms dealer; or (3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

There is no question that the standard-capacity ammunition magazines that California has banned are "presumptively protect[ed]" by the Second Amendment. They plainly satisfy the test that *Bruen* reaffirmed governs which "arms" are protected-namely, "they are indisputably in 'common use' for self-defense today." *Id*. at 2143 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). It is beyond dispute that such magazines are arms. *See Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). It is equally beyond dispute that they are commonly owned by law-abiding citizens for lawful purposes; indeed, they constitute half of all magazines in the United States. The state thus bears the burden to "justify its regulation by

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

The state has had years to survey the comprehensive historical record regarding its gun laws, especially magazine bans; the state cannot produce a historical analog for such a ban. There is no history or tradition in our nation of magazine-capacity limits. Restrictions on firing capacity were nonexistent until well into the twentieth century, and even then, they were rare and "short lived." *Id*. at 2155; see *Duncan v. Becerra*, 970 F.3d 1133, 1150 & n.10 (9th Cir. 2020).

### III. HANDGUN BAN

#### § 31910. "UNSAFE HANDGUN"

As used in this part, "unsafe handgun" means any pistol, revolver, or other firearm capable of being concealed upon the person, for which any of the following is true:

(a) For a revolver:

(1) It does not have a <u>safety device</u> that, either automatically in the case of a double-action firing mechanism, or by manual operation in the case of a single-action firing mechanism, causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge.

(2) It does not meet the firing requirement for handguns.

(3) It does not meet the drop safety requirement for handguns.

(b) For a pistol: (1) It does not have a <u>positive manually operated safety device</u>… (2) It does not meet the firing requirement for handguns. (3) It does not meet the drop safety requirement for handguns. (4) …it does not have a <u>chamber load indicator</u>. (5) … it does not have a <u>magazine disconnect</u> mechanism if it has a detachable magazine. (6)(A) Commencing July 1, 2022, for all semiautomatic pistols that are not already listed on the roster pursuant to Section 32015, it is not designed and equipped with a <u>microscopic array of characters used to identify the make, model, and serial number of the pistol, etched or otherwise imprinted in one or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired</u>… (7) The Department of Justice shall, for each semiautomatic pistol newly added to the roster pursuant to Section 32015, <u>remove from the roster exactly three semiautomatic pistols lacking one or more of the applicable features</u> described in paragraphs (4), (5), and (6) of subdivision (b) and added to the roster before July 1, 2022. …

> **§ 32000. PUNISHMENT FOR MANUFACTURE, IMPORT, SALE, GIFT, OR LOAN OF UNSAFE HANDGUN; EXCEPTIONS [EFFECTIVE JANUARY 1, 2022]**[4]
>
> (b) This section shall not apply to any of the following:
>
> *** (4) …. This section does not prohibit the sale to, or purchase by, sworn members of these agencies of a handgun.

Plaintiffs assert two claims under 42 U.S.C. § 1983—one for deprivation of their Second Amendment rights, as secured by the Fourteenth Amendment, and one for violation of the Fourteenth Amendment right to equal protection of the laws. This Court based its original decision regarding the handgun ban on *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018). This case was in fact filed to challenge that decision. Under *Bruen*, *Pena* is no longer valid and this court is now unrestrained to strike down one of the most draconian handgun bans in America; the likes of which have never been seen in any other state or under federal law.

California's *de facto* handgun ban works like this: the Unsafe Handgun Act ("UHA") defines an "unsafe handgun" in California Penal Code § 31910 and requires handguns to have various features in order to be deemed not unsafe. Currently, semiautomatic pistols are required to have a chamber load indicator ("CLI"), magazine detachment mechanism ("MDM"), and microstamping technology. See Cal. Penal Code § 31910(b)(4)-(6).

The Unsafe Handgun Act (UHA), Cal. Penal Code § 32000(a) et seq., adds mechanical complexities to handguns which actually make handguns less safe and less reliable.

In *Pena v. Lindley*, the Ninth Circuit held constitutional the requirement that a semiautomatic handgun have three features—CLI, MDM, and microstamping—in order to be deemed "not unsafe" under the UHA. 898 F.3d at 980-86. *Pena* further rejected an equal

---

[4] This section has more than one version with varying effective dates.

protection challenge. *Id.* at 986-87. *Pena* did not address the issue of the removal of handguns from the roster, and the enactment of AB 2847 postdates *Pena*.[5]

The UHA effectively presumes all handguns are unsafe unless otherwise determined by the California Department of Justice ("CDOJ"), and charges CDOJ with maintaining a roster of handguns determined to be "not unsafe" ("the roster").

AB 2847 went into effect on January 1, 2021. Cal. Penal Code § 31910(b)(4). California Penal Code § 31910(b)(7) now provides: "The Department of Justice shall, for each semiautomatic pistol newly added to the roster pursuant to Section 32015, remove from the roster exactly three semiautomatic pistols lacking one or more of the applicable features [CLI, MDM, and microstamping] . . . and added to the roster before July 1, 2022." It further provides that "each semiautomatic pistol removed from the roster pursuant to this subdivision shall be considered an unsafe handgun," and that the Attorney General shall remove semiautomatic pistols from the roster in reverse order of the date they were added, continuing until the only handguns on the roster are those which have each of the three applicable features. *Id*.

The UHA's roster scheme prevents individuals from exercising their Second Amendment rights to purchase handguns that are in common use and prevents licensed retailers from selling such handguns to law-abiding adults. The Ninth Circuit has recognized that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Such rights include an individual's ability to acquire firearms.

Since the conduct is covered by the Second Amendment's plain text, the government must justify its regulations as consistent with this Nation's tradition of firearm regulation. "When the

---

[5] Plaintiff respectfully requests leave to supplement and amend the pleadings according to proof and change in the law.

Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. *Heller* has already established the relevant contours of the tradition: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are both dangerous and unusual. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

And the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (citations omitted).

"Semiautomatic weapons," such as those proscribed under the Handgun Ban, "traditionally have been widely accepted as lawful possessions." *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022) (quoting *Staples v. United States*, 511 U.S. 600, 612 (1994)). Handguns are indisputably in common use for self-defense today. They are, in fact, the "quintessential self-defense weapon." *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 629).

"Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) (per curiam), concerning stun guns).

In this case, the analysis is straightforward: Plaintiffs, and all similarly situated individuals, are not prohibited from exercising their right to keep and bear arms. The Second

Amendment's text covers the conduct Plaintiffs, and all those similarly situated, wish to engage in and the arms they wish to acquire and possess.

There is <u>no analogous history supportive of the State's ban</u>. Under the Supreme Court's precedents, the constitutionally relevant history, and the proper analysis, Plaintiffs must prevail.

Because of an onerous regulatory scheme, which is designed to deny, chill, suppress, and/or burden the exercise of fundamental, individual rights (as poignantly illustrated by the State's enactment of CCP § 1021.11, specifically designed to not only prevent but penalize legitimate efforts to vindicate such rights under 42 U.S.C. sections 1983 and 1988), people in California cannot exercise their Second Amendment right to keep and bear arms in common use throughout the United States.

### IV. REFUSAL TO RETURN ARMS WHEN PLAINTIFFS COMMITTED NO CRIME AND WERE NEVER CONVICTED OF A CRIME.

### § 33850. APPLICATION FOR RETURN; MISDEMEANOR

> (a) Any person who claims title to any <u>firearm</u>, <u>ammunition feeding device</u>, or <u>ammunition</u> that is in the custody or control of a court or law enforcement agency and who wishes to have the firearm, ammunition feeding device, or ammunition returned shall make application for a determination by the Department of Justice as to whether the applicant is eligible to possess a firearm, ammunition feeding device, or ammunition. The <u>application shall be submitted electronically</u> via the California Firearms Application Reporting System (CFARS) …

Previously, this court judged § 33850 through the lens of a commercial transaction; equating § 33850 with the laws regulating the purchasing of firearms. However, this was not a purchase of a firearm. This was a governmental seizure of protected arms under *Bruen*, and there has never been any other property or right subjected to such regulation. The state can produce no historical analog as to why Plaintiffs are required to make an application and pay a fee for the return of their arms when they committed no crime.

First, Cupp was unlawfully arrested for a <u>felony</u> by Citrus Heights police officers on March 25, 2014, for carrying a concealed knife in violation of C.P.C. § 21310. (ECF No. 65, 120,

13

122.) and the officers then searched his home without a warrant and illegally seized six firearms, ammunition, magazines, and two non-folding hunting knives. (*Id.* 120.) The district attorney dismissed the case against Cupp two months after his arrest and Cupp's two knives were returned to him in court, but his firearms and "other firearm related tools and equipment" were not returned. (*Id.* 124.) He was told that he must complete the application and pay a fee.

On February 14, 2016, a Sacramento County Sheriff's Deputy searched Haven's residence without a warrant and without probable cause and seized three firearms, and three of which are now banned in California – but not at the time of legal purchase through an FFL. Haven was never arrested and because no criminal charges were ever filed, Haven could not even obtain a copy of any police report because the answer was an active investigation. The unlawful confiscation of Haven's firearms violates his Second Amendment rights *per se*.

There is no mechanism for the return of arms unlawfully confiscated by government under state law. There is no historical analog as to why Plaintiffs' property was not returned just as a wallet or knife is returned as personal property. The application and fee offends both the Second Amendment and Equal Protection Clause.

> **V.    OPEN AND CONCEAL CARRY OF LOADED FIREARM**
>
> **§ 25850. CARRYING LOADED FIREARM IN PUBLIC; PUNISHMENT; PREVIOUS CONVICTION; PROSECUTION UNDER OTHER SECTION; ARREST WITHOUT WARRANT**
>
> (a) A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory.
>
> **§ 25400. CARRYING CONCEALED FIREARM; CARRYING FIREARM OPENLY IN BELT HOLSTER; PUNISHMENT**
>
> (a) A person is guilty of carrying a concealed firearm when the person does any of the following: (1) Carries concealed within any vehicle that is under the person's control or direction any pistol, revolver, or other firearm capable of being concealed upon the person. (2) Carries concealed upon the person any pistol, revolver, or other firearm capable of being concealed upon the person. (3) Causes

to be carried concealed within any vehicle in which the person is an occupant any pistol, revolver, or other firearm capable of being concealed upon the person.

\*\*\*

### § 25450. PEACE OFFICERS EXEMPTED FROM CRIME

As provided in this article, Section 25400 does not apply to, or affect, any of the following: (a) Any peace officer, listed in Section 830.1 or 830.2, or subdivision (a) of Section 830.33, whether active or honorably retired. (b) Any other duly appointed peace officer. (c) <u>Any honorably retired peace</u> officer listed in subdivision (c) of Section 830.5. (d) <u>Any other honorably retired peace officer who during the course and scope of his or her appointment as a peace officer was authorized to, and did, carry a firearm.</u>

\*\*\*.

In light of *Bruen,* the Court can issue a summary ruling and injunction as to California law which clearly conflicts with the ability of Plaintiffs to open carry or conceal carry a loaded firearm. California can present no historical analog for the complete banning of arms public.

### **CONCLUSION**

In sum, this case represents how California's incremental approach to abolish the Second Amendment has come to fruition in an all too familiar fashion, and why this case clearly proves that government cannot be trusted every time the government claims "public safety." Under *Bruen*, California shenanigans in the name of public safety are foreclosed.

The request for injunctive and declaratory relief should be granted.

Date: September 30, 2022

Respectfully Submitted,

/s/ Gary W. Gorski

Gary W. Gorski CBN: 166526
Attorney at Law
3017 Douglas Blvd., Suite 150
Roseville, CA  95661
Cell: (775) 720-1000
Fax: (916) 520-3930
CivilRightsAttorney@BlackWolfLaw.com