1 | Gary W. Gorski (SBN 166526)
2 | LAW OFFICES OF GARY W. GORSKI
3017 Douglas Blvd. Suite 150
Roseville, CA 95661
3 | 916-758-1100
CivilRightsAttorney@outlook.com
4 | www.lonewolflaw.com

5 | Daniel M. Karalash (SBN 176422)
Strategic Law Command
6 | 3017 Douglas Blvd. Suite 150
Roseville, CA 95661
7 | (916) 787-1234
dan@stratlaw.org
8 | www.stratlaw.com

9 | Attorneys for Plaintiffs
JAMES EDWARD CUPP and
10 | LAWRENCE "WOLF" HAVEN

## THE UNITED STATES DISTRICT COURT

## IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES EDWARD CUPP, an individual; ) **Case No.** 16-CV-00523-TLN-KJN
LAWRENCE "WOLF" HAVEN, an individual )
)
            Plaintiff, ) **SIXTH AMENDED COMPLAINT FOR**
) **DECLARATORY AND INJUNCTIVE**
) **RELIEF (42 U.S.C. § 1983)**
    vs. )
) **(1) a Second Amendment constitutional**
ROB BONTA, Attorney General of the State of ) **challenge to California's LEGR regime and**
California, in his official capacity only; ) **accompanying fees established by California**
KAMALA D. HARRIS, former Attorney ) **Penal Code §§ 33850, 33855, 33860, 33865,**
General of the State of California, in her official ) **33880;**
capacity only; XAVIER BECERRA former )
Attorney General of the State of California, in ) **(2) a Second Amendment constitutional**
his official capacity only ) **challenge to California Penal Code § 22210's**
) **bar on the manufacture, sale, and possession**
            Defendants. ) **of a slingshot.**
_____ )
)
) **DEMAND FOR JURY TRIAL**

Plaintiffs aver as follows:

## JURISDICTION AND VENUE

1.    Jurisdiction of this action is founded on 28 U.S.C. § 1331 in that the action arises under the

Constitution and laws of the United States of America, and under 28 U.S.C. § 1343(a)(3) and

42 U.S.C. § 1983 in that this action seeks to redress the deprivation, under color of the laws,

statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress.

2.   Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(1), whereas all DEFENDANTS reside in the State of California and Defendant HARRIS resides in this judicial district.

3.   The state's conduct and law is inherently impermissible, regardless of any protected or remedial procedures. There is no distinction between personal liberties and property rights under 42 U.S.C. § 1983.

## THE PARTIES

4.   Plaintiff JAMES EDWARD CUPP is a competent adult, natural person, and citizen of the United States of America, and at all relevant times a legal resident of Emery, South Dakota, and a citizen of the state of South Dakota.

5.   As a resident of the state of South Dakota, and fully exercising the rights and privileges thereof as a free person of that state, the only limitation CUPP has on firearm ownership, possession and transfer is that which is prohibited by federal law.

6.   Plaintiff LAWRENCE "WOLF" HAVEN is a competent adult, natural person, and citizen of the United States of America, and at all relevant times a legal resident of County of Sacramento, California.  He is a Veteran and Native-American, and as such belongs to a class which consists of a long tradition of keeping and bearing arms.

7.   Plaintiff is a Native American, Veteran (1979-1983 U.S.N. Honorable Discharge) and an avid hunter and owner of firearms. Veterans and Native Americans have a long tradition of carrying and using California banned and prohibited weapons, such as bowie knives, knives, slingshots, slungshots, hatchets, and especially firearms.

8.   Defendants KAMALA D. HARRIS and XAVIER BECERRA were former attorney generals, and ROB BONTA is the successor in interest as Attorney General of the State of California (Defendants Kamala Harris, Xavier Becerra, and Rob Bonta's are hereby collectively, the "Attorney General") whereby the California Constitution Article V, section 13 grants the

Attorney General a supervisory role over "every district attorney and sheriff and over such other law enforcement officers as may be designated by law."  Defendant KAMALA D. HARRIS and Defendant XAVIER BECERRA are hereby "Defendant" for the purposes of this pleading.

9.     The individuals named as Defendants, namely KAMALA D. HARRIS and XAVIER BECERRA, both of whom served as former attorneys general, with ROB BONTA subsequently assuming the position of Attorney General for the State of California (referred to collectively hereinafter as the "Attorney General" or "Defendant" or "State"), are vested with significant authority under the California Constitution Article V, section 13. This constitutional provision confers upon the Attorney General a supervisory role over various law enforcement entities, including district attorneys, sheriffs, and other designated law enforcement officers.

10.    California Article V, section 13 is further elaborated upon through various California statutes, which empower the Attorney General with comprehensive jurisdiction and control, particularly in matters pertaining to sheriffs and police chiefs. This authority extends to the capacity to mandate written applications and fees related to firearms. Defendant holds the office of the State of California Attorney General and serves as the highest-ranking law enforcement official within the state, with all other law enforcement agencies reporting to this office.

11.    The Attorney General is tasked with the execution and administration of the laws, customs, practices, and policies that are the subject of this legal action within the State of California.

12.    Defendant is regarded as an agent, servant, and/or employee of the State of California, acting under the purview of state law, as defined in 42 U.S.C. § 1983. In this capacity, Defendant is responsible for enforcing the code sections that are the subject of this legal action.

13.    In addition, Defendant, holding the office of the State of California Attorney General, is the principal law enforcement officer of the State, to whom all other named Defendants report. Consequently, Defendant is sued in an official capacity.

**FIRST CLAIM FOR RELIEF**

- 3 -

**CONSTITUTIONAL CHALLENGE TO STATE LAW**
**Violation of the Second Amendment Right to Keep and Bear Arms**
(Plaintiffs HAVEN, CUPP)
(California Penal Code §§ 33850, 33855, 33860, 33865, 33880, Unconstitutional Statute - LEGR)
(Injunctive and Declaratory Relief Only for Return of Firearms and Enjoining Enforcement)

14.     Plaintiffs incorporate the above allegations as if set forth fully here.

15.     This action challenges the constitutionality of the following statutes contained in the

California Penal Code (Law Enforcement Gun Release (LEGR) Process):

§ 33850. Application for return; Misdemeanor
(a) Any person who claims title to any firearm, ammunition feeding device, or
ammunition that is in the custody or control of a court or law enforcement agency and
who wishes to have the firearm, ammunition feeding device, or ammunition returned
shall make application for a determination by the Department of Justice as to whether
the applicant is eligible to possess a firearm, ammunition feeding device, or
ammunition. The application shall be submitted electronically via the California
Firearms Application Reporting System (CFARS) and shall include the following:
(1) The applicant's name, date and place of birth, gender, telephone number, and
complete address.
(2) Whether the applicant is a United States citizen. If the applicant is not a United
States citizen, the application shall also include the applicant's country of citizenship
and the applicant's United States Citizenship and Immigration Services-assigned
number or I-94 number.
(3) If the seized property is a firearm, the firearm's make, model, caliber, barrel
length, type, country of origin, and serial number, provided, however, that if the
firearm is not a handgun and does not have a serial number, identification number, or
identification mark assigned to it, there shall be a place on the application to note that
fact.
***

§ 33855. Requirements for return
A law enforcement agency or court that has taken custody of any firearm, ammunition
feeding device, or ammunition shall not return the firearm, ammunition feeding
device, or ammunition to any individual unless all of the following requirements are
satisfied:
(a) The individual presents to the agency or court notification of a determination by
the department pursuant to Section 33865 that the person is eligible to possess a
firearm, ammunition feeding device, or ammunition.
(b) If the seized property is a firearm and the agency or court has direct access to the
Automated Firearms System, the agency or court has verified that the firearm is not
listed as stolen pursuant to Section 11108.2, and that the firearm has been recorded in
the Automated Firearms System in the name of the individual who seeks its return.
(c) If the firearm has been reported lost or stolen pursuant to Section 11108.2, a law
enforcement agency shall notify the owner or person entitled to possession pursuant to
Section 11108.5. However, that person shall provide proof of eligibility to possess a
firearm pursuant to Section 33865.
(d) This section does not prevent the local law enforcement agency from charging the
rightful owner or person entitled to possession of the firearm the fees described in
Section 33880. However, an individual who is applying for a background check to
retrieve a firearm that came into the custody or control of a court or law enforcement
agency pursuant to Section 33850 shall be exempt from the fees in Section 33860,
provided that the court or agency determines the firearm was reported stolen to a law

**- 4 -**

_____

**Sixth Amended Complaint**

enforcement agency prior to the date the firearm came into custody or control of the court or law enforcement agency, or within five business days of the firearm being stolen from its owner. The court or agency shall notify the Department of Justice of this fee exemption in a manner prescribed by the department.
(e) This section shall become operative on July 1, 2020.
§?33860. Fee per request
(a) The Department of Justice shall establish a fee of twenty dollars ($20) per request for return of a firearm, ammunition feeding device, or any quantity of ammunition plus a three-dollar ($3) charge for each additional firearm being processed as part of the request to return a firearm, to cover its reasonable costs for processing applications submitted pursuant to this chapter.
                    ***

§ 33880. Fee for seizure, impounding, storage, or release of firearm, ammunition feeding device, or ammunition
(a) A city, county, or city and county, or a state agency may adopt a regulation, ordinance, or resolution imposing a charge equal to its administrative costs relating to the seizure, impounding, storage, or release of any firearm, ammunition feeding device, or ammunition.
***
(3) The charges shall be in addition to any other charges authorized or imposed pursuant to this code.
***

16.   The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). (ECF No. 99.), the Supreme Court clarified the *Heller* test governing Second Amendment challenges to government statutes and regulations. *Bruen* created a two-part test where a court must: (1) determine whether the Second Amendment's "plain text" covers the individual's challenged conduct; and (2) if the plain text of the Second Amendment covers the individual's conduct, the regulation is valid only if the government shows the regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

17.   The Second Amendment is the only right which cannot be exercised without the physical possession of an arm, (i.e. gun, knife, slingshot, Bowie knife, taser, etc.).

18.   Under statute, plaintiffs had their firearms and ammunition confiscated, without an arrest or criminal complaint being filed (HAVEN) or a specious criminal complaint and dismissal at best (CUPP).

19.   Plaintiffs have consistently and lawfully maintained ownership of handguns, long-rifles,

**Sixth Amended Complaint**

1  ammunition, and magazines that were obtained through legal means and rightfully belong to
2  them. These items were legally purchased and have been in the possession of the Plaintiffs
3  throughout, until seized by the State.

4  20.  In violation of the Second Amendment, Defendant enforces a statutory scheme pursuant to
5  Penal Code Section Penal Code Section 33850 (application for return of firearm), 33855
6  (authority of law enforcement to enforce), 33860, 33880 (fee), requiring Plaintiffs to: 1) fill
7  out and sign **a LEGR application**, and any future iteration, under the penalty of perjury
8  called the "CALIFORNIA DEPARTMENT OF JUSTICE BUREAU OF FIREARMS Law
9  Enforcement Gun Release Application" during the statute of limitations for a criminal
10  proceeding to be instituted, and 2) pay a processing fee of $20.00 for the first firearm (long
11  gun or handgun), and $3.00 for each additional gun, and 3) pay a storage fee.

12  21.  According to information available on the defendant's official website at
13  https://oag.ca.gov/firearms/online-reporting#legr, in accordance with Penal Code section
14  33850, individuals asserting ownership of firearms, ammunition, and ammunition feeding
15  devices that are within the custody or control of a court or law enforcement agency and
16  seeking their return must submit a Law Enforcement Release Application.

17  22.  When an individual is apprehended and their firearms are seized, the Defendant carries out a
18  comprehensive background check on the arrested person to ascertain their eligibility to own
19  and possess firearms. In addition, they perform serial number checks in a database to
20  determine whether the firearms have been reported stolen and to identify the legal owner or
21  prior sales information. Subsequently, based on the results of these background checks,
22  decisions are made regarding potential additional charges against the arrested individual.

23  23.  Defendant is charged with the responsibility of establishing and executing standardized Law
24  Enforcement Release Applications as stipulated in Penal Code Section 33850. Specific
25  criteria for applicants are not only delineated by Defendant but are also enforced.

26  24.  In the role of State of California Attorney General, Defendant is tasked with establishing and
27  executing standardized Law Enforcement Release Applications, as defined in Penal Code
28  Section 33850, including specific criteria enforcement. Attached as Exhibits are: "A" - 2015

**- 6 -**

**Sixth Amended Complaint**

Law Enforcement Release Application, "B" - 2020 Law Enforcement Release Application, and "C" - the currently mandated online registration process.

25. The background check at the time of purchase of firearms is aimed at preventing individuals with disqualifying factors (e.g., criminal history, mental health issues) from acquiring firearms. The LEGR process, being a duplicate of the initial background check at the time of arrest through the same database used to purchase firearm, serves no practical purpose in ensuring public safety. Its purpose is clear, particularly when applied to individuals who have already been deemed eligible to own firearms through the judicial system and when compared to other property at the time of release such as knives and money.

26. The Law Enforcement Gun Release (LEGR) form essentially replicates information obtained during the initial background check upon firearm seizure, appearing to serve no practical purpose beyond fees excised for those wrongly accused.

27. Confiscation of firearms implicates the Second Amendment, and therefore implicates the challenged conduct.

### *CUPP*

28. Unlawful Arrest and Seizure: On or around March 25, 2014, police officers from the City of Citrus Heights, including Citrus Heights Police Officer (Report Number CH14-02589 on or about 03/26/2014), falsely arrested CUPP under color of law without probable cause. They issued a temporary restraining order, conducted an unwarranted search of his residence, which was approximately 8-9 miles away from the arrest location, and seized six legally owned firearms, along with ammunition, magazines, and two openly carried non-folding hunting knives. Notably, these arms were all purchased prior to January 1, 2014.

29. False Charge: CUPP was erroneously charged with a violation of California Penal Code § 21310 for carrying a concealed knife, despite the fact that the knife was not concealed.

30. Lack of Warrant and Exigent Circumstances: Throughout this incident, Citrus Heights Police Officers had ample time to obtain a warrant, and there were no exigent circumstances that warranted the actions taken.

31. Lack of Due Process: CUPP was subjected to false arrest, handcuffed, and booked into the

Sacramento County Jail without any form of due process. Consequently, he was required to post bail through a bail bondsman, incurring financial damages, while none of his seized property, including the firearms, was returned to him.

32. Criminal Complaint and Dismissal: On or about 03/27/2014, a criminal complaint *(People v. Cupp*, Sacramento Case Number 14M02083) was filed against CUPP for violation of penal code section 21310. This section states that anyone in the state carrying a concealed dirk or dagger upon their person is subject to imprisonment. However, on May 30, 2014, the case against CUPP was dismissed with prejudice on the Sacramento District Attorney's own motion. This dismissal resulted in an order for the return of all seized property to CUPP, although not all his property was returned.

33. Discrepancy in Property Return: Although two knives were returned to CUPP in the courtroom, his six firearms and other firearm-related tools and equipment, including ammunition, remained in the custody of the Citrus Heights Police Department, pending clearance from the Defendant.

### *HAVEN*

34. Unlawful Entry: On February 14, 2016, a Sacramento Deputy Sheriff, acting under color of law and without a warrant or probable cause, unlawfully entered HAVEN's residence.

35. Absence and Unawareness of Entry: HAVEN was absent and unaware of the deputy's entry, which occurred without his consent.

36. Unwarranted Seizure of Firearms: The deputy, without a warrant, seized HAVEN's property, including three firearms, among them an AR-7 semi-automatic rifle and a standard military semi-automatic 1911. It is essential to note that these arms were all purchased before January 1, 2014.

37. Absence of Criminal Charges: Despite no criminal charges ever being filed, the government did not return HAVEN's three firearms, ammunition, and magazines due to his refusal to pay a fee and sign a document allowing a firearms check to determine his eligibility to own a firearm.

38. Defendant's Knowledge of the Situation: Prior to January 31, 2018, the Defendant had actual

1  knowledge of this action and the fact that Plaintiffs had not committed any crimes.

2  39.   Defendant's Authority to Order Release: The Defendant possesses the ability to conduct a

3  name and firearm clearance check and can easily instruct local law enforcement agencies to

4  release the arms.

5  40.   Requirement of Attorney General's Permission: When CUPP and HAVEN sought the return

6  of their firearms from the seizing agencies, they were informed that no arms could be

7  returned without permission from the Attorney General's office and the payment of fees.

8  41.   Defendant's Law Enforcement Release Process: The Defendant has established a process, the

9  Law Enforcement Release process, which mandates individuals who were neither charged

10  with a crime nor had a criminal complaint dismissed entirely to submit a Law Enforcement

11  Release Application form (Exhibit "B") to the State Attorney General, California Department

12  of Justice (the Defendant). This process is required to determine eligibility to possess a

13  firearm, ammunition, and/or ammunition feeding devices, as per California Penal Code

14  section 33850.

15  42.   Universality of the Release Process: This release process is applicable to situations where

16  guns and ammunition are seized by law enforcement, even if no charges are filed against the

17  citizen or the criminal case is dismissed due to an erroneous arrest.

18  43.   Exclusive Authorization for Return: The only way individuals seeking the return of a firearm,

19  ammunition, and/or ammunition feeding device in the custody or control of a court or law

20  enforcement agency can proceed is by submitting a Law Enforcement Release Application

21  along with the appropriate fees to the Defendant Attorney General.

22  44.   At the direction of Defendant, Plaintiffs had their firearms confiscated by law enforcement in

23  perpetuity unless each plaintiff paid fees and surcharges, along with completing an

24  application called the Law Enforcement Release Application.

25  45.   This application is separate and distinct from a property receipt in criminal or civil

26  proceeding in that Plaintiffs have to sign a document under the penalty of perjury in violation

27  of the right to remain silent, pay a fee and surcharge, and submit to additional background

28  checks that were performed at the time of arrest and confiscation.

**Sixth Amended Complaint**

Case 2:16-cv-00523-TLN-KJN   Document 119   Filed 10/25/23   Page 10 of 24

46. The LEGR process duplicates the initial background check, which was designed to prevent ineligible individuals from acquiring firearms, rendering it redundant and unnecessary.

47. Other property like money, jewelry, and knives is not subject to a similar process, proving the lack of a compelling government interest for this discriminatory practice.

48. The exclusive focus on firearms within the LEGR process, while excluding other property, reveals an absence of compelling government interest.

49. The discrepancy in treatment between firearms and other forms of property underlines the absence of a universally applicable purpose for the LEGR process.

50. The historic absence of a tradition or legal precedent for requiring bureaucratic forms and fees for the return of property, especially when charges are dropped, underscores the bias against firearms, a constitutionally protected right.

51. The LEGR process, designed to enhance public safety by returning property to lawful owners, should apply to all property types; this exclusion of money, jewelry, and knives contradicts the stated intent.

52. The redundancy of checks through the LEGR process, following initial investigations upon property seizure, reveals the unjust bias against firearm owners.

53. The selective application of the LEGR process and fees to firearms, excluding other property, clearly establishes discrimination against firearm owners and the Second Amendment.

54. The unprecedented imposition of fees for the return of lawfully owned firearms, uniquely observed in California, is without historical precedent in the United States. This practice departs from established legal norms, creating a distinctive and unfair process concerning the return of constitutionally protected firearms.

55. There is no American tradition of limiting ammunition capacity and the 10-round limit has no historical pedigree and it is arbitrary and capricious. It is extreme. Our federal government and most states impose no limits17 and in the states where limits are imposed, there is no consensus.

56. Bruen at 142 S. Ct. at 2129-30 (emphasis added) says,

When the Second Amendment's plain text covers an individual's conduct, the

- 10 -

Sixth Amended Complaint

Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm <u>regulation</u>. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

57.    The difference in LEGR is the government, by removing the firearms, automatically deprive a person of their second amendment rights, as compared to a person who walks into a gun shop to buy a firearm. The difference being the government forcing a fee on a person whereby the government had no business removing the arms to begin with.

58.    The United States Supreme Court has concluded that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and . . . individual self-defense is 'the central component' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting Heller, 554 U.S. at 628).

59.    The Second Amendment is a right which requires the possession of an "arm" for personal self defense.

60.    The unlawful seizure of "arms" is also a seizure of rights, not just property.

61.    The "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens" for lawful purposes.

62.    Plaintiffs requested a return of their arms from local law enforcement, and local law enforcement advised Plaintiffs that they have to pay a fee, fill out an application, and fill out a gun registration form with Defendant's agency to get their arms returned, and this happens when it is unknown if a criminal complaint is even going to be filed.

63.    Both Plaintiffs have had their firearms seized from their residences, without a warrant, without being charged, tried or convicted of a crime.

64.    The firearms illegally seized were never returned to Plaintiffs.

65.    By failing to immediately return Plaintiffs firearms once it was determined that no crime had been committed, defendant has deprived Plaintiffs of their ability to exercise their Second Amendment rights by taking the very instruments necessary for exercising such a right, akin to confiscating a paper and pen preventing the free exercise of speech.

66.    Plaintiffs seek a positive injunction for defendant to release and return all firearms and

- 11 -

**Sixth Amended Complaint**

ammunition illegally confiscated, and be enjoined from further enforcement of the challenged codes as those sections were applied to Plaintiffs and others similarly situated.

67. Plaintiffs have standing because they have demonstrated a direct injury of having to undergo eligibility checks for the return of arms, pay a fee for each firearm, and beyond that, by being placed at the mercy of paying a fee and filling out a form which is a *per se* Fifth Amendment violation be eliciting a statement when there is a right to remain silent on the subject of the arrest itself.

68. But for the confiscation of their arms, Plaintiffs would exercise their constitutionally guaranteed right to self-defense both inside and outside of home.

69. Plaintiffs are being subjected to unconstitutionally been prevented from doing so because of the code sections challenged and complained of herein, and because of Defendant's unconstitutional application and enforcement of those same sections.

70. Defendants, under color of state law, entered the homes of Plaintiffs and confiscated their arms, in violation of the Second Amendment. Plaintiffs lawfully owned firearms at the time they were seized by the government.

71. Plaintiffs' seeks declaratory and injunctive relief authorized by 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

72. Plaintiffs, and those similarly situated, have no means of recovering their firearms except by way of court order, or compliance with the statutory scheme including the payment of money.

73. Plaintiffs' firearms were illegally seized, and therefore, they were deprived of their Second Amendment rights at the moment of seizure since all arms were seized.

74. This is an actual injury to a legally protected interest, fairly traceable to the state statutes and it is likely that this injury will be redressed by a favorable decision with a prohibition of enforcing such payments, fees, and detailed information regarding the acquisition of arms legally possessed and owned by Plaintiffs, and those similarly situated.

75. Defendant's enforcement of the provisions of the "Return or Transfer of Firearm in Custody or Control of Court or Law Enforcement Agency", Penal Code §§ 33850 — 33895 violates the Second Amendment.

**Sixth Amended Complaint**

76. But for this enforcement, Plaintiffs would forthwith retrieve such arms to exercise their rights.

77. Unless enjoined, Defendant will continue to violate the Second Amendment Rights of Plaintiffs and others similarly situated.

78. There is no mechanism for situations of false or frivolous arrests, and return of arms, without the payment of money; even when the confiscation was illegal *per se.*

79. Defendant is named only for purposes of injunctive and declaratory relief only.

80. Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

**SECOND CLAIM FOR RELIEF (previously NINTH)**
**CONSTITUTIONAL CHALLENGE TO STATE LAW**
**Violation of the Second Amendment Right to Keep and Bear Arms**
(Plaintiff HAVEN and Defendant)
( California Penal Code § 22210 (see also § 16590(m))  - as-written and as-applied challenge)
(Declaratory and Injunctive Relief)

81. Plaintiffs incorporate the above allegations as if set forth fully here.

82. This action challenges the constitutionality of the following statutes contained in the California Penal Code criminalizing Slungshots:

§ 22210. Saps and similar weapons; Punishment
Except as provided in Section 22215 and Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any leaded cane, or any instrument or weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap, or slungshot, is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

§ 22290. Saps and similar weapons as nuisance
Except as provided in Section 22215 and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any leaded cane or any instrument or weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap, or slungshot is a nuisance and is subject to Section 18010.

§ 18010. Weapons constituting nuisances; Confiscation, destruction; Enjoinment of manufacture and importation
(a)      The Attorney General, a district attorney, or a city attorney may bring an action to enjoin the manufacture of, importation of, keeping for sale of, offering or exposing for sale, giving, lending, or possession of, any item that constitutes a nuisance under any of the following provisions:
***
(10) Section 22290, relating to a leaded cane or an instrument or weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap, or slungshot.
***
(b)      The weapons described in subdivision (a) shall be subject to

**- 13 -**

confiscation and summary destruction whenever found within the state.

83. A slungshot began as a maritime tool consisting of a weight, or "shot," affixed to the end of a long cord, which pre-existed the founding of the United States. It was a simple weapon, which itself had been modified to become a slingshot. In sum, it was an "arm" used prior to the invention of gunpowder. "The slung-shot, also known as a "monkey's fist," is composed of a rope tied into a large, dense knot covering a heavy weight. It was traditionally used as a maritime tool to cast a line from one location to another. But it was also used as a weapon, similar to how one might use a flail." *Teter v. Lopez*, 76 F.4th 938, 951 n.11 (9th Cir. 2023)

84. The slungshot, boasts a longstanding tradition and historical usage as an arm protected by the Second Amendment, as recognized by many historical laws restricting access to minors, and not adults, except there were some laws which restricted concealment of the slungshot.

85. The slung-shot is both functional and symbolic. Slungshots were carried by motorcycle clubs of the 1960s and 1970s. A slungshot is a decorative accessory or ornament commonly attached to the handlebars of motorcycles. It consists of a long leather strap or multiple leather strands that extend from the handlebars and often have a decorative ornament at the end. Slungshots can come in various lengths and designs.

86. These accessories are decorative and are used by motorcycle riders to enhance the aesthetics of their bikes. They are often adorned with various colors, designs, or patterns, allowing riders to express their individuality and personal style, similar to the handle on a sword or knife. The decorative ornament at the end of the whip can also feature various symbols, charms, or emblems that hold personal significance for the rider.

87. Slungshots, sometimes called "Get-back whips", have a history associated with motorcycle culture, particularly in the context of motorcycle clubs from the 1960s through the 1970s. In the past, they were primarily used for self-defense, but their modern usage is mostly decorative and symbolic when displayed while riding or the when parked. Riders attach them to their bikes for the visual appeal and as a means of personal expression. Modern slungshots hanging from the handlebars is ornamental, and it is not intended threaten the public.

**Sixth Amended Complaint**

88.   However, the police in arresting plaintiff Haven used the slungshot being displayed as probable cause to harass and arrest him - hence, why it was a First Amendment violation. The use of these accessories varies among motorcycle enthusiasts, and they are often seen by law enforcement as a way to harass motorcycle riders only (as compared to equestrian riders).

89.   Custom swords, knives, guns with engravings, family names, and shields share a common thread with get-back whips on motorcycles. They all serve as forms of personal expression and symbolism, but never lose the objective primary trait as being an arm and used for personal self-defense.

90.   Similar to plaintiff's custom slungshot, he had a custom .45 cal. seized and destroyed by the police. Custom firearms and knives with engravings often feature intricate designs, initials, or family names. These customizations are chosen by their owners to make the weapons unique and meaningful. Just as with slungshots, these engravings and customizations serve as a way for individuals to express their identity, values, or affiliations through their possessions. They are like artistic expressions, similar to the decorative elements on get-back whips.

91.   Swords and muskets, historically used in combat for protection, are now often used in ceremonies, reenactments, and as decorative pieces. Personalized shields can carry family crests, symbols, or designs that hold personal significance. Like slungshots, they represent an intersection of functional and decorative elements, with the potential to convey a sense of heritage, identity, or honor.

92.   In each of these cases, whether it's a slungshot hanging from a motorcycle, a custom firearm with engravings, a knife with family names, or a personalized sword, these items go beyond their functional purpose. They are expressions of individuality, heritage, and personal values. Just as the First Amendment protects symbolic speech and expressions of personal beliefs, these custom items and accessories can be seen as extensions of one's freedom of expression and the right to express their unique identity. However, the primary purpose of possession is for self-defense, and that is recognized right for possession.

93.   This is the same reason why law enforcement officers don't carry pink, white or pastel color firearms and wear dark color uniforms because just the color of a firearm makes an

- 15 -

**Sixth Amended Complaint**

1    impression on the observer.

2    94.    The choice of black or dark-colored firearms by many law enforcement agencies often serves

3           as representing authority and power, which can have a significant impact on public

4           perception.

5    95.    Examples of Symbolic Significance: To draw a parallel, consider the use of colors and

6           symbols in other contexts. For instance, the robes and gavels of judges in courtrooms are

7           chosen to represent the authority and impartiality of the judicial system. Similarly, the color

8           and design of military uniforms and badges convey a sense of discipline, duty, and authority.

9           Swords displayed in military ceremonies are symbolic, but they are still considered arms

10          protected by the Second Amendment.

11   96.    On the 8th day of February in the year 2016, the Placer County Sheriff's Department executed

12          a stop of the individual herein referred to as HAVEN. This halt was predicated upon the

13          display of an "illegal weapon" suspended from the handlebars of HAVEN's motorcycle,

14          affectionately referred to as his "iron horse." At the time of said apprehension for the

15          possession of a slungshot, the plaintiff owned two such slungshots, and they were identical in

16          all respects. **Figure 1** represents the other slungshot that was not destroyed, the red and black

17          representing the colors of his affiliation with a motorcycle civil rights organization called

18          Bikers of Lesser Tolerance ("BOLT"):



**Figure 1.**

23   97.    HAVEN's possession of these slungshots was and is for personal self-defense, and displayed

24          on his motorcycle as a curio and relic of a bygone tradition of motorcycle clubs displaying

25          their respective club colors.

26   98.    Driven by the confiscation of all his firearms by governmental authorities, who failed to

27          return said armaments to him, he maintained ownership of the second slungshot.

28   99.    HAVEN has actual real apprehension of imminent arrest and prosecution in the absence of

1    declaratory and injunctive relief spurred this action.

2    100.    The slungshot hanging from the motorcycle was for ornamental and expressive purposes

3    only, and was in no way displayed to threaten the public and the deputy.

4    101.    The deputy placed HAVEN under felony arrest for violation of P.C. 22210. This detention

5    and subsequent legal proceedings violated his Fourth Amendment rights and imposed various

6    damages upon the plaintiff, encompassing expenditures for bail, legal counsel, and the

7    retrieval of his impounded motorcycle.

8    102.    On or about the 3rd day of March in the year 2016, the Placer County District Attorney

9    instituted a criminal complaint under Penal Code section 22210. Defendant HAVEN was

10    subsequently arraigned in response to these charges, which were later dismissed, but his

11    slungshot was retained by the state.

12    103.    It is unequivocally established in jurisprudence that the Second Amendment safeguards all

13    forms of "arms," inclusive of "slungshots," thereby extending beyond the confines of

14    firearms.

15    104.    The plaintiff seeks injunctive and declaratory remedies, to prohibit future arrests and

16    enjoining the state from enforcing the impugned law. HAVEN's fears are compounded by the

17    looming specter of additional arrests and prosecutions, since there is nothing stopping

18    another officer from arresting HAVEN.

19    105.    HAVEN remains in fear of prosecution to exercise his constitutional entitlement to possess

20    the arm delineated in California Penal Code sections 16590(m) and 22210, as he is paralyzed

21    by the fear of further detainment and prosecution, underscored by the associated

22    impoundment costs and the potential weapon-related convictions that could debilitate his

23    capacity to possess firearms.

24    106.    While the initial prosecution was terminated, the defendant persists in permitting the arrest

25    and prosecution of citizens for alleged infractions of California Penal Code sections

26    16590(m) and 22210, as no remedial measures have been implemented to avert future

27    detentions and legal proceedings.

28    107.    In actuality, such detentions and prosecutions continue to transpire presently and shall persist

**- 17 -**

**Sixth Amended Complaint**

in the future. The customary modus operandi entails criminal charges levied against citizens, leading to the confiscation of the contested "slungshot," with subsequent dismissal of the charges in the event of its obliteration.

108.   HAVEN is resolute in his commitment to perpetuate the behavior that led to his initial arrest and prosecution, championing his Second Amendment right to bear "arms." In the broader perspective of past, current, and impending arrests, the rationality underlying his fear of future arrests or threats thereof, and the accompanying prosecutions, becomes apparent.

109.   The resolution of the charges hinged on the requisite destruction of HAVEN's so-called "slungshot" by government authorities, which is an injury to a legally safeguarded interest, with a causal nexus to the state statutes.

110.   Had it not been for the sequestration of his armaments, the plaintiff would have exercised his constitutionally endowed right to self-defense, both within and outside his domicile, by carrying the arm openly on his motorcycle, as represented in **Figure 2.**



**Figure 2.**

111.   California jurisprudence accommodates the open carrying of knives, which fall under the purview of protected "arms" per the Second Amendment. At the time of their apprehensions, both HAVEN and CUPP were adorned with fixed-blade knives, as delineated in Figures 3 (HAVEN) and 4 (CUPP). These knives served the dual purpose of personal self-defense and adhering to customary "biker" attire, evident in their conspicuous display.

**Sixth Amended Complaint**



**Figure 3.**



**Figure 4.**

112.  In a contrasting trajectory, while CUPP encountered illicit detention due to his knives, HAVEN faced arrest on account of a slungshot suspended from his motorcycle's handlebars.

113.  The Second Amendment, in its essence, ensures that law-abiding citizens enjoy the prerogative of retaining and bearing arms for the preservation of self-defense, encompassing entities that bear semblance to a "slungshot." The exhibition of these armaments was twofold: an artifact of historical curiosity and as a deliberate measure to preclude their categorization as concealed weapons. This stratagem finds its roots in the historical legislative focus on the concealed attributes of slungshots, a facet of their usage that was subjected to regulation.

114.  For HAVEN, these armaments held value as implements of personal self-defense and concurrently assumed the role of ornamental relics, evoking the ethos of a bygone era.

115.  It is imperative to note that Plaintiff HAVEN was unjustly arrested on account of an alleged violation of California Penal Code section 22210 (also see section 16590(m)), constituting a felony offense, punishable by a jail term not to exceed one year or incarceration in consonance with subdivision (h) of Section 1170.

116.  Crucially, it is underscored that the slungshot, by virtue of its classification as an arm, is fortified by the protective umbrella of the Second Amendment. Analogous to handguns and pistols, slungshots were subjected to regulation of a comparable degree. The historical trajectory of slungshot regulation was circumscribed to the realm of "concealed" carry and the

- 19 -

**Sixth Amended Complaint**

possession by minors, as opposed to an absolute prohibition.

117.    Laws of the states during the relevant time periods clearly present the lack of a historical analog.

118.    Alabama: 1872 Ala. Laws 130 (banning the concealed carry of **slung-shots** or brass knuckles)

119.    Kentucky: 1859 Ky. Acts 245, § 23 (prohibited selling, giving, or loaning "any pistol, dirk, bowie-knife, brass-knucks, **slung-shot**, colt, cane-gun, or other deadly weapon . . . to any minor," The law contained an exception that allowed parents or guardians to give, lend, or sell deadly weapons to their minor children. See *id.* At that time, the age of majority in Kentucky was twenty-one years old. Kentucky's law prohibiting the sale of firearms to minors also persisted through the Reconstruction Era. See ch. 29 Ky. Code § 1 (1877), reprinted in The General Statutes of Kentucky 359 (J.F. Bullitt & John Feland eds. 1877).

120.    Indiana: 1875 Ind. Acts 59 (making it "unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one-years, any pistol, dirk, or bowie-knife, **slung-shot**, knucks, or other deadly weapon").

121.    Mississippi: 1878 Miss. Laws 175 (making it unlawful "for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, knuckles, slung shot, or other deadly weapon of like kind or description)

122.    Nevada: Nev. Rev. Stat. § 4864 (1885) (making it unlawful for anyone "under the age of twenty-one (21) years" to "wear or carry any pistol, sword in case, slung shot, or other dangerous or deadly weapon").

123.    West Virginia: 1882 W. Va. Acts 421 (making it unlawful for a person to "sell or furnish" "any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character" "to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years").

124.    Kansas: 1883 Kan. Sess. Laws 159 (making it unlawful to "sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol . . . or any dirk, bowieknife, brass knuckles, slung

**Sixth Amended Complaint**

shot, or other dangerous weapon[] to any minor").

125. Wyoming: 1890 Wyo. Terr. Sess. Laws 140 (making it "unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person"); see also Revised Statutes of Wyoming 1253.

126. District of Columbia: 27 Stat. 116-17 (1892) District of Columbia (making it unlawful to "sell, barter, hire, lend or give to any minor under the age of twenty-one years" "any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles").

127. North Carolina: 1893 N.C. Sess. Laws 468 (making it "unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot").

128. Texas: 1897 Tex. Gen. Laws 221-22 (making it unlawful to "knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife  or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof")

129. Further, "the right to 'bear arms' refers to the right to 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person."'

130. Haven did not display the curio or relic in a threatening manner, no different than a holstered pistol or sword.

131. A slungshot does not have uniquely dangerous propensities and was never banned, only regulated as to minors and concealed carry. The slungshot is simply a rope with a heavy object affixed to the end of it. A slungshot is nothing more than a poor person's slingshot which too is perfectly legal.

132. To determine whether a weapon is dangerous and unusual, "we consider whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by

**Sixth Amended Complaint**

law-abiding citizens for lawful purposes." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), abrogated on other grounds by *Bruen*, 142 S. Ct. 2111.

133. Since the police confiscated and destroyed his arms, he is relegated to only carrying a slungshot for self-defense.

134. California Penal Code § 16590(m) likewise references "slungshot" as prohibited by Section 22210.

135. Defendant's enforcement of §§ 16590(m) and 22210 interferes with the right to possess non-lethal weapons for purposes of self defense.

136. This is an actual injury to a legally protected interest, fairly traceable to the state statutes and it is likely that this injury will reoccur unless redressed by a favorable decision with a prohibition of enforcing said statutes.

137. But for this enforcement, Plaintiff would carry openly and display his slungshot forthwith.

138. Unless enjoined, Defendant will continue to violate the Second Amendment Rights of Plaintiff and others similarly situated.

139. There is no mechanism for situations of false or frivolous arrests, and return of arms, and no court process for the return of a slungshot.

140. Defendant is named only for purposes of injunctive and declaratory relief only.

141. Plaintiff seeks attorney fees pursuant to 42 U.S.C. Section 1988.

142. Plaintiff's burden of establishing irreparable injury in the absence of an injunction is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages alone as in order to exercise a right, the necessary tools must be returned to exercise such a right.

143. Declaratory and Injunctive relief is required as to the offending statutory provisions are unconstitutional and cause irreparable injury and harms to those arrested and charged.

144. Plaintiffs seeks attorney fees pursuant to 42 U.S.C. Section 1988.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendant, and pray for relief as follows:

- 22 -

1.   A preliminary injunction under rule 65 of the Federal Rules of Civil Procedure enjoining Defendant Attorney General of the State of California from enforcing California Penal Code §§ 33850, 33855, 33860, 33865, 33880, and permutations thereof, including **Exhibits "A" through "C"**.

2.   A preliminary injunction under rule 65 of the Federal Rules of Civil Procedure enjoining Defendant Attorney General of the State of California from enforcing provisions of California Penal Code §§ 16590(m) and 22210 ("slungshot").

3.   For declaratory judgment and relief, pursuant to 28 U.S.C. §§ 1983 and 2201, that California Penal Code §§ 33850, 33855, 33860, 33865, 33880 are unconstitutional and violate the Second Amendment as-written and as-applied to Plaintiffs;

4.   For declaratory judgment and relief, pursuant to 28 U.S.C. §§ 1983 and 2201, that California Penal Code §§ 16590(m) and 22210 ("slungshot") are unconstitutional and violate the Second Amendment as-written and as-applied;

5.   An injunction prohibiting Defendant from employing a statutory scheme, similar to that embodied in California Penal Code §§ 33850, 33855, 33860, 33865, 33880.

6.   For declaratory judgment and injunctive relief, pursuant to 28 U.S.C. §§ 1983 and 2201, Defendant be enjoined from enforcing California Penal Code §§ 16590(m) and 22210 ("slungshot") in its entirety, or, alternatively, to the extent such can be segregated from the rest of the statute, any provision that prohibits the acquiring, using, or possessing of arms that are in common use by the American public for lawful purposes, including a slungshot;

7.   For declaratory judgment and injunctive relief, pursuant to 28 U.S.C. §§ 1983 and 2201, Defendant be enjoined from enforcing California Penal Code §§ 16590(m) and 22210 ("slungshot") in its entirety, or, alternatively, all such ropes with a heavy metal end attached.

8.   Enter a declaratory judgment under 28 U.S.C. §§ 1983 and 2201 that California Penal Code §§ 33850, 33855, 33860, 33865, 33880 is unconstitutional on its face or, alternatively, to the extent its prohibitions apply to law-abiding adults who have had their right to acquire, use, or possess firearms and magazines that are in common use by the American public for lawful purposes, because such unlawfully infringes on the right of the People to keep and bear arms

**Sixth Amended Complaint**

1  in violation of the Second Amendment.

2  9.    For declaratory judgment and relief, pursuant to 28 U.S.C. §§ 1983 and 2201, that California

3      Penal Code sections seizure of arms, magazines, ammunition and parts legal to posses and

4      own are included in the protection of "arms" under the Second Amendment.

5  10.   For declaratory judgment and relief, pursuant to 28 U.S.C. §§ 1983 and 2201, that the Law

6      Enforcement Release Application. (Attached hereto as **Exhibits "A" to "C"**, and any further

7      permutations) shall not be applied to any person who has not been charged with a crime, or

8      who has been arrested without a formal criminal complaint being filed, or has been arrested

9      and a criminal complaint filed, but later dismissed.

10  11.   For declaratory judgment and relief, pursuant to 28 U.S.C. §§ 1983 and 2201, that Defendant

11      cannot exact a fee, charge, or tax on the DROS Entry System, Automated Firearms System,

12      or any other database as a condition to return arms after confiscated by law enforcement

13      without an arrest or criminal complaint being filed after arrest, or filed, but later dismissed.

14  12.   For injunctive relief, consistent with declaratory relief sought herein, enjoining Defendant,

15      and their officers, agents and employees, from enforcing any of the provisions of California

16      Penal Code §§ 16590(m) and 22210 ("slungshot"), including, but not limited to, what is

17      depicted in **Figure 1.**

18  13.   For declaratory judgment and relief, pursuant to 28 U.S.C. §§ 1983 and 2201, that all arms

19      confiscated by local law enforcement be returned without the payment of a fee or application,

20      other than the typical return of property receipt.

21  14.   Award of reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

22  15.   An order mandating that Defendant turn over all firearms and their accessories which were

23      illegally seized by Defendant.

24  Dated: October 25, 2023          THE LAW OFFICES OF GARY W. GORSKI
                                     Respectfully Submitted,

25
                                      /s/ Gary W. Gorski
26                                   Gary W. Gorski
                                     Attorney for Plaintiffs

27

28

**Sixth Amended Complaint**