1  Rob Bonta, State Bar No. 202668
   Attorney General of California
2  Benjamin M. Glickman, State Bar No. 247907
   Supervising Deputy Attorney General
3  Katrina Uyehara, State Bar No. 349378
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone:  (916) 210-7867
6    Fax:  (916) 324-8835
     E-mail:  Katrina.Uyehara@doj.ca.gov
7  *Attorneys for Rob Bonta, in his official capacity as*
   *Attorney General of the State of California*

8                 IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

| | |
|---|---|
| 13  **JAMES EDWARD CUPP,** | 2:16-cv-00523-TLN-KJN |
| 14                              Plaintiffs, | |
| 15        **v.** | **MEMORANDUM OF POINTS AND** |
| 16 | **AUTHORITIES IN SUPPORT OF** **DEFENDANT ATTORNEY GENERAL** |
| 17 **KAMALA D. HARRIS Attorney General of** **the State of California, in her official** | **ROB BONTA'S MOTION FOR** **SUMMARY JUDGMENT** |
| 18 **capacity only,** | Date:          October 30, 2025 |
| 19                              Defendant. | Time:          2:00 p.m. Dept:          Courtroom 2, 15th Floor |
| 20 | Judge:          The Honorable Troy L. Nunley Trial Date:   None set. |
| 21 | Action Filed:  March 11, 2016 |

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

I.     Statutory Background.................................................................................. 2

       A.    Law Enforcement Release (LER) Process .................................. 2

       B.    Penal Code Section 22210's Restriction on Slungshots ............. 3

II.    Procedural History ..................................................................................... 4

Legal Standard .................................................................................................... 5

Argument ............................................................................................................. 6

I.     California's Law Enforcement Release Process Does Not Violate the Second Amendment ................................................................................... 6

       A.    California's Law Enforcement Release Process Does Not Burden Conduct Covered by the Plain Text of the Second Amendment and Is Presumptively Lawful .................................................. 6

       B.    California's Law Enforcement Release Process Is Consistent with the Nation's Historical Tradition of Keeping Arms out of the Hands of Dangerous Individuals and Extending the Right to Only Law-Abiding Individuals................................................................. 10

           1.    Historical Laws on Weapons Licensing and Groups Deemed Dangerous ............................................................. 11

           2.    The Surveyed Restrictions Are Relevantly Similar to California's Law Enforcement Release Process ......................... 13

II.    California's Restriction on Slungshots Does Not Violate the Second Amendment............................................................................................. 14

       A.    Slungshots Are Not Presumptively Protected Under the Second Amendment............................................................................. 14

           1.    Slungshots Are Not Commonly Used or Suitable for Self-Defense......................................................................... 15

           2.    Slungshots Are Dangerous and Unusual...................................... 16

       B.    California's Restriction on Slungshots Is Consistent with the Nation's Historical Tradition of Restricting Laws to Protect Innocent Person from Especially Dangerous Uses of Weapons .............. 17

           1.    The Challenged Statutes Fit Comfortably Within a Long Tradition of Restricting Slungshots and Other Dangerous Concealable Weapons .................................................. 17

           2.    The Surveyed Restrictions Are Relevantly Similar to Section 22210's Restrictions on Slungshots ................................. 19

Conclusion ........................................................................................................ 20

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Atkinson v. Garland*
  70 F.4th 1018 (7th Cir. 2023) .................................................................................................. 7

*B & L Productions v. Newsom*
  104 F.4th 108 (9th Cir. 2024) ........................................................................................... 6, 14

*Bevis v. City of Naperville*
  657 F.Supp.3d 1052 (N.D. Ill. 2023) ..................................................................................... 16

*Brandstetter v. City of Riverside*
  No. 23-55739, 2025 WL 66045 (9th Cir. Jan. 10, 2025) ................................................... 9, 10

*Cupp, et al. v. Kamala Harris, et al.*
  No. 21-169809 (9th Cir. 2021) ............................................................................................... 4

*Delaware State Sportsmen's Ass'n v. Delaware Dept. of Safety*
  664 F.Supp.3d 584 (D. Del. 2023) ........................................................................................ 16

*District of Columbia v. Heller*
  554 U.S. 579 (2008) .................................................................................................... *passim*

*Duncan v. Bonta.*
   133 F.4th 852 (9th Cir. 2025) (en banc) ..................................................................... *passim*

*Duncan v. Bonta*
  (Sup. Ct. Dkt. No. 21-1194) ....................................................................................... *passim*

*Fouts, et al. v. Bonta, et al.*
  718 F.Supp.3d 1276 (S.D. Cal. 2024) ..................................................................................... 4

*Frlekin v. Apple, Inc.*
  979 F.3d 639 (9th Cir. 2020) ................................................................................................... 5

*Fyock v. Sunnyvale*
  779 F.3d 991 (9th Cir. 2015) ................................................................................................. 16

*Hanson v. District of Columbia*
  120 F.4th 223 (D.C. 2024) .................................................................................................... 17

*Jackson v. City & Cnty of San Francisco*
  746 F.3d 953 (9th Cir. 2014) ................................................................................................... 7

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*McDonald v. City of Chicago*

4
    561 U.S. 742 (2010) ............................................................................................ 11

5

*McRorey v. Garland*
    99 F.4th 831 (5th Cir. 2024).................................................................................. 7

6

*Nat'l Ass'n for Gun Rights v. Lamont*

7
    685 F.Supp.3d 63 (D. Conn. Aug. 3, 2023) ....................................................... 16

8

*New York State Rifle & Pistol Ass'n v. Bruen*

9
    597 U.S. 1 (2022) ........................................................................................*passim*

10

*Ocean State Tactical, LLC v. Rhode Island*
    95 F.4th 38 (1st Cir. 2024).............................................................................. 8, 17

11

*People v. Fannin*

12
    91 Cal.App.4th 1399 (3rd Dist. 2001) ........................................................... 4, 16

13

*People v. Williams*

14
    100 Cal.App. 149 (1st Dist. 1929) ...................................................................... 4

15

*Rhode v.* Bonta,
    ___ F.4th ___, 2025 WL 2080445 (9th Cir. July 24, 2025).................................. 8

16

*Silvester v. Harris*

17
    843 F.3d 816 (9th Cir. 2016)................................................................................ 7

18

*United States v. Duarte*

19
    137 F.4th 743 (9th Cir. 2025) (en banc)............................................................... 7

20

*United States v. Rahimi*
    602 U.S. 680 (2025) ..................................................................... 6, 8, 11, 14

21

*United States v. Salerno*

22
    481 U.S. 739 (1987) ............................................................................................ 6

23

*Vincent v. Garland*
    80 F.4th 1197 (10th Cir. 2023)............................................................................ 7

24

*Wa. State Grange v. Wa. State Republican Party*

25
    552 U.S. 442 (2008) ............................................................................................ 6

26

*Young v. Hawaii*

27
    (Sup. Ct. Dkt. No. 20-1639)................................................................................. 5

28

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

California Penal Code
  § 22210 ............................................................................................... *passim*
  § 33850 .................................................................................................. 2, 10
  § 33855 .................................................................................................... 2, 3
  § 33860 .................................................................................................... 2, 3
  § 33865 .............................................................................................. 2, 13, 14
  § 33870 ......................................................................................................... 2
  § 33875 ......................................................................................................... 2
  § 33880 ......................................................................................................... 2

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Second Amendment ............................................................................. *passim*

**COURT RULES**

Federal Rule of Civil Procedure
  § 56 ............................................................................................................ 5

**OTHER AUTHORITIES**

4 Blackstone, *Commentaries on the Laws of England* 148 (1769) ............................................. 16

# INTRODUCTION

In the nine years this case has been pending, Second Amendment jurisprudence has undergone major changes.  While previous filings in this case used the Circuit Courts' two-step, interest-balancing test, this motion for summary judgment applies the *New York State Rifle & Pistol Ass'n v. Bruen* framework to finally dispose of Plaintiffs' two remaining Second Amendment claims:  challenges to the State's Law Enforcement Release process and the State's restriction on slungshots.  597 U.S. 1 (2022).  Both claims fail under *Bruen*'s two-step framework for evaluating Second Amendment claims.

California's Law Enforcement Release (LER) process is the statutorily-required process that enables the return of any firearm, ammunition, or ammunition feeding device to its owner that is in the custody or control of a law enforcement agency or court.  Plaintiffs cannot establish that the Constitution presumptively protects a right to the return of firearm, ammunition, or ammunition feeding devices without first complying with a background check.  Indeed, that background check falls within classes of regulations that the Supreme Court has declared to be presumptively lawful and necessary to ensure that the Second Amendment right is extended only to ordinary, law-abiding citizens.  Even if this Court determines that the LER Process implicates the Second Amendment, the LER process is constitutional because it is consistent with our Nation's tradition of keeping firearms out of the hands of dangerous individuals and extending the Second Amendment right to only ordinary, law-abiding individuals.

Turning to Plaintiffs' other remaining challenge, California Penal Code section 22210 makes it a misdemeanor or felony for "any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any . . . slungshot."  Cal. Pen. Code, § 22210.[1]  Slungshots are not "Arms" under the Second Amendment because they are not in common use for self-defense—they are dangerous and unusual weapons outside the Second Amendment's scope.  Even if this Court determines that slungshots are Arms subject to Second Amendment protection, section 22210 is consistent with our Nation's tradition of regulating slungshots and other dangerous and deadly

---

[1] Unless otherwise specified, all statutory citations are to the Penal Code.

1

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

concealable weapons.

For these reasons, and those set forth below, there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law on the only two remaining claims in this matter.  Accordingly, this Court should grant Defendant's motion for summary judgment.

I.    STATUTORY BACKGROUND

A.    Law Enforcement Release (LER) Process

California's Law Enforcement Release process is the statutorily-required process that enables the return of any firearm, ammunition, or ammunition feeding device that is in the custody or control of a court or law enforcement, and is codified in Penal Code sections 33850, 33855, 33860, 33865, 33870, 33875, and 33880.  These sections outline the different responsibilities for the California Department of Justice, local law enforcement, courts, and applicants who are seeking the return of their firearm, ammunition, or ammunition feeding device.  None of these sections by themselves offer the statutory authority to remove firearms from individuals.  They merely work in conjunction with other state and federal statutes to facilitate the return of firearms, ammunition, or ammunition feeding devices to those eligible to possess them.

In relevant part, section 33850, subdivision (a) states:

> "Any person who claims title to any firearm, ammunition feeding device, or ammunition that is in the custody or control of a court or law enforcement agency and who wishes to have [it] returned shall make application for a determination by the Department of Justice as to whether the applicant is eligible to possess [it].  The application shall be submitted electronically via the California Firearms Application Reporting System (CFARS) . . ."

Subdivisions (a)(1)-(6) of section 33850 list the information that must be included in this LER application.  The application must include personally identifiable information like the applicant's name, date of birth, gender, telephone number, address (§ 33850(a)(1)), driver's license or ID (§ 33850(a)(4)), and signature (§ 33850(a)(6)).  The application must also include the name of the court or law enforcement agency holding the firearm, ammunition, or ammunition feeding device (§ 33850(a)(5)) and if applicable, the firearm's make, model, caliber, barrel length, type, country of origin and serial number (§ 33850, subd. (a)(3)).  Any person who

2

1    knowingly furnishes or knowingly omits incorrect information is guilty of a misdemeanor.

2    § 33850 (a)(7), (d).  Subdivisions (b) and (c) allow owners to sell or transfer the firearm,

3    ammunition, or ammunition feeding device to a third party if they no longer wish to possess it.[2]

4         To cover reasonable costs for processing LER applications, section 33860 permits the

5    Department of Justice to charge twenty dollars per request for return of a firearm, ammunition

6    feeding device, or any quantity of ammunition plus a three-dollar charge for each additional

7    firearm being processed.  § 33860(a).  The Department can adjust these fees if necessary to fully

8    fund the reasonable costs of processing LER applications.  § 33860(c).

9         After the owner has submitted the requisite LER application and fees, the Department of

10   Justice has 30 days to conduct an eligibility check to determine whether the applicant is eligible

11   to possess a firearm, ammunition, or ammunition feeding device.[3]  § 33865(a)-(b).  If an applicant

12   is ineligible to possess a firearm, ammunition, or ammunition feeding device, the applicant will

13   receive notification via the online portal, CFARS explaining the reason for the denial and

14   information about the appeal process.[4]  § 33865(f).  If, on the other hand, an applicant is eligible,

15   the Department must provide the applicant with a written notice identifying the applicant as a

16   person eligible to possess a firearm, ammunition, or ammunition feeding device, and any

17   description of the firearm, if applicable.  § 33865(c).  The applicant must then present this written

18   notice with the Department's determination to the law enforcement agency or court, which then

19   may return the firearm, ammunition, or ammunition feeding device.  § 33855(a).  Law

20   enforcement agencies and courts are prohibited from returning any firearm, ammunition feeding

21   device, or ammunition outside of this process.  § 33855.

22        **B.    Penal Code Section 22210's Restriction on Slungshots**

23        Penal Code section 22210 makes it a misdemeanor or felony for "any person in this state

---

24   [2] *See also* § 33870(a) (additionally permitting rightful owners who are prohibiting from possessing firearms and ammunition to sell or transfer the item to a licensed firearms dealer or
25   licensed ammunition vendor, or to store the item with one of these entities if the prohibition "will expire on a specific ascertainable date").
26   [3] The Department is allowed to exceed the 30-day window if the "background check is delayed by circumstances beyond the control of the Department."  § 33865(b).
27   [4] If the applicant is ineligible to possess an otherwise legal firearm, the Department must also provide the applicant with a form that allows for the sale or transfer of the firearm to a
28   licensed dealer. § 33865(e).

3

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

1    who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or

2    exposes for sale, or who gives, lends, or possesses any leaded cane, or any instrument or weapon

3    of the kind commonly known as a billy,[5] blackjack, sandbag, sandclub, sap, or slungshot."

4    Plaintiffs' challenge to section 22210 is limited to slungshots.  California caselaw has defined a

5    slungshot as "a small mass of metal or stone fixed on a flexible handle, strap or the like, used as a

6    weapon."  *People v. Williams*, 100 Cal.App. 149, 279 (1st Dist. 1929) (defining slungshot as

7    above); *see also People v. Fannin*, 91 Cal.App.4th 1399 (3rd Dist. 2001) (using *Williams'*

8    definition); *see also* Declaration of Robert Escobar [Escobar Decl.], ¶ 15; Declaration of Robert

9    Spitzer [Spitzer Decl.], ¶ 20.

10       Slungshots did not emerge until around the 1840s; when they did, they were viewed as

11   "especially dangerous or harmful," and states were ubiquitous in their restrictions limiting "the

12   weapon's development and their spreading use by criminals as fighting implements."  Statement

13   of Undisputed Facts [SUF], No. 1; Spitzer Decl., ¶ 20.  As weapons, they had "the advantage of

14   being easy to make, silent, and very effective, particularly against an unsuspecting opponent."

15   SUF No. 2; Spitzer Decl., ¶ 24.

16   **II.    PROCEDURAL HISTORY**

17       Plaintiffs have filed seven versions of the complaint since March 11, 2016.  ECF Nos. 1, 5,

18   12, 65, 80, 83, and 119.  In response, Defendant has filed three motions to dismiss in response to

19   Plaintiffs' Second, Third, and Fifth Amended Complaints.  ECF Nos. 18, 74, and 84.  For the first

20   two motions to dismiss, the Court has granted Defendant's motion without oral argument and

21   allowed Plaintiffs leave to amend at least some of their claims.  ECF Nos. 61, 79.  Defendant's

22   third motion to dismiss was granted without leave to amend.  ECF No. 91 at 8.  Judgment was

23   entered (ECF No. 95), and Plaintiffs appealed. ECF No. 96.

24       At the Ninth Circuit, the case was never fully briefed.  *Cupp, et al. v. Kamala Harris, et al.*,

25   (9th Cir. 2021 No. 21-169809).  After Appellants-Plaintiffs filed their opening brief, Appellee-

26       _____

          [5] The constitutionality of Section 22210 as it applies to billies is currently on appeal at the
27   Ninth Circuit in *Fouts, et al. v. Bonta, et al.,* 718 F.Supp.3d 1276 (S.D. Cal. 2024), appeal
     pending, No. 24-1039 (9th Cir. February 27, 2024) (appeal deferred pending issuance of mandate
28   in *Duncan v. Bonta* and *Teter v. Lopez*).  The law as it applies to billies is enjoined pending
     resolution of the appeal.  *Fouts*, 718 F.Supp.3d at 1276.

4

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

1    Defendant requested (and Appellants-Plaintiffs did not oppose) a stay (ECF No. 16) pending

2    resolution of *Young v. Hawaii* (Sup. Ct. Dkt. No. 20-1639) and *Duncan v. Bonta* (Sup. Ct. Dkt.

3    No. 21-1194), which was granted.  ECF No. 16.  In August 2022, the Court vacated and

4    remanded the case for further proceedings consistent with the U.S. Supreme Court's then-recent

5    decision in *Bruen*, 597 U.S. 1.  ECF No. 23.

6          In September 2022, this Court issued a minute order requiring the parties to file

7    supplemental briefs explaining *Bruen*'s effect on the case.  ECF No. 102.  The parties filed their

8    supplemental briefs (ECF Nos. 105, 106), and the Court issued an order granting Defendant's

9    motion to dismiss with leave to amend as to the Law Enforcement Release and slingshot claims

10    and allowed Plaintiffs to file a Sixth Amended Complaint.  ECF No. 109.

11          The operative Sixth Amended Complaint was filed in October 2023.  ECF No. 119.

12    Plaintiffs allege that the LER process violates their Second Amendment rights and that "but for"

13    enforcement of the LER process "Plaintiffs would forthwith retrieve such arms to exercise their

14    rights."  ECF No. 119 at ¶ 76-77.  Plaintiffs also allege that California's restriction on slingshots

15    violates the Second Amendment.  They allege that a slingshot "does not have uniquely dangerous

16    propensities and was never banned, only regulated as to minors and concealed carry."  ECF No.

17    119 at ¶ 131. They allege that the law "interferes with their right to possess non-lethal weapons

18    for purposes of self-defense."  ECF No. 119 at ¶ 135.  Defendant filed his answer on November

19    15, 2023.  ECF No. 120.  The parties were granted an extension to complete fact and expert

20    discovery, which has since been completed.[6]  ECF No. 127.

21                                      **LEGAL STANDARD**

22          Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if the

23    "movant shows that there is no genuine dispute as to any material fact and the movant is entitled

24    to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Frlekin v. Apple, Inc.*, 979 F.3d

25    639, 643 (9th Cir. 2020).

26

27           [6] The parties were granted an extension of the dispositive motion deadline following discovery of Plaintiff Haven's passing.  ECF No. 129.  Defendant and opposing counsel have

28    discussed the process for removing Plaintiff Haven from the case, and opposing counsel is in the process of preparing and filing a statement of death.

5

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

Plaintiffs raise both facial and as-applied challenges. A facial challenge is "'the most difficult challenge to mount successfully,' because it requires a [challenger] to 'establish that no set of circumstances exists under which the [law] would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 693 (2025); citing *United States v. Salerno*, 481 U.S. 739, 745 (1987). "That means that to prevail, the Government need only demonstrate that [the law] is constitutional in some of its applications." *Id*. Facial challenges are also "disfavored" because "a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 449 (2008). An as-applied challenge, on the other hand, challenges the application of the statute to a specific circumstance or the way it was applied to the particular facts of the plaintiffs' case. *See*, *e.g.*, *Salerno*, 481 U.S. at 751 n. 3. When evaluating either facial or as-applied challenges under the Second Amendment, courts apply the *Bruen* framework, described below. *See Rahimi*, 602 U.S. at 693-700.

**ARGUMENT**

I.    CALIFORNIA'S LAW ENFORCEMENT RELEASE PROCESS DOES NOT VIOLATE THE
      SECOND AMENDMENT

Under *Bruen*'s text-and-history standard for adjudicating Second Amendment claims, the party challenging a restriction must first demonstrate that the law regulates conduct that is presumptively protected by the Second Amendment. *Bruen*, 597 U.S. at 24; *B & L Productions v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024) (explaining that "[f]or any law to be presumptively lawful, it necessarily must not implicate the text of the Second Amendment"). If Plaintiffs cannot meet this burden, then the Court need not proceed further.

A.    California's Law Enforcement Release Process Does Not Burden Conduct
      Covered by the Plain Text of the Second Amendment and Is Presumptively
      Lawful

Plaintiffs cannot show that the Constitution presumptively protects a right to the return of firearm, ammunition, or ammunition feeding devices without complying with a background check. Indeed, that background check falls within classes of regulations that the Supreme Court have declared to be presumptively lawful. [7]

---

[7] Other courts have also understood *Bruen* and *Heller* to indicate that "background checks (continued…)

6

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

1     The Supreme Court has made clear that "the right secured by the Second Amendment is not

2     unlimited." *Bruen*, 597 U.S. at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 579, 629

3     (2008).). It does not extend to "a right to keep and carry any weapon whatsoever in any manner

4     for whatsoever and for whatever purpose." *Id.* Throughout its jurisprudence, the Supreme Court

5     has repeatedly recognized that "nothing in [*Heller*] should be taken to cast doubt on the

6     longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws

7     imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-

8     27. Accordingly, "[t]o determine whether a challenged law falls outside the historical scope of

9     the Second Amendment," this Court must "ask whether the regulation is one of the

10    'presumptively lawful regulatory measures' identified in *Heller*." *Jackson v. City & Cnty of San*

11    *Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. 1;

12    *see Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016), *abrogated on other grounds by Bruen*,

13    597 U.S. 1 (Thomas, C.J., concurring) (10-day waiting period after firearms purchase set

14    presumptively lawful condition).

15    Consistent with this understanding of the Second Amendment's scope, the Supreme Court

16    has also described the right as belonging only to "law-abiding, responsible citizens." *Heller*, 554

17    U.S. at 635. *Bruen* reiterated that limitation numerous times in describing the Second

18    Amendment's scope. *See Bruen*, 597 U.S. at 9, 15, 26, 29-31, 34, 38, 60, 70-71, & nn.8-9; *see*

19    *also United States v. Duarte*, 137 F.4th 743, 751 (9th Cir. 2025) (en banc) (recognizing that

20    *Bruen* used the term "law-abiding citizens" fourteen times). Specifically, *Bruen* explained that

21    "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States'

22    'shall-issue' licensing regimes." *Bruen*, 597 U.S. at 38 n.9. And "[b]ecause these licensing

23    regimes do not require applicants to show an atypical need for armed self-defense, they do not

24    necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment

25    right . . . Rather, it appears that these shall-issue regimes, which often require applicants to

26    undergo a background check or pass a firearms safety course, are designed to ensure only that

27    . . . are presumptively constitutional." *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024);
*see also Vincent v. Garland*, 80 F.4th 1197, 1201-1202 (10th Cir. 2023); *Atkinson v. Garland*, 70

28    F.4th 1018, 1022 (7th Cir. 2023).

7

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

1  those bearing arms in the jurisdictions are, in fact, 'law-abiding, responsible citizens.'" *Id.*

2       Most recently, in *United States v. Rahimi*, the Supreme Court reaffirmed these assurances,

3  recognizing again that "many such prohibitions, like those on the possession of firearms by

4  'felons and the mentally ill,' are 'presumptively lawful.'" 602 U.S. 680, 699 (2024) (citation

5  omitted); *see also id.* at 735 (Kavanaugh, J., concurring) (recognizing that *Heller* "recognized a

6  few categories of traditional exceptions to the [Second Amendment] right," which included the

7  "longstanding prohibition on the possession of firearms by felons" (quotation marks omitted)).

8  The Supreme Court reiterated "we do not suggest that the Second Amendment prohibits the

9  enactment of laws banning the possession of guns by categories of persons thought by a

10 legislature to present a special danger of misuse." *Id.* at 698 (citing *Heller*, 554 U.S. at 626).[8]

11      Applying these limiting principles, California's LER process—which requires a

12 background check to ensure that firearms, ammunition, and ammunition feeding devices are

13 returned to their ordinary, law-abiding owners—is constitutional under the Second Amendment.

14 Defendant does not dispute that Plaintiffs seek to keep "Arms' and that they are "People" under

15 the Second Amendment's plain text.  However, their proposed course of conduct falls outside the

16 scope of the Second Amendment's plain text.

17      In the event an individual's firearm, ammunition, or ammunition feeding device comes into

18 law enforcement or court custody, California's LER process ensures that the individual is eligible

19 to possess that same firearm, ammunition, or ammunition feeding device before it is returned to

20 its owner.  Implicit in the LER process is the understanding that if an individual's firearm,

21 ammunition, or ammunition feeding device came into law enforcement or court custody, some

22 event might have occurred that may make that person ineligible to possess that same firearm,

23 ammunition, or ammunition feeding device.  Similarly, in cases where firearms, ammunition, or

---

24

25 [8] A panel of the Ninth Circuit recently held that California's background check
   requirement for ammunition transfers is unconstitutional under the Second Amendment.  *Rhode v.*

26 *Bonta*, ___F.4th___, 2025 WL 2080445 (9th Cir. July 24, 2025).  The Attorney General filed a
   petition for rehearing en banc on Thursday, August 7, 2025, which contends that the panel's
   decision is fundamentally inconsistent with circuit precedent and Supreme Court precedent

27 instructing that shall-issue licensing schemes are presumptively lawful.  *Rhode*, No. 24-542, ECF
   No. 79.  The Ninth Circuit has ordered a response to the Attorney General's petition.  *Id.* at ECF

28 No. 80.

8

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

1  ammunition devices may have been stolen, the LER process allows ownership to be verified.

2  Like the background checks endorsed in *Bruen*, the LER process and its requisite background

3  check does not operate on its face to prevent any person from keeping and bearing arms and

4  merely ensures that those seeking return of their firearms, ammunition, or ammunition feeding

5  devices are "in fact, 'law-abiding, responsible, citizens.'"  *Bruen*, 597 U.S. at 39 n.9.

6        Importantly, an individual who is eligible to possess a firearm, ammunition, or ammunition

7  feeding device *may still possess* a firearm, ammunition, or ammunition feeding device outside of

8  the LER process while their application is pending.  Similarly, a person eligible to possess a

9  firearm or ammunition may even purchase one while their application is pending.  The LER

10  process does not prevent someone from acquiring firearms for self-defense, keeping them for that

11  purpose, and bearing the firearms for confrontation; indeed, an applicant could acquire, keep, and

12  bear a firearm in the 30-days that their application is pending.  In this way, the LER process does

13  not operate on its face to prevent any person from keeping and bearing arms; it is merely a

14  verification and background check process to ensure that those seeking the return of their

15  firearms, ammunition, or ammunition feeding devices that have been taken into law enforcement

16  or court custody are "in fact, 'law-abiding, responsible, citizens.'"  *Bruen*, 597 U.S. at 39 n.9.

17        The Supreme Court has recognized that background checks—such as those employed in the

18  LER process—do not impede an individual's right to "keep" or "bear" arms.  *See Bruen*, 597 U.S.

19  at 38 n.9; *see also id*. at 80 (Kavanaugh, J., concurring) (shall-issue regimes "may require . . . a

20  background check" and states employing such laws "may continue to do so").  Without

21  performing any historical analysis, the *Bruen* Court explained that shall-issue requirements are

22  consistent with the Second Amendment because "they do not necessarily prevent law-abiding,

23  responsible citizens from exercising their Second Amendment right to public carry."  *Id*. (internal

24  quotation marks omitted).

25        Consistent with this precedent, the Ninth Circuit previously upheld the LER process as

26  constitutional under the Second Amendment in an unpublished decision.  *Brandstetter v. City of*

27  *Riverside*, No. 23-55739, 2025 WL 66045 (9th Cir. Jan. 10, 2025).  Relying heavily on *Bruen*'s

28  footnote 9, the Court determined that the LER process was relatively similar to the shall-issue

9

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

1  regimes that were held presumptively constitutional unless "put toward abusive ends" like

2  "lengthy wait times" or "exorbitant fees." *Brandsetter*, 2025 WL 66045, at *2 (9th Cir. 2025)

3  (citing *Bruen*, 597 U.S. at 38, n. 9).  In doing so, the panel recognized that the LER process is

4  "reasonably designed 'to ensure only that those [keeping] arms in the jurisdiction are, in fact, law-

5  abiding, responsible citizens.'" *Brandstetter*, 2025 WL 66045 at *2 (quoting *Bruen*, 597 U.S. at

6  38, n.9) (internal citation omitted).  Similar to the plaintiff in *Brandsetter*, here, Plaintiffs have

7  "presented no evidence that section 33850 was 'put towards abusive ends' or that the State has

8  employed 'lengthy wait times in processing [section 33850] applications or exorbitant fees [to]

9  deny ordinary citizens their right to' possess firearms.  Nor ha[ve] [they] presented any evidence

10  that the State uses anything but 'narrow, objective, and definite standards' in applying the

11  statute." *Id*. (quoting *Bruen*, 597 U.S. at 38, n.9) (internal citation omitted).

12      *Brandsetter* is consistent with this Court's previous order dismissing Plaintiffs' challenge to

13  the LER process.  ECF No. 109 at 5-9.  In that order, this Court recognized that the LER process

14  "is an analogue to the shall-issue regimes discussed in *Bruen* and for that reason are lawful." *Id*.

15  at 9.  Plaintiffs' arguments still suffer from the same "fatal flaw" this Court identified in its order:

16  *Bruen*'s narrowest holding recognized that shall-issue style regulations were presumptively

17  constitutional.  *Id*. at 8.  The order also explained that to challenge the LER process, the

18  Complaint must include "factual allegations that this shall-issue style regime fails to operate

19  properly in practice" and was "subject only to an as-applied challenge." *Id*. at 7-8.  Given that

20  Plaintiffs have still failed to submit an LER application and fee, it is unclear how they intend to

21  bring such an as-applied challenge.  Consistent with *Brandsetter* and the forty-three

22  presumptively constitutional shall-issue regimes recognized in *Bruen*, this Court should hold that

23  the LER process does not implicate the Second Amendment.

24      **B.   California's Law Enforcement Release Process Is Consistent with the
            Nation's Historical Tradition of Keeping Arms out of the Hands of
25          Dangerous Individuals and Extending the Right to Only Law-Abiding
            Individuals**

26  Even if this Court finds that the LER process implicates the Second Amendment's plain

27  text, Plaintiffs' challenge still fails at the second step of the *Bruen* analysis because California's

28

10

LER process is consistent with the Nation's historical tradition of keeping arms out of the hands of dangerous individuals and extending the Second Amendment right to only ordinary, law-abiding individuals. *Rahimi*, 602 U.S. 680, 698.

*Bruen*'s historical analysis is not meant to impose "a regulatory straightjacket." *Bruen*, 597 U.S. at 30. The Second Amendment does not bind governments to the same forms of regulations that were adopted in the past but allows for "state and local experimentation." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). To ensure that flexibility, *Bruen* does not require the government to identify a "historical twin" or "dead ringer," but allows the government to justify a regulation by establishing it falls within a historical tradition of regulations that are "relevantly similar," meaning that they "impose a comparable burden on the right of armed self-defense" that is "comparably justified" 597 U.S. at 29-30.

### 1. Historical Laws on Weapons Licensing and Groups Deemed Dangerous

Throughout American history, governments have required individuals to demonstrate their eligibility to possess and carry firearms. SUF No. 3; *See generally* Spitzer Decl., ¶¶ 19-59, 62-101. The State's historical expert groups these laws into two broad categories: historical laws concerning weapons licensing and historical restrictions on named groups deemed dangerous.

Historical licensing laws functioned similarly to modern waiting periods: where possession or carry is "predicated on a process where a license applicant provides or submits some kind of information which is then evaluated and judged acceptable or not." SUF No. 4; Spitzer Decl., ¶ 35. By its very nature, historical licensing laws filtered out those eligible to possess or carry weapons and contemplated some sort of waiting period as opposed to the ability to possess or carry weapons on demand. SUF No. 4; Spitzer Decl., ¶ 35. Generally, licensing laws were a symptom of a more mature and nuanced form of governance that could address specific circumstances through licenses when the prevailing norm had been to outright prohibit. SUF No. 5; Spitzer Decl., ¶ 35, 40. Many of the first weapons licensing laws were enacted by municipalities who had the capabilities to issue and enforce licenses. SUF No. 6; Spitzer Decl., ¶ 39. Municipalities were also often highly populated areas where the use and misuse of weapons

11

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

posed a greater public safety risk.  SUF No. 7; Spitzer Decl., ¶ 39.

Historical licensing and permitting laws date back to the 1600s and 1700s.  SUF No. 8; Spitzer Decl., at ¶ 39.  These laws focused on dangerous, concealable weapons that posed a threat to public safety.  SUF No. 9; Spitzer Decl., at ¶ 36.  These laws became even more popular in the 1800s and 1900s, where at least 89 different licensing laws were enacted in at least 34 states as a pre-requisite for weapons carrying or ownership.  SUF No. 10; Spitzer Decl., at ¶ 37, 43.  An 1871 Missouri law acts as a good example of similar licensing laws at the time:

> § 9 Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

SUF No. 11; Spitzer Decl., ¶ 45; Exhibit C, p. 72.

Consistent with many other historical licensing laws, the Missouri law places unlimited discretion behind a single person, the mayor, and makes it a crime to carry concealed a broad range of weapons without a license. This general regulatory scheme, where possession or carry is predicated on a process where an applicant submits some kind of information which is then evaluated and judged acceptable or not, is analogous to the State's LER return process.

In addition to historical licensing laws, states also enacted laws restricting and disarming persons deemed dangerous.  SUF No. 12; Spitzer Decl., ¶¶ 62-96.  Historically, these restrictions addressed at least four different groups of individuals who were deemed too dangerous for firearm ownership:  certain races (Black and Native Americans, *id.* at ¶¶ 63-66), intoxicated persons, (*id.* at ¶¶ 67-75), vagrants and the mentally unsound (*id.* at ¶¶ 76-84), and non-residents (*id.* at ¶¶ 85-96).  SUF No. 13.  Consistent with the historical licensing laws mentioned above, these laws also attempted to (1) ensure that the Second Amendment right was exercised only by those who at the time, were considered to be ordinary, law-abiding individuals and would (2) keeping arms out of the hands of those who were deemed dangerous.

12

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

1    California's LER process fits comfortably within this long and unbroken tradition of

2    extending the Second Amendment right to only ordinary, law-abiding citizens.

3        **2.    The Surveyed Restrictions Are Relevantly Similar to California's
          Law Enforcement Release Process**

4        The surveyed historical licensing restrictions on weapons and groups deemed dangerous are

5    relevantly similar to the State's LER process in light of their comparable burdens and

6    justifications.  *See Bruen*, 597 U.S. at 29 (modern regulation must "impose a comparable burden

7    on the right of armed self-defense" that is "comparatively justified").  Indeed, many of the

8    historical laws regulating weapons licensing were actually significantly more burdensome than

9    California's LER restrictions.

10       Historical licensing laws "made clear that the government could take whatever time was

11   needed to complete the licensing process" and there was no indication of "anything resembling a

12   'right' to obtain or use firearms on demand."  SUF No. 14; Spitzer Decl., ¶ 42.  Here, section

13   33865 requires the government to process LER applications within a 30-day window starting

14   from when the application is submitted, which is significantly less burdensome than its historical

15   precursors, which exercised no time limit to process and issue licenses.

16       Similarly, most historical licensing laws also allowed the governing authority to "withdraw

17   or cancel [the license] at his or its pleasure."  SUF No. 15; Spitzer Decl., ¶ 42, 52 (describing

18   Nebraska state law allowing the mayor to grant licenses "to so many and such persons as he may

19   think proper" and allowing them to be revoked "at his pleasure").  Here, the Department exercises

20   no such discretion and must explain the statutory reason behind each denial.  § 33865(f).

21       Historically, licenses and permits also had a set time period ranging from a month to a year.

22   SUF No. 16; *see*, *e.g.*, Spitzer Decl., at ¶ 41, 52 (describing 1892 law enacted by the District of

23   Columbia, which granted permits for no more than one month at a time upon satisfactory proof

24   before a judge of the police court).  This is much more burdensome than the LER process, where

25   applicants are subject to a single background check to obtain the return of their firearm,

26   ammunition, or ammunition feeding device, and applicants need not submit to additional

27   background checks in order to keep those returned items (unless the items are taken into custody

28

13

1   again for different reasons).

2          Similarly, the fees under the LER process are modest when compared to some of their

3   historical counterparts.  The LER process requires twenty dollars per request for return of a

4   firearm, ammunition feeding device, or any quantity of ammunition plus a three-dollar charge for

5   each additional firearm being processed.  § 33860(a).  Some non-resident licensing laws were

6   cost prohibitive and equal to $1,519 dollars in 2024.  SUF No. 17; *Compare* § 33860(a) *with*

7   Spitzer Decl., ¶¶ 91-93 (an 1899 non-resident licensing fee, which was 40 times the resident fee).

8          Finally, during the LER process if the applicant is ineligible to possess an otherwise legal

9   firearm, the Department must also provide the applicant with a form that allows for the sale or

10  transfer of the firearm to a licensed dealer. § 33865(e).  Historical licensing laws could involve a

11  complete forfeiture of the weapon without the option of transfer or sale like the LER process.

12  SUF No. 18; *Compare* § 33865 *with* Spitzer Decl., ¶¶ 60-61 (describing statutes involving

13  forfeiture and sale of weapons for failing to pay a tax).

14         The modest burdens imposed by California's LER process and its analogues are

15  comparably justified by similar concerns that the Second Amendment right should be exercised

16  only by those who are considered to be ordinary, law-abiding individuals and that the public has

17  an interest in keeping firearms out of the hands of individuals who are deemed dangerous.

18  *Rahimi*, 602 U.S. 680, 698; *Bruen*¸ 597 U.S. at 29-30.

19  **II.     CALIFORNIA'S RESTRICTION ON SLINGSHOTS DOES NOT VIOLATE THE SECOND
20           AMENDMENT**

21         **A.     Slingshots Are Not Presumptively Protected Under the Second
                   Amendment**

22         For many of the same reasons, Plaintiffs cannot demonstrate that California's restriction on

23  slingshots burdens any conduct that is presumptively protected by the Second Amendment.

24  Under *Bruen*'s text-and-history standard for adjudicating Second Amendment claims, the party

25  challenging a restriction must first demonstrate that the law regulates conduct that is

26  presumptively protected by the Second Amendment.  *Bruen*, 597 U.S. at 24; *B&L Productions v.*

27  *Newsom*, 104 F.4th 108, 119 (9th Cir. 2024) (explaining that "[f]or any law to be presumptively

28  lawful, it necessarily must not implicate the text of the Second Amendment").  If Plaintiffs cannot

14

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

meet this burden, then the Court need not proceed further.

### 1.    Slungshots Are Not Commonly Used or Suitable for Self-Defense

The Second Amendment only protects those weapons that are "'in common use at the time' *for lawful purposes like self-defense.*"  *Heller*, 554 U.S. at 624 (emphasis added) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).[9]  This "important limitation on the right to keep and carry arms," recognized in *Heller*, remains a critical limitation on the Second Amendment following *Bruen*.  *See Bruen*, 597 U.S. at 81 (Kavanaugh J., concurring).  *Bruen* recognized that "the Second Amendment protects only the carrying of weapons that are those in common use at the time, as opposed to those that are highly unusual in society at large."  597 U.S. at 47 (internal quotations omitted).  Here, the Ninth Circuit and the State's experts agree that slungshots are not self-defense weapons.

In *Duncan v. Bonta*, the Ninth Circuit recognized that "the slungshot proved incredibly useful to criminals" but was of "minimal value in self-defense." 133 F.4th 852, 876 (9th Cir. 2025) (recognizing that slungshots followed a similar regulatory trajectory as other dangerous and concealable weapons); *see infra* at 17-19.  This Court's analysis can and should end here.  Indeed, Defendant's historical slungshot expert confirms, "[F]rom its inception the slungshot was commonly understood to be an *offensive* criminal implement."  SUF No. 19; Escobar Decl., ¶ 42 (emphasis added); *see also* Escobar Decl., ¶¶ 28-42, 48, 56 (evidence of the relationship of slungshots with crime in newspapers, fiction, political cartoons, and famous criminal uses).  Slungshots are ill-suited for self-defense because they "(1) cannot be used easily for defensive techniques," (2) "must be swung at near full-force," and (3) are "best-suited to and normally used for strikes to the head."  SUF No. 20; Escobar Decl., at ¶ 53; *see also* id. at ¶ 55.  In short, the slungshot is a far cry from the "quintessential self-defense weapon" discussed in *Heller* and *Bruen*.  It is an offensive weapon closely associated with criminal use and is ill-suited for self-defense.  Because Plaintiffs cannot establish that slungshots are commonly used for self-defense, their claims fail at the *Bruen*'s threshold step.

---

[9] *See also Bruen*, 597 U.S. at 21 (referencing whether the subject "weapons [are] 'in common use' today for self-defense"

15

1

### 2. Slungshots Are Dangerous and Unusual

2

In addition to being ill-suited for self-defense, slungshots fall outside the scope of the

3

Second Amendment for the separate reason that they are dangerous and unusual weapons.  As

4

explained above, *Heller* made clear that the Supreme Court did not intend to cast doubt on the

5

constitutionality of longstanding prohibitions traditionally understood to be outside the Second

6

Amendment's scope.  *Heller*, 554 U.S. at 626; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 996-

7

967 (9th Cir. 2015).  One of those historical traditions is the prohibition on "dangerous and

8

unusual weapons."  *Heller*, 554 U.S. at 627.

9

Blackstone, the leading historical source cited by *Heller* on this point, elaborated on this

10

tradition and explained that "[t]he offense of riding or going armed, with dangerous *or* unusual

11

weapons, is a crime against the public peace . . . and is particularly prohibited."  4 Blackstone,

12

*Commentaries on the Laws of England* 148 (1769) (emphasis added).  A weapon qualifies as

13

dangerous and unusual if it has some heighted "level of lethality or capacity for inquiry" that

14

makes the weapon "especially dangerous."  *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F.Supp.3d

15

63, 89-90 (D. Conn. Aug. 3, 2023); *see also Duncan*, 133 F.4th at 865.

16

The Ninth Circuit and other courts have recognized that slungshots are uniquely dangerous

17

weapons that are not typically possessed for law-abiding purposes.  *Duncan*, 133 F.4th at 876,

18

878-79; *Bevis v. City of Naperville*, 657 F.Supp.3d 1052, 1070 (N.D. Ill. 2023); *Delaware State*

19

*Sportsmen's Ass'n v. Delaware Dept. of Safety*, 664 F.Supp.3d 584, 600-601 (D. Del. 2023).

20

California has long prohibited slungshots and similar weapons because they are "ordinarily used

21

for criminal and improper purposes."  *People v. Fannin*, 91 Cal. App. 4th 1399, 1402 (2001)

22

(citations omitted).  Moreover, slungshots are "easily concealed, mostly silent in operation, had

23

the ability to efficiently knock out the victim quickly, and in certain cases could be easily

24

disassembled" into perfectly legal constituent parts.  SUF No. 21; Escobar Decl., ¶ 41.  "They had

25

the advantage of being easy to make, silent, and very effective, particularly against an

26

unsuspecting opponent."  SUF No. 22; Spitzer Decl., ¶ 24 (internal citation omitted).  This

27

confirms that slungshots are uniquely dangerous as weapons and are thus outside the scope of the

28

Second Amendment's protections.

1

**B.    California's Restriction on Slingshots Is Consistent with the Nation's Historical Tradition of Restricting Laws to Protect Innocent Person from Especially Dangerous Uses of Weapons**

2

3       Even if the Court holds that slingshots are presumptively protected by the Second

4   Amendment, Plaintiffs' challenge would still fail at the second step of the *Bruen* analysis because

5   the State's restriction on slingshots is consistent with the Nation's historical tradition of enacting

6   "laws to protect innocent persons from especially dangerous uses of weapons once those perils

7   have become clear." *Duncan*, 133 F.4th at 876-877.  The regulation of weapons throughout U.S.

8   history tends to follow a similar regulatory sequence:  weapons that are particularly dangerous or

9   susceptible to criminal misuse gain popularity and notoriety for their criminal use, and then

10  legislatures enact significant restrictions on them. *Id*. at 875.  In such circumstances, it is

11  common for the government to enact a variety of restrictions on that particular weapon, while

12  leaving a range of alternatives available to law-abiding citizens for self-defense.

13      Here, like in the preceding section, the relevant historical tradition has already been

14  identified and relied on by courts.[10]  The specific historical tradition on which the State relies—

15  the tradition of enacting "laws to protect innocent persons from especially dangerous uses of

16  weapons once those perils have become clear"—was recently recognized by an en banc panel of

17  the Ninth Circuit in *Duncan v. Bonta*.  133 F.4th at 876-877.  This tradition is dispositive in this

18  case and supports California's law restricting slingshots. *Id*. at 876-877.

19      **1.    The Challenged Statutes Fit Comfortably Within a Long Tradition of Restricting Slingshots and Other Dangerous Concealable Weapons**

20

21      In *Duncan*, the Ninth Circuit drew out this historical tradition by focusing on three distinct

22  categories of laws, which it referred to as "historical legal regimes:" (1) laws related to the

23  storage of gunpowder, (2) laws concerning trap guns, and (3) laws that were significant

24  restrictions on weapons after their use by criminals exposed an especially dangerous use of a

25  weapon, which it found to be the most extensive of the three categories. *Id*. at 874-876.  The

26  Ninth Circuit explained that restrictions on slingshots fell into the latter category:

27      [10] *See Hanson v. District of Columbia*, 120 F.4th 223, 237 (D.C. 2024) (recognizing historical restrictions on "weapons particularly capable of unprecedented lethality"); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46 (1st Cir. 2024).

28

17

"Invented in the 1840s, its use by criminals and street gangs became widespread. States again reacted. In 1849, New York and Vermont prohibited the manufacture, sale, or carry of slungshots, punishable by up to five years' imprisonment. By the end of the century, nearly every State had enacted anti-slungshot laws."[11]

*Id.* at 876 (internal citation omitted).

The State's historical expert, who was also relied on by the Court in *Duncan*, addresses these laws in detail and explains they were used in crime and interpersonal violence. SUF No. 23; Spitzer Decl., ¶ 19-25. The earliest laws restricting slungshots were enacted in 1849 by New York and Vermont. SUF No. 24; Spitzer Decl. at ¶ 23. These laws were almost identical in their sweeping restrictions of slungshots and outright prohibited their possession:

§ 1. Any person who shall, within this state, hereafter manufacture or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon of the kind usually known as slung shot, or of any similar kinds shall be liable to indictment for misdemeanor, and on conviction, shall be punished by fine of not less than two hundred and fifty, nor over five hundred dollars, or by imprisonment in a county jail for not less than six months, nor over two years.
§ 2. Any person who shall, within this state, hereafter carry, or be found in the possession of, or use, or attempt to use, as against any other person, any instrument or weapon of the kind usually known as slung shot or of any similar kind, shall be liable to indictment for felony, and on conviction shall be punished by imprisonment in a state's prison for a term not less than one, nor more than five years.

SUF No. 25; Spitzer Decl., Exhibit C at 95.

At least four other states—California, Florida, Illinois, and Massachusetts—had similar laws prohibiting the manufacture, possession, sale, or their use in crime. SUF No. 26; Spitzer Decl., ¶ 19. The first California law restricting slungshots dates back to 1864. SUF No. 27; Spitzer Decl., ¶ 25; Exhibit C at 13-14. California's first slungshot law was a restriction on the concealed carry of slungshots punishable by imprisonment or fine. SUF No. 28; Spitzer Decl., ¶ 25; Exhibit C at 13-14. This law is similar to most other slungshot restrictions at the time, which were (1) primarily laws that addressed carry and (2) usually lumped the weapon with other

---

[11] Slungshots were even more heavily restricted than other dangerous and concealable weapons. For example, 12 states had anti-club laws from 1664 to the early 1900s (Spitzer Decl., ¶ 30), and 19 states had anti-billy club laws in the from 1862 to the early 1990s. Spitzer Decl., ¶ 29.

18

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

1    types of dangerous and deadly weapons.  SUF No. 29; Spitzer Decl., ¶ 19.

2        In total, 48 states and the District of Columbia restricted slingshots between the 1840s and

3    the early 1900s.  SUF No. 30; Spitzer Decl., ¶ 23.  In the 1800s, 46 states enacted laws restricting

4    them, and 21 states in the early 1900s.[12]  SUF No. 31; Spitzer Decl., ¶ 23.  In fact, states enacted

5    restrictions on slingshots more than any other type of club or impact weapon.  SUF No. 32;

6    Spitzer Decl., ¶ 23.  Localities also restricted slingshots.  SUF No. 33; Spitzer Decl., ¶ 25.

7    In California alone, the State's expert identified laws restricting slingshots from the cities of Los

8    Angeles (1878), Alameda (1882), Modesto (1884), Fresno (1885), and Stockton (1891).  SUF No.

9    34; Spitzer Decl., ¶ 25.

10        While some of these laws may not outright prohibit slingshots and other dangerous and

11    deadly weapons in the same exact way section 22210 does, the government need only identify a

12    "well-established and representative historical *analogue*"—not a "historical twin" or "dead

13    ringer"—to the challenged laws.  *Bruen*, 597 U.S. at 30.  But in many ways, section 22210 is a

14    dead ringer: it addresses the exact same weapon that was restricted for the exact same reasons as

15    its historical analogues.

16        As *Duncan* explains, other historical statutes restricting trap-guns, Bowie knives, and

17    concealable pistols are also part of this broader category of laws that represent significant

18    restrictions on weapons after their criminal use exposed an especially dangerous use of a weapon.

19    *Id*. at 875-876.  The State's expert also describes these laws at length and explains that laws

20    regulating blunt, impact weapons were ubiquitous throughout our nation's history.  SUF No. 35;

21    Spitzer Decl., ¶ 26-33.  Taken together with the laws restricting slingshots, the Ninth Circuit

22    came to the conclusion that our nation had a historical tradition of enacting laws to protect

23    innocent persons from especially dangerous uses of weapons once those perils have become clear.

24    *Duncan*, 133 F.4th at 876-877.

25        **2.**    **The Surveyed Restrictions Are Relevantly Similar to Section 22210's Restrictions on Slingshots**

26

27    The surveyed historical restrictions identified in *Duncan* and by the State's historical expert

28

---

[12] Some states enacted laws in both centuries.  Spitzer Decl., ¶ 23

19

1    are relevantly similar to California's slungshot restriction in light of its comparable burdens and

2    justifications.  *Duncan*, 133 F.4th at 874-879; Spitzer Decl., ¶¶ 19-32; *Bruen*, 597 U.S. at 29

3    (requiring that a modern regulation must "impose a comparable burden on the right of armed self-

4    defense" that is "comparatively justified").  To determine whether a law is relevantly similar to

5    historical analogues, courts look to "how and why the regulations burden a law-abiding citizens'

6    right to armed self-defense." *Bruen*, 597 U.S. at 29.  California's restriction on slungshots

7    imposes a modest burden on the right to self-defense when compared to its historical

8    counterparts.  Historical laws restricting deadly concealable weapons were particularly more

9    burdensome on the right to self-defense because at the time, there were significantly less

10   alternatives for self-defense weapons. Today, California's law leaves a broad range of weapons

11   available for lawful self-defense, and of those weapons, many of them are significantly more

12   well-suited for self-defense, like handguns.

13        The historical laws restricting dangerous and concealable weapons—trap-gun bans and

14   restrictions on Bowie knives, slungshots, and concealable pistols—restricted these weapons for

15   the same reason, or "why" as California's restriction on slungshots: "to protect innocent persons

16   from harm from especially dangerous uses of weapons." *Duncan*, 133 F.4th at 878-879.  As both

17   the State's experts confirm, slungshots were an offensive weapon that became closely associated

18   with crime and interpersonal violence.  SUF No. 36; Spitzer Decl., ¶¶ 20, 24; Escobar Decl., ¶¶

19   28-42, 48, 56. As a result, they—along with other similar dangerous and concealable weapons—

20   were restricted by Legislatures in nearly every state. California's restriction on slungshots is

21   consistent with our Nation's tradition of enacting laws to protect innocent persons from especially

22   dangerous uses of weapons once those perils have become clear, and thus, section 22210, as it

23   pertains to slungshots, is constitutional under the Second Amendment.

24                                    **CONCLUSION**

25        This Court should enter summary judgment in favor of Defendant because there is no

26   genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law on

27   the only two remaining claims in this matter.

28

1   Dated:  August 11, 2025                          Respectfully submitted,

2                                                    ROB BONTA
                                                     Attorney General of California
3                                                    BENJAMIN M. GLICKMAN
                                                     Supervising Deputy Attorney General
4

5

6                                                    */s/ Katrina Uyehara*
                                                     KATRINA UYEHARA
7                                                    Deputy Attorney General
                                                     *Attorneys for Rob Bonta, in his official*
8                                                    *capacity as Attorney General of the State of*
                                                     *California*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:16-cv-00523-TLN-KJN)

# CERTIFICATE OF SERVICE

Case Name:  **Cupp, James Edward v.**        No.    **2:16-cv-00523-TLN-KJN**
            **Kamala D. Harris, et al.**

I hereby certify that on <u>August 11, 2025</u>, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 11, 2025</u>, at Plumas Lake, California.

                Jessica Munoz                                    *Jessica Munoz*
                Declarant                                          Signature

SA2016102600
39225336.docx