ROB BONTA, State Bar No. 202668
Attorney General of California
BENJAMIN M. GLICKMAN, State Bar No. 247907
Supervising Deputy Attorney General
KATRINA UYEHARA, State Bar No. 349378
Deputy Attorney General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone: (916) 210-7867
 Fax: (916) 324-8835
 E-mail: Katrina.Uyehara@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES EDWARD CUPP,<br><br>Plaintiff,<br><br>v.<br><br>KAMALA D. HARRIS Attorney General of the State of California, in her official capacity only,<br><br>Defendant. | 2:16-cv-00523-TLN-KJN<br><br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date: October 30, 2025<br>Time: 2:00 p.m.<br>Dept: Courtroom 2, 15th Floor<br>Judge: The Honorable Troy L. Nunley<br>Trial Date: None set.<br>Action Filed: March 11, 2016 |

**TABLE OF CONTENTS**

Page

Introduction .................................................................................................................................. 1

Argument ..................................................................................................................................... 2

    I.    California's Law Enforcement Release Process Does Not Violate the Second Amendment ................................................................................................ 2

        A.    Plaintiff Has Not Established That California's Law Enforcement Release Process Burdens Conduct Covered by the Plain Text of the Second Amendment .................................................................................. 2

        B.    The Law Enforcement Release Process Is Consistent with the Nation's Historical Firearms Tradition ....................................................... 4

            1.    Historical Laws on Weapons Licensing and Groups Deemed Dangerous ........................................................................................ 6

            2.    The Surveyed Restrictions Are Relevantly Similar to California's Law Enforcement Release Process ............................. 7

            3.    The LER Process Prevents Illegal Firearm Possession and Is Not Abusive ............................................................................ 8

Conclusion ................................................................................................................................. 10

# TABLE OF AUTHORITIES

**Page**

**CASES**

*B & L Productions v. Newsom*
104 F.4th 108 (9th Cir. 2024)............................................................................................. 2

*Brandsetter v. City of Riverside*
No. 23-55739, 2025 WL 66046 (9th Cir. Jan. 10, 2025) ................................................... 1

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ........................................................................................................... 5

*New York State Rifle & Pistol Ass'n v. Bruen*
597 U.S. 1 (2022)....................................................................................................... *passim*

*United States v. Perez-Garcia*
96 F.4th 1116 (9th Cir. 2024).......................................................................................... 1, 5

*United States v. Rahimi*
602 U.S. 650, 691 (2024) ........................................................................................ 5, 7, 10

**STATUTES**

Title 18 of the United States Code
§ 924(d) .............................................................................................................................. 5

California Penal Code
§ 33860............................................................................................................................... 8
§ 33860(a) .......................................................................................................................... 9
§ 33865............................................................................................................................... 8

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Second Amendment .................................................................................................. *passim*

**INTRODUCTION**

Plaintiff's opposition to Defendant's motion for summary judgment fails at both steps of the *Bruen* framework. At *Bruen*'s first step, Plaintiff bears the burden of establishing whether the Law Enforcement Release (LER) process regulates conduct that is presumptively protected by the Second Amendment. Plaintiff provides a short four-sentence response explaining that because Plaintiff seeks to keep his firearms in his home, his conduct is protected by the Second Amendment. However, the Second Amendment is not so simple. In his analysis, Plaintiff fails to address the numerous cases upholding background checks as presumptively constitutional measures. Importantly, Plaintiff fails to address *Bruen*'s footnote 9, which explained that nothing in the Supreme Court's analysis should be interpreted to cast doubt on shall-issue regimes and their related background checks. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022). In a previous order dismissing Plaintiff's LER claim, this Court explained that the LER process "is an analogue to the shall-issue regimes discussed in *Bruen* and for that reason are lawful." ECF 109 at 5-9. Since the Court's order was issued, the Ninth Circuit has also upheld the LER process as constitutional in an unpublished opinion. *Brandsetter v. City of Riverside*, No. 23-55739, 2025 WL 66046 (9th Cir. Jan. 10, 2025). Plaintiff offers no response to the overwhelming weight of authority against him, and he provides no new evidence or authority for this Court to consider. Accordingly, Plaintiff's claim fails at *Bruen*'s first step.

Because Plaintiff's claim fails at *Bruen*'s first step, the Court's analysis need go no further. But even assuming Plaintiff's claim survives *Bruen*'s first step, it still fails as a matter of law at the second step because Defendant has established that the LER process is consistent with the Nation's historical tradition of keeping arms out of the hands of dangerous individuals and extending the Second Amendment right to only law-abiding individuals. Defendant relies on historical analogues, specifically historical licensing laws and laws restricting groups deemed dangerous. In a half-page response, Plaintiff takes an impermissible "divide-and-conquer" approach to Defendant's historical analogues, wherein Plaintiff attempts to distinguish categories of analogues, rather than addressing the historical tradition as a whole. *United States v. Perez-*

*Garcia*, 96 F.4th 1116, 1191 (9th Cir. 2024).  Nothing in Plaintiff's opposition refutes the comprehensive historical record supporting the LER process.  For these reasons, and those set forth below, this Court should grant Defendant's motion for summary judgment.

## ARGUMENT

**I.   CALIFORNIA'S LAW ENFORCEMENT RELEASE PROCESS DOES NOT VIOLATE THE SECOND AMENDMENT**

Under *Bruen*'s text-and-history standard for adjudicating Second Amendment claims, the party challenging a restriction must first demonstrate that the law regulates conduct that is presumptively protected by the Second Amendment.  *Bruen*, 597 U.S. at 24; *B & L Productions v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024).  If Plaintiff cannot meet this burden, then the Court need not proceed further.[1]

**A.   Plaintiff Has Not Established That California's Law Enforcement Release Process Burdens Conduct Covered by the Plain Text of the Second Amendment**

Plaintiff provides this Court with a four-sentence analysis on *Bruen*'s first step, arguing that since Plaintiff "seeks to keep his lawfully owned firearms in his home" (ECF 133 at 6), this Court may proceed to *Bruen*'s second step.  These bald contentions fail to meet Plaintiff's burden under *Bruen*'s first step.  Defendant incorporates by reference the legal arguments in the brief in support of his motion for summary judgment.  ECF 130 at 6-10.

Plaintiff makes no attempt distinguish the LER Process from the presumptively lawful background checks that courts across the country have upheld as constitutional.  As this Court recognized in a previous order, Plaintiff's "fatal flaw" was that *Bruen*'s narrowest holding recognized that shall-issue style regulations were presumptively constitutional.  ECF 109 at 5-9.  The order also explained that to challenge the LER process, the Complaint must include "factual allegations that this shall-issue style regime fails to operate properly in practice" and was "subject only to an as-applied challenge."  *Id*. at 7-8.  Both Plaintiff's Complaint and opposition fail provide any evidence that the LER Process is not presumptively constitutional.

---

[1] Following the dismissal of Plaintiff Haven, only the Law Enforcement Release claim remains.  ECF 132.  Plaintiff errs in listing the slungshot challenge in his opposition briefing. ECF 133 at 4.

1    Specifically, *Bruen* explained that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 597 U.S. at 38 n.9. And "[b]ecause these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right . . . Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdictions are, in fact, 'law-abiding, responsible citizens.'" *Id*. Applying these limiting principles, California's LER process—which requires a background check to ensure that firearms, ammunition, and ammunition feeding devices are returned to their ordinary, law-abiding owners—is constitutional under the Second Amendment because it regulates conduct that falls outside the scope of the Second Amendment's plain text.

If an individual's firearm, ammunition, or ammunition feeding device comes into law enforcement or court custody, California's LER process ensures that the individual is eligible to possess that same firearm, ammunition, or ammunition feeding device before it is returned to its owner. Implicit in the LER process is the understanding that if an individual's firearm, ammunition, or ammunition feeding device came into law enforcement or court custody, some event might have occurred that may make that person ineligible to possess that same firearm, ammunition, or ammunition feeding device. Similarly, in cases where firearms, ammunition, or ammunition devices may have been stolen, the LER process allows ownership to be verified. Like the background checks endorsed in *Bruen*, the LER process and its requisite background check does not operate on its face to prevent any person from keeping and bearing arms and merely ensures that those seeking return of their firearms, ammunition, or ammunition feeding devices are "in fact, 'law-abiding, responsible, citizens.'" *Bruen*, 597 U.S. at 39 n.9.

Importantly, an individual who is eligible to possess a firearm, ammunition, or ammunition feeding device *may still possess* a firearm, ammunition, or ammunition feeding device outside of the LER process while their application is pending. Similarly, a person eligible to possess a firearm or ammunition may even purchase one while their application is pending. The LER

3

process does not prevent someone from acquiring firearms for self-defense, keeping them for that purpose, or bearing them for confrontation; indeed, an applicant could acquire, keep, and bear a firearm in the 30-days that their application is pending.  In this way, the LER process does not operate on its face to prevent any person from keeping and bearing arms; it is merely a verification and background check process to ensure that those seeking the return of their firearms, ammunition, or ammunition feeding devices that have been taken into law enforcement or court custody are "in fact, 'law-abiding, responsible, citizens.'"  *Bruen*, 597 U.S. at 39 n.9.

The Supreme Court has recognized that background checks—such as those employed in the LER process—do not impede an individual's right to "keep" or "bear" arms.  *See Bruen*, 597 U.S. at 38 n.9; *see also id*. at 80 (Kavanaugh, J., concurring) (shall-issue regimes "may require . . . a background check" and states employing such laws "may continue to do so").  Without performing any historical analysis, the *Bruen* Court explained that shall-issue requirements are consistent with the Second Amendment because "they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry."  *Id*. (internal quotation marks omitted).

Plaintiff's failure to address *Bruen*'s clear statements and other post-*Bruen* cases, recognizing that background checks are presumptively lawful measures that are not implicated by the Second Amendment's plain text, dooms his claim.  This Court's analysis should end here.

### B.  The Law Enforcement Release Process Is Consistent with the Nation's Historical Firearms Tradition

Even if this Court finds that the LER process implicates the Second Amendment's plain text, Plaintiff's challenge still fails at the second step of the *Bruen* analysis because California's LER process is consistent with the Nation's historical tradition of keeping arms out of the hands of dangerous individuals and extending the Second Amendment right to only ordinary, law-abiding individuals.

Plaintiff argues a different tradition applies—one that has not been cited by any Court, and one that he provides no evidence for:  the Nation's historical firearm tradition to "return seized firearms forthwith absent a legal bar."  ECF 133 at 5.  Plaintiff alleges that a "government may

not warehouse a law-abiding person's arms after the criminal process ends without a conviction and without a prohibitor." *Id.* However, Plaintiff's only support in favor of his historical tradition is from present-day: 18 U.S.C. § 924(d), which outlines the seizure, forfeiture, and return of firearms and ammunition in certain federal proceedings. Plaintiff alleges section 924 "codifies the constitutional baseline," but he cites no authority declaring it as such—nor could he. Since Plaintiff's tradition does not rely on any relevant authority, this Court must reject this tradition. Moreover, the Second Amendment does not bind governments to what the federal government has done, but rather encourages state and local experimentation to address local conditions and problems. *McDonald v. City of Chicago*, 561 U.S. 742, 783-84 (2010).

Plaintiff argues that the State's analogues are inadequate because they do not involve "the return of already-owned arms after the criminal process ends without a conviction." ECF 133 at 6. However, Plaintiff's argument comes dangerously close to requiring the government to identify a "historical twin" or "dead ringer," which *Bruen* explicitly warned against. *Bruen*, 597 U.S. at 29-30. Doing so, would impose "a regulatory straightjacket" (*Bruen*, 597 U.S. at 30) and suggest a law "trapped in amber." *Rahimi*, 602 U.S. at 691. To ensure flexibility, *Bruen* allows the government to justify a regulation by establishing that it falls within a historical tradition of regulations that are "relevantly similar," meaning that they "impose a comparable burden on the right of armed self-defense" that is "comparably justified." 597 U.S. at 39-30. In *Rahimi*, the Court further explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. 692; *see also id.* at 740 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold.").

Defendant identifies at least two relevant historical traditions: (1) the historical tradition of keeping arms out of the hands of dangerous individuals and (2) the historical tradition of extending the Second Amendment right to only law-abiding individuals. Plaintiff attempt to take a "divide-and-conquer" approach to Defendant's analogues—wherein Plaintiff attempts to distinguish each individual analogue, rather than address the historical tradition as a whole—is unpersuasive, particularly since the Ninth Circuit disclaimed this approach in *United States v.*

5

*Perez-Garcia*, 96 F.4th 1116, 1191 (9th Cir. 2024). Nothing in Plaintiff's opposition refutes the comprehensive historical record supporting California's Law Enforcement Release process set forth in Defendant's motion for summary judgment.

### 1. Historical Laws on Weapons Licensing and Groups Deemed Dangerous

Plaintiff fails to recognize the inherent similarities between presumptively lawful background checks like the LER process, and the robust historical regulations that required individuals to demonstrate their eligibility to possess and carry firearms that existed throughout American history. SUF No. 3; *See generally* Spitzer Decl., ¶¶ 19-59, 62-101. The State's historical expert groups these laws into two broad categories: historical laws concerning weapons licensing and historical restrictions on named groups deemed dangerous.

As explained in Defendant's motion for summary judgment, historical licensing laws functioned similarly to modern waiting periods—where possession or carry is "predicated on a process where a license applicant provides or submits some kind of information which is then evaluated and judged acceptable or not." SUF No. 4; Spitzer Decl., ¶ 35.

Historical licensing and permitting laws date back to the 1600s and 1700s. SUF No. 8; Spitzer Decl., at ¶ 39. These laws focused on dangerous, concealable weapons that posed a threat to public safety. SUF No. 9; Spitzer Decl., at ¶ 36. These laws became even more popular in the 1800s and 1900s, where at least 89 different licensing laws were enacted in at least 34 states as a pre-requisite for weapons carrying or ownership. SUF No. 10; Spitzer Decl., at ¶ 37, 43.

In addition to historical licensing laws, states also enacted laws restricting and disarming persons deemed dangerous. SUF No. 12; Spitzer Decl., ¶¶ 62-96. Historically, these restrictions addressed at least four different groups of individuals who were deemed too dangerous for firearm ownership: certain races (Black and Native Americans, *id*. at ¶¶ 63-66), intoxicated persons, (*id*. at ¶¶ 67-75), vagrants and the mentally unsound (*id*. at ¶¶ 76-84), and non-residents (*id*. at ¶¶ 85-96). SUF No. 13. Consistent with the historical licensing laws mentioned above, these laws also attempted to (1) ensure that the Second Amendment right was exercised only by

those who at the time, were considered to be ordinary, law-abiding individuals and would (2) keeping arms out of the hands of those who were deemed dangerous.

California's LER process fits comfortably within this long and unbroken tradition of extending the Second Amendment right to only ordinary, law-abiding citizens.

### 2. The Surveyed Restrictions Are Relevantly Similar to California's Law Enforcement Release Process

Defendant's surveyed historical licensing restrictions on weapons and groups deemed dangerous are relevantly similar to the State's LER process in light of their comparable burdens and justifications. *Bruen*, 597 U.S. at 29 (modern regulation must "impose a comparable burden on the right of armed self-defense" that is "comparatively justified"). In determining whether regulations are relevantly similar, *Bruen* pointed courts to two different metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. Defendant incorporates by reference the historical arguments in the brief in support of his motion for summary judgment. ECF 130 at 10-14.

In response, Plaintiff offers two sentences of argument, which in turn fail to address most of Defendant's arguments, including that the historical laws were actually significantly more burdensome than California's LER restrictions. First, Plaintiff argues that "[t]he familiar 19th century enactments concern public-carry licensing or punishment of misuse" and "not the return of already-owned arms after the criminal process ends without a conviction." ECF 133 at 6. As explained above, Plaintiff is asking the government to present a "dead ringer" or "a law trapped in amber" which *Bruen* and *Rahimi* explicitly warned against. *Bruen*, 597 U.S. at 30; *Rahimi*, 602 U.S. at 691; *see also id*. at 739 (Barrett, J., concurring) ("[I]mposing a test that demands overly specific analogues has serious problems.").

Plaintiff's second line of argument is that "[s]urety laws and targeted disarmament turned on adjudicated dangerousness and were tightly cabined in time and purpose," which Plaintiff alleges is different from the LER process. ECF 133 at 6. But this directly contradicts statements by the State's expert who explained that most historical licensing laws allowed the governing authority to "withdraw or cancel [the license] at his or its pleasure," thus were not "tightly

7

cabined" by "purpose." SUF No. 15; Spitzer Decl., ¶ 42, 52 (describing Nebraska state law allowing the mayor to grant licenses "to so many and such persons as he may think proper" and allowing them to be revoked "at his pleasure"). Plaintiff also provides no evidence to support this allegation.

Similarly, the historical licensing laws were not "tightly cabined" by "time." ECF 133 at 6. As before, Plaintiff Historical licensing laws "made clear that the government could take whatever time was needed to complete the licensing process" and there was no indication of "anything resembling a 'right' to obtain or use firearms on demand." SUF No. 14; Spitzer Decl., ¶ 42. Here, section 33865 requires the government to process LER applications within a 30-day window starting from when the application is submitted, which is significantly less burdensome than its historical precursors, which exercised no time limit to process and issue licenses.

Historically, licenses and permits also had a set time period ranging from a month to a year. SUF No. 16; *see, e.g.*, Spitzer Decl., at ¶ 41, 52 (describing 1892 law enacted by the District of Columbia, which granted permits for no more than one month at a time upon satisfactory proof before a judge of the police court). This is much more burdensome than the LER process, where applicants are subject to a single background check to obtain the return of their firearm, ammunition, or ammunition feeding device, and applicants need not submit to additional background checks in order to keep those returned items (unless the items are taken into custody again for different reasons). Plaintiff fails to provide any evidence to the contrary.

### 3. The LER Process Prevents Illegal Firearm Possession and Is Not Abusive

Plaintiff has not provided any evidence that the LER process is abusive and involves "lengthy wait times" or "exorbitant fees."[2] ECF 133 at 6. Nor could he—Plaintiff has not submitted an application, and thus, his "lengthy wait time" is a result of his own choice to not submit an LER Application. Similarly, the fees are far from exorbitant and are regulated by statute. Pen. Code, § 33860 (limiting the fee to what is required "to cover [the Department's]

---

[2] Plaintiff also alleges that the LER Process is a "post-seizure prior restraint on home keeping," but these are remnants of prior First and Fourth Amendment claims, which the Court previously dismissed and prohibited from being brought in the Sixth Amended Complaint.

8

1  reasonable costs for processing applications and requiring an annual review to assess if fees need
2  to be readjusted).  As explained in Defendant's motion for summary judgment, the fees under the
3  LER process are modest when compared to some of their historical counterparts. The LER
4  process requires twenty dollars per request for return of a firearm, ammunition feeding device, or
5  any quantity of ammunition plus a three-dollar charge for each additional firearm being
6  processed. § 33860(a). Some non-resident licensing laws were cost prohibitive and equal to
7  $1,519 dollars in 2024. SUF No. 17; *Compare* § 33860(a) *with* Spitzer Decl., ¶¶ 91-93 (an 1899
8  non-resident licensing fee, which was 40 times the resident fee).

9  Similarly, Plaintiff's argument—that historical laws relied on "adjudicated dangerousness"
10  suggesting that the LER process does not (ECF 133 at 6)—exposes that he has a fundamental
11  misunderstanding about how the LER Process functions:  the LER process does not on its face
12  prohibit any individuals from possessing a firearm or ammunition—those prohibitions and their
13  requisite findings of dangerousness, convictions, et cetera, are found in other state and federal
14  laws and adjudicated by courts; the LER Process is merely the statutorily-required application,
15  fee, and background check to ensure that an individual is not prohibited at a certain given time.[3]

16  This misunderstanding also manifests itself in Plaintiff's adamant assertion that because the
17  Department did not identify a prohibiting record in response to Plaintiff's discovery requests back
18  in December, Plaintiff Cupp must still hold that status today.  ECF 133 at 6-7; *see also* Cupp
19  Decl., ¶¶ 10-13.  That is simply not the case.[4]  Firearm eligibility changes, and the LER process is
20  meant to account for this. As explained above, implicit in the LER process is the understanding
21  that if an individual's firearm, ammunition, or ammunition feeding device came into law
22  enforcement or court custody, some event might have occurred that may make that person
23  ineligible to possess that same firearm, ammunition, or ammunition feeding device, and thus, a
24  new background check is conducted by the State.  Plaintiff alleges the LER background check is

---

[3] Plaintiff also argues that the LER process should be struck down on Second Amendment grounds because there is "[n]o evidence of public-safety necessity." ECF 133 at 7. *Bruen* expressly disclaimed this kind of public safety interest balancing. 597 U.S. at 23-24.

[4] In response to Plaintiff's discovery requests, Defendant pulled Plaintiff Cupp's RAP sheet, but did not conduct further investigation and background checks into other potentially prohibiting indicators.  If Plaintiff submitted an LER application and fee, the Department could begin this process.

"duplicative," "redundant," and the "same" (ECF 133 at 6-7; ECF 119 at ¶¶ 25, 46, 52) as any background check done during the booking process or firearm purchase process, but because these background checks happen at different times and often involve different databases, that allegation is plainly incorrect.

Throughout the course of this litigation, Plaintiff has fixated on the notion that knives, wallets, and other goods are treated differently from firearms, ammunition, or ammunition feeding devices. ECF 133 at 5, 7; ECF 119 at ¶¶ 25, 28, 33, 46-51. The line of arguments that stem from this vary—suggesting "only firearms were singled-out" for the LER process, which suggests a "category-based restriction[] on firearms" that is "not tied to individualized dangerousness or genuine necessity"—but all are equally irrelevant. As written by the Legislature, Penal Code sections 33850 through 33880 only apply to firearms, ammunition, and ammunition feeding devices, which explains why firearms, ammunition, and ammunition feeding devices are treated differently from other objects and goods.

The modest burdens imposed by California's LER process and its analogues are comparably justified by similar concerns that the Second Amendment right should be exercised only by those who are considered to be ordinary, law-abiding individuals and that the public has an interest in keeping firearms out of the hands of individuals who are deemed dangerous. *Rahimi*, 602 U.S. 680, 698; *Bruen*, 597 U.S. at 29-30. Plaintiff's arguments at step two of the *Bruen* framework cite to no cases or rebuttal historical expert testimony—they are bald contentions that this Court must reject outright if it chooses to reach this step.

## CONCLUSION

As set forth above and in Defendant's motion for summary judgment, Plaintiff has failed to meet their evidentiary burden at the first step of the *Bruen* analysis and have further failed to refute Defendant's historical evidence at *Bruen*'s second step. Accordingly, Defendant is entitled to summary judgment.

| | | |
|---|---|---|
| 1 | Dated: September 4, 2025 | Respectfully submitted, |
| 2 | | ROB BONTA<br>Attorney General of California |
| 3 | | BENJAMIN M. GLICKMAN<br>Supervising Deputy Attorney General |

/s/ *Katrina Uyehara*
KATRINA UYEHARA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*